1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

UNITED STATES OF AMERICA   Criminal No.  RDB-08-056

Baltimore, Maryland

v.                         April 15, 2009

PATRICK BYERS, JR.,        9:30 a.m.

        AND

FRANK GOODMAN,

        Defendants.

--------------------------------------------------------/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Government:        United States Attorney's Office
                           By:  JOHN PURCELL, JR., ESQUIRE
                               BRYAN GIBLIN, ESQUIRE
                           36 South Charles Street
                           Fourth Floor
                           Baltimore, Maryland 21201

For Patrick Byers, Jr.:    WILLIAM PURPURA, ESQUIRE
                           8 East Mulberry Street
                           Baltimore, Maryland 21201

                           A. EDUARDO BALAREZO, ESQUIRE
                           400 Fifth Street, NW
                           Suite 300
                           Washington, D.C. 20001

For Frank Goodman:         CHRISTOPHER DAVIS, ESQUIRE
                           MARY DAVIS, ESQUIRE
                           514 10th Street, NW
                           Ninth Floor
                           Washington, D.C. 20004

1    Court Reporter                Lisa K. Bankins RMR
2                                  101 West Lombard Street
                                   Room 5515
3                                  Baltimore, Maryland 21201

4    Proceedings recorded by mechanical stenography,
     transcript produced by notereading.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                MISCELLANY

3    Closing argument on behalf of the Government . . . . . . . . . .501

4    Closing argument on behalf of Frank Goodman . . . . . . . . . .556

5    Closing argument on behalf of Patrick Byers. . . . . . . . . . . .580

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURT:   All right.  Before we bring the jury in, I've
 3    just modified the proposed verdict sheet a little bit.  You all will
 4    have plenty of time throughout the day to look at that just to
 5    formalize it in some way.  And we have copies of the jury instructions
 6    from the charge, your conference yesterday and I think we are ready to
 7    proceed with the jury and with closing arguments.  Anything further
 8    from the point of view of the government before we proceed?
 9              MR. PURCELL:   No.  Thank you, Your Honor.
10              THE COURT:   Anything further from the point of view of the
11    defense?
12              MR. PURPURA:   Nothing.  Thank you, Your Honor.
13              MS. DAVIS:   No.
14              THE COURT:   And we've made accommodations everyone that you
15    wanted from the point of view of your families.  They're here in
16    court.
17              MR. PURPURA:   Yes.  Thank you.
18              THE COURT:   Mr. Byers and Mr. Goodman, your family members
19    are seated and plenty of room for everyone.  All right.  With that,
20    we'll bring the jury in and proceed with closing arguments.
21              (Jury present.)
22              THE COURT:   Good morning, everyone.  You all may be seated.
23    We are ready to proceed now with closing arguments.  You all have
24    filled out your luncheon menus and sometimes I say that we're buying
25    you lunch today.  But we don't buy you anything because you pay for
```

1    everything that happens in this courthouse.  So you'll be getting some

2    of your tax dollars back on tax day because the government is going to

3    buy you lunch.  So you'll have lunch brought to you around 1:00.  And

4    with that, we're ready to proceed with closing argument on behalf of

5    the government, Mr. Giblin.

6                    MR. GIBLIN:    May it please the Court.  Good morning.

7                    THE JURY:    Good morning.

8                    MR. GIBLIN:    On July 2nd, 2007, the last day of Carl Lackl's

9    life, he got up and went to work.  And while he was at work that day,

10   a subpoena sat at his house calling upon him to testify in court.  He

11   was going to testify in a little bit more than a week in the Baltimore

12   City Circuit Court and he was going to testify about something he had

13   seen about a year before.  And while Mr. Lackl was at work, Frank

14   Goodman, Patrick Byers, Marcus Pearson were plotting against him.

15   They were plotting to kill him that night.  Mr. Lackl was trying to do

16   the right thing and he paid for it with his life.

17                    On March 4, 2006, Carl Lackl was in east Baltimore.  He was

18   in an alley and he heard gunshots.  As he came out of that alley, the

19   shots still ringing in the air, he saw Patrick Byers run down Montford

20   Avenue right past him.  They made eye contact, they stared at each

21   other and Mr. Byers kept going.  Mr. Lackl saw that.  And what did he

22   do after having witnessed this, having seen this man running from the

23   scene of a shooting throwing a gun away?  Well, he got in Connie Mays'

24   car and they started to get out of there.  But one thing that's kind

25   of been buried in all of the evidence you've heard.  One thing that I

1   think that deserves highlighting is what he did, Mr. Lackl did before

2   he got home.  As they drove past that corner of Montford and

3   Jefferson, Mr. Lackl tells Connie Mays to stop, stop the car.  When he

4   gets out of the car, there is a man lying in a puddle of blood, still

5   bleeding profusely from the head at the corner of Montford and

6   Jefferson.  Mr. Lackl does not know Mr. Haynes, doesn't know about his

7   tattoos, doesn't know anything about his background.  All Mr. Lackl

8   knows is that there is a man dying on the streets of Baltimore right

9   in front of him in broad daylight on a violent drug corner in

10   Baltimore City and Mr. Lackl said stop, I'm going to try and help him.

11   He was trying to do the right thing.  And when he got home, he

12   continued to try to do the right thing.  Against the advice of his

13   family, he called the police and told them that he had information

14   about a shooting.  He didn't have to do that.  He didn't have to try

15   and help Mr. Haynes, but he did and he paid for it with his life.  And

16   he was going to follow through.  He was going to testify.  He was not

17   recanting.

18         Now let's step into the world of Patrick Byers and Frank

19   Goodman because they didn't see Carl Lackl as a person.  They didn't

20   see him as working man, a family man, a devoted boyfriend, a good

21   Samaritan.  They didn't see any of that.  To him, he wasn't even a

22   person to Mr. Byers and Mr. Goodman.  He was an obstacle.  He was a

23   nuisance.  He was a $2500 problem for Mr. Byers because Mr. Lackl was

24   telling on Mr. Byers.  That's all he was to Mr. Goodman and Mr. Byers.

25   So they decided to silence him, to murder him as Mr. Byers' court date

1     approached.  They decided to take him away from his family, take his

2     life away from him all so Patrick Byers could come home.  Whatever it

3     takes for Mr. Byers to come home and it was cheap and it was easy.

4     That's what we're here for.  Now it's your decision whether Mr. Byers

5     gets to come home.  No longer his decision.  It's up to you.

6              When Mr. Byers and Frank Goodman succeeded in eliminating

7     the witness, killing Mr. Lackl, there was a long investigation and

8     you've heard all about that.  You've heard about pages and pages of

9     phone records summarized.  You've heard from eyewitnesses, police

10    witnesses, all sorts of evidence that you've heard over the past

11    month.  And all of that evidence taken together proves that Patrick

12    Byers through Frank Goodman had his eyewitness killed, Carl Lackl.

13    Hired someone to do it.  Hired Marcus Pearson who in turn got some

14    other people to handle it for him.

15             Now that's generally what the case is about.  Once you hear

16    from all the lawyers today, you're going to hear from the judge about

17    what the law is because you've been here for about a month and you've

18    only heard a very little bit about well, what are these guys actually

19    charged with and is what they did a violation of these statutes that

20    they're charged with.  Now you're going to hear from the judge at

21    length about this.  So I just want to give you kind of a framework

22    before we go through the evidence of what happened in this case.  I'm

23    hoping you all can see this.  You're going to hear a lot about the

24    concepts of aiding and abetting and conspiracy that kind of run

25    throughout all of the charges.  And as non-lawyers, as laypersons,

1   you've probably heard these things before and they're generally what
2   you probably think they are. Aiding and abetting occurs when another
3   person commits a crime or does an actual act and the defendant
4   knowingly associates himself with the crime and tries to help make the
5   crime succeed. Generally, not actually pulling the trigger, but
6   helping someone else pull the trigger in some way. And what the judge
7   will instruct you is that aiders and abettors are just as guilty.
8   They take part in the crime. They facilitate the crime. They make it
9   happen. There's no distinction under the law between the person who
10  gives out the address and indicates where Mr. Lackl lives and the
11  person who actually pulls the trigger. Everybody is just as guilty.
12          The same thing with conspiracy. All the conspirators as
13  long as they're in the same conspiracy are just as guilty as one
14  another, no matter what their role is. And all a conspiracy is is an
15  agreement, an agreement to do something illegal. In this case an
16  agreement to murder Mr. Lackl, a witness and in this case an agreement
17  to hire somebody to murder Mr. Lackl. So you'll hear about that at
18  length. But those are kind of the concepts which will run through the
19  law in this case and we'll touch on them again.
20          Now you've got a nine-count indictment that you're going to
21  see. Let's take you briefly through the counts. Counts 1 and 2 are
22  essentially murder for hire. And again, that means probably what you
23  think it means. Where someone hires somebody else for money to kill
24  someone. The legal definition is a little bit more refined and
25  there's some jurisdictional elements. For example, the first one is

1  that there has to be a facility of interstate commerce used.  That's

2  why we're in federal court and you've heard that cell phones, the

3  phone system basically satisfy that element.

4          The second element is using those phones with the intent to

5  commit a murder.  Clearly, what happened here and we'll go through how

6  that happened.  And then that the murder was committed for something

7  of value.  Could be money, could be a car, could be anything of value.

8  In this case it was money and of course, resulting in death.

9          Counts 1 and 2 is murder for hire and conspiracy to murder

10 for hire.  Basically, the same thing.  Murder for hire under an aiding

11 and abetting theory.  Patrick Byers, Frank Goodman aided and abetted

12 each other, one another, the people who actually committed the murder

13 by helping them.  They also conspired to do that.  It's two counts,

14 essentially the same set of facts.

15         Counts 3 and 4.  Again essentially the same set of facts.

16 Violates a different statute.  Murder of a witness, conspiracy.  The

17 substantive, the actual murder in an aiding and abetting theory as

18 well as a conspiracy to do the same thing.  What you'll have to find,

19 what the judge will instruct you is that the defendant killed another

20 person.  Now clearly, Mr. Byers did not pull the trigger.  Mr. Goodman

21 did not pull the trigger, but they aided and abetted those that did.

22 They took part in the crime itself.  Tried to facilitate it, make it

23 happen and they did make it happen.  If not for Mr. Goodman and

24 Mr. Byers, none of this would have happened.  With the intent to

25 prevent a communication to law enforcement or a judge.  Essentially to

1   silence Mr. Lackl, to prevent him from talking, prevent him from

2   communicating something to the authorities.  And that something is

3   information relating to the commission or possible commission of a

4   federal offense.  And as you'll see in the indictment, Mr. Lackl

5   witnessed Patrick Byers with the gun that day.  Mr. Byers had a prior

6   felony conviction, had that gun in furtherance of a drug trafficking

7   crime at that corner and essentially witnessed him committing federal

8   crimes.  In addition to witnessing the body of Larry Haynes, he also

9   witnessed the federal crime of possession of a firearm.

10          Now the killing constituted murder and all you really need

11  to know about murder, this is not going to be a contested case about

12  whether it was, there was malice whether it was willful or deliberate.

13  You've heard at length that it was a planned, orchestrated murder.

14  That's not an issue.  But murder is the intentional killing, willful,

15  deliberate, malicious, premeditated.  All of those things happened.

16  It took several phone calls arranging for people to do this, finding

17  out an address, transferring address to Mr. Pearson, all sorts of

18  premeditation, willfulness, planning.  That's what you're looking for,

19  their planning.  And the one caveat that you'll hear is that federal

20  proceedings need not be pending or ongoing.  There was never a federal

21  case against Mr. Byers when Mr. Lackl saw him.  There didn't need to

22  be.  He was a potential federal witness and that's all that's required

23  for the federal firearms offense.  That's Count 3 and 4, murder of a

24  witness to silence him.

25          Counts 5, 6 and 7, they're all basically firearms offenses

1    that have to do with the murder of Mr. Lackl.  There's lots of

2    statutes in the U.S. Code that deal with firearms and Mr. Byers and

3    Mr. Goodman in Counts 5 through 7 violated three of them and they're

4    all related.  All they basically say is that in this murder that they

5    aided and abetted, there was a firearm used in furtherance of that

6    murder.

7           Now to break it down a little bit more clearly in terms of

8    the statutes violated, Count 5 is use of a firearm in furtherance of a

9    crime of violence.  All you have to find is the defendant committed a

10   crime of violence again under an aiding and abetting theory, that

11   either of these two defendants possessed the firearm that killed Mr.

12   Lackl.  Knowingly used, carried, discharged the firearm.  Aiding and

13   abetting.  Did they aid and abet the use of a firearm in furtherance

14   of Counts 1 through 4?

15          Count 6 is fairly simple.  It's just did Count 5 result in a

16   murder.  The defendant is guilty of Count 5.  Caused the death of Mr.

17   Lackl with a firearm and that killing constituted murder.  No doubt

18   about that.

19          Count 7 is conspiracy to commit Count 5.  Did Mr. Byers and

20   Mr. Goodman conspire, agree, enter an unlawful agreement to commit the

21   Counts 1 through 4, the murder for hire and in so doing to commit

22   Count 5, conspiracy, all relating to the murder of Mr. Lackl and the

23   firearm used.

24          Now you'll also find out that neither Mr. Byers nor Mr.

25   Goodman needed to know which particular firearm was going to be used.

1   Just that they were in the same conspiracy.  Counts 8 and 9 -- getting

2   to the very end of the indictment.  Almost done.  Those relate to

3   firearms offenses against Mr. Byers alone.  Those are counts that

4   relate to Mr. Byers possessing a firearm on March 4, 2006.  Count 8 is

5   called felon in possession.  It basically means that Mr. Byers

6   possessed a firearm, had it within his control when Mr. Lackl saw him

7   throwing it up on that garage roof.  At the time he did that, he had

8   already sustained a felony conviction.  He was a convicted felon at

9   the time which means under the law, he's not allowed to possess a

10  handgun.  So it's a crime to have a handgun.  And that the gun

11  affected commerce and you heard something about that.  All that means

12  is it crossed the state line.  It wasn't manufactured in Maryland.

13  You heard from a firearms expert that it was actually manufactured in

14  Germany.

15          Count 9 is the same thing, but it asks an additional

16  element.  Did he have that firearm in furtherance of a drug

17  trafficking crime?  Not only in furtherance of.  He used it to kill

18  Larry Haynes.  But he had it there at the corner of Montford and

19  Jefferson you've heard which was his drug corner.  He admitted he

20  sells heroin at that drug corner.  Other people have told you that he

21  sells heroin at that drug corner and he has a gun at that drug corner

22  and you've heard from several witnesses what the relationship is

23  between drugs and guns.  They're needed, guns are, for protection

24  because if somebody robs you for your drug money or for your drugs,

25  you can't go to the police and say hey, so-and-so just took, you know,

1    my vials of heroin.  It's a violent business and you need a gun to

2    protect yourself, to protect your drugs, to protect your money.  And

3    one of the reasons that Mr. Byers had that gun at that time was to

4    protect his turf, to protect himself and to protect the corner of

5    Montford and Jefferson where he sold heroin.  So when you keep those

6    counts in mind when you go through the evidence.  And where we end up

7    is where I began.  Really the question that you'll have to answer

8    although you'll be inundated with all the jury instructions is did

9    they do it.  Did they conspire?  Did they help one another?  Did they

10   basically help make this murder happen?  And I'm confident that you'll

11   find that the absolute answer is yes, that they did.  And I think that

12   the evidence has led you there and that we've convinced you of that

13   and I want to take you through some of that evidence.

14           Now before we talk about what happened in the summer of 2007

15   when Mr. Lackl was murdered, the first thing I want to talk about is

16   why.  And when you think about why Mr. Lackl was murdered, really the

17   big question to ask yourself is who in the world would want to kill

18   Mr. Lackl?  Who stood to gain from Carl Lackl dying?  Who is it?  And

19   when you ask yourself that question and think about all the evidence

20   that you've heard over the past month, there's only one answer.  It's

21   Patrick Byers and it's because of what's on the screen in front of you

22   right now.  This is the witness list that Patrick Byers had hidden in

23   his cell.  Not in his cell.  I'm sorry.  Among his belongings at the

24   J.I. building.  Nobody stood to gain anything from Mr. Lackl dying

25   other than Patrick Byers.  Mr. Pearson, Tammy Graham, Jonathan

509

1   Cornish, Steven Thompson, Ronnie Williams, the driver.  You've heard

2   all these names.  You've heard about all these terrible things they've

3   done.  But at the end of the day, they had never heard of Carl Lackl

4   until Patrick Byers got them that information and the way he got it

5   there was through Frank Goodman.  Never heard of this guy before in

6   their entire lives and then all of a sudden, on July 2, 2007, they all

7   get together, drive out to Baltimore County, don't even know where

8   they're going without Tammy Graham and killed Mr. Lackl on his front

9   lawn and the only person who had motive to do that was Mr. Byers

10  because Mr. Lackl was going to testify.

11          Now who else had a motive once Mr. Byers communicated that

12  information to him?  Well, Mr. Goodman because Mr. Goodman you've

13  heard is tight with Patrick Byers.  Knows his family, has connections

14  through his family.  They were friends.  They spent time in J.I.

15  together.  They know each other.  In phone contact all the time.

16  Mr. Goodman couldn't wait for Patrick Byers to come home.

17          Now Mr. Lackl was the single most important witness against

18  Mr. Byers.  The single most important witness.  He had made a strong,

19  reliable identification of Patrick Byers on the day that Patrick Byers

20  murdered Larry Haynes. He was out there on Montford.  Mr. Byers ran

21  right past him.  He told the police how many shots he heard, where he

22  ran, what the person looked like and he I.D.ed him that night.  And

23  unlike Mr. Parham, Mr. Lackl was not going to be turned around.  He

24  was going to testify and he was going to testify truthfully.  He was

25  the single most important witness and the defense knew it and

1    Mr. Byers knew it.  The defense knew and Patrick Byers knew that

2    Joseph Parham had effectively been neutralized.  That he had made up a

3    story about why he heard what he heard and where he was and that Carl

4    Lackl was the only person who identified Patrick Byers at the scene.

5    They knew that.  Patrick Byers knew that.  All that was left was Mr.

6    Lackl.  And at the end of the day, there's no reason in the world why

7    these people would kill Mr. Lackl but for that.  It's not like they

8    just felt like doing it.  Just felt like figuring out Mr. Lackl's

9    address, his phone number, putting together a caravan to go out there,

10   buying a burner phone to throw away the day of do all these things to

11   orchestrate this murder.  People just don't do that for no reason.

12   They had a good reason in this case.  Mr. Pearson was going to be

13   paid.

14            Now the why of this case.  The why Mr. Lackl was murdered is

15   obvious.  The timing of the murder and the reason behind it.  The

16   identification and the impending testimony.  Let's talk about how it

17   happened.  And that's essentially what you've heard over the first

18   three weeks or so of this trial was how did that happen.  You heard

19   all the evidence about Mr. Byers' state court date coming up after all

20   of the defense requested postponements.  That the July 10th date was

21   the date.  That there were witnesses who were preparing to testify.

22   And that unlike the prior trial dates, this one was not going to be

23   postponed.  You also heard that just prior to this trial date, after

24   the last postponement in April, Joseph Parham recanted and in

25   Mr. Byers' mind, the only thing standing between him and coming home

1    was that one identification witness, one eyewitness, Carl Lackl.

2            Now Mr. Byers could not kill Mr. Lackl himself.  He was in

3    jail.  He had his good friend, Frank Goodman, though who had been in

4    jail with him before and who his father brought to see him, who he

5    called on his contraband phone, his illegal phone that he has in jail.

6    They had known each other for years.  Mr. Goodman agreed to make it

7    happen.

8            Now it wasn't just in that jail visit that they talked.

9    Mr. Byers had a cell phone.  There is no doubt about it.  We're not

10   going to call it the phone attributed to Mr. Byers anymore.  It's his

11   cell phone.  He had it.  And we've proved that to you and we'll talk

12   about how we've proved that.  But he had that phone and he also had

13   Mr. Lackl's name and address with his property at the Baltimore City

14   Jail.  Cell phone, information to Frank Goodman.

15           Now what's the missing piece?  Well, where did that phone

16   number come from?  How did Marcus Pearson get Carl Lackl's phone

17   number to call him up and lure him out of his house?  Well, we know

18   that Frank Goodman knows his way out to Philadelphia Road.  We learned

19   that yesterday when his mother testified.  She told you that his

20   girlfriend had worked out that way.  They bought their phones out that

21   way.  That he knew how to get out there.  Marcus Pearson didn't.  He

22   had to get Tammy Graham to drive him out on July 2nd, 2007.  None of

23   these other guys knew how to get out there.  They had to follow Tammy

24   Graham.  But Frank Goodman knew.  And lo and behold, in front of

25   Mr. Lackl's house, at his address on Philadelphia Road is his name and

1    his phone number.  The same phone number that these individuals,

2    Mr. Pearson, ended up calling to get him to come out of the house.

3              How else did it happen?  What else have you heard?  Well,

4    you've heard that Frank Goodman met with Marcus Pearson on July 2nd,

5    2007.  Gave him this information.  That Mr. Pearson confirmed that he

6    would do it.  Talked to Mr. Byers on the phone.  Found out that the

7    money was for real.  And once he was satisfied that he was actually

8    going to get paid for this, went about figuring out how to do it.  He

9    didn't want to do it either.  Mr. Goodman didn't want to drive out

10   there and risk it.  Mr. Pearson didn't want to do it.  But he found

11   somebody who would do it.  So he called Steven Thompson, another

12   Blood, west Baltimore, who served up Mr. Cornish.  Mr. Pearson made

13   these calls to the Lackl home using the burner phone, the phone that

14   he had bought specifically to do this.  He drove over with Tammy

15   Graham to west Baltimore to pick up Mr. Cornish.  Mr. Randle, Michael

16   Randle was tagging along.  They came back to Normal Avenue.  Got the

17   gun.  Got Ronnie Williams to drive the green Camaro and they went out

18   to Philadelphia Road, made some calls along the way which we'll hear

19   about.  And when they got there, Mr. Pearson and Ms. Graham kept going

20   after he identified Mr. Lackl.  Ronnie Williams in the green Camaro

21   with Mr. Cornish and Mr. Randle came back around.  Called Mr. Lackl

22   over to the car and they ended his life at that moment.

23             Now who were these people calling, who was Marcus Pearson

24   calling after this murder after having confirmed through Jonathan

25   Cornish, the 15-year-old shooter, that the murder was done?  He's

1    talking to Frank Goodman.  He's talking to Patrick Byers, the very

2    person against whom Carl Lackl was going to testify, within minutes of

3    the murder.  That's no coincidence.  And having heard about the phone

4    records in this case, you can be certain that there was a

5    conversation.  It wasn't somebody just talking into thin air.  It

6    might have been a short conversation.  But I encourage you when you

7    deliberate to see how much you can say in seven seconds.  See how much

8    you can say in thirty seconds.  You can say a lot.  Maybe they didn't

9    need to say much.

10            You've heard that Mr. Pearson came back to Normal Avenue,

11   met with Mr. Goodman and got paid.  There was some dispute over how

12   much he got paid.  He only got $2300.  He was supposed to get 25.

13   There's a couple of calls in the early morning hours of July 3rd about

14   that with Mr. Byers.  And all of the evidence in this case confirms

15   what I've just told you.  That's how it happened.  You've heard from

16   eyewitnesses, detectives.  You've seen physical evidence.  You looked

17   at phone records, probably more phone records than you'd ever hope you

18   would ever see.  You've heard about cell tower information and they

19   all lead to Patrick Byers and Frank Goodman.  All of the evidence.

20            Let's first talk about the eyewitness testimony, the people

21   who were there.  Now there's lots and lots of other evidence besides

22   them and we'll hear about that, too.  But what did they tell you

23   happened?  There's Marcus Pearson's testimony.  He told you about

24   Frank Goodman approaching him about the money, about how Goodman said

25   that this was for his homeboy, Pat, in jail and we know both of those

1  things are true.  Pat is his homeboy and he was in jail.  And

2  Mr. Goodman also told Mr. Pearson he's ready to go to trial and we

3  know now that that's true, too.  It was eight days away and it was not

4  being postponed.

5         Mr. Pearson talked to Mr. Byers on the phone he told you.

6  We have the phone records to confirm that.  And he also talked to

7  Frank Goodman on the phone.  And we know that that's true.

8  Mr. Pearson's phone records that you saw at length in this

9  highly-colored chart as well as the fact that Mr. Byers and

10 Mr. Goodman's phones, phone numbers, direct-connect information are in

11 Mr. Pearson's phone.  Now it took him a long time to admit that, that

12 he had Mr. Byers' phone and Mr. Goodman's phone in his phone and the

13 reason it took so long for him to admit that is that by admitting that

14 he was in contact with Mr. Byers and Mr. Goodman, he would be

15 admitting to have been right in the center of this conspiracy.  That

16 the two people who had the motive to make this happen, especially

17 Mr. Byers, were in his phone.  He would have been putting himself

18 right in the middle of it, which is why he held out so long on that

19 information.

20         Mr. Pearson also told you that he had received the

21 information that the car was for sale.  That Mr. Goodman had given the

22 information about where this was, Mr. Lackl's house and how to get out

23 there.  Mr. Goodman came to him later that day asking him whether he

24 was still going to handle the murder and he did.  He arranged it at

25 that point.  Called up Mr. Thompson.  Got Mr. Cornish.  Went over and

1  picked them up.  Went out to Normal Avenue, got the gun, went up to

2  Philadelphia Road, came back, got paid.  That's basically what

3  Mr. Pearson told you.  That's what all the evidence shows.

4          Now he also told you that he went to the Marriott that night

5  for the first time, spent $400 on a hotel room.  He had come into some

6  money.  He has given money, a hundred dollars each to Mr. Cornish and

7  Mr. Randle.  Mr. Cornish told you the same thing.

8          Now if this case were all about what Mr. Pearson told you,

9  we would have been done a long time ago.  This case is not about the

10  credibility of Marcus Pearson because Mr. Pearson, what he's told you

11  and what I've told you in terms of how this happened has been

12  corroborated left and right.  Mr. Pearson is not the only witness in

13  this case.  You heard from Jonathan Cornish who basically said the

14  exact same thing as Mr. Pearson and they don't really know each other.

15  They both told you that.  They had never met in person before.  They

16  had each other's phone number.  Neither of them had really talked much

17  after this happened and most importantly, neither of them had any of

18  this phone evidence that would ultimately prove that what they were

19  saying happened happened.  They couldn't have just made this up and

20  luckily got it right.  Just couldn't have happened.  Yet, Mr. Cornish

21  basically confirms what Mr. Pearson says.  Getting the mission through

22  Steven Thompson, talking with Mr. Pearson on the phone about where to

23  pick him up, Mr. Randle coming along, getting the gun on Normal

24  Avenue, driving out to Philadelphia Road, having conversations about

25  how Mr. Williams was driving, all of these things that they say match

1    up.  They corroborate one another.

2            What Mr. Cornish also does is he corroborates Mr. Pearson

3    about the meeting with Frank Goodman.  Now how does he do that?  Well,

4    Mr. Cornish told you as well as Mr. Pearson that once they drove past

5    Mr. Lackl's house, Marcus Pearson kept going and was actually already

6    on his way back while the shooting was happening.  Mr. Pearson left

7    Baltimore County first.  Yet, it was Mr. Cornish and Mr. Williams and

8    Mr. Randle that got back to Normal Avenue first.  They were there

9    first and they were there for a little while before Marcus Pearson

10   showed back up.  He was somewhere else.  And you heard from Tammy

11   Graham and Marcus Pearson where he was.  He's meeting with Frank

12   Goodman.  Mr. Cornish told you that nobody was celebrating.  Nobody

13   was happy about this.  Ms. Graham told you the same thing.  This

14   wasn't some big Bloods initiation that you heard about in opening

15   statement from the defense.  There was never, never any evidence of

16   that.  You never heard any evidence of that.  That's just something

17   that's been thrown out there to see if it sticks.  There's no evidence

18   that this was some Bloods initiation.  But Ms. Graham and Mr. Cornish

19   basically say the same thing about what happened.  Ms. Graham confirms

20   the trips and what she also confirms perhaps more directly Mr. Cornish

21   is that right after this murder, minutes after this murder, minutes,

22   Mr. Pearson is meeting with Frank Goodman.  She knows his car,

23   everybody knows his car.  The black Thunderbird with the black rims

24   and she sees Mr. Pearson minutes after the murder meeting with Frank

25   Goodman.  The three eyewitnesses who were there that night all

1   corroborate one another and none of them knew about the phone records,

2   the cell tower information or the physical evidence. And yet, all of

3   that information corroborates what they've told you.

4           Now let's talk about that because as I said, if it were just

5   the testimony of those three people, we would have been done a long

6   time ago. We've done everything we can to make this an easy decision

7   for you so you can be sure that Mr. Goodman and Mr. Byers are guilty.

8           What else have you heard about? You've heard about physical

9   evidence. You've heard the statements of Patrick Byers and Frank

10  Goodman and you've heard a lot about phone records. So let's talk

11  about those. Well, there's physical evidence. This is the cracker

12  box that was among Mr. Byers' possession, the J.I. section. And this

13  is what was inside an envelope with somebody else's name on it. Now

14  you may hear some sort of an explanation, I don't know if you will,

15  about how that could have just belonged to somebody else and I'd ask

16  you to use your common sense. This is a document about Mr. Byers'

17  court case, his court number, case number, copied to Mr. Byers right

18  on the front. It's among his possessions at the J.I. section. It's

19  his. There's no reason anybody else would have his witness list.

20  It's a ridiculous argument that someone else would have this. Well,

21  somebody else's name was on the envelope. Well, that's because he was

22  trying to hide it. What people try to hide is important and it's

23  important that Mr. Byers tried to hide this. He knows that this is

24  direct evidence of him killing Carl Lackl. This is in his possession.

25  It's Carl Lackl's address and Mr. Lackl is dead. So he hides it. And

1  what else does he do?  When they go to pick up this box, that's not

2  mine.  Okay.  Why is he saying that, distancing himself from the

3  crime?  He knows that there's something in that box that absolutely

4  incriminates him and ties him to this murder.  That's not mine.  Of

5  all the things that they went through that day, that's not mine.  What

6  people lie about is important.  And you've heard about a lot of lies

7  in this case.  And I'd submit to you that when you're thinking about

8  who lied about what, consider what they lied about.  And in this case,

9  most of the lies are the same.  They're all about trying to withdraw

10  themselves, Mr. Pearson, Mr. Goodman, Mr. Byers from this conspiracy.

11  Trying to withdraw.  We're going to go through some of those lies in a

12  moment.

13         You also heard that Mr. Byers was interested in getting out.

14  Did paperwork in his cell that indicated he was trying to get out on

15  pretrial release.  He was always trying to get out.  Trying to get

16  out, trying to get out.  Not trying to get to trial.  Trying to get

17  out.  You have the Goodman phone taken from him.  You have heard about

18  Mr. Cornish's phone taken from him.  And perhaps some of the most

19  compelling evidence that you've heard of was the statements of

20  Mr. Byers and Mr. Goodman.

21         Now as I said, what people lie about is important and in

22  these interviews with Detective Ruby that you heard at length

23  throughout this trial, you kind of saw a showcase for guilty people

24  lying and these people all had reason to lie because they knew that

25  Mr. Ruby, Detective Ruby had evidence of them being involved in

1   orchestrating the murder of Carl Lackl and they all lie about things

2   that if they admit it would connect them to this murder.  They all lie

3   to keep themselves out of trouble.  They all lie to withdraw

4   themselves and put other people forward.  That's the theme in these

5   lies that happened in that interview room.  And the problem that they

6   have is as they sit there lying to Detective Ruby, they don't know

7   what he knows.  He gives them bits and pieces from time to time and

8   they adjust.  They change their story based on what they think he

9   knows and they end up digging themselves deeper and deeper.  And all

10  three of them did it.  Goodman, Pearson, Byers.  All lied the same

11  way.

12          Now what did they lie about?  They lied about knowing who

13  was involved.  They lied about their motivations.  For example,

14  Mr. Pearson made a big show to Detective Ruby.  Oh, I don't want

15  Patrick Byers to come home, I don't like that guy.  He doesn't even

16  know Patrick Byers.  And the reason he says that and concocts this

17  story about some girl that they had a beef over, he wanted Detective

18  Ruby to think that as far as Pearson was concerned, Patrick Byers can

19  stay in jail forever because if Pearson admitted that he had some

20  reason to help Mr. Byers, that would have put him right in the middle

21  of it.  He wants Detective Ruby to think I don't want Patrick Byers to

22  come home.  I wouldn't try and kill his witness for him.  I have no

23  motive to do that.

24          People also lie about who they've called, when they've

25  called them, who's in your address book, where you were, who you were

1    with.  They all lie about whether Mr. Byers had a cell phone.  Why did

2    they lie about that?  Because the cell phone is how Mr. Byers

3    orchestrated the murder.  Another lie that you'll see not just among

4    these three assailants, but generally, you see people admit to a

5    lesser crime to try and gain some credibility.  What they say is oh,

6    well, I was selling drugs.  So you know I'm telling the truth because

7    I'm admitting selling drugs, but they don't want to admit their role

8    in the murder.  That's what they do and you'll see evidence of it.

9    And one thing that everybody also does with Detective Ruby just to

10   make sure is they assure him that they're telling the truth.

11   Mr. Pearson does it in more colorful ways than other people.  But they

12   all say honestly, honestly, just to make sure Detective Ruby believes

13   them.  That happened in all three interviews.

14           Let's look at some of them.  Here's some clips from Frank

15   Goodman's interview with Detective Ruby.

16           (The video clip was played in open court.)

17           MR. GIBLIN:   Now that's Mr. Goodman lying about Mr. Pearson

18   and making it a point to Detective Ruby, if I saw Pound, if I saw

19   Pearson, I don't know when it was, but it wasn't around the 4th of

20   July.  Definitely wasn't then.

21           Now the next lies we'll hear from Mr. Goodman are about how

22   well he knows Patrick Byers or whether he knows Patrick Byers.  He

23   even makes up a fake name for Patrick Byers and then at the end of

24   this clip, you'll see what it looks like when Mr. Goodman gets caught

25   in a lie.

1          (The video clip was played in open court.)

2          MR. GIBLIN:   Okay.  He denies everything about Mr. Byers

3   until he's confronted and admits it.  Even makes up a fake name.  Now

4   the next clip we hear, the common theme, Goodman 3 of assuring the

5   police that you're telling the truth while you're lying to their face.

6          (The video clip was played in open court.)

7          MR. GIBLIN:   Honestly.  Now the same interview in the next

8   clip, Goodman 4, we hear Mr. Goodman honestly telling the police that

9   Patrick Byers doesn't have a cell phone.

10          (The video clip was played in open court:)

11          MR. GIBLIN:   All lies right in Detective Ruby's face.  Let's

12   do the last one for Mr. Goodman, Number 6, where Mr. Goodman lies

13   about ever, ever, ever talking with Pound on the phone, dealing with

14   Pound.

15          (The video clip was played in open court:)

16          MR. GIBLIN:   Never, never, never.  Never, never.  We've seen

17   the phone records that prove the exact opposite.

18          Now let's talk about Mr. Byers' lies to Detective Ruby.  And

19   the biggest one, the most important one that you'll hear about and

20   that was told to Detective Ruby by Patrick Byers is this one.  I don't

21   know Frank Goodman.  Now before I told you it's important what people

22   lie about because it tells you what they're concerned about.  Why in

23   the world would Patrick Byers deny knowing Frank Goodman unless Frank

24   Goodman had helped him do something bad?  What is it about the

25   association between Patrick Byers and Frank Goodman that would cause

1    Patrick Byers to deny repeatedly, repeatedly that he knows Frank

2    Goodman who he's known since before he went to jail, who he spent time

3    with in jail, whose father brought him to jail, who he's talked with

4    on the phone?  If Mr. Byers has nothing to do with this and

5    Mr. Goodman has nothing to do with this, why are they denying that

6    they know each other up and down?  They admit to Detective Ruby that

7    they know other people, talk about how they know other people.  But

8    when it's do you know each other, both of them are repeatedly saying

9    to Detective Ruby, I don't know that guy.  And you'll hear that

10   Patrick Byers goes to great lengths in his explanations of his

11   relationship with Frank or lack thereof to convince Detective Ruby, I

12   do not know, don't know Frank Goodman.  Let's start with Byers 1,

13   which is where he's lying about having spent time with anybody that he

14   knows at the J.I. section.

15              (The video clip was played in open court.)

16              MR. GIBLIN:    Denying that he spent time with anybody he

17   knows like Frank Goodman.  Clip 2, Byers lying about selling drugs at

18   Montford and Jefferson.

19              (The video clip was played in open court.)

20              MR. GIBLIN:    Now we'll jump to Clip 4 with Mr. Byers again

21   lying about Frank Goodman, where he lives, what he looks like, this

22   person, Frank, who he's concocting for Detective Ruby's benefit.

23   Really coming up with a story.

24              (The video clip was played in open court.)

25              MR. GIBLIN:    Now that's a involved lie.  Creating a person.

1   Trying to disassociate himself with Frank Goodman.  The question is

2   why.

3           Now he also lies to Detective Ruby about having Frank

4   Goodman's phone number.  Remember yesterday, the Frank Nitty number

5   that just happened to pop up in Mr. Goodman's T-Mobile records?  Clip

6   6 is Mr. Byers lying about who that number belongs to.

7           (The video clip was played in open court.)

8           MR. GIBLIN:   Now finally on the same issue, Byers 7

9   continuing to deny Frank Goodman.

10          (The video clip was played in open court.)

11          MR. GIBLIN:   "I don't know who's telling until I get to

12  trial."  This is in his paperwork.  He knows who's telling.  And

13  throughout that video, Mr. Byers fights Detective Ruby every step of

14  the way on who Frank Goodman is, how he knows him because he knows

15  that Frank Goodman is the link between him and the outside, between

16  him and the murder of Carl Lackl.

17          Now one more clip for Mr. Byers and we'll move on.  But not

18  only what people lie about tells you things, how people react when

19  they're told information tells you things, too.  Take a look at how

20  Patrick Byers reacts when he's told that he is being charged with

21  murder and conspiracy to commit murder.

22          (The video clip was played in open court.)

23          MR. GIBLIN:   You think his pulse elevated at all?  Was he

24  surprised?  He was just leaning back in his chair, relaxed, totally

25  not surprised when he's told that he's being charged with a murder.

1   He knew why he was there. And throughout those interviews, he lied

2   just like Frank Goodman lied, just like Marcus Pearson lied over and

3   over again about who he knew and what his role was. He also lied

4   about who was on his list. Said he didn't know any of these people.

5   We know he knows Joseph Parham. We knew he knew Mr. Lackl because he

6   communicated the information to Mr. Goodman.

7            He also during the course of that interview and we're not

8   going to go through all of the clips, but he pretends that Larry

9   Haynes was a friend of his. He told the same lie to Tom Martin to

10  make it seem like he would have no motive to kill Larry Haynes. Again

11  trying to withdraw himself from the center of an investigation. Larry

12  Haynes is my homeboy. That's who they say I killed. Did the same

13  thing to Detective Martin.

14           And he also denies knowing anything about his case. Don't

15  know anything about my witnesses. Don't know anything about my case.

16  Yet, you heard in great detail from the defense all of the attorney

17  visits on his visitor list which we'll go through. Ivan Bates, Roland

18  Walker, Mark Zayon. Over and over again, he's getting visits from his

19  attorneys. He knows about his case and he knows that Carl Lackl in

20  July of 2007 is the last man standing to identify him. He knows. He

21  talks to his lawyers in person. He talked to Mr. Bates on his cell

22  phone repeatedly before and after the murder of Mr. Lackl. Mr. Byers

23  knows about his case and knows about the evidence against him. Yet

24  when Gary Ruby asked him questions about do you know this witness, do

25  you know Mr. Lackl, did he even know a witness got killed, he pretends

1    he doesn't know anything about that.

2              Now I'm sure you'll hear in the defense closing all the lies

3    that Marcus Pearson told.  Now what's the difference?  Well, there's

4    one interview with Patrick Byers, one interview with Frank Goodman and

5    they lied through their teeth throughout the entire thing.  The only

6    difference is Marcus Pearson had more chances to do it because they

7    kept bringing him back and they kept bringing him back and he kept

8    lying because he thought it was working.  He thought hey, what I'm

9    telling these guys is getting me out of here.  I'm going to keep doing

10   it, I'm going to keep withdrawing myself and that's what he continued

11   to do.  Although each time he met, he got a little bit closer.  He

12   admitted certain things, forgot what he had admitted before and dug

13   himself deeper and deeper.  And you can have no doubt that if there

14   were nine interviews with Patrick Byers, there would be nine sets of

15   lies.  Nine sets of lies from Frank Goodman.  That's what people who

16   murdered somebody else do when they're being interviewed by a homicide

17   detective.  Mr. Pearson started out saying it was all Jonathan

18   Cornish.  He was the one who was talking to Pat in jail.  Then he got

19   to the point where hey, I think I'll be helpful, I'll try and get them

20   the gun.  If I give them the gun, maybe they'll go away.  So he

21   arranges to get the gun for the police, thinking that that will help.

22   He does that.  Pretends to be helpful.  Thinks he's being helpful so

23   the police will leave him alone.  He gets them the confession from

24   Jonathan Cornish.  Leave me alone, it was Cornish.  It was Cornish and

25   Pat in jail.  That's all I know.  And then eventually, when he's

1    confronted with more and more evidence, his story changes because it

2    has to.  He wasn't as stubborn as Mr. Byers in admitting Mr. Goodman.

3    He would change his story.  Well, I saw it from across the street.  I

4    was out there.  I didn't have anything to do with it, but maybe I saw

5    it.  And then it became well, I drove them out there, but I didn't

6    know what they were going to do.  I didn't have anything to do with it

7    that way.  He makes up this story about why he wouldn't have anything

8    to do with wanting Mr. Byers to come home.  Well, there was this girl

9    he fought over.  For all I care, Mr. Byers can stay in jail forever.

10    Again withdrawing himself from motive, withdrawing himself from the

11    murder.

12         Toward the end he starts to implicate Goodman and he holds

13    out on that for a long time and we know why because knowing Frank

14    Goodman puts you right in the middle of this case because Goodman was

15    the one who communicated the information to Marcus Pearson and he

16    continued to deny to the very end and he continued to deny knowing

17    Byers, talking with Byers on the phone until the very end.  Was always

18    withholding this, Byers and Goodman's numbers in his directory.  Never

19    told them about that.

20         The one constant through all of Mr. Pearson's statements

21    however was that it was a murder for Pat in jail, a murder for Pat in

22    jail.  Even Mr. Pearson couldn't come up with a reason why anybody

23    else in the world would want Carl Lackl killed other than Patrick

24    Byers.  Always for Byers.  Now he lied throughout all those

25    interviews.  Then what did he do when he finally got an attorney,

1   somebody to sit down and say Marcus, they're not buying and you're

2   digging yourself deeper and you're going to go to jail forever?

3   Starts listening to his federally-appointed attorney.  What does he

4   start doing?  Well, he stops putting things on everybody else and what

5   he does is he actually puts things on himself.  He admits things.  He

6   admits his role.  He admits all sorts of facts that put him directly

7   in the center of this thing over and over again.  Before October 2007,

8   and after 2007, there's a number of things that Mr. Pearson finally

9   admits once he's got representation and hasn't changed his story on

10  those to this day.  He admits that he was the one who was promised the

11  $2500 by Frank Goodman for the murder.  He admits that he was the one

12  who called Byers before the murder to make sure the money would be

13  paid.  That he called Thompson.  That he spoke to Cornish.  That he

14  picked up Randle and Cornish.  None of these things he admitted

15  before.  All of these things are implicating him, putting it on him,

16  not putting it on others.  That Pearson directed Williams and Terry to

17  get the gun.  That it was Pearson who had the phone, the burner phone

18  that he threw away.  That he called Lackl.  That it wasn't somebody

19  else.  It wasn't Brazy who called Lackl.  He's trying to put

20  everything on the kid.  Finally he admitted that he threw away the

21  chip.  That he called Goodman after the murder.  That he himself was

22  the one who got paid.  He's admitting yes, I am involved in a murder

23  for hire.  I got paid.  I orchestrated it.  Putting everything on

24  himself and admitting the truth because there was nowhere else to go.

25  And you'll see in the video when he's spinning with Detective Ruby,

1   he's animated.  He's doing everything he can to get out of there.  And

2   when you saw him on the stand, he's completely resigned.  Completely

3   resigned.  Nowhere else to go.  Just admits what happened.  And it was

4   always for Byers.  Stayed consistent ever since.

5               Now what Mr. Pearson couldn't have known when he admitted

6   all these things, what none of these people could have known was that

7   everything they said would be corroborated by Sprint, Nextel, Chuck

8   Gruss, pen link, the Baltimore County Police Department.  That all of

9   their lies before could be disproved and what they're saying now could

10  be proved.  There's just no way they could have known that and

11  Mr. Pearson's motivation when he was talking to Detective Ruby, I'm

12  going to get out of here.  This is working.  He's believing me.  And

13  what's his motivation now?  What's his mindset now?  You've heard it

14  from his lips.  If I lie, I'll get life.  That's what he thinks.

15  Telling you the truth.  And the phone records make you sure.

16              Now Patrick Byers had that phone in jail.  There's no doubt

17  about it.  There's no doubt about it and he fought like crazy to keep

18  that phone a secret.  He lied about it.  Frank Goodman lied about it.

19  He had family members saying they didn't know he had a phone.  To this

20  day, Ms. Booze was telling you that she didn't know he had a cell

21  phone.  All these efforts to obscure the fact that Mr. Byers had a

22  cell phone.  And why he lied about that, not just because it's illegal

23  to have a cell phone.  You've heard that there's too many cell phones

24  in jail.  The reason he fought so hard to keep this cell phone a

25  secret was because he used it to kill Carl Lackl.

```
 1              Now let's get past was this his phone or not.  Let's talk
 2    about the investigation that the police undertook to prove it's his
 3    phone.  And you have a small version of this in front of you.  These
 4    are contacts with Mr. Byers by people who know Mr. Byers, by people
 5    who Mr. Byers knows and this jail cell phone which was in Patrick
 6    Byers' possession throughout this conspiracy.  At the top, Frank
 7    Goodman.  We know they know each other.  About 89 calls.  Another
 8    Frank Goodman phone.  Patrick Byers' grandmother.  Lump from Normal
 9    Avenue.  Davina Winchester knows Patrick Byers.  Whitney Mears.  There
10    is testimony about her knowing Patrick Byers.  Ebony Green admitted
11    it.  Somebody admitted it.  Tierra Pollard who I don't think any of
12    you will forget in terms of her contacts with Patrick Byers.  She had
13    two phones.  656 direct connects, all with Patrick Byers.  Inez Cole,
14    family member.  Davina Wilkinson, which I believe is Patrick Byers'
15    first wife.  Vonda Cole, a witness.  Now there's these icons for
16    people who you have not seen.  For us, well, we didn't just throw them
17    on there.  2006 phone directory when Mr. Byers was arrested and his
18    phone directory, there was this person's phone number and lo and
19    behold, this contact with the jail cell phone.  Same thing with Davon.
20    Marcus Pearson, heard all about him.  Randle, another person in the
21    phone directory.  Jason Torbert, a common link with Marcus Pearson.
22    Patrick Byers, Sr.  It's his phone.  Now that kind of collapses the
23    defense in a certain way that makes them question, well, can you
24    really prove that he had it on July 2nd, 2007 and we've proved that,
25    too.
```

1          Remember when there was kind of an argument, well, just
2    because it's Patrick Byers' phone and he talked to all these people,
3    well, maybe he lent it to somebody else in the jail that day who
4    wanted to kill his main witness.  Well, maybe somebody else borrowed
5    it and killed his witness with Marcus Pearson without his knowledge.
6    And with Government's Exhibit 428, I'm sorry, 424-A on the screen, you
7    see that every hour that day, there's connection to Patrick Byers.  11
8    a.m., 12 p.m., 1 p.m., all the way through the end of the night.
9    There is no doubt that Patrick Byers had that cell phone.  That he had
10   it on July 2, 2007, all day.
11          Now Mr. Goodman's phone was easier.  It was in his pocket.
12   Mr. Byers took a lot of efforts to hide his.  Mr. Goodman couldn't
13   hide his.  He had a couple of other numbers which he fought up until
14   yesterday.  You heard about the old T-Mobile number, the 443-722-8470.
15   We saw that in his T-Mobile records yesterday.  And we also saw it on
16   Mr. Byers' jail paperwork for Frank Nitty.  You know, the older guy
17   with the beard who's tall and comes from Montford.  Remember that lie.
18   Frank Goodman.
19          We also know that he had a later T-Mobile cell phone number
20   because he wrote it on his information sheet when he interviewed with
21   Detective Ruby.  There's no doubt that all of these phones that we've
22   attributed to Mr. Goodman are in fact being used by him.  And then of
23   course, the Nextel which was prominently featured on the day of the
24   murder in his pocket when he's arrested.
25          Same thing with the Cornish phone.  We know that Steven

1   Thompson who appears on this list, that that's him because Mr. Cornish

2   and Mr. Goodman, I'm sorry, Mr. Pearson both acknowledged that he's a

3   common Blood member and that that's his phone number. He's in both of

4   their directories. And what the records tell us which you've seen

5   over and over again is that on July 2nd, 2007, Mr. Lackl was murdered.

6   It was done by Marcus Pearson using Blood members and it was done all

7   for Patrick Byers through Frank Goodman.

8           Now you've got this in front of you. 343. I'll go through

9   it very briefly to show what it shows. We know at the very top, we're

10  not going to use the big ones because it's so hard to see. But at the

11  very top you've got contact between Mr. Byers, Sr. and Frank Goodman.

12  Mr. Byers, Sr. says that's about heroin. You can believe whatever you

13  want about that. But there's contact there the day before, I'm sorry,

14  a few days before and it's between Mr. Goodman and the father of the

15  man against whom Carl Lackl was going to testify.

16          Now who reaches out to Marcus Pearson first? Does Marcus

17  Pearson start calling these guys and start offering up his services?

18  Line 3, Frank Goodman in red is the first one to reach out to Marcus

19  Pearson, Pound. 6-28-07. Then there's in blue, there's a number of

20  back and forth calls involving Thompson and Cornish. There's also

21  calls between Byers and Goodman about what's going to happen.

22  6-30-07, more contact between Byers and Goodman.

23          Now all the lines in bright yellow, July 2, 2007, these are

24  all calls on the day of the murder. Line 17 through 20 there, about

25  3:28 in the afternoon, at this time Mr. Pearson had agreed to do the

1   murder.  He wants to talk to Mr. Byers about it.  Contacts Mr. Byers.

2   Mr. Lackl by the way is probably at work at this time while these guys

3   are conspiring against him.  Let's focus on the range, 16, line 16 to

4   28.  That 20-minute period where Patrick Byers and Frank Goodman are

5   speaking with one another.  Marcus Pearson is speaking to Patrick

6   Byers for a minute at least and line 18, Patrick Byers is talking to

7   Marcus Pearson back and forth and in line 21, within ten minutes, I'm

8   sorry, within just a few minutes of calling and speaking with

9   Mr. Byers, who does Marcus Pearson call?  Line 21 calls Carl Lackl.

10  Line 22, who does he call right afterwards?  Patrick Byers.  Is there

11  any explanation for that other than the obvious?

12          Then having confirmed what he's going to do, goes about

13  making calls with the burner phone throughout the day.  There's more

14  contact with Mr. Goodman to make sure that the wheels are in motion.

15  Now Mr. Pearson wants somebody else to do this.  It's a high risk

16  venture.  So for a number of calls at the bottom of the page there,

17  you see conversations between Pound, Marcus Pearson and Steven

18  Thompson and Jonathan Cornish.  That's about who's going to do this

19  and then finally at the end, you see Pound and Cornish speaking to one

20  another.

21          Turning to the next page, you see more conversations now

22  later in the day between Pearson and Cornish.  Remember how both

23  Pearson and Cornish told you well, Pearson didn't really know his way

24  around west Baltimore so I had to kind of tell him where I was going

25  to be, where to meet me, that sort of thing.  It's all corroborated

1   right there.  A number of calls from the burner phone to Carl Lackl

2   again.  More calls between Pearson and Cornish trying to figure out

3   where to meet each other, where they're going to be.  More calls to

4   Carl Lackl.  And finally, starting at around line 73, there's another

5   call to Carl Lackl and calls between Cornish and Pearson on the way to

6   Mr. Lackl's house.  Do you remember both of them told you that Ronnie

7   Williams wasn't driving to -- the whole reason Ronnie Williams was

8   there you heard because he had a driver's license.  They wanted to

9   make sure he wasn't going to attract any attention to himself.  So

10  he's calling back and fourth about how Mr. Williams is driving, where

11  they're going, that sort of thing, all the way out to Philadelphia

12  Road.  And of course, at 20:45:40, there's a 911 call reporting Mr.

13  Lackl has been shot.

14          Mr. Cornish is in contact with Pearson to confirm what had

15  happened.  He actually calls him before the 911 call.  About 37

16  seconds before the 911 call, Pearson and Cornish are already on the

17  phone about what happened and there's more back and forth between

18  them.  And who does Mr. Pearson bump at 20:51:35 about five minutes

19  from the murder of Carl Lackl?  Patrick Byers after having confirmed

20  it through Jonathan Cornish.  Now Mr. Byers calls him back, line 91.

21  Mr. Pearson calls him back, line 92 and all these conversations, brief

22  as they are between Patrick Byers and the man who Frank Goodman found

23  to put into motion the plan to kill Mr. Lackl.  All right there.

24          You'll also hear or see that there are conversations between

25  Pearson and Goodman.  Got to get paid.  Got to find out where to meet

1    Frank, get my money, it's done.  What does Mr. Pearson tell you about
2    Mr. Byers' reaction when he finds out that Mr. Lackl is dead?  Kind of
3    happy.  Knows other people in the jail who might want to use Marcus
4    Pearson.  Mr. Byers' reaction.
5              Now, of course, we know that that cell phone is in jail and
6    you'll see exhibits like this where you've got the city jail and all
7    of the cell towers around it being hit by that phone.  There was never
8    any doubt that that was a jail cell phone.  It's confirmed to you now
9    that it was Patrick Byers'.  And you also heard through cell tower
10   information corroboration about where these guys were after the
11   murder, where Mr. Pearson was after the murder.
12             Now you heard that this isn't exact.  Nobody ever
13   represented to you that it was.  You can't say he specifically here
14   just based on these towers.  But there's a general correlation between
15   where the phone is and what tower it's going to hit off of.  So when
16   you hear Marcus Pearson say, well, we went to west Baltimore to pick
17   up Cornish and Randle, then we went back to Normal Avenue, then we
18   went out to east Baltimore County to kill Mr. Lackl, then we came
19   back, we've shown you that his phone actually does that.  Just another
20   bit of corroboration for you to make you sure.
21             Now you also heard that Mr. Pearson and Mr. Goodman were
22   hitting off the same cell tower after the murder.  You've heard from
23   Mr. Snavely yesterday that in a big city like Baltimore, there's lots
24   of cell towers.  You can actually see that, see some of them here.
25   They're not very far from each other.  And the fact that they're

1  hitting off the same cell tower tells you they're in the same

2  vicinity, same area.  Lots of cell towers in Baltimore.  Can't

3  pinpoint it.  But you know that they're in the same area.  That's when

4  they're together.  That's when they're meeting.  That's when they get

5  together to exchange the money.

6              Now let's talk about these durations, what was said, what

7  was not said, whether anything was said.  You've learned that these

8  were all based on billing records.  That the clock starts running when

9  the person answers.  Mr. Snavely was confused about that.  He was

10  absolutely confused about that and we showed that to you and he

11  admitted it.  He thought these were based on pen registers.  He

12  thought that the time that the clock starts running is when the person

13  picks up and starts dialing.  It could be ringing.  If it's a

14  traditional phone call, if it's a Nextel, you could just be sitting

15  there talking into it and no connection on the other end.  These are

16  billing records.  Nextel will only bill you for calls that are

17  completed and you heard that from Detective Gruss.  And what

18  Mr. Snavely told you was that, well, it could just be that somebody is

19  talking into thin air for however many seconds that it shows.

20  Regardless of whether somebody bumped and they called back, it could

21  just be that nobody actually makes the connection and continues the

22  conversation and he admitted that that's just theoretical.  It's just

23  theoretically, you know, he can't really say that there was a

24  conversation.  Well, there's nothing theoretical about this case,

25  ladies and gentlemen.  Mr. Lackl is not theoretically dead.  They did

1    not theoretically kill him.  And these are not theoretical

2    conversations.  These are conversations among co-conspirators about

3    the murder of Mr. Lackl.  And again I encourage you to see how much

4    you can say in 24 seconds, 29 seconds, a minute.  You can say a lot.

5    You didn't need to say much in this case.

6              How else do you know that that's what these calls are about,

7    not just what Mr. Pearson tells you they're about?  First and foremost

8    there's the common sense of it.  What else would they be talking

9    about?  What else would Patrick Byers and the person who killed his

10   witness be talking about at the time of the murder?  Nothing else.

11   And it's significant that Patrick Byers and Frank Goodman have

12   absolutely no contact with Marcus Pearson except for during the

13   timeframe of this murder.  All of the contact between Patrick Byers

14   and Marcus Pearson occur on July 2nd, 2007.  That's it.  What happened

15   that day that connects the two?  It's obvious.  There's no other

16   explanation for why they would be talking.  And you may hear theories,

17   schemes left and right about what they could be talking about.  The

18   primary tool that you have at your disposal is common sense.  We ask

19   that you exercise it.  They're talking about the murder of Mr. Lackl.

20   The first contact between Mr. Goodman and Mr. Pearson ever, remember

21   that date range, 1980 to the end of time is June 28, 2007, a few days

22   before the murder.  No calls after.  No calls before.  Short little

23   window of contact.  Only one thing they could be talking about.  And

24   that just leaves the defense with the argument, well, you didn't

25   record these calls.  So it could be anything.  So you haven't really

1  proved your case without Marcus Pearson.  But all of the evidence in

2  this case proves not to be true.  All the evidence in this case proves

3  that they were talking about the murder when combined with your common

4  sense and that's why you're free to use your common sense.

5  What all this evidence shows is that Mr. Pearson,

6  Mr. Goodman, Mr. Byers were in a murder for hire scheme, a contract.

7  Lasted a very short time.  Was executed very quickly.  That

8  Mr. Pearson met with Mr. Goodman after the murder.  Got paid $2300.

9  Had conversations with Mr. Byers before and after the murder and the

10  next day about being shorted the $200.  That he went to an expensive

11  hotel room that night and used some of the money he just came into and

12  of course, the lack of any other reason why Mr. Pearson, Mr. Cornish,

13  Mr. Williams would go out and kill Mr. Lackl.  Murder for hire, murder

14  of a witness.  This was an orchestrated premeditated murder planned

15  and it's been proven.

16  Now all of the evidence in this case was not just about the

17  murder of Mr. Lackl.  We're going to shift gears and talk about Larry

18  Haynes now.  The murder of Larry Haynes at Montford and Jefferson on

19  March 4, 2006 because that provides the why of why Mr. Lackl was

20  murdered.  It provided Mr. Byers with the motive to kill Mr. Lackl

21  which is why there's been a lot of time spent giving you evidence

22  about that and it's important that you understand that you actually

23  don't have to find Mr. Byers guilty of murder that day.  It's not

24  charged.  The significance of that case is not that Mr. Byers actually

25  committed the murder, although he did and you've seen overwhelming

evidence to show you that, but you don't have to find that. The significance of that case is that Mr. Byers was charged with that murder and that Mr. Lackl was testifying against him. And Mr. Lackl was going to be telling the authorities about what he saw that day. Mr. Lackl's role as a witness to what happened on March 4, 2006 provided the motivation for Mr. Byers to kill him. That win or lose in that case, Mr. Lackl was going to testify against him and that Mr. Lackl was the key witness against Mr. Byers in that case.

Now what happened on March 4, 2006? Mr. Lackl was in the alley. You heard all about that. He hears shots. He sees Patrick Byers run right past him. Their eyes meet. They stare at each other for a second. He tries to help Mr. Haynes on the way home. He goes home and calls the police. Gives statements, signs a photo array and tells the police and prosecutors I will testify. That's why he's dead because he was going to tell the police about what happened.

Now why did Mr. Byers have to worry about Mr. Lackl? He's got four witnesses. Right? Four witnesses, who we know he knew about. But why is it Mr. Lackl who has to die? Well, there was a strong case against Mr. Byers in that city circuit court case. He was facing an uphill battle. There was motive in that case for him to have killed Larry Haynes. There was an opportunity for him to kill Larry Haynes. It was at his drug corner. There were admissions that he made to Detective Jenkins and Detective Martin, which did not look good for him and did not look good for him during this trial and there were eyewitnesses. He knew all of this. Remember all those attorney

visits.  He knew what was going on.  He knew the case against him.  He

knew that there was motive in the case.  He told the detectives about

what the motive was.  When he gets arrested for murdering Larry

Haynes, he volunteers that to Detective Martin.  He says Duray Cole

and Dontay Bellamy were killed about four days ago.  We know that to

be true.  They were killed on February 28, 2006, four days before

Mr. Haynes was murdered and Mr. Byers tells Detective Martin that he

thinks that Larry Haynes killed his family members.  He gives them the

motive.  And he did think that Larry Haynes had killed his cousins.

Perfect reason to shoot somebody five times in the head if you're

Mr. Byers.  Mr. Haynes who killed his cousin standing on his corner in

broad daylight on his corner four days after killing his cousin

standing on Mr. Byers' corner.  I don't think so.  Shoots him five

times in the head.  Sending a message.  That was a personal killing.

He had every motive in the world and he knew it going into that

Circuit Court of Baltimore City case.  He also had every opportunity.

This was not some random location in Baltimore City.  This is his

area.  He admitted it.  You've heard from several witnesses that this

is where he hung out.  This is where he hustled.  It wasn't just

somebody else that they wrongly put at this area.  This was his area,

Montford and Jefferson where he sells drugs.  He had been arrested

there before.  He had shot someone across the street before.  He hangs

out there.  This is his place.  And he had admitted that he had guns

in that area, that he had a gun in that area.  These are all things

that would have come out at the trial.  Not only that, but he also has

1    to contend with his own lies and his own conduct, his inconsistent

2    statements with the police.  You heard from Wayne Jenkins that there

3    was this completely foolish attempt to use Jenkins as an alibi the day

4    of the murder.  Figures that well, if I'm with Jenkins, tell them

5    about the murder, I couldn't possibly be involved and that's the same

6    thing that we saw with Marcus Pearson.  Trying to feign

7    cooperativeness, trying to be helpful so the police won't focus on you

8    and it actually does the exact opposite.  That's what Mr. Byers did

9    with Wayne Jenkins.  And again just like Marcus Pearson and Frank

10   Goodman and Patrick Byers did in the Lackl case, Mr. Byers tries to

11   throw them off the scent by saying, well, I heard it was a really tall

12   guy.  He was tall.  He was big.  Mr. Byers is not big.  It's an

13   attempt to throw it off on somebody else.

14              Mr. Jenkins, Detective Jenkins was going to testify and this

15   testimony was going to come out.  Mr. Byers knew that.  Mr. Byers was

16   there.  Detective Jenkins told you that when he met with Patrick Byers

17   that day, unlike any other time before, he was nervous, stuttering,

18   shaking.  This is not the Patrick Byers he knew.  He was acting that

19   way because he had just killed somebody and he knew that Carl Lackl

20   had looked him in the eyes.  Trying to find a quick alibi, do anything

21   to try and cover his tracks.  He also admitted to Detective Jenkins

22   that he knew where the gun was.  I know where the gun is for that

23   murder case and that would have come out.  What he doesn't say, but

24   yet later says to Detective Martin, you inconsistent statements here

25   is that there is this whole Officer Kevin story.  Remember that.  And

1 he never says to Detective Jenkins, I heard the shots. But he says

2 that to Detective Martin. He never says to Detective Jenkins, it was

3 my friend, Larry. He says that to Detective Martin. All these little

4 inconsistencies. He's tripping himself up. He's appearing to be

5 useful to Detective Jenkins to try and pull himself out of it.

6      What did Detective Jenkins also tell us? Well, he tells you

7 that he sits right at the corner, right on the stair steps where the

8 gun was found. You saw the picture in front of you now. Detective

9 Jenkins told you that he always saw Patrick Byers sitting right there,

10 right on those steps, feet from where the gun was found. It's not

11 good. That's the murder weapon from the shooting of Larry Haynes. He

12 sits right there. He hustles at that corner. And Jenkins was going

13 to testify.

14      You heard about the second story to Detective Martin about

15 how he was at the car wash with the girlfriend. He heard the shots

16 and ran up and didn't see anything. So that was it. But he also

17 tells Detective Martin the story about Officer Kevin and that well, I

18 might have a gun in that area. So if you find one, I had it for an

19 officer. His name is Kevin and I needed to get it to him. Now what

20 is Mr. Byers doing when he talks about Officer Kevin? He said before

21 that most of the time the person who's being interviewed doesn't know

22 what the police know. So they try to anticipate what the police know

23 in case there's some bad evidence against them. That's exactly what

24 was happening here. Mr. Byers is telling Detective Martin, Detective

25 Martin hadn't told him anything about a gun by the way. This is

something Mr. Byers volunteers.  He says well, there's Officer Kevin

and I had gotten a black semi-automatic weapon for him and if you find

one in the area, that's probably why it might have my fingerprints on

it.  He doesn't say that.  But that's what he's thinking.  He knows

that he has a gun that he used to kill Larry Haynes and that it's

right there on his drug corner in his area and he's worried that

somehow, that somehow CSI is true and they can just lift fingerprints

off of everything and somehow that this gun is going to come back to

him.  So he'd better have a ready-made story about why he would have a

gun in that area.  Hence, Officer Kevin.  He doesn't know what the

police know and he's trying to cover it.

Does the same thing with the motive.  Detective Martin

didn't say anything to him about Duray Cole and Dontay Bellamy.  He

volunteered that.  He knows that, he thinks Larry Haynes killed his

cousins.  So they're probably talking to him because well, they know I

have a motive.  So maybe I'd better volunteer something about that to

appear truthful and that's what he does.  And he also does what Mr.

Pearson did when he said oh, well, I don't like Patrick.  I want him

to stay in jail.  He's trying to lie about what his motivations are so

the investigation won't focus on him.  And what Mr. Byers does with

Detective Martin, he says, yeah, me and Larry are homeboys, we're

friends to make it look like he wouldn't have a motive to kill this

man.  Of course, this was just after he admitted that he thinks Larry

killed his family members.  All these different stories.  His

helpfulness just digs him deeper.  He's involved and he's trying to

1  cover his tracks.  But he's got the motive, the opportunity, and all
2  these statements to police that are going to trip him up at trial.
3  But what's left?  There's bad taste for Mr. Byers, but eyewitnesses
4  make it a whole lot worse because at the end of the day, when he gets
5  to court, somebody is going to have to say that they saw Patrick Byers
6  out on that street corner that day.  Larry Haynes can't do it.  But
7  there's two people who could.  Joseph Parham and Carl Lackl.
8          Two other witnesses.  Mr. Hunt didn't I.D. Mr. Lackl.  You
9  heard that.  Ms. Rookstool did not identify Mr. Lackl.  You heard
10  that.  And Mr. Byers knew these things.  He talked to his lawyers.  He
11  knows who the eyewitnesses are and who the non-eyewitnesses are.  He
12  had nothing to worry about with Weldon Hunt or Cheryl Rookstool.  Just
13  Joseph Parham and Carl Lackl.  Those were the eyewitnesses.
14          Now Mr. Parham was not going to be a problem, was he, come
15  July 2010?  Mr. Parham identified Mr. Byers just like Mr. Lackl did.
16  Mr. Parham made the right identification.  He told the truth.
17  Mr. Byers did kill Larry Haynes and Mr. Parham who had no reason to
18  just pick Mr. Byers out of thin air, identify him as the person who he
19  saw shooting Larry Haynes repeatedly in the head.  He's there that
20  night with Detective Martin having been arrested for marijuana and as
21  you've heard, there is no limit to what you can say to the police to
22  come up with a story.  He could have just said, well, I saw the guy
23  and he was tall and he looked like this.  He had hair on his face and
24  he was wearing a red ski cap.  He could have said that to try to get
25  himself out of trouble.  He could have just used a first name or a

nickname like he did on the stand when he said, oh, well, I heard about it from Tony, last name unknown. He could have done that. He could have said, he could have used a movie character's name like Frank Nitty like Mr. Byers did. But what does he do instead? He gives details. I know who it is. It's Pat, the guy who shot Car Wash back a year ago. He gave details about who he was talking to that day, where he was, the number of shots, where Patrick Byers ran after he was finished murdering Larry Haynes. Provided details. There's no reason in the world of all the people that Mr. Parham could identify, real and imagined that without any connection to the murder, he just happened to pick Patrick Byers as the shooter. No reason he would just pull him out of thin air. But they got him to recant. He took it all back when Mr. Traut comes knocking on his door on Montford Avenue a few blocks from the murder saying that I represent the guy who represents Patrick Byers and he's told that this isn't going away and you know, you're confronted with the reality, Mr. Parham was confronted with the reality that he might actually have to testify in this murder case and he backed off. This murder case that happened a few blocks from where he lives, where he's got family in the area and Mr. Byers' attorney comes knocking on his door, the investigator comes knocking on his door. Once he starts realizing that you might have to testify against a murderer, you start to unsee the things that you saw. And Mr. Parham did that. He unsaw the murder of Larry Haynes. And why? Well, he told you he doesn't want to be involved. He's told people that, he's told investigators, you heard from Detective Martin

1   that he's got family in the area.  He's concerned more about people

2   finding out that he's telling that he's a witness than he is about

3   telling the truth and you heard the absolute unbelievability of his

4   testimony that he would wait three full years knowing that he had

5   falsely identified someone and that that person was sitting in jail

6   for that for three full years, his friend.  He told you it was his

7   friend.  Let him sit there for three years on a murder that he didn't

8   do.  That he would never tell anybody about that.  What did he say?

9   Nobody asked.  He said nobody asked.  He's been in contact with police

10  investigators, prosecutors from the state and he's telling you well, I

11  just never thought to mention it.  I just let my friend, Patrick, sit

12  in jail for three years.  Doesn't make sense.

13          Now what just happens to come along with Mr. Parham's recent

14  recantation?  Remember, you heard from Detective Martin that back in

15  November of 2008, he met with Mr. Parham with some other investigators

16  and Mr. Parham said yes, you know, I did actually see that that day

17  and I don't remember why I signed or what was even said in the thing I

18  signed for Mr. Traut.  It's November 2008 after this case gets

19  indicted federally.  He tells that to Detective Martin.  And then what

20  happens right around when he's actually getting close to testifying in

21  this case and he recants?  That's when we get the calls from Patrick

22  Byers.  Government's 464, calls from Patrick Byers on, calls to and

23  from Patrick Byers on March 5, 2009 which was remember the day that

24  the detectives went out to see Mr. Parham at work and he said get out

25  of here, I don't want to be a part of this anymore.  Several more

1  calls on March 12 of 2009.  That was the first time that he was

2  supposed to come in and testify.  That was the pretrial hearing where

3  he was supposed to speak and identify Patrick Byers.  Who is he

4  talking to on the phone and what does he say when he gets to court?  I

5  didn't see anything.  I did not see anything.  That was the day he was

6  supposed to testify.  3-12-09.  Got postponed.  Mr. Parham needed a

7  lawyer.  He got a lawyer.  But the calls didn't stop even after he got

8  the lawyer.  On the 13th, the next day, there's an eight-minute and

9  twenty-one second call to Patrick Byers.  What do you think they're

10  talking about?  Are you going to believe Mr. Parham just had nothing

11  to do with this case?  Nothing at all except I was asking Patrick

12  Byers for legal advice about perjury even though I got a

13  federally-appointed attorney the day before.  What do you think

14  they're talking about?  Has everything to do with what you saw when

15  Mr. Parham testified.  He was communicating something to Patrick Byers

16  when he got up there and testified.  He didn't care whether he seemed

17  credible or not.  Didn't care.  What he was communicating to Patrick

18  Byers and everybody else in this courtroom, I'm not telling, I'm not

19  the witness.  He recanted and he recanted because he doesn't want to

20  be a witness.  He's got family in that area.  He unsaw what he saw

21  when it came time to testify.  What that did of course was it left

22  Carl Lackl all alone.  Mr. Parham was a nonfactor because Mr. Byers

23  knew he had recanted.

24          And you met Cheryl Rookstool.  Very nice lady.  Didn't I.D.

25  Mr. Byers.  And you learned why Detective Martin didn't use her as an

1  I.D. witness.  Detective Martin has to make some judgment calls when

2  he interviews people whether to show them a photo array or not,

3  whether they're going to be a reliable eyewitness or not.

4  Ms. Rookstool is not a reliable identification witness.  She told you

5  she was in the store.  You know, the layout of the store.  She has to

6  look in an angle where she couldn't actually see what she said she

7  saw.  Detective Martin went back and looked.  Decided not to interview

8  her based on that.  Also decided not to interview her based on who she

9  was and his experience with her which was probably very similar to the

10  one that she had with you in court.  One eye is blind.  She's brain

11  damaged.  She's not a reliable eyewitness.  She wasn't a problem for

12  Mr. Byers.  She's out of the mix.  Mr. Hunt is out of the mix.  Didn't

13  I.D. Mr. Byers.  Mr. Parham is out of the mix.  Who is that who's

14  left?  Carl Lackl all by himself, vulnerable and completely valuable

15  to the prosecution case strong as it was.  He's the only person who

16  was going to point the finger at Mr. Byers.  He wasn't backing off.

17          Carl Lackl's identification, coincidence is just too much

18  that Mr. Parham would just make something up and then lo and behold,

19  Mr. Lackl who he had never met before, never seen before, didn't know,

20  never seen in that area, lo and behold, they both identify the exact

21  same person, the exact same person who sells drugs at the corner where

22  Mr. Haynes was murdered, the exact same person who shot Carlyle

23  Coleman right across the street from where the gun was recovered,

24  right across the street.  Mistaken identity that somebody else did it,

25  somebody else was in the area.  I don't think so.

1        Mr. Lackl didn't know Patrick Byers.  He didn't know any of

2   these guys.  But he saw Patrick Byers, made eye contact and he never

3   wavered before trial.  Unlike Mr. Parham, he had the courage to stand

4   up and tell the truth, to maintain the truth despite visits from

5   Mr. Traut.  Mr. Lackl was not under the influence of drugs that day.

6   You heard from the people who were with him that day.  You heard from

7   Detective Martin.  He was fine.  You heard him on the tape.  Maybe the

8   argument is that well, drugs might make you just coincidentally pick

9   the same person that Joseph Parham picked.  I don't know what drug

10  does that.  He told you the same, told Detective Martin the same

11  details that Joseph Parham told him, six to eight shots.  Ran past me

12  on Montford toward Monument.  Same details.  Our eyes met.  It's a

13  reliable identification witness.

14        Carlyle Coleman.  He was brought in and he testified that he

15  saw the same person shooting him and there can't be any doubt that

16  that happened.  Mr. Coleman lives with the scar from that shooting

17  every day of his life.  When he gets dressed, he sees that scar.  And

18  what do you think goes through his mind?  Laying on the floor just

19  like Mr. Purcell did with Patrick Byers standing over him, said I'm

20  going to kill you.  It's not something you forget.  And when somebody

21  is standing over you, looking right at you saying I'm going to kill

22  you, you do not forget that face.  Mr. Coleman will never forget that

23  face.  It was Patrick Byers right across the street from where he

24  threw the gun that murdered Larry Haynes, that he murdered Larry

25  Haynes with.  This is Mr. Coleman's array.  Same identification.  Same

1  person.  Never going to forget that face.  Even with all this,

2  Mr. Byers knew that somebody had to show up in court and testify

3  against him and Mr. Lackl was the strongest link in that evidence, the

4  only eyewitness.

5  Now how about some of the half alibis that you heard in this

6  case?  They're supposed to be alibis, but they're really not.  You had

7  Mr. Parham saying well, he was at work that day, but the records

8  really show he was only at work up until about two hours before the

9  shooting.  You heard yesterday some testimony that Patrick Byers was

10  in court during the Carlyle Coleman shooting, but he can only be

11  actually accounted for by the court records up to a certain point.

12  That it doesn't actually vary far from court to where he shot Mr.

13  Coleman and doesn't take all day to get there.  Doesn't leave much

14  time to get that phone call from the guy who went around the corner

15  and called him to come and shoot Mr. Coleman in the stomach.

16  You also heard about these blue light cameras and you saw

17  that video that shows somebody running across a street about ten

18  minutes before Mr. Larry Haynes gets murdered.  How valuable is that

19  to you?  It doesn't tell you anything.  All it tells you is that it's

20  another half alibi.

21  Now this was not an easy case for Mr. Byers.  Without the

22  eyewitnesses, the eyewitness, it's going to be even harder.  Mr. Lackl

23  was going to testify and killing him to Mr. Byers was nothing.  It was

24  cheap.  It was easy.  And why risk his testimony at trial?  Why even

25  risk it even if he thought Mr. Lackl was going to be a bad witness?

1   He's a drug user.  Why even worry about his testimony?  To Mr. Byers,

2   it's why risk it.  Because he's going to say he saw me.  And why

3   Mr. Byers really didn't want to risk it is because he knew, he knew

4   that Carl Lackl saw him.  He knew it was a strong identification

5   because he ran right past Carl Lackl and they made eye contact.  He

6   was worried about Carl Lackl the minute he locked eyes with him and

7   worried about him up until that day that he murdered him.  He had to

8   silence him and that's what he did.

9               Now unfortunately, it didn't end there.  This was the cell

10  phone that was taken from Mr. Byers while we were in jury selection in

11  this case.  While we were in jury selection, this was taken from

12  Mr. Byers' cell in his mattress at the Supermax prison.  He got

13  another phone.  Having used this cell phone to orchestrate the murder

14  of Carl Lackl, what does Mr. Byers do?  Gets another phone.  Starts

15  calling the same people.  None of whom tell the police, none of whom

16  tell anybody hey, you know that defendant who's over at Supermax who

17  is accused of orchestrating a hit with a cell phone, he's got another

18  cell phone.  Too busy protecting Mr. Byers to tell anybody about that.

19  We know it's his.  Ebony Green admits it's his.  Keisha Newsome, the

20  former corrections officer at Supermax admits that those thousands and

21  thousands of calls are with Mr. Byers.  It's his phone.  A little bit

22  easier to prove than the first one.  But requiring of less work.  It's

23  his phone.  And what does he do with it?  Calls Joseph Parham, the

24  surviving eyewitness to the Haynes murder.  Mr. Byers' attorneys might

25  tell you that Mr. Byers never really was worried about the Haynes case

1    because he thought he was going to beat it.  It was a weak case.

2    Mr. Byers is still worried about the Haynes' case.  He's still worried

3    and he's calling the remaining eyewitness.  He killed the other one

4    and now he's calling Mr. Parham to make sure he's going to represent

5    at trial and that's what Mr. Parham did.

6           We also learn in kind of an aside from Darrell Briggs that

7    he's calling Darrell Briggs' brother.  That's the defense witness.

8    Remember that?  Mr. Byers has called Darrell Briggs' brother recently.

9    Interesting.  Still contacting witnesses on an illegal cell phone in

10   jail.  It's not something an innocent person does.

11          Now if Mr. Byers and Mr. Goodman are truly not guilty in

12   this case, there is some truly inexplicable things that you'll have to

13   resolve when you go back and deliberate.  And the first one is I've

14   touched on over and over again is why would Marcus Pearson, Steven

15   Thompson, Jonathan Cornish, Tammy Graham, Ronnie Williams, Michael

16   Randle, why would they go out there, Baltimore County, July 2nd 2007

17   and kill Mr. Lackl if not for Mr. Byers and Mr. Goodman?  Who else in

18   the world wanted Mr. Lackl dead?  Nobody.

19          Another inexplicable thing is why Patrick Byers would

20   repeatedly, repeatedly deny knowing Frank Goodman when he's brought in

21   for questioning?  Why would he do that?  The reason he did it is

22   because he knew that Goodman was his link to the outside and that

23   Goodman helped him make this happen.  And then you'll have to resolve

24   why Mr. Parham and Mr. Lackl just happened to pick the same person

25   that day.  Is this some big coincidence?  Is this all just a big

1   string of bad luck for Mr. Byers?  Do we all owe Mr. Byers an apology?

2   Is this just a star in the lining against him starting with Carlisle

3   Coleman just happening to misidentify the person who stood overtop of

4   him and shot him?  Some other guy did that.  Did the streak of bad

5   luck continue with Mr. Parham just picking Mr. Byers out of a photo

6   array and identifying him as the shooter and the string of bad luck

7   continues with Carl Lackl just happening to pick him out as the person

8   he saw throwing that gun on the roof of those garages?  Just looked

9   right into somebody else's eyes and picked out Mr. Byers.  That's some

10  bad luck.  And I guess Mr. Pearson and Mr. Cornish are all doing the

11  same thing now, too.  Just piling on bad luck to Mr. Byers.  We're all

12  going to owe him a big apology at the end of this.

13          Now the reason you're here is that you have common sense and

14  we ask you to use that common sense in your deliberations and ask you

15  to find that this is exactly what it looks like.  The evidence here is

16  overwhelming.  The phone records, the eyewitnesses, the physical

17  evidence all comes together and points directly at Patrick Byers and

18  Frank Goodman and you deserve strong evidence.  You don't just deserve

19  arguments thrown out there unsupported by evidence, allusions to facts

20  that might or might now exist.  Just suggestions.  You deserve

21  evidence and that's what you've received.  Evidence that corroborates

22  itself and you can thank the investigators for that, for that comfort

23  you'll have when you deliberate and all of this was done, all of this

24  was done so Mr. Byers could come home.  He wanted out.  He wanted the

25  murder case in Baltimore City and the evidence shows that Mr. Byers is

a ruthless person.  There are a number of lives left in Mr. Byers'
wake.  Mr. Haynes is gone.  He wasn't a boy scout.  But let's start
with Mr. Lackl.  He's dead because of Mr. Byers.  He's dead because he
saw Mr. Byers on March 4, 2006.  Mr. Lackl's family is without him for
the rest of their lives because of Mr. Byers, because Mr. Byers wanted
to come home and because of Mr. Goodman who was willing to help him
come home.

Mr. Cornish who's 15 years old when he pulled that trigger
is going to be in jail until he's older than most of you by far.  15
years old.  Also Mr. Byers can come home.  Of course, Mr. Cornish
bears responsibility for this as well.  But it was all for Byers.  It
was always for Byers.  Always so he could come home and he's still
trying.  Still calling, still trying to come home.

Mr. Lackl was silenced in this case.  He never got to that
chair over there, but he intended to.  He was trying to do the right
thing.  But Mr. Byers and Mr. Goodman made sure that that never
happened.  That he never got to testify.  That he never got to tell
the authorities about what had happened.  And you heard from Mr. Lackl
in this case and those recordings.  You heard from the testimony, the
exhibits, the evidence, everything points to Patrick Byers and Frank
Goodman.  And we're going to hear from Mr. Lackl one last time.

(The video clip was played in open court.)

MR. GIBLIN:   Mr. Lackl finally got his day in court.  Do
what the evidence tells you you should do.  All of the evidence points
back to Frank Goodman and Patrick Byers.  Return a verdict of guilty

1  on each and every count against Mr. Byers and against Mr. Goodman.

2  Thank you.

3          THE COURT:   All right.  Ladies and gentlemen -- thank you,

4  Mr. Giblin.  We will take a recess now before we then hear closing

5  arguments from counsel for the defendants and we will be breaking at

6  1:00 for lunch.  We'll take a recess.

7          (Recess.)

8          THE COURT:   Before the jury comes back in, Mr. Davis,

9  obviously, we're going to break for lunch at 1.  What I would tell the

10  jury is that around five minutes of 1 or 1:00, we're going to stop for

11  lunch and you can continue after lunch.

12          MR. DAVIS:   Can we check to see where I am at about five

13  after 1?

14          THE COURT:   That's fine.  That's fine.  I'm not trying to

15  rush you.  You'll have plenty of time is the point.

16          MS. DAVIS:   If we could do it in a --

17          THE COURT:    You're certainly welcome.  I just want you to

18  understand that certainly I'll be more than willing to explain to the

19  jury that you're not going to be rushed to finish by 1:00 and that

20  we're going to plan to break about 1:00.  Do you want me to so advise

21  the jury when they come back in or wait?

22          MR. DAVIS:   Oh, we can wait.

23          THE COURT:   That's fine.  Okay.  But I don't want them to

24  think I'm rushing you is the point.

25          MR. DAVIS:   That's fine.  Thank you, Your Honor.

1     THE COURT:   That's fine.  All right.  That's fine.

2              (Jury present.)

3     THE COURT:   All right.  You all may be seated.  We'll still

4  be taking our lunch break around 1:00 and Mr. Davis may or may not be

5  finished by then.  We're not going to rush him and we'll just have to

6  wait and see.  But we'll be stopping at 1:00 for lunch.  Mr. Davis?

7     MR. DAVIS:   Thank you, Your Honor.  Good afternoon, ladies

8  and gentlemen.

9     THE JURY:   Good afternoon.

10     MR. DAVIS:   Well, yesterday when I spoke to you, I explained

11  to you that I only had the opportunity to point out what facts would

12  be introduced into evidence and I had told you that today I would be

13  back and I would be in a position to be able to argue those facts and

14  tell you why we believe certain facts indicate or warrant certain

15  inferences and that's what I'm here for today to point those factors

16  out to you.  And I'd like to thank you for your attention here because

17  I know it's been very hard and very difficult.  And I'd like to thank

18  Mr. Goodman's family and Mr. Lackl's family and Mr. Byers' family.

19  When you lose a loved one, it is hard, it is very hard.  Whether it's

20  to lose someone in jail as in Mr. Pearson for 35 years or to lose

21  someone in death.  No matter how you look at it, it's hard, it's

22  emotional and it's sad.  And this is a very serious case for everyone

23  involved in here.  Literally everyone.

24              Let's start with what's going on here as far as how a

25  criminal case goes.  In a criminal case, the United States government

1  decides that charges are warranted and they go before a grand jury and

2  they present enough evidence so then it warrants bringing the case

3  into a courtroom.  Now when it goes before a grand jury, there are no

4  defense attorneys to cross-examine witnesses, no opportunity for any

5  defense input at all.  It's literally the opportunity of the

6  government to go in and to show to citizens of the community that they

7  believe a crime may have been committed.  An indictment, a charge is

8  returned.  Then it comes to a courtroom and that's where the

9  Constitution comes into play as it relates to my argument here because

10  what happens is when you come into a courtroom, the United States then

11  assumes the burden beyond a reasonable doubt to prove the charges.

12  And that is a very different situation than an indictment, ladies and

13  gentlemen, because what happened at the indictment stage is just an

14  allegation.  It's just enough to bring it in for the show.  This is

15  the show and they have the burden.

16         Mr. Goodman has absolutely no burden at all.  He could have

17  sat in this courtroom and not questioned one witness, not introduced

18  one exhibit, made an opening statement, pointed out what he believed

19  the facts would be in this case and then say that the United States

20  has failed to meet their burden with respect to him and point out why.

21  That's very important and that's very hard.  That's very hard.  That's

22  why the United States had a chance to come back after we put two

23  witnesses, two or three witnesses on the stand yesterday and put up

24  what they called rebuttal witnesses because they have that burden.

25  And you notice there are two prosecutors at the table.  One of them

1    spoke to you for two hours this morning.  When I finish and when

2    Mr. Balarezo finishes, another prosecutor is going to get up and

3    they're going to come up here and they are going to have the last word

4    and you can guess which one is going to have the last word and we will

5    not be able to say anything and the reason they have that opportunity

6    is because they bear this heavy burden to prove these charges beyond a

7    reasonable doubt and if they don't meet that burden, it doesn't mean

8    we're innocent.  It doesn't mean that anyone is innocent.  It means

9    that they did not meet their burden with respect to these charges.

10   This isn't about innocence.  This is about whether they meet their

11   burden of proving beyond a reasonable doubt and we submit right from

12   the get-go that with respect to Mr. Goodman, that is not the case at

13   all.

14                Frank Goodman has no motive in this case to be involved in

15   this homicide.  Absolutely no motive whatsoever.  He visited Patrick

16   Byers on one occasion in March of '07.  They took photographs out of

17   his house.  They tossed his house.  They had a warrant.  It was legal.

18   They went in.  They got what they wanted and you saw them going

19   through the photographs with him during that videotaped interview.

20   Not one photograph of Patrick Byers in there.  Where is the motive

21   here, ladies and gentlemen?  If this man would kill somebody for that

22   man, why with all the other photographs in there, isn't there a

23   picture of that man?  None.  Pound.  Did we see a picture of Pound in

24   this man's photographs?  No.  These are things that weren't planned.

25   These are things that weren't organized.  These are facts, ladies and

gentlemen.  His mother did not know Patrick Byers.  She knows some of
his cousins because he's friends with some of the cousins.

Now I'm certain you got the feel as the case went on that
Cliffview Avenue or Normal Avenue, there are lots of different people
that go down different paths in life.  Frank Goodman works at Lenny's
Deli.  He's worked there since he got out of high school.  He says on
the videotape.  He tells you, well, some of my friends have gone to
jail for this, some of my friends have gone to jail for that.  He
knows and is friends with some of Patrick Byers' cousins.  But that's
just the way it is.  Just because he knows somebody doesn't mean he's
involved in something.  Just because he knows someone doesn't mean he
has motive to become involved in something like this.  There are less
Frank Goodman initiated contacts from any phone associated with him to
any phone associated with Patrick Byers throughout the whole time
period of when everybody was looking at phone calls.  Then on one day,
on July 2nd, when this Tierra lady was contacting the phone alleged to
be Patrick Byers.  She made more calls to the phone that was alleged
to be connected with Patrick Byers on July 2nd than Mr. Goodman made
throughout the whole time period these records were being collected.
Now you ask yourself, where is the motive?  Where is the, where is the
unbending, dying loyalty to go out and kill somebody for someone?
It's just not there.  It doesn't make sense and that's one of the
instructions the judge is going to give you at the conclusion of this
case.  He's going to tell you not to check the common sense at the
door.  Use it.  And that's why you will easily determine that this man

1    has absolutely no motive here.

2        Well, yesterday I told you what the evidence was.  It's

3    Pound and phone records.  Literally Pound is the only inculpatory

4    testimony you heard with respect to Frank Goodman.  The only

5    inculpatory testimony.  Jonathan Cornish did not inculpate Frank

6    Goodman.  Tammy Graham did not inculpate Frank Goodman.  The only

7    inculpatory testimony in this case came from Pound and that's scary

8    because we're going to talk about him.  Mr. Balarezo is probably going

9    to talk about him from now until next year.  But the bottom line is

10    that's scary because this man's fate is hanging in the wind as a

11    result of Pound.  And we'll talk a little bit more about him as we go

12    along.  But, you know, I have no burden.  They have a burden.  They

13    didn't have to call every witness who was out there.  But we heard all

14    kinds of names in this case.  We heard about Dino and Dino's car and

15    Michael Randle and Trigga and all these people.  Not one of them

16    inculpates this man.  Not one.  The only one is Pound.  Not even his

17    girlfriend, who quite frankly was with him every minute of that day.

18    The July 2nd, she was with him in the beginning of the afternoon.  She

19    was with him --

20        MR. PURCELL:   Objection.

21        THE COURT:   Overruled.  Overruled.

22        MR. DAVIS:   Your recollection controls.  She was with him

23    almost every minute of that day.  She was with him when he took the

24    people he recruited out to kill this man.  She was with him after it.

25    She was with him when they went to the hotel later on to get high.

1    She was with him in the morning.  She wasn't with him the next day

2    though because Pound got another bitch.  I think that's what we heard.

3    I don't know if you recall that.  But that speaks to Mr. Pound's

4    character.  That doesn't say anything about Ms. Graham.  Mr. Pound or

5    Pound or Mr. Pound or whatever you want, Mr. Pearson filled in the

6    blanks here.  He had phone numbers on his phone and he's asked

7    questions and he fills in the blanks and he is it for Frank Goodman in

8    terms of inculpatory testimony.  And you got to stop and ask yourself

9    because when we were watching the DVD of Frank Goodman being

10   interviewed, Frank Goodman tells Detective Ruby that Pound is a

11   snitch.  He knows he's a snitch.  He puts someone that Frank Goodman

12   knew in jail.  Marcus Simmons.  You heard the testimony.  It was

13   played on the DVD.  That is evidence.  He knows the man is a snitch.

14   He's been in fights with him.  Doesn't sound like a real good

15   relationship between the two.  Doesn't sound like the type of person

16   you'd go out to have kill somebody for you, does it?  Someone that you

17   know is a snitch and that you're physically fighting with.  Doesn't

18   really sound -- it doesn't make sense, ladies and gentlemen.  It

19   doesn't make sense.

20              This is a high profile case.  You know, it's a high profile

21   case.  We know it from the evidence.  Everybody is talking about the

22   news stations, the newspapers, reading this.  Pound is telling you

23   he's getting half of his information on videotape from the news.  It's

24   a high profile case.  Everybody knows about it.  It's a horrific

25   murder.  It's an absolutely horrific, senseless murder.  Frank Goodman

gets interviewed. He gets picked up at about 11:00 in the morning and he goes in and he's in there until 2:30 a.m. He does deny he knows Patrick Byers. Big surprise. News, newspapers gets picked up. How many times did Frank Goodman ask what he was there for? How many times did he ask what he was being charged with? He wasn't even told he was being charged. He was told he was being interviewed because he was a person with knowledge. And just take a look at his videotape. That videotape of Frank Goodman literally is probably the best evidence in this case. He doesn't even know what's going on. He's being repeatedly asked about this. He knows that Byers has been implicated in this high profile murder. Everybody's face has been across the news. Everybody's face has been in the newspaper. Pound, hey, Pound made the news, too. Everybody knew about Pound. Actually, Frank Goodman on the videotape said even his criminal record is in the newspapers. So he's asked. Do you know these guys? He's down in the police station. His house has been tossed. He's been raked in. And they're asking him about people he's been watching on the 6:00 news for the past two months. It was wrong. It was wrong. But do you want to know what the difference between what he did when he told them he didn't know these people and what Pound did? He had a reason. He didn't want to be drawn into this. He had a reason. A logical common sense reason. It's been all over the news. Patrick Byers is in jail charged with a murder. You saw this videotape which by the way is much shorter than Mr. Goodman's. He's going to sit down and talk with the detectives about someone that's been murdered. He's going to deny

1　he knows everybody.  If the detective had asked him if he was in the
2　room right then, he would have probably denied it.  He is in so much
3　trouble when he's in there.  He just denies everything.  And it's
4　short.  That's the reason that he denies it.  He's in so much trouble
5　anyway.  He's denying he knows anything, anybody.  He'd probably deny
6　himself.

7　　　　　　What you got here, what you got here is a lot of pressure on
8　everyone.  When you have a high profile case that's in the news all
9　the time, there's a lot of pressure on law enforcement, an extreme
10　amount of pressure.  This is a witness that was killed according to
11　the allegations and it's all over the news.  And what pressure means,
12　it's just like when Pound gets dragged in and he knows he's going
13　down.  He knows he's going down.  Pressure.  And what does pressure
14　mean?  You might as well take a little equal sign and put pressure
15　equals bias because that's what it normally turns into.  You grab
16　someone like Pound and you tell them that he may never see the light
17　of day again and that pressure turns into bias and he told you what
18　type of bias.  To do anything I can to get out.  Now you take that
19　pressure and you put it on everyone else charged with the
20　responsibility for solving this and what it means is is despite good
21　intentions, corners get cut sometimes and people overlook things
22　because assumptions are made and that pressure is there.

23　　　　　　Did Pound look pressured on the tape?  I call it the blanket
24　of truth.  He's sitting there all wrapped up in the blanket.  Did he
25　look pressured in there?  He's wheeling and dealing, explaining why he

1    lied this time, explaining why he lied that time. And why? Because

2    he wants to get out. Well, he's sitting there making fun of Jonathan

3    Cornish talking about how stupid he is. It's really kind of

4    interesting to watch Pound sit there and talk his way into 35 years

5    without parole thinking he's going to get out by setting up the little

6    kids that he hired, that he arranged, that he put a gun in their hand

7    and took out and put on a guy. Pressure? Imagine the pressure on

8    this guy. A gangster, who has people that he says look up to him and

9    they won't bother him because he's a Blood. Pressure. Look at him on

10    the tape. Look at how he acts. Make your own determination how

11    pressured he is, how much he's going to lie and then listen to him

12    being truthful throughout. And then when he lies and he gets caught,

13    look for the reason and see if it's the same reason that I just gave

14    you for Mr. Goodman's misrepresentations about Patrick Byers or Pound.

15         Pound told you a number of times that he lied to get out.

16    He lied and he changed his story to fit whatever anyone wanted. He

17    told them that he told them things in the past because that's what he

18    thought they wanted to hear. Let me give you an example. Initially,

19    he told them Frank Goodman gave him the gun. That's what he thought

20    they wanted to hear. Apparently, that didn't coincide with what

21    Jonathan Cornish said. So that isn't a fact that slipped through the

22    cracks. That isn't a fact that came in here and made it into the

23    courtroom. It was too obvious. Nobody made any assumptions there.

24    Nobody cut any corners. Hey, wait a second, we can't have this guy

25    saying that. The guy that shot the guy says he got the gun from him.

1    Pressure, ladies and gentlemen.  Bias.

2              Now the real kicker here, the real kicker here is this.

3    This is the real kicker.  This is the bias and there's no explanation

4    for it and you heard absolutely no explanation for this.  This phone

5    was waved around during the detective's testimony.  The testimony was

6    that it was seized from Frank Goodman's house on September 5th.  Pound

7    had already testified that he saw a text message.  Your recollection

8    controls, but I believe he said it was from Byers.  Maybe it wasn't.

9    Your recollection controls.  But he says he sees it on Frank Goodman's

10   Blackberry and I think they prompted him or got out of him that it

11   looked like a Dash phone.  I don't recall if they showed it to him,

12   but that's what he said.  That's what he said.  And then the detective

13   came in and testified that this phone, this T-Mobile phone had the

14   same number as the T-Mobile phone that Goodman had back in June.  Good

15   intentions, ladies and gentlemen.  Not saying that anybody is lying

16   because that's not the case here.  Very good intentions.  But pressure

17   does weird things to people and assumptions are made.

18             You know, had they run that number on this phone and

19   determined that it wasn't issued until August 22nd, do you think Pound

20   would have come in and sat there and told you that he got a text

21   message that Frank Goodman showed him on a Dash type phone?  Do you

22   think that would have been the testimony?  No.  You know it wouldn't

23   have been the testimony.  You absolutely know it wouldn't have been

24   the testimony.  And the rebuttal case, the rebuttal evidence that was

25   put on after we put on our evidence, did you hear one explanation for

1   that, one explanation?  This man is on trial here for what we all know

2   are extremely serious charges.  It was represented that he had this

3   phone, this empty box and it was implied if not stated that he

4   probably got rid of it and that this is the phone that he took a text

5   message with the victim's address on it and showed it to that clown,

6   Pound.  And you have no explanation for that other than the bias that

7   I'm talking about with you.  Absolutely none.  Solid and convict.

8   This is serious.  This is high profile.  What did Pound say?  You're

9   going to go down.  You're going to go down.

10                  Pound's bias is easy.  Save himself.  Law enforcement's

11  bias, they have very good intentions.  But this cannot be overlooked.

12  You cannot overlook that because that really demonstrates what happens

13  in cases like this.  And that's why you're in here because they have

14  to meet their burden and you have to evaluate the evidence and really

15  assess what's going on.  And you have to look behind all the frenzy

16  that everybody is involved in and judge because you folks are the

17  final say whether they meet that burden.  There is no other final say.

18  There's no Court of Appeals that's going to decide whether they met

19  that burden.  You decide it in here.

20                  And that was an important point, too.  I mean it's not like

21  it was a non-material point.  It's not like it was an innoxious fact.

22  This was the phone that had the victim's address on it.  Pound said he

23  got it from the phone and went out and killed him.  So it's not like

24  it's a minor mistake.  It's not like it's a -- it's not small.  It's

25  the beginning of the case or we would like to think the end of Pound.

1  But you cannot sit here and tell yourself that had that not been

2  discovered before trial, Pound would have testified the way he did.

3  It would have been all different.  It would have been all different

4  and we know why because we saw him do it on videotape, interview after

5  interview after interview, hour after hour after hour.  I was going to

6  tell you that I was going to play all the tapes and then tell you I

7  was joking, but I thought that was mean and I thought it would make

8  light of the situation.  But that man is on hours and hours and hours

9  of tape doing that.  You couldn't even watch it all if you wanted to.

10  False impressions created to corroborate the only witness who has

11  repeatedly said on tape that he lied to get out and I told you what

12  you wanted to hear.

13          How do you define what Pound is saying that he wanted to

14  save himself or he wanted to get good treatment?  What does it mean

15  here?  What does it mean here?  Well, initially he thought, initially

16  he thought that, it seemed like he thought he was going to get out.

17  You decide.  I mean you can assess what this man is thinking.  But it

18  looks like that's what he's thinking.  But what does it mean now?  And

19  this is critical.  This is really critical.  What does it mean to

20  Pound now to get good treatment?  Why does Pound need to be treated

21  favorably by the government and law enforcement?  Think about it for a

22  second.  Is he going to get less than 35 years?  No.  He's got 35

23  years without parole.  He's got to do it.  Probably will be younger

24  than me when he gets out, but he's still got to do it.  But what does

25  it mean to him?  Pound needs them more now than he has ever needed

1  anything in his life.  For the next 35 years, this man has to sit in
2  jail populated by Bloods, populated by Bloods.  He told you that.
3  They're all in the jails.  We know that.  Common sense does not get
4  checked at the door.  Do you think Pound walks in and says Mr. Warden,
5  I helped the prosecutors, I don't want to be in here with these guys,
6  they're going to skewer me.  He needs them now more than he ever
7  needed them because if they close their eyes, turn their back on him,
8  he's toast.  You don't even want to think about what will happen to
9  him.  A Blood, a high level Blood that ratted out his little gang
10  Blood buddies and another Blood -- what was the other guy's name?
11  Think about it.  What would happen to him?  He needs them now more
12  than ever.  He will do anything they say.  Anything.  That's his only
13  salvation.  There is no other.  He has no control over anything.
14                The T-Mobile records.  Could you bring up Defendant's
15  Exhibit Number 3?  The T-Mobile records establish -- when you get back
16  in there, take a look at Defendant's Exhibit Number 3.  Compare it to
17  the number on this phone.  This is the phone.  It's not just Frank
18  Goodman's mom that's telling you that she bought this phone on August
19  22nd.  It's T-Mobile that's telling you this.  And by the way,
20  Ms. Fisher, Goodman's mom was brought back in as a rebuttal witness.
21  Ask yourself what did she rebut.  What in her testimony did she rebut?
22  She was questioned about her son calling her on Easter.  How did that
23  change this?  That's the only reason Ms. Goodman came in to testify
24  was to testify about this.  How did it change that her son called her
25  on Easter?  What did that have to do with anything other than just

knocking her around?  What did it have to do with anything?  I mean at
the very least, it actually made Mr. Goodman look good because at
least he called his mom on Easter.  I doubt Pound did.  But ask
yourself what was that all about.  It's the pressure.  It's search and
destroy.  Annihilate.  You have to realize that unless you can answer
the question how did she rebut her testimony she was a rebuttal
witness.  What did she say that was different than what she said when
we had her in here?  Search and destroy.  Annihilate.

Can we bring up Defendant's Exhibit Number 2?  Ms. Davis was
questioning Detective Gruss and she was asking him is there any record
that any text messages were made back then.  And you know why we were
asking this.  We're asking this because, you know, we know that this
didn't exist and now you know it.  So we're wondering about these
records of text messages, which you were given the impression came
from, you know, Byers, from the Byers jail.  Remember that sketch.
The Byers jail.  That's the impression you were given.  So we asked
him.  Got any records of these?  Oh, no.  There are no records that
any text messages were sent.  No records.  He came back in rebuttal.
I didn't hear him rebut that.  I didn't even hear him say he was
sorry.  I didn't hear him say anything about that.  But I know one
thing and you know it now, too.  That that isn't the text message with
the victim's address on it and that's what came before July 2nd.  As
Pound said, two days before on a phone which we know now does not
exist and with T-Mobile records that show that there was nothing that
came in text format to this man.  But you were told that there was no

1    record of it.  Pressure, ladies and gentlemen.  Pressure.  Pressure.

2            Good intentions.  Do not misunderstand me.  Very good

3    intentions.  But you can tell that this isn't my first time in a

4    courtroom.  Good intentions don't equate with being right.  And my job

5    is to show you why sometimes pressure does strange things to what

6    happens when you get into the courtroom.

7            Motive.  Who's got motive in here?  Well, Pound said he did

8    it for money.  That's the best motive I see in here.  And he used

9    younger Bloods to accomplish it.  His gang buddies.  He said he got

10   money in an envelope.  Use your common sense.  He says he gets an

11   envelope, a jail envelope with cash in it.  I guess what he's trying

12   to tell you is that Patrick Byers reaches into his piggy bank at the

13   jail and stuffs two grand in there and puts it in a jail envelope.  I

14   don't know.  Maybe he goes up in the warden's office and asks if he

15   can borrow an envelope.  Put the money into it and then delivers it to

16   Pound.  This is ridiculous.  This is beyond ridiculous.  This is

17   stupid. That's what it is.  It defies common sense.  Absolutely defies

18   common sense.

19           Pound is a snake, ladies and gentlemen.  And you can put any

20   characterization you want on it, but he's a snake.  And it's not so

21   much that he doesn't have a right to be a snake.  But, you know,

22   everybody has got a right to be whatever they want.  But the problem

23   is is that the snake's biting people now and that's a problem and we

24   didn't even pick him up and that's a problem.  He's a career drug

25   dealer.  He doesn't work.  He sells dope.  He sells crack.  He sells

1 the very drug that the poor victim obviously tapped into. That's what

2 Pound is. He's a snake. He doesn't smoke crack. He smokes weed. He

3 takes feel good pills. Gee, I wonder why. His boys did the deed for

4 him. He killed a suburban drug user just like that. You'll never

5 know why he did it. You think he's going to tell you? Do you think

6 you can trust anything he says? Anything? He tells you that he puts

7 it on the tape. He tells you he puts it on Jonathan Cornish because,

8 A, the guy is stupid and, two, he won't do anything to him because

9 he's a Blood. He's afraid of him. That's what he's telling you.

10 He's telling you Cornish is afraid of him. He's got rank I guess. I

11 don't know. It's absolutely mind boggling to think that someone of

12 this nature could have rank anyplace. I guess there's a place in time

13 everybody gets their 15 minutes. But he thinks he's got something

14 that would overpower Jonathan Cornish from telling the police hey,

15 Pound did this. He's the one who got me into this. And did you see

16 him just give him away? It's amazing. Why did he do that? He has to

17 believe this man is absolutely petrified of him.

18        What about Tammy Graham? As I said earlier, she was with

19 him for most of the day and into the night. She told you she saw

20 nothing. She knew nothing. She was with him when he picked up the

21 killers. She was with him when he went over and hung out on Normal

22 Avenue. She was with him when he bought some weed on the way out to

23 kill this guy. She was with him as he sat out there. She was with

24 him when he came back into town and stopped and met the Thunderbird

25 with the black rims. She was with him when he went to the hotel and

1    she knows nothing, nothing inculpatory, nothing about the murder.  She

2    has some facts that she talked about.  Could you bring up that slide,

3    please?  She has some facts.

4          Marcus Pearson said that he met Frank Goodman outside the

5    car on the day of the murder after the murder.  Tammy Graham said,

6    didn't say that Frank Goodman was there.  She identified a car that

7    looked like Goodman's car.  But she said they got into the car.  She

8    couldn't see anything.  Marcus Pearson says he goes and meets Frank

9    Goodman, gets an envelope filled with cash and then he gets back in

10   the car that Tammy Graham is in and he counts the money and she sees

11   it and she sees it.  There was no mention of that in Tammy Graham's

12   testimony.  Absolutely none.

13          Pound says he comes back to the car with the envelope in his

14   hand.  Tammy Graham doesn't see any envelope that Pound has when he

15   comes back to the car.  Beside from the fact they differ on whether he

16   got in or got out or whether Frank Goodman was there or whether he was

17   not.  But she doesn't see anything in his hand.  Tammy Graham says

18   that they went to Darley Ave.  Pound says Normal Ave.  Pound says

19   Tammy is not afraid of him.  I'm going to let you listen to a very

20   short clip.  It's thirty seconds.  Now you have to give me a minute to

21   bring it up.  She tells us that she's not afraid of this man.  And

22   he's telling you that she's not afraid of him because he doesn't want

23   her to say anything.  That's why he's telling her that.  He doesn't

24   want her to say anything.  But he doesn't want you to think she's got

25   a reason to be afraid of him.

1           (The video clip was played in open court.)

2           MR. DAVIS:   You ask yourselves, ladies and gentlemen, if it

3    wasn't inferred during questioning by questioning by my colleagues

4    over at the other table that Tammy Graham was afraid because she had

5    denied she was out at the murder scene.  So you ask yourself who Tammy

6    Graham is afraid of and then you ask yourself and don't check your

7    common sense at the door because this man has already told you that

8    his little gangsters aren't going to help him out.  You ask yourself

9    why she's afraid and then you ask yourself how this lady could have

10   been with this man all day, all night and into the morning and not

11   know anything other than a few innocuous facts which quite frankly,

12   none matched his.  There's a problem here, ladies and gentlemen.

13   There's a very big problem.

14           Pound and these phone records, there's no proof of contact

15   on these phone records.  There's no proof of content of what was said

16   on any phone calls.  There's no proof of who used any phones at any

17   time with respect to Goodman other than Pound.

18           We brought an expert in to try to shed some light on this

19   cell phone business because what, we've got like 300 exhibits over

20   here?  We've got more charts than we've ever seen in our life.  I feel

21   like anyone ever see Alice's Restaurant when they went out and

22   investigated the crime scene?  I mean we got charts, we got

23   photographs, we got everything.  But the bottom line is, the bottom

24   line is there's no proof who used any of these phones with respect to

25   Mr. Goodman other than from Pound.  And the expert told you that on

573

1    these direct-connect calls, when you call just like I told you

2    during -- when did I tell you that?  When I was questioning someone

3    about a shaving example.  If I had my Nextel phone out on the living

4    room table and I'm in shaving and someone direct connects me, when

5    does the clock start ticking on the duration?  Mr. Snavely told you

6    that the direct connect, these walkie-talkie phones, it starts as soon

7    as you put it through.  That it requires no action on the recipient's

8    end and you have heard no testimony from anyone to rebut that.

9    Absolutely none.  You heard rebuttal evidence about DNRs.  DNRs.  DNRs

10   is a fancy word for caller I.D. and the detective told you.  That's

11   why he was talking about Title 3 warrants and phone companies and

12   court orders.  They get a court order.  They say phone company, track

13   every telephone number that comes into this.  So that we have it and

14   every number that they call out.  That's what a DNR is.  What's the

15   heck that got to do with any of this?  And they spent 15 minutes on

16   this.  And the one thing they didn't address, the one thing they

17   didn't address is is that Detective Gruss just a day before told you

18   that he knew, even though he's not expert, even though he concedes

19   that he's not an expert, he told you that on a Nextel phone when you

20   do a direct-connect, someone has to take action on the other end to

21   get a duration and that is not true.  And that is not disputed.

22   Nobody rebutted that and that is a fact in this case.  And you know,

23   actually, the expert kind of sheds some light on some other things I

24   mean literally just to kind of put things into perspective.  He said

25   that if he got 00, maybe someone called and then the person just

1  called back afterwards.  We didn't know that before.  We didn't.  They

2  never told us that because nobody is really -- assumptions are made.

3  The assumptions are Pound is telling the truth.  This looks good.  We

4  got these calls.  We got these numbers.  This is it.  This is it.  And

5  again it's with very good intentions.  But it isn't true.  It isn't

6  accurate.  It isn't provable, which is what we're getting to, proof,

7  because they have the burden of proof and they didn't rebut that.

8  They got up and threw smoke up.  Search and destroy.  Search and

9  destroy.

10         And what did you think about Snavely?  Did he look like he

11  was playing around?  I mean he looked like a typical engineer.  That's

12  what he does.  He isn't even an expert that rolls into courts every

13  day.  He has for 30 years he's been an electrical engineer that's been

14  a wireless consultant for all kinds of phone companies and businesses

15  and that's what he does.  He doesn't come into court all the time.

16  Did his answers look evasive at all?  Did he look like he was playing

17  around at all?  He just laid it out.  He just laid it out.  And his

18  testimony is absolutely unrebutted.  He put, shed light on these cell

19  towers which makes sense.  Makes absolute sense.

20         The implication was that each time you see seven seconds or

21  twenty-three seconds, the inference what the United States is asking

22  you to draw even though they cannot back it up with evidence, even

23  though they did not attempt to rebut our expert, the inference they're

24  asking you to draw is that people were talking and they were plotting

25  because the representations were made in the closing arguments a few

1   moments ago, it doesn't take long to talk.  But it is not proven,

2   ladies and gentlemen.  It is not proven.

3          Frank Goodman said he called Pound on occasion.  And Pound

4   called him on occasion.  He tells you to listen to that tape.  That

5   tape of this man being interviewed probably is the best evidence in

6   this case.  Listen to it.  Pound buys E-pills.  All right.  It's not a

7   real good thing to have to own up to.  But, you know, we're kind of in

8   a lot of trouble here.  So you know the truth is coming out, ladies

9   and gentlemen.  And the man does sell E-pills off and on and he tells

10  you that.  He tells you that in the tape.  And Pound tells you he uses

11  two or three a day in his tape.  And he had one in his pocket that

12  day.  Well, on one time he said that in the grand jury and then one

13  time he said he didn't.  There's some problem with that.  Your

14  recollection controls on that.  But the bottom line is he did have

15  contact with him off and on.  He didn't tell the detective that when

16  he first got in there because Pound is all over the paper including

17  his criminal record and he's being identified as someone that hired

18  people and go out and kill somebody.

19          Pound stops by and buys weed.  And, you know, if Pound is

20  buying weed before he goes out to kill somebody and he's on his way to

21  a hotel before he parties and smokes his weed with his girl, maybe

22  he's going to pop a few E-pills.  Who knows if he didn't have it in

23  his pocket and he wasn't shy anyway.  The only evidence you've got on

24  any of this is coming from Pound and it's unreliable and there's other

25  evidence in here that gives equally plausible explanations for any of

1  this.  They're using Pound to fill in the blanks.

2          The walkie-talkie.  The walkie-talkie, the Nextel

3  walkie-talkie, Goodman had when he got arrested, it's in someone

4  else's name.  Big deal.  The expert told you that his Nextel

5  walkie-talkie phone, you buy a prepaid phone.  You go in the store.

6  You get a $25 chip.  You put it in.  Nobody ever gets a bill.  It's

7  not like they send the bill to anybody.  Nextel doesn't care.  They're

8  making their money off the little chips that are sold and the reason

9  these things are exchanged like American Express checks from South

10  America is because they're fungible.  Who cares?  All you got to do is

11  buy a $25 chip and pop it in it.  Nobody cares.  Hey, did you just get

12  a new phone?  I'll buy yours for ten bucks.  All right.  Sure.  Here,

13  man.  There's no big mystery here.  There's absolutely no big history.

14  But as he said, they gave Nextel an advantage.  These are

15  walkie-talkies.  It gives them a real advantage.  You can talk on

16  those for free.  You can buy a $25 chip and talk on your walkie-talkie

17  direct-connect on your Nextel phone and you don't have to spend any

18  more money.  It's a free cell.

19          I'm going to take about two more minutes, ladies and

20  gentlemen.  The best evidence in this case comes from Frank Goodman on

21  September 5 to September 6 as he's being interviewed.  They arrest him

22  at 11 a.m.  They shut the interview down at 2:30.  Throughout that

23  tape if you watch it and they cut out the legs and delays when he's

24  sitting in a room by himself.  But, you know, those are kind of

25  interesting, too.  But you don't have them.  So it doesn't matter.  At

1    any rate, he's in there all that time and he's being questioned. That

2    is the best evidence here because you know what you can do then? He

3    doesn't know he's being taped. There's no indication on that tape

4    that he knows he's being taped. Don't check your common sense at the

5    door. But common knowledge applies. But wasn't Monica Lewinsky,

6    didn't someone tape her and get charged for taping someone without

7    their knowledge? Law enforcement is a different story. But I thought

8    someone got jacked up for taping Monica Lewinsky without her

9    knowledge. That's my recollection. But at any rate, listen to that

10   tape. Look at Goodman. Look him right in the eye as he explained why

11   he didn't admit he knew Patrick Byers and why he explained why he

12   didn't know Pound. Look him right in the eye and you assess whether

13   he's telling the truth. And by God, if you think you're under

14   pressure and more pressure under any other circumstances really give

15   some thought to what's going on here because they're talking about a

16   real serious offense when this is going on and look them right in the

17   eye and make a determination what you think he's saying and he keeps

18   asking the detective why am I here, am I going to be charged with

19   anything am I charged with anything and the detective never tells him

20   on the tape. You don't see him get arrested because that's not on the

21   tape. You don't see that. So you never see him when he gets told

22   that he's being arrested. But you do see him repeatedly ask am I

23   getting charged and he's repeatedly told you're being interviewed

24   because you have knowledge.

25           He denies constantly that he had anything to do with this.

1    He never waivers in that.  He never goes a-ha, you got me.  This is
2    what it is and feeds them some lie and tries to get out of it.  No.
3    He tells them point blank, I did not do this constantly.  Watch the
4    tape.  It's not that long.  It's the single best piece of evidence in
5    this case as far as Mr. Goodman is concerned and it makes sense.  Look
6    them right in the eye.
7              Mere presence is not enough.  Living on Cliffview Avenue is
8    not enough.  Talking on the phone is not enough to get this man
9    convicted of the offenses he's charged with here.  It's just not
10   enough.  Mere association with individuals that are involved in crime
11   is not enough to get a person convicted of a crime and His Honor is
12   going to send the jury instructions back with you and it's going to be
13   right in there.  I can associate with someone that's committing a
14   crime.  But if I'm not participating in it, I'm not guilty of it.
15   This is too serious of a case to make any assumptions here.  And
16   you've seen how when people make assumptions how seriously distorted
17   the truth gets.  Don't make assumptions here.  Hold them to their
18   burden.  Thank you.
19             THE COURT:    Thank you, Mr. Davis.  All right.  Ladies and
20   gentlemen, we will take our lunch recess now.  We will go from now
21   until ten minutes after 2 and we will continue at ten minutes after 2
22   with the closing argument of Mr. Balarezo on behalf of Mr. Byers.
23   We'll stand in recess for one hour.
24             (Luncheon Recess.)
25                          AFTERNOON SESSION

1    THE COURT:   Sorry to keep you all waiting for a few minutes.

2    I apologize.  We're ready to bring the jury in and proceed, Mr.

3    Balarezo.  Are you ready, sir?

4           MR. BALAREZO:   Yes, sir.

5           THE COURT:   All right.  Okay.  Let's bring the jury in.

6           (Jury present.)

7           THE COURT:   You all may be seated.  Thank you very much.

8    And as you all probably know by now, on Wednesdays, all the judges

9    have lunch together and have our weekly meeting and I apologize.  It

10   just goes over and I was late getting to it as it was.  So that's why

11   we're a little bit late through my fault and I apologize.  So we're

12   now ready for the closing argument on behalf of Mr. Byers.

13   Mr. Balarezo?

14          MR. BALAREZO:   Thank you, Your Honor.  May it please the

15   Court, counsel, Mr. Byers, Mr. Goodman.  Ladies and gentlemen of the

16   jury, of course, the portion of my case is United States v. Patrick

17   Byers.  You have been here now for many weeks listening to the

18   government put on its case.  You've heard closing arguments from Mr.

19   Giblin.  You've heard closing arguments from Mr. Davis.  Now it's

20   Patrick Byers' turn.  During Mr. Giblin's closing argument at the

21   beginning of it, they had a picture up of Mr. Lackl.  It was a picture

22   of Mr. Lackl and a young child.  Presumably a son or daughter.  And

23   I'm not going to lie to you, I'm not going to stand here and blow

24   smoke.  This is a horrible case.  What happened to Mr. Lackl was

25   terrible.  You feel for the family.  You feel for Mr. Lackl.  You feel

1 for his children.  And I also noticed that Mr. Giblin left that

2 picture up there for about 20 minutes.  And one of the things that I'm

3 going to talk to you about today and the judge will talk to you about

4 probably tomorrow when he instructs is what you need to consider when

5 you weigh the evidence that you've seen.  I'll talk about that in a

6 little bit though.

7 　　　　The first thing I want to mention to you in the opening

8 statements by Mr. Purpura, he said that there's three things that you

9 need to remember.  First is this thing called the presumption of

10 innocence.  The presumption of innocence.  The second thing is that

11 the government, this table here, Mr. Purcell and I promise not to

12 invade his space, Mr. Giblin, everybody here has the burden of proof.

13 The burden is not at this table over here.  The third thing is that

14 the burden of proof is to prove the offenses charged beyond a

15 reasonable doubt.  These are three things that I'm sure all of you

16 have heard before.  If you watch Law and Order, if you watch CSI, if

17 you watch Homicide, the Wire, all those shows you that you put on your

18 jury questionnaire form that you watch, you've heard this.  But when

19 you watch it on T.V., when you hear it on T.V., you hear it at the

20 movies, you think, oh, presumption, yeah, I know what that is.  Burden

21 of proof, I know what that is.  But what happens in those shows is

22 something happens in the beginning.  In the 55 minutes, everything is

23 solved.  That's T.V.  That's not real life.  This is real life.  This

24 is not a show as I think somebody called it earlier.  This is Patrick

25 Byers -- stand up, Patrick.  This young man, this 23-year-old man,

1    this is his life.  It's not a show.  And they have to prove to you

2    what they've charged.

3              Let's talk about each of these things.  These are from the

4    instructions that the judge will read and instruct you on probably

5    tomorrow.  Patrick Byers is presumed innocent.  This means that when

6    the government indicted Patrick Byers with these charges, he's

7    innocent.  When he is brought into court for the first time when he

8    was arrested and presented, he was innocent.  When you all walked in

9    here on March the 9th with all these other people that came in for

10   jury selection, he's innocent.  When the very first witness sat in

11   this chair weeks ago, he's innocent.  When the very last witness sat

12   in this chair yesterday I guess, he remained innocent.  He remains

13   innocent through Mr. Giblin's closing argument, through Mr. Davis'

14   arguments, through my arguments, through Mr. Purcell's presumably

15   rebuttal argument.  He will remain innocent through the judge's

16   instructions.  And the judge will tell you that the law presumes a

17   defendant to be innocent of all the charges against them.  Each

18   defendant is presumed to be innocent.  And I'm reading the blue part

19   because those are the main parts.  The presumption of innocence alone

20   is sufficient to acquit a defendant unless you as jurors are

21   unanimously convinced beyond a reasonable doubt of his guilt.  If the

22   government fails to meet its burden, he remains innocent.  That's what

23   that means.  This is not a T.V. show.  That man is innocent right now.

24   No matter what each of you individually right now is thinking of

25   Patrick Byers or thinking of Mr. Lackl or thinking of anyone else

1    mentioned in this trial, Patrick Byers is innocent.

2              Second issue.  The burden of proof.  The burden is on the

3    prosecution to prove guilt beyond a reasonable doubt.  The burden

4    never, never shifts to Mr. Byers.  I think Mr. Davis touched upon

5    this.  Patrick Byers does not have to say a word.  I don't have to

6    stand in front of you babbling like a fool right now.  The burden sits

7    at this table and it never jumps there.  They, United States

8    Government used their powers to investigate, to indict, to frame the

9    indictment, to decide what to charge him with, they decided what to

10   present to you as evidence here, what witnesses to bring, what charts

11   to make, what to say.  It's all on them.  Your role is a jury here,

12   ladies and gentlemen.  You're here to decide what are called the

13   factual issues.  The judge is the finder of law in this case.  He is

14   the law.  You are the facts.  You sit there and you watched and you

15   listened.  You decide what you will believe, what you won't believe,

16   what to maybe believe.  It's all on you.  You weigh the evidence.

17   There's some things however that you cannot consider.  Some things

18   such as personal feelings you may have about a defendant's race,

19   religion, national origin or age.  It's got nothing to do with

20   anything.  When you came here, were sworn in as a jury, you raised

21   your hands and you took an oath to follow the law, follow the

22   instructions.  That's all we're asking you to do.  It is improper for

23   you to allow any feelings you might have about the nature of the crime

24   charged to interfere with your decisionmaking process.

25              Sympathy.  You are not to be swayed by sympathy, which

1   brings me to the picture of Mr. Lackl that was up on your screen for

2   twenty minutes.  You have a right to see what Mr. Lackl looked like.

3   But sympathy is not something that you can consider and we feel for

4   the family.  They suffered a huge loss.  But again, that has nothing

5   to do with what your job is to decide the facts.

6           What was the government's case?  Witnesses, phone records.

7   Yeah.  That was basically it.  Some videos.  As the finders of fact,

8   you have to decide the credibility of a witness.  Again I'll move

9   through these quickly because you'll hear them again.  Was the witness

10  candid, frank and forthright?  Were they hiding something?  Were they

11  being evasive?  Were they suspect?  Did the way that they testified on

12  cross-examination differ from the way they testified on direct?  These

13  are things to keep in your mind as you decide what to believe.

14          Interest in the outcome.  Evidence that a witness has

15  testified may benefit in some way from the outcome of this case.  Such

16  an interest in the outcome creates a motive to testify falsely and may

17  sway the witness to testify in a way that advances his own interests.

18  And we'll talk about who those people are.  But you know who they are.

19  You'll hear from people who are considered accomplices, alleged

20  accomplices and these are people that the government in order to meet

21  their burden can put before you.  They can put who they want.  Mr.

22  Purcell might get up and say, prosecutors usually do, they put a

23  witness up and they take them as they find them.  And they'll say

24  well, it was Mr. Byers that picked the witnesses.  I haven't been

25  around as long as Mr. Purpura, but I've heard that a few times.  We

1    didn't pick any witnesses.  They pick the witnesses and they put them

2    in front of you to try to convict my client, to try to make you

3    believe their story.

4              Accomplices.  They must be scrutinized with great care and

5    viewed with particular caution.  You've heard from people who were

6    immunized.  Pearson, Graham, Cornish.  Examined by you with greater

7    care than the testimony of an ordinary witness.  Why?  They're

8    immunized.  That means that all their wrongs will not be punished.

9    They got nothing to lose.  They have the government's imprimatur,

10   their blessing.  We're not going to charge you with anything you told

11   us.  Might sway some testimony.

12             You'll hear instruction about witnesses who use or addicted

13   to drugs.  Again, they're witnesses that the government can put forth.

14   But again their testimony must be examined with greater scrutiny than

15   the testimony of other witnesses.  They may be less believable because

16   of the effects the drugs may have on their ability to perceive or

17   relate.  Whether or not it was 30 feet or 40 feet away or 148 feet

18   away.  Whether he was 5'10 or 5'6.  Everyone said you don't check your

19   common sense at the door.  A long time drug user is not in full use of

20   their faculties.  That's common sense.  And if you're the government,

21   you say well, you can believe one drug user, but not another one.  But

22   the burden is on them.

23             Co-defendants' plea agreements.  These are people who have

24   admitted to crimes.  The crimes they have admitted to don't bear

25   anything on Patrick Byers because that was their individual decision

1    to plead guilty.  They may give testimony favorable to the

2    prosecution.  They may have a motive to testify falsely.  Examine

3    their testimony with caution and with great care.

4               What is the government's evidence in this case?  What did

5    you see the last several weeks?  I'm not going to go through the

6    indictment.  Mr. Giblin did a great job with that.  Counts 1 through 7

7    basically deal with the murder of Mr. Lackl.  Various iterations,

8    permutations, whatever you want to call it, that's what it deals with.

9    One incident, seven counts.  Counts 8 and 9 deal with weapons charges

10   against Mr. Byers from March 4, 2006.  What was the evidence?  First

11   -- well, maybe not in the order they presented it.  There's evidence

12   concerning the murder of Larry Haynes, evidence concerning a shooting

13   of a Carlyle Coleman and of course, evidence concerning the murder of

14   Mr. Lackl.  Keep this in mind.  The Haynes murder is not charged here.

15   If you read the indictment twenty times, you will not see charging the

16   murder of Larry Haynes.  Larry Haynes is here, the evidence of it,

17   only to establish a motive for Mr. Byers to have killed Mr. Lackl or

18   have been involved in the murder of Mr. Lackl.  That's all it is.  And

19   the reason I put evidence, that word in quotes, is because I know from

20   watching T.V. or the movies, people hear the word evidence and say

21   show me the evidence.  You assume it's true.  Evidence is just another

22   word.  Evidence is what we lawyers call what you see here.  They got

23   to put it up.  It doesn't mean it's true.  It doesn't mean it's false.

24   It doesn't mean anything.  It's just a word.  It's what it's called.

25   Haynes' murder, the evidence of it was here to show motive.  Why on

July the 2nd, 2007 was Carl Lackl killed?  Why?  The government's only
conclusion is because this man had been arrested and charged with the
murder of Mr. Haynes in 2006, was pending trial.  According to them
Mr. Lackl was the only thing standing between him and freedom.  He was
out there, I think the phrase was either he was out there alone, kind
of a sentinel.  That's what they're saying.  Lackl was murdered so he
wouldn't testify against Mr. Byers.  But what is Mr. Byers' state of
mind?  But that's what motive goes to.  Your state of mind.  What's in
your head?  Why do you do the things that you do?  On July the 2nd of
2007, what was in this man's head?  What was in his head?  Well, he
knew he had been charged with the Haynes murder.  He knew that Mr.
Parham had recanted.  There was DNA evidence taken from the weapon
that Mr. Lackl said he saw thrown which pointed at an unidentified
male.  He knew that Rookstool and Hunt were witnesses.  He knew that
Dorsey Ebb was a witness and he also knew that Mr. Lackl as a witness
was not credible.  He had retained a new lawyer, Ivan Bates.  He felt
confident about his case.  And trial was a week, nine days away.  On
July the 2nd, 2007, that's what's in his head.

        Let's discuss each of these.  Charged with the Haynes
murder.  He was arrested on March 20, 2006 and he made a voluntary
statement to the police, to the detectives.  And I know the government
made a big deal about this when their witnesses were lying, not
telling the truth, equivocating, shading, exaggerating, whatever you
want to call it.  But Mr. Byers did not have a lawyer on that day when
he was questioned.  What did he say?  He admitted to being in the

1    area.  Well, surprise.  He lives about two or three blocks away with

2    his grandmother.  He admitted to stashing a gun in the alley.  Okay.

3    He explained why and we'll get into each of these things.  He told the

4    detectives that he heard on the street that Dontay or Tay-Tay had

5    committed that murder.

6              Now all of you -- well, I shouldn't make generalizations.

7    I'm sure that within the last five weeks or however long we've been

8    sitting here, most of you, all of you probably have been transported

9    into a world that you probably didn't even know existed, that you

10   never thought about, don't live in and probably just drive through on

11   the way out to the counties.  But in some of these worlds when people

12   are stopped by the police, you know, you ain't got to talk.  And you

13   ain't going to tell them what they want to say.  You're going to tell

14   them something else.  That's just the world that existed back then.

15             Let's talk about Mr. Parham in particular.  July the 2nd,

16   Mr. Byers knew that Parham had recanted.  Parham had identified

17   Mr. Byers as the shooter of Larry Haynes.  And when he sat here in

18   front of you, looking you in the eye under oath, he said it because it

19   was based on what the neighborhood is.  It was a rumor.  And in those

20   neighborhoods that you guys are not familiar with, maybe in your own,

21   rumors fly.  Hey, did you hear so and so, did you hear such and such?

22   That's what I heard.  Things get rolling.  Next thing you know,

23   everyone is spreading one thing, spreading another.  He named Patrick

24   Byers as Larry Haynes' killer based on what he heard.  He also said

25   that the reason he did it was because he had a pound of marijuana and

$700 on his person.  That is not small potatoes.  A pound of marijuana
is a pound of marijuana.  He knew that he had a new drug charge
pending.  He had backup time from an old case and he would have gotten
enhanced penalties if he were convicted because he was a subsequent
offender.  He knows the streets.  And he says well, it's me or someone
else.  And they're asking him about what happened.  Well, I heard
Patrick Byers did it.  It's as easy as that.  Patrick Byers did it.
He also told you that he didn't want the police to run up in his
mother's house.  Why?  Well, when the police run in your house for a
search warrant, it ain't nice.  They don't say, you know,
Ms. Homeowner, let me just move this, let me look under your pillows.
They trash the place because they're looking for stuff.  Parham did
not want them to run into their house, his mother's house.  He
recanted on April 27, 2007 before Mr. Lackl was killed.  That's
Mr. Byers' state of mind.  And this whole thing about phone calls made
to Mr. Parham recently, he recanted two years ago, three years ago
almost.  These recent calls that the government keeps mentioning have
nothing to do with that.  That's the letter.  The statement.  I hope
you can all see it.  It's in evidence on the right.  It's a statement
that he signed, that Parham signed for Mr. Traut, the defense
investigator hired by Ivan Bates.  You can see obviously the date when
he signed it.  April 27th.  It's not a recent recantation as
Mr. Giblin said.  Three years ago.  That's not recent.  And for some
reason, you saw Mr. Traut when he testified, all he said was look, I'm
a defense investigator, I was hired by Mr. Bates, I went out to

1   interview a witness.  There's no evidence that he threatened, that he
2   bribed, that he cajoled, that he did anything but what his job is.  A
3   good defense investigator goes out and finds useful information.
4   What's the point otherwise?  You saw how he was treated by the
5   government.  Like this guy was Jesus.  The devil incarnate.  You saw
6   how he was treated.  Why is that necessary?  Because what he had to
7   say didn't help out their burden, because it lightened their evidence
8   perhaps.
9              Parham when he was here again explained why he named
10  Patrick.  Here we go again.  When Parham named Patrick, guess what?
11  He didn't have a lawyer.  Like Pearson didn't have a lawyer.  Like
12  Cornish didn't have a lawyer.  But it's all right when the government
13  witnesses don't have lawyers.  But not when the defense people don't
14  have lawyers.  But he didn't have a lawyer when he made those
15  statements.  He has a lawyer now.  He has immunity now.  And he can be
16  prosecuted by these people if he lies.  So when they say he waited for
17  three years, for three years to tell his story, why didn't you go to
18  the authorities?  Well, because he had lied to them because he had
19  named Patrick falsely as the killer and the only reason he can tell
20  you in open court now and sit there under oath and say I lied was
21  because they gave him the immunity.  I mean it's not rocket science.
22  They have the power to immunize people.  We don't.  Just look at his
23  statement briefly.  The 2nd.  "Where were you when Larry Haynes was
24  killed?  I don't know where I was.  I might have been working."  This
25  is in April of '07 he says this.  "Who shot Larry?  I don't know.

1    Have you ever identified Patrick Byers as having shot Larry?  Yes, but

2    he was alive.  I was trying to get out of trouble.  Why did you lie

3    about seeing Larry shot?  I was dealing weed and I was arrested and I

4    was trying to get out of trouble.  The police said give them something

5    better and they will let me go.  So I told them that I saw Pat shoot

6    Larry on Jefferson and Montford last year which was a lie because

7    that's what I heard.  Did you see Patrick Byers shoot Larry Haynes?

8    No."  This is in Patrick Byers' mind on July the 2nd, 2007.  And this

9    is what I mentioned about immunity.  He didn't wait three years.  If

10   he talked about it to the authorities, he would have been charged.

11   Now he has immunity, he talks.

12              What else is in Patrick's mind back in July?  The DNA

13   evidence.  You heard Jocelyn Carlson talk about the weapon that was

14   found on top of this garage somewhere, right here in this alley and

15   how they were able to get some samples or leals and all this stuff

16   that I quite frankly don't understand.  But the one thing I do

17   understand is that she said if you look at the bottom little snippet,

18   an unknown individual's DNA was on that gun.  They didn't know who the

19   unknown individual was back then.  But we know it wasn't Patrick

20   Byers.  I also know what she said was that Patrick Byers was excluded

21   as a sample on the clip.  You got a gun and you got the magazine.  And

22   notwithstanding the government's attempts to show you that, you know,

23   if you fire a gun, you don't have to touch the magazine, I mean look,

24   you got to put bullets in a gun to fire it.  Somebody grabbed that

25   magazine, stuck it in the gun.  Patrick was excluded from the clip,

1    which means Patrick, there's no evidence that he touched it.  There
2    was evidence that this unidentified male.  Her conclusion also that
3    this is a government's expert, remember.  Not a defense expert.
4    Government expert.  She works for the police department.  She said
5    neither Byers nor Haynes could be excluded as a donor for the gun.
6    The gun itself could not be either included or excluded.  What does
7    that mean?  You can't put them in.  You can't put them out.  So it
8    doesn't mean anything.  But if they come back and say well, look, they
9    can't exclude them.  So he could be there.  Well, her conclusions were
10   also that Haynes, the victim who got shot, could not be excluded from
11   the gun.  So what does that tell you?  Doesn't tell you anything.
12          Patrick's state of mind on July the 2nd.  He knew that
13   Rookstool and Hunt were going to be witnesses and that's based on that
14   filing that you see there from July 31st of '06 where it lists all
15   these individuals including at Number 2, Mr. Lackl.  This is July '06.
16   Mr. Lackl was not killed after that letter went out.  From this other
17   letter from November of '06 from Mr. Roland Walker who was one of
18   Mr. Byers' initial attorneys which names all these individuals.  This
19   is what the government has been calling a witness list.  And I guess,
20   you know, you can maybe call it that.  But that's a little misleading
21   because what it is is a request from Mr. Walker to the clerk of the
22   Circuit Court in Baltimore requesting criminal records of various
23   individuals.  This is what a defense lawyer does.  You try to get
24   information.  Mr. Lackl's name is on that letter.  So is Rookstool.
25   So is Hunt.  You heard what Ms. Rookstool had to say, notwithstanding

1   her brain damage and one bad eye as the government pointed out.  We'll

2   talk about her in a little bit.

3           Knew Dorsey Ebbs was a witness.  Dorsey Ebbs lives right

4   across the street.  Gives a description.  How far away he was.  He saw

5   a person running from the area.  Wearing a hoody.  Black male in his

6   40's, 5'9, heavy build.  Mr. Byers knew about this back on July the

7   2nd.  But guess what?  You didn't hear from Dorsey Ebbs, did you?

8   Remember we don't have the burden.  They do.

9           Mr. Byers knew that Mr. Lackl was not a credible witness

10  back in July.  This one person who's the only thing according to the

11  government keeping Patrick Byers from going home.  This is what they

12  say he's so worried about.  This one man that it's conclusive that he

13  had him killed.  This is Mr. Lackl.  Remember there were several

14  statements that were testified about through Detective Martin who's

15  here over several days.  The very first one was this handwritten

16  statement or notes if you will from Detective Martin.  And this one,

17  just kind of sets the tone for the investigation.  First of all, it's

18  dated March the 5th which we know the date is wrong.  It was March the

19  4th at 17:25 hours which is at 5:25 p.m.  At least if you follow the

20  chronology of these statements, this is the first statement for which

21  there is notes or any evidence that Mr. Lackl gave.  And what did Mr.

22  Lackl tell Detective Martin?  He says, "he and his friend, Connie

23  Mays, were traveling eastbound on Monument Street, made a right onto

24  Jefferson in a white Cougar.  Carl had to take a pee.  So he pulled

25  over into Jefferson and went into some alley and heard some gunshots."

1    I think you're probably tired of seeing all these maps.  That's

2    Montford.  That's Jefferson.  I think you know by now that Monument

3    will be up here somewhere.  Monument and Jefferson are parallel.  You

4    can't make a right on Jefferson from Monument.  And at some point,

5    Detective Martin testified, well, that was just an error.  You know,

6    don't hold that against Mr. Lackl.  Well, he's the Baltimore City

7    homicide detective.  Detective Martin.  You think he would show a

8    picture to the witness and say well, this is a map.  Show us how did

9    you really go.  Do you think he would take a witness out to the scene

10   and say hey, where were you, where were you standing, what did you

11   see, how long were you here, what were -- didn't happen, did it?  The

12   description on that same interview or that same instance from Mr.

13   Lackl was he walked out of an alley into Jefferson.  Saw a black male

14   approximately 5'10, 160, 170 pounds, medium skin.  Blue puffy jacket,

15   dark knit hat, hair on his face and blue jeans.  There is no -- strike

16   that I'd like to say.

17            Remember the big deal they made about Traut and how he did

18   not tape or record Mr. Parham's interview?  Well, this is the very,

19   very first interview, March 4th or 5th, whatever the date was at 5:25

20   p.m. with Mr. Lackl and the lead homicide detective.  They don't tape

21   it.  But according to Detective Martin, he says that that's what Mr.

22   Lackl said.  Came out of the alley onto Jefferson.  Well, back to this

23   Government's Exhibit Number 2.  Montford, Jefferson.  The red light is

24   at the store where the murder happened.  Based on what Connie Mays

25   said, Mr. Lackl was in this alley peeing.  The alley closest to

1  McElderry.  Right there.  But during that first statement, he says he

2  came out onto the alley into Jefferson.  You tell me how he came out

3  from that alley into Jefferson which is over here.  Something is

4  wrong.  Maybe he just doesn't know the streets.  Maybe he wasn't

5  there.  Maybe he was confused.  Maybe the effects of the drugs it

6  takes or took were not letting him get his story out.  We don't know.

7  But what we know is that that detective wrote that down and that's the

8  record you have to go on.

9            Twenty-five minutes later at 17:50 on the 4th now so I guess

10 it is on the 4th when this all happened, there was a second statement

11 by Mr. Lackl.  This is the first tape of his that you heard.  And even

12 on that, if you look at the cutaway, it was listed as March the 5th,

13 but we know it was the 4th.  And in this entire taped interview, keep

14 in mind, the one where he describes the person -- let me go back to

15 the 2nd.  5'10, 160, 170, medium skin -- stand up, Patrick.  5'10.

16 What's the description?  5'10, 160 to 170, medium skin.  From that

17 alley according to Ms. Mays, running this way quickly, that's a

18 description he gives.  I think Mr. Purpura measured it out.  From here

19 to right behind the government's table is 30-some feet if you believe

20 one version of the distance.  If he was elsewhere, the distance would

21 have been beyond that wall.  This is a man, Mr. Lackl and again, the

22 things I'm saying about Mr. Lackl, the government's own witness has

23 said.  We're not, you know, we're not trying to denigrate him.  But

24 this is an issue of did Mr. Lackl see what the government wants you to

25 believe he saw?  Did he see it?  Was he in that alley and the guy is

1   running over here?  I think Mr. Ehasz, the defense investigator who

2   escaped Mr. Purcell's wrath, said that distance was 148 feet.  From

3   the alley across the street was 60 feet.  Shots, look out, guy running

4   and that's a description we get.  Common sense, that man is not 5'10.

5   That man is not 160, 170 pounds in the taped interview the one I was

6   talking about before this and this all goes to the credibility of the

7   witnesses, et cetera.  He told the detective, Mr. Lackl, Mr. Lackl,

8   are you under the influence of any narcotics or alcohol at this time?

9   No, sir.  Think of this.  You've heard from Ms. Mays who went with Mr.

10  Lackl to that area to buy drugs and that's what they were there for.

11  There's no doubt about it.  The government's own witnesses said that's

12  what they were there for.  She said that he had been there previously.

13  I think it was Saturdays, they go and buy drugs in the city.  That's

14  what they were there for.  And if you remember Ms. Mays after the

15  shooting and she was panicked and telling him to get in the car.  On

16  the way out to the county, she said she took her heroin on the way out

17  there and she also told you that Mr. Lackl had bought crack.  Now do

18  you think that crack was just bought and not used?  A person who's had

19  a long-term addiction who went to the area to buy drugs.  And when

20  they're interviewed by the police that night about what you saw, that

21  wasn't on drugs.  You know, do you buy it?

22          The taped statement, the same one, the first recorded

23  statement that you heard, there's one description of the shooter.  It

24  is not as Detective Martin writes in that little one paragraph

25  handwritten snippet.  5'10, 160, 170, hair, chest, whatever.  The only

596

1  description in that whole statement was a black youth.  That's it.

2  You're the lead homicide detective.  You got an eyewitness.  You got a

3  recording.  That's all you get.  A black youth.  Now common sense

4  doesn't end at the door, but that's probably not an unusual sight in

5  that area of Baltimore City.  A black youth.  From 30 feet away, 60

6  feet away, 148 feet away, however it was in an instant, that's what

7  you heard Mr. Lackl say in his own voice.

8         Same statement.  "Where were you heading at this time, the

9  detective asks him.  I was going back to my house.  Is that in the

10  city?  No.  It was the county.  Which way were you traveling before

11  you made that turn into Jefferson?  Down Monument Street.  Toward the

12  county?  Yes.  Which way did you turn into Jefferson?  We made a

13  right.  Going down Monument, off the map.  Made a right on Jefferson."

14         Now the detective said, you know, that was a mistake that he

15  made in the original statement, the handwritten statement.  But now

16  this is a taped witness repeating the same mistake.  You got a

17  Baltimore City detective.  You don't think that he can provide a map

18  or tell the witness, well, wait a minute, witness, Monument and

19  Jefferson are parallel, you can't make a right?  Does that raise an

20  antenna about what this witness really saw, about what this witness

21  experienced?  Apparently not.

22         What else?  This is the third statement now at 23:15.  He

23  made eye contact and stared at each other for a second.  Eye contact

24  from 30 feet away beyond that wall, down the street in an instant.

25  Made eye contact and now he can identify this man as the killer.  This

1    is on the recording. Not on the detective's little handwritten note.

2    That's the description. And then I'm trying to maintain the sequence.

3    You got the little handwritten note with the nice description, 5'10,

4    weight. The recorded statement about the black youth and we made eye

5    contact. And now for some reason when Mr. Lackl was shown the photo

6    array itself, when Mr. Lackl was shown the photo array, the one with

7    the picture, the photo array that they made up after Mr. Parham had

8    falsely accused Mr. Byers. Now they don't record that identification.

9    You didn't hear a tape of what Mr. Lackl was making this

10   identification and he made it on March 4th at 11:10. That's his

11   signature. And on the back he wrote I, Carl Lackl, believe that I saw

12   that person I picked out as the person that threw the gun, et cetera,

13   et cetera. I, Carl Lackl, believe. Not I Carl Lackl am positive, I

14   Carl Lackl am sure, I Carl Lackl with no doubt in my mind. I, Carl

15   Lackl, believe that's the person after a fleeting black youth runs by

16   and they make eye contact. That's what you got so far. And remember

17   that's what's in Patrick's mind at the time. No tape of that

18   particular identification.

19          But what do they do then? The photo array was done at

20   11:10. The next identification -- which is 23:10 in military time.

21   The next tape starts at 23:15. That is the second recording of

22   Mr. Lackl that you've heard here in court. And look at it closely and

23   listen to it closely because that is not Mr. Lackl making the I.D. on

24   the photo array. That is the detective telling Mr. Lackl, I showed

25   you the photo array and you picked this person out, isn't that what

1  happened?  Well, why didn't he record the actual identification?  Why

2  do we have to go back and recreate it?  Why?  Burden of proof is on

3  this table.  And what does he say then on this particular interview?

4  "Detective Martin asked you got a good look at the individual when he

5  threw the gun.  Correct?  Yes, sir.  You said you looked at his eyes.

6  And then it's inaudible.  We both stared at each other from across the

7  street."  We've gone from a handwritten note from 5'10, 160, 170

8  pounds to a black youth and I saw his eyes so I believe it's him to we

9  stared at each other across the street.  And also I came out of the

10  alley onto Jefferson and I made a right onto Jefferson from Monument.

11  That's what you got.  That was Mr. Lackl's identification of Patrick

12  Byers.  That is the man who according to the government is keeping

13  this guy locked up, keeping him from getting home.  All of this was

14  known to Patrick Byers.

15          What else was in his mind?  Upon his arrest, Mr. Byers had a

16  public defender who for whatever reason sometimes don't get the credit

17  they deserve.  But Mr. Byers retained Roland Walker.  You heard his

18  grandmother testify about this.  Edna Booze.  This family shelled out

19  $15,000 to Roland Walker.  You heard from Detective Martin I believe

20  that Roland Walker is an older -- no offense to anyone because I'm

21  getting there myself -- attorney who's been around a long time.  Maybe

22  he wasn't aggressive enough.  We don't know.  But for some reason

23  Mr. Byers decided to change lawyers and he got Ivan Bates, who you

24  heard from the detective, Ivan Bates is a former prosecutor

25  experienced in homicide cases who hired the investigator, John Traut.

1  Traut shared his investigation with Mr. Haynes.  This is all in

2  Mr. Byers' mind.  We know Mr. Bates visited Patrick in jail.  They

3  have the records.  Do you think that Mr. Bates went to the jail to see

4  Patrick to talk about the Orioles or the Ravens or about the weather?

5  Common sense tells you he went to the jail to visit him and talk about

6  the case.  Parham recanted.  We got a not credible identification from

7  Mr. Lackl.  We got Rookstool.  We got Hunt.  We're good.  That's in

8  his mind on July the 2nd of '07.  There's some information about the

9  visits, about Mr. Bates being on the phone with Patrick.  Patrick's

10  state of mind is the defense is good.

11          What else did you hear?  He felt confident about his case.

12  You heard from his father, Mr. Patrick Byers, Sr.  Patrick thought

13  that he had the best lawyer in the world, albeit until we came along.

14  He thought Mr. Bates was the best lawyer in the world and he felt

15  confident with his representation.  Shelled out 15,000 to Roland

16  Walker.  Another 15 -- although he only paid I think 8 to Mr. Bates.

17  Ebony Green said he thought the murder case was weak and that his

18  lawyer could beat it.  Remember, this was a Baltimore City

19  run-of-the-mill murder case at that point.  Didn't get all the press,

20  none of that stuff.  That's what Patrick Byers is facing.  That's what

21  was in his mind.  Do you think Patrick Byers is going to go, get a new

22  lawyer, shell out all that money knowing what he knew, knowing that he

23  probably was going to beat the case or had a good shot and come home?

24  But they want you to believe that instead, he orchestrated the murder

25  of Mr. Lackl.  Does that make sense?  You're a week away from trial.

1  You had the person's name for how long.  All of a sudden you are going
2  to wind up dead knowing what he knew at the time.  The burden of proof
3  is here.
4          Now that was July the 2nd of 2007.  That was Mr. Byers'
5  state of mind.  What have you seen here at this trial?  You've seen
6  Mr. Byers is not guilty straight out of killing Mr. Haynes.  How do we
7  know this?  The investigation was shoddy.  The investigation was
8  incomplete.  That's what we know.  Detective Martin -- well, you
9  didn't even hear from Weldon Hunt.  You didn't hear from the store
10 owners.  You didn't hear from Dorsey Ebbs.  The detective, the lead
11 homicide detective didn't go walk the streets and get all those videos
12 that might have caught the murderer.  He failed to follow up on leads.
13 And what did he do?  You know, in all fairness to the detective, those
14 homicide detectives, they got a lot of work to do in this town.
15 They're overworked.  Probably don't have all the resources.  But you
16 do what you can.  And what he did in this case, he settled on Parham
17 and Lackl as the witnesses.  Forget everything else.
18          Let's look at this video.  You saw it.  The video from the
19 corner store.  That's Weldon Hunt coming in.  And as was testified
20 where the little hand is is where the door is, the front door is.
21 That's Ms. Rookstool.  Remember she was in there to get a number from
22 him.  She's got her phone in her hand typing it into her phone.  This
23 is a brain-damaged lady according to the government.  Typing her
24 number in.  Moving closer to the window.  Something happens.  Mr. Hunt
25 is looking out.  Look at the top right.  This one right here.  It's

the top right frame.  What is she doing?  She's looking right out that
window.  So is Mr. Hunt.  So is the store owner who's peering right
out the window right now.  That store is right there where the light
is.  Corner of Montford and Jefferson.  There's a little diagonal
entrance.  The murder happened right there, right in front of the
door.  You saw that government's exhibit with Mr. Haynes' body covered
with the blanket, right in front of the door.  Weldon Hunt, the one
you didn't hear from, they said they couldn't find him.  I mean they
were able to get phone records from here to Sunday.  They couldn't
find Mr. Hunt.  Ms. Rookstool told you that Mr. Hunt is her fiance's
cousin.  Ms. Rookstool was here.  They couldn't find Mr. Hunt.
Mr. Hunt was in the store.  You just saw him.  He was never shown a
photo array.  He was never interviewed by the detective.  And more
importantly, you didn't hear from him.  Their burden of proof.  You
didn't hear from him, the man who was right there during the murder.
You saw it in the video.  Why didn't you hear from him?  Because he
perhaps he wasn't going to identify that man?  But we know you didn't
hear from him.

The store owners, both of them in the store.  Never shown a
photo array by the detectives.  Detective Martin's only reference to
these people is their name.  Hope you remember that.  It was a little
yellow pad.  Just had a name.  Why didn't you interview them?  Why
didn't you show them a photo array?  Well, they told me they didn't
see him.  Okay.  So I'm done.  You didn't hear from them.

Cheryl Rookstool, the one you did hear from.  She was in the

store.  She was never shown a photo array by the detectives.  She did give a taped statement on March the 4th, the same day.  We played a portion of it.  Detective Martin himself, the lead homicide detective.  You have a woman who says I was there.  I saw the shooter.  I was ten feet away.  Gun in the right hand shooting.  The lead homicide detective doesn't bother to go and talk to her.  They want you to believe, well, he didn't believe her because she was brain damaged and had one eye or whatever nonsense they were saying.  When she testified right there, did she look like she was brain damaged to you?  Does she look like she couldn't see what she was doing?  Did she look incoherent?  He never talked to her.  Why?  You know why.  They didn't bring her in.  Remember?  They called her as a witness.  But she told you we brought her in.  The defense brought her in.  We don't have the burden of proof.  We brought her into the courthouse.  And when I was talking to her downstairs, remember all those interruptions?  The prosecutors, the detectives, all of a sudden, they want to talk to her.  Why didn't they talk to her back on March the 4, '06?  Why?  Because it didn't fit their story that it was Patrick?  Her story was consistent then.  It's consistent now.  She said she was ten feet away, 10 to 15 from the shooter.  The guy is shooting with his right hand.  She told you she lived in the area.  She knew this man.  She knew him as Pat.  She knew who he was.  She was sitting right here, looking at him with that one eye and she said that's not the shooter.  That is not the shooter.  Is that why they never talked to her?  Is that why they didn't bring her in?  This is the government's own

1  exhibit.  It's a diagram.  Look at the body.  Look at that little
2  cutaway on the left side.  You got Mr. Haynes' body by the door and
3  all those little numbers and dots with the casings.  Ms. Rookstool
4  said that he had a gun in his right hand shooting and there was some
5  demonstration I think by the detective.  The casings come out on the
6  right side.  Well, it's totally consistent with what she said.  If the
7  shooter is shooting this man with his right hand, casings are going
8  that way and he's looking at her through that glass door.  She saw his
9  face.  It was not Patrick Byers.  It wasn't Patrick.  And they have
10  the burden of proof.  What did they give you to take that away, to
11  take what she said away.  Nothing.  They didn't want to give her to
12  you to begin with.  They cannot attack her credibility.  They cannot
13  attack her observations except to say that she's brain damaged and had
14  one good eye.  That's the most they could say about Cheryl Rookstool.
15  Not reliable because of that brain damage and the one eye.  She's not
16  reliable because she didn't fit their story.
17            What did you hear in this trial about Mr. Lackl again?  In
18  one of those videos, I think he said he saw two black youths running.
19  Not one.  Two.  No one else described two.  He was in the area buying
20  drugs.  He had been in the area before.  We covered all this.
21  Ms. Mays said that.  Concealed his drug use from Detective Martin.
22  Misrepresented the extent of his addiction.  He said he had been in a
23  methadone treatment program for six months and there was some
24  testimony about how he stopped using.  But you heard from the medical
25  examiner how at the time of his death unfortunately he had opiates and

other drugs in his system.  So he continued to use.  I mean people have their issues.  But this is not to denigrate Mr. Lackl in any way.  This is to show the person who made this observation that the government is relying on.

He also told Ms. Humes, his fiancee, his loved one, she testified Carl told me that he witnessed the shooting.  I don't think you heard anything from anyone else saying Carl Lackl witnessed the shooting.  At most, he saw some black youth running across the street.  Does that indicate that perhaps he tried to exaggerate?  I don't know.  But that's what she said.  But those two things don't mesh and this, all this information right here is not the defense bringing it in to tear Mr. Lackl down.  This is them, the government.  Their own witnesses said all these things.  These are the same information you see here.

There was a lot of talk about these blue light cameras.  In case you dozed off during Mr. Purpura's cross-examination, the blue light cameras are at certain corners in the city.  They're high up.  They're there to witness crimes, to catch crimes.  I think Detective Martin said well, they're not really relevant because, you know, they're spinning one way or the other.  Why do you think the city put those cameras up there for?  Because they had nothing else to spend their money on?  Why did they put them, three that we know of in this neighborhood?  Because they wanted to see the people doing good works, planting plants and flowers?  No.  They're crime cameras.  You put them in high crime neighborhoods either to deter criminal activity or

1    to catch it.  That's what they're there for.  It's common sense.

2              The lead homicide detective, Detective Martin, ordered one

3    blue light camera for a very specific period of time, 1450 to 1455 for

4    a five-minute span.  That's what he ordered.  That's what he got.

5    This is the result of that.  And if you see where the little hand is,

6    that's McElderry and Montford.  And what the camera caught for the

7    time that was requested was, surprise, a black youth with a hoody,

8    dark jacket sprinting across the street.  That's what a blue light

9    camera does.  If the records had been done, you might have seen more.

10   But that's all we got.  He failed to order there was a blue light at

11   Monument and Montford.  Remember, Mr. Lackl said the shooter or the

12   person who dumped the gun running up Monument Street -- excuse me.  Up

13   Montford toward Monument.  If you're the lead homicide detective,

14   somebody tells you the shooter is running right up Monument and if I

15   had bothered to walk the neighborhood, which he didn't, I might have

16   seen or you might have seen that there's a blue light camera right at

17   Monument and Montford.  Failed to get the blue light video from

18   McElderry and Rose up the street.  Up here somewhere.  Again if he had

19   bothered to walk the neighborhood, investigate, he might have seen,

20   hmm, blue light camera, let me order that.  Let me order more than

21   five minutes of it.  This is an exhibit that was brought in for

22   Mr. Ehasz.  Those are the three blue light cameras in the immediate

23   vicinity.  The one on the right, the left is at McElderry and

24   Bradford.  The one at the top is at Monument and Montford.  The one on

25   the right is at North Rose and McElderry.  Oh, well, he says I didn't

1  bother with them because, you know, you didn't see anything because it
2  might be spinning the other way.  Well, you got three.  You got a good
3  chance of catching something.  You know, order maybe ten minutes of
4  the video or 15.  Order from all three.  You might have seen
5  something.  But you know what he did see in that video was, he saw
6  that the person running and if you look at that little intersection of
7  McElderry and Montford where the shooter or the person who dropped the
8  gun, whatever you want to call him, had to have run up.  You didn't
9  see anyone running up that way.  This is the only guy you see running
10 around, given that Mr. Lackl did not know whether he was on Jefferson
11 or Monument or Montford.  Is that the guy he saw running?  We don't
12 know.  That's all he got on the video that the police ordered and they
13 got the burden of proof.
14            At some point, they arrested Mr. Byers.  You heard evidence
15 that he's 5'6, about 140 pounds.  Mr. Lackl, the man who's keeping him
16 locked up, says he's 5'10, 160 and 170.  Did the detective ever do a
17 lineup?  You have a discrepancy as to the height, the weight.  Maybe
18 even the complexion of this person.  Does he bother to put him in a
19 lineup?  You didn't hear about that.  They have the burden of proof.
20 He failed to walk the area.  Why?  There was no need to.  No need to.
21 Mr. Lackl said who it was.  Mr. Parham, I'm done, case closed.
22 Guilty.  No need to walk the street.  Rookstool didn't feel it was
23 necessary to talk to her.  Hunt.  Did not feel it was necessary to
24 talk to him.  These are people in the store at the time of the murder.
25 Did not feel it was necessary.

1          There was a little discussion about this during the

2    interview of Mr. Byers and again this is I think emblematic of that

3    investigation.  Mr. Byers says I had a gun that I stashed in the alley

4    behind 505 Montford.  And why does he keep that gun?  Well, he keeps

5    the gun because he gives it to police officers when he's stopped.  You

6    would think man, that's crazy.  Why would a cop let somebody go in

7    exchange for a gun?  Well, you heard from Detective Jenkins, their

8    witness.  He says that that happens.  I think Detective Martin

9    actually said that he had heard about it.  No one had ever done it,

10   but they heard about it.  And what happened with this?  Your

11   recollection controls.  This piece right here is from the transcript

12   that you saw regarding that statement given by Mr. Byers.  It was for

13   your use to help you follow it.  You won't have it in the back.  Your

14   recollection of the events controls.  He was asked "what did you do

15   with the gun?  Stashed it in the alley.  In what alley did you stash

16   it in?  Montford Street right there.  There's a garage at Montford.

17   Do you know what hundred block?  500 block.  Where did you stash it in

18   the alley?  Under a porch in an alley behind I guess 505.  Do you know

19   if it was a vacant house?  I think it is."  Montford, 500 Montford.

20   Vacant house in the alley.  Remember these pictures.  That house on

21   the bottom left, that back yard is right there.  There's a garage.

22   There's that white stoop in the alley under the porch behind 505.

23   What did the detective say?  I think Mr. Purpura asked him.  Did you

24   go out and try to find this gun?  And he actually sat there and said

25   yeah, I walked around behind the garage.  Well, did you look in that

1    backyard, on the back stoop?  Well, that's not what he told me.  He

2    said it was behind, you know, the garage.  So I didn't look.  If he's

3    behind the garage, he's right there.  He didn't even bother to look.

4    You got a suspect to a murder telling you he has a gun, telling you

5    exactly where he stashes it and they don't bother to look.  But do you

6    know what's really rich?  They get up and try to argue that with

7    respect to Counts 8 and 9, the gun charges that my client is facing,

8    well, he told you that he had a gun.  So you can use that to convict

9    him of those charges.  The government never bothered to look for -- he

10   said he had so you can convict him.  Rich.

11           What else did you see here about Parham's recantation?

12   Haynes was shot on March 4, '06.  The records are faint.  That's how

13   they are.  You have to look at them closely.  Parham was at work that

14   day.  The work records indicate it.  His statements at trial indicate

15   he was at work.  The murder was about 3 p.m.  The records indicate he

16   was working.  We introduced the documents relating to what he has to

17   do.  He drives a trash truck.  He might get paid for six or eight

18   hours.  Who cares?  What he told you is I was there.  We got to take

19   the truck.  We got to do X, Y and Z and I was at work and I lied about

20   Mr. Byers shooting Larry Haynes because I had a pound of marijuana and

21   money and I didn't want to get more time.  But you're supposed to

22   discount this because it doesn't fit their story.  It doesn't help

23   them meet the burden of proof.

24           You heard from Detective Jenkins.  He says that he knew Mr.

25   Byers from the neighborhood.  Called him an informant.  Suspected that

1    Mr. Byers was a drug dealer.  But all he knows is he's seen him

2    around, never caught any drugs on him.  Never found a gun on him.

3    Nothing.  But what he's here to tell you is that on some day three

4    years ago, Mr. Byers calls him all agitated, excited.  Says detective,

5    I got something to tell you.  I heard somebody else killed Larry

6    Haynes three years ago.  You're a detective.  Somebody gives you that

7    kind of information, you don't even write it down anywhere.  Remember

8    he had no notes, he had no record, no report, no nothing about that

9    purported meeting in the back of his police car.  Nothing.  But he

10    remembers that bright as day because of his recollection.  That's all

11    you got.  His word.  And he's a detective with the Baltimore City

12    Police.  Same department as Detective Martin.  All you got is his

13    word.  And of course, I asked him about, oh, what about stashing guns

14    in areas like that stoop.  Oh, drug dealers will never, never, ever,

15    ever stash a gun in such a stoop because, you know, cops driving by

16    may find it.  Here's a street.  That is in an alley out of the way.

17    No one driving by is going to see anything under there.  But no one

18    ever would stash a gun there.  But if you think about what the

19    government's own witness Mr. Pearson whom they want you to believe and

20    we'll talk about him.  Mr. Pearson himself said that on Normal Avenue,

21    they keep guns under the stoop on Normal Avenue.  So why is Detective

22    Jenkins telling you these things?  I don't know.  What does it really

23    have to do with anything?  The burden of proof is right here.

24            Mr. Haynes.  Who was Mr. Haynes?  Mr. Haynes was a person

25    who had had an extensive criminal record for violence and drugs.  This

is introduced as evidence. 29 other crimes. Two homicides as a non-fatal victim and a witness. Four aggravated assaults, two as a victim, two as a suspect. Fifteen domestic violence reports. 14 as a suspect, one as a victim. I guess that one time, his better half got the best of him. It was Mr. Haynes. It was Mr. Haynes. The autopsy found that he had been shot at least five times previously. Those were the case numbers in which he had been shot. The slugs were found during the autopsy. Surely, they would have to believe that Patrick Byers shot him those other five times. Surely somebody else shot at him five other times. It seems like somebody was out there gunning for Mr. Haynes.

And then that KH tattoo. Killer Hill, that's what it means. Killer Hill. They want you to believe that it's the initials of somebody. K. Haynes or somebody. You didn't hear that, did you? It's Killer Hill. He was proud of it. That's who he was. That's the life he led. Five shots, five slugs in his body from prior shootings.

And at this trial, you heard about the DNA. You heard from Jocelyn Carlson. We already talked about Mr. Byers being excluded from the clip and about Mr. Haynes and Byers cannot be included or excluded. Tells you nothing. Detective Martin knows now is that at some point Mr. Hogan, Quentin Hogan was arrested. They did a random DNA test and that unidentified male that was picked up way back before July the 2nd happens to be Quentin Hogan. Quentin Hogan's DNA is on that gun. Surprise. Who's Quentin Hogan? He's a Blood. We haven't talked about them yet. Mr. Hogan. Here's a description from one of

1    his case files.  African-American.  Height, 6 feet, weight, 175

2    pounds.  Lives in McElderry.  In case you haven't figured it, it was

3    somewhere right over here somewhere.  Quentin Hogan.  Blood.  See the

4    little closeup, making the Blood symbols.  He's a Blood.  And this is

5    really interesting.  Mr. Quentin Hogan, 23 years old, male black, 6

6    feet, 175 pounds.  Who does Carl Lackl describe at least according to

7    detective's notes as the shooter?  A black male in his early 20's,

8    5'10, 160 to 180.  Sounds a lot more like Mr. Hogan than Mr. Byers.

9    Especially since Mr. Hogan's DNA is on that gun.  Burden of proof

10   right here.

11        Remember Mr. Haynes, the murder of Mr. Haynes is not

12   charged.  He was brought and presented to you solely to establish a

13   motive.  But we, the defense, although the murder itself is not

14   charged, we had to defend against it because of Counts 8 and 9, those

15   gun charges.  Count 8, March 4th, the date of the murder, Mr. Haynes'

16   murder, Mr. Byers having been previously convicted of a crime

17   possessed a firearm.  Count 9, same firearm, but possessed a firearm

18   in relation to a drug trafficking offense.

19        Now I lost my hair a long time ago and my memory is fading

20   and sometimes I get bored and I doze off.  But during the last three

21   or four weeks of testimony, what evidence of Mr. Byers possessing a

22   weapon during a drug trafficking offense did you hear?  They never

23   looked for the gun that they said he had.  But they want you to use

24   that gun.  On that day or the day before, the day after, what evidence

25   did you hear?  But they threw him in there.  He got indicted on that

| | |
|---|---|
| 1 | charge and that's what Mr. Davis was saying. It is a great saying in |
| 2 | the criminal law that good prosecutors can indict a ham sandwich. |
| 3 | That's a ham sandwich. Where is the evidence of that? Where is the |
| 4 | evidence that he possessed a weapon at all that day? He said that he |
| 5 | stashed a gun, but he never bothered to look at it. Never found it. |
| 6 | And then you got Mr. Lackl saying he saw the black youth running, |
| 7 | throwing a gun who happens to match the description of Mr. Hogan whose |
| 8 | DNA is on the gun. Burden of proof sits right there. |
| 9 | MR. BALAREZO: Your Honor, can we take a break for -- |
| 10 | THE COURT: Whatever you want, Mr. Balarezo? |
| 11 | MR. BALAREZO: Everyone all right? |
| 12 | THE COURT: Everybody is fine. Is everybody okay? Just |
| 13 | continue on. |
| 14 | MR. BALAREZO: You also heard from Mr. Coleman. The |
| 15 | shooting of Carlyle Coleman like the murder of Larry Haynes is not |
| 16 | charged. It is not in the indictment. You can look all day, all |
| 17 | night. You're not going to find it. They presented Mr. Haynes' |
| 18 | murder to show motive. Why did they present Mr. Coleman? Well, when |
| 19 | you got a weak case and you keep adding to it, let's present evidence |
| 20 | of another shooting and, you know, pile it on. And it's allowed. I |
| 21 | mean the law allows it. So I'm not saying they did anything improper. |
| 22 | But think about it. What does Coleman have to do with anything? Even |
| 23 | if he shot Mr. Coleman, what does that have to do with Mr. Lackl? |
| 24 | Even if he shot Mr. Coleman, what does that have to do with Larry |
| 25 | Haynes? Nothing. To buttress that weak murder case against |

1  Mr. Haynes that we've shown you was not Mr. Byers.

2          And this will be very brief.  Carlyle Coleman was a handy

3  man who was working in a house over here, somewhere where the light is

4  on Montford.  He decided one day because the owner of the house was

5  going away, asked him if he could stay and he stayed.  He opened up a

6  car wash and makes a few bucks washing cars.  He has some -- your

7  recollection controls, but some dispute with somebody, Pierre or

8  somebody who whacks him with a broom.  Next thing he knows, somebody

9  is knocking on the door or somebody barges in.  He runs, gets shot in

10  the buttocks.  Somebody shoots him in the kitchen.  Shoots him several

11  times in the stomach.  He was a drug user.  He admitted to that.  He

12  admitted that the incident was very, very quick.  He told you that he

13  had never seen that man before.  Never seen that man before.

14          Now the government keeps saying this was Patrick Byers'

15  corner.  That was his corner.  Detective Jenkins, the young detective,

16  said that that stoop right there was where he would see Patrick Byers

17  all day every day.  Now granted, that was in 2006.  Maybe you can

18  infer that the same was true in 2004.  I don't know.  But the fact of

19  the matter is Carlyle Coleman whose house was right here somewhere,

20  right across the street from that stoop had never seen Patrick Byers

21  before.  Never.  He identifies the shooter as a black male.  Again

22  that strange rare being in that neighborhood.  5'2, little guy, thin,

23  with two braids.  Not three, not four.  Two braids.  That's his

24  description.  He doesn't have a name.  He doesn't have anything else.

25  And he was badly hurt in the shooting.  You heard that.  And as you

can understand, you can feel for the man.  You're minding your

business, you're selling your little car wash.  You're washing cars

and somebody shoots you.  You don't know the person.  What do you want

to do?  You want to get somebody.  Somebody has got to pay for this.

Somebody has to pay for shooting me in the butt and causing me all

this pain.  The detective approach him in the hospital.  He can't talk

to him because he's too medicated.  They approach him again.  They

show him some pictures.  Lo and behold, this is what they show him.

This was shown, this photo array by Detective Mundy.  Remember the

description that he gave, black male, 5'2, thin, two braids.  I mean

look at that thing.  Look at this picture.  Look at this photo array.

Mr. Purpura asked the detective, there's no picture number 1.  Does he

look small?  Does he look like he has two braids?  No.  Number 2?  No.

Number 3?  No.  Number 4?  No.  Number 6?  No.  Oh, Number 5.  You can

see the braids sticking out.  And whether it's the angle of the shot

or the camera they use or the type of film that they use, what you

have in that photo array is a picture of Mr. Byers appearing to be

much smaller than the other five people in that photo array.  I mean

look at it.  You don't need to be an expert.  You are the finders of

fact.  They have the burden of proof.  Detective Martin even agreed

that looking at it now, he agrees that it could be a little misleading

because it makes Mr. Byers stick out.  And Carlyle Coleman who is shot

by somebody who he did not know, boom, boom, boom, who's been injured,

who spent all this time in the hospital wants to get back.  And they

showed him, well, that's the guy right there.  Patrick Byers.  That's

1  it.  And you know, at the end of the day, what does that have to do
2  with anything?  What does that have to do with Mr. Lackl?  What does
3  that have to do with Mr. Haynes.  What does that have to do with
4  anything?
5          Now regarding that day though, notwithstanding that they
6  have the burden of proof, we brought you Ms. Vonda Cole, Mr. Byers'
7  cousin.  Young lady, 30 some years old, has worked for about ten years
8  at Hopkins.  Didn't really hear anything negative about her except
9  that she's Mr. Byers' cousin.  Apparently, that's a bad thing.  What
10  did she tell you?  She and Edna Booze, Mr. Byers' grandmother
11  accompanied him to traffic court on North Avenue on that same day that
12  Mr. Coleman got shot.  The tape that was played in court which you'll
13  have as evidence indicates that they were there in court at about
14  11:00.  Mr. Coleman was shot that afternoon about an hour later and
15  the government puts up a little map from Google that says to get from
16  North Avenue to Mr. Coleman's house, it takes about a minute and six
17  seconds.  So therefore, even if Patrick Byers is at the courthouse, he
18  could have got back in time to shoot Mr. Coleman.  Well, what did she
19  tell you?  They went to Wendy's for lunch.  I mean I know it's fast
20  food.  But it ain't that fast.  Right?  Then they went to Edna's house
21  where she took a nap and stayed until about 1:30 in the afternoon
22  after Mr. Coleman was shot and as far as she knows, Patrick was there
23  the whole time.  That's what you got.  You got a person who says
24  Mr. Byers was somewhere else and you have evidence, the tape which
25  puts him somewhere else at the time near to the event and you have Mr.

1   Coleman saying that's the guy based on that photo array.  But again,

2   what does that have to do with anything?  He's not charged.  It's got

3   nothing to do with Mr. Lackl.  It's got nothing to do with Mr. Haynes.

4   It's got nothing to do with Counts 8 and 9, which gets us to why we're

5   here.

6               And, Your Honor, if the Court is prepared, this might be a

7   good time --

8               THE COURT:    I'm not prepared to break.  We're going to break

9   after your conclusion, Mr. Balarezo.

10              MR. BALAREZO:    Very good.  I'll continue, Your Honor.

11              Counts 1 through 7 have to do with Mr. Lackl's murder.  All

12  right.  Mr. Byers had no motive based on what you've seen, what he

13  knew in July to have Mr. Lackl killed.  The telephone evidence that

14  you've heard so much about, these charts, they're highly misleading

15  and I'll tell you why in a second and what holds these calls together

16  is Mr. Pearson.  Marcus Pearson is the glue that holds that portion of

17  the government's case together.  You heard from cooperators, Cornish,

18  Pearson, Graham with motives to lie.  We'll talk about them.

19  Mr. Pearson is not credible.  Multiple versions were presented.

20  Multiple liars.  We knew that the Haynes murder case was weak and a

21  new lawyer who was confident.

22              Let's talk about these phone records.  I think this is the

23  exhibit.  This is all you were getting during direct examination.

24  This is Government's Exhibit 330.  Big, big chart, big picture of

25  Mr. Byers right in the middle and all around him, all these people

that he knows.  And the top says May 10th through September the 8th,
'07.  These are the phone direct connects to Byers.  But that's all
you got.  You're like wow.  That's Byers' phone.  The only people that
were contacted were his families and friends.  It's his phone.  What's
the doubt?  That's what they want you to believe.  Well, what did
Detective Gruss and he said this on cross-examination, not direct.
Remember they got the burden of proof.  What did Detective Gruss say?
That that phone that they're saying belonged to Mr. Byers had over
14,000 activations, calls, connections, whatever.  14,000.  And what
he told you was they're only about 1200 of those can be tied to
Mr. Byers, which is what this is.  So this chart that they put in
front of you and say, hey, this is Byers' phone because he's the only
one using it.  I mean if my math is right, this only depicts about 10%
of all the calls made by that phone.  I hope you're following me on
that.  Math is not my suit.  So they can attribute only 10% of the
calls from that phone to Mr. Byers.  But you didn't hear that on
direct.  You heard it on cross.  Why?  Well, because it doesn't really
help their case, does it?  Because they're trying to make it seem
Patrick Byers' phone.  He had exclusive use of it.

            Then they also showed you these.  These are Government's
Exhibit 352.  The top one is the one that's on the screen.  Byers'
Nextel or direct connect.  Now these deal with the connections on July
the 2nd, the date of Mr. Lackl's murder.  And again big picture of
Mr. Byers in the middle and all these connections around him.  Boy,
you look at this, that Byers and he's really on the phone a lot.  This

1    is July the 2nd.  He's the only one on that phone.  He's guilty.  It's

2    his phone.  Who else would call?  Well, remember when I started

3    questioning Detective Gruss and I started asking him well, what

4    connection do you have between any of these people here and Mr. Byers?

5    I don't know.  None.  Why did you put him up there?  It's a little

6    misleading, isn't it?  What else did he say?  Only about 25% of these

7    calls they could have associate with Mr. Byers.  25%.  Not all of them

8    like that map, I mean that -- and one of the important things is this

9    chart depicts all of the July the 2nd calls.  So they are trying to

10   show you or make you believe that Byers is using that phone

11   exclusively on that day.  Only 25% of the calls can be attributed to

12   him.

13            The bottom chart.  This one.  Same thing.  These are

14   telephone calls.  Gruss said those are all of the telephone calls, not

15   direct-connect, the telephone calls of July the 2nd, the day of

16   Mr. Lackl's murder.  Again makes you believe if you look at that, they

17   didn't tell you this on direct, that that is Byers' phone and he's the

18   only one who made the calls.  Well, Gruss said I think it was about

19   50%, only about half the calls, old-fashioned calls made on that phone

20   on July 2nd could be attributed to Byers.  So what does that tell you?

21   That tells you that perhaps other people are using the phone for calls

22   or direct-connects on July the 2nd.  And this -- I keep saying this is

23   rich.  This is rich.  They showed you this exhibit.  I don't remember

24   the exhibit number, but it was a Byers' AT&T phone contact with

25   Darrell Briggs from February the 2nd to the 23rd of '09.  19 calls.

1    And when they showed this to you, you had no idea of why they were

2    showing it to you.  But I asked Detective Gruss, who's that little guy

3    on the right there, that little picture right above Darrell Briggs?

4    Is that Darrell Briggs?  No.  It's just some random black guy that

5    they put on there.  Did they tell you that on direct?  No.  They just

6    put him there.  That is Darrell Briggs.  No, it's not.  It's not.

7    What does that have to do with anything?  I honestly don't know.  But

8    why are they trying to make you think that that's Darrell Briggs when

9    it's not?  And then the second page to that exhibit might be a little

10   unclear.  They have all these connections between, that they say are

11   between Mr. Byers and Darrell Briggs.  When you look at the exhibit,

12   look at the duration on the right snippet, the right column.  Every

13   single one of those contacts is a zero connection.  So what are they

14   showing?  I don't know.  What does it mean?  I don't know.  But the

15   burden is on this table.

16              Next, these phone call records.  This big chart,

17   Government's Exhibit 344 which we've seen ad nauseam.  They broke down

18   the left side, Exhibit 424-A.  An hourly breakdown of all the calls

19   from the phone that they attribute to Mr. Byers.  An hourly breakdown.

20   And then they have this chart where they have all the calls.  If you

21   remember on cross-examination I took two hours specifically and asked

22   Detective Gruss about it.  I asked him about the 3:00 hour which

23   according to the government's exhibits, there were 12 contacts.  Six

24   of them associated with Mr. Byers.  If you look at the bottom, the

25   yellow part which is from this chart, the 3:00 hour is when Pearson

1  and his little gang of cohorts start their little plan to kill Mr.

2  Lackl.  So this is according to this chart here, there's a lot going

3  on.  There's about 10, 12 calls including when Mr. Pearson calls Mr.

4  Lackl.  So if you look at the government's record, there's 12 calls,

5  six of them associated with Mr. Byers and the critical time of 3:00

6  when all this stuff is going on, but yet, there's six other calls that

7  aren't accounted for.  So what are you supposed to believe?  That

8  Mr. Byers is on the phone say, you know, go out and kill him, I'll pay

9  you.  But then he tells his little jail mate, here use the phone now,

10  you know.  It just doesn't make any sense.  What is he supposed to be

11  doing?  Is he sharing the phone with somebody during this critical

12  moment?  And it's more clear at the 8:00 hour.  The 8:00 hour is when

13  Mr. Lackl was killed.  19 total contacts.  Six associated with

14  Mr. Byers.  This is Mr. Byers' exclusive phone according to these

15  people, to the government.  There are 12 calls that are unaccounted

16  for at the 8:00 hour when Mr. Lackl is being killed when Mr. Byers is

17  supposed to be on the phone directing this stuff.  He's like a puppet

18  master from jail.  It doesn't make sense.  Who are those other 12

19  calls?  Who's using it?

20          Detective Gruss also talked about the phone there on the pen

21  link stuff which I still don't get, but.  He said what he does is get

22  the data from the phone companies.  He dumps into the program and

23  these charts come out.  According to him, the data cannot be changed.

24  He doesn't verify.  He puts it in and out it comes.  Well, I noticed

25  this.  This is lines 18 and 19 which are right here.  If you look at

the first line, line 18, it's a call or connection on July the 2nd,

which begins at 15:36:05 and supposed to lasts if these records are

accurate for a minute and one second.  If my math is right, that would

take me to 15:37:06.  But if you look at very next line, the very next

line starts at 15:36:29 which is telling me that the next call is

happening while the first call was going on.  And if you look at line

18, it's Pound supposedly calling Mr. Byers and then Mr. Byers calling

Pound.  Well, you look at that and ask yourself if Pound is calling

Byers, why is Byers calling Pound in the middle of the call?  That's

the government's own record.  It doesn't make sense to me.  But this

is what we're working with.  I hope you're following me on that.  Same

thing.  Another call that same day.  It's another call that starts

while the other one is going on.  I don't know.  Figure it out.

          Quick thing about text messages.  This whole thing started

according to Mr. Pearson, Pound, when Mr. Byers sent a text message to

Mr. Goodman and Mr. Goodman then showed it to Pearson, to Pound where

he has a Blackberry, where he had the address and the name of Mr.

Lackl.  Detective Gruss, the government's witness, said well, they

don't keep text records.  We don't have them.  Ryan Harger, the Sprint

representative, I asked him very specifically, were you ever asked to

get any text records.  He said no.  Well, what does this exhibit tell

us?  And this was I believe a Goodman exhibit, a defense exhibit, not

the government's exhibit.  This is from Mr. Goodman's phone if I'm

correct.  And when Mr. Pearson has said that it was around June the

30th is when Mr. Goodman showed him that -- June the 30th is when he

approached him.  July the 2nd is when he showed him the text message
with the address of Mr. Lackl.  This is the only record of text
messages that you have and if you look at the phones with the numbers
that sent text messages to Mr. Goodman's phone, none of them are at
Byers' phone.  No record of that text message that Pound says he saw.
Now this is Pound.  This is their star witness who was here, the glue
that holds this together.  There are also some questions regarding the
interview that Detective Ruby had with Mr. Byers.  On the government's
closing, Mr. Byers is lying through his teeth.  He knew what was going
on with his case.  Mr. Lackl was the only thing getting in his way.
He had to kill him.

Well, what was Mr. Byers' state of mind at that time?  He's
facing -- he's locked up.  He's facing a murder charge in the Haynes
murder and some detective from Baltimore County comes and pulls him
out and starts questioning him.  Any good defense lawyer, even
probably a bad defense lawyer, the first thing you tell your client is
don't talk to the police.  Don't talk to anyone about your case.  So
you know, and again keep in mind, he didn't have a lawyer with him.
But that's a problem.  When it's Pearson lying without a lawyer,
that's all right.  When it's Byers saying something that's not perhaps
truthful, that's a big problem.

Let's talk about these cooperators.  Tammy Graham.  Who was
she?  Pearson's girlfriend.  She knew the man was a Blood.  She drove
him to and from the murder.  She was with him in the car while all
these calls were being had according to these records.  Pearson to

1    Patrick Byers to Goodman to Cornish to Thompson.  Back and forth, back

2    and forth.  I don't know anything about it.  I didn't hear anything.

3    This is the driver's seat, passenger seat.  Constantly on the phone.

4    She claims she knows nothing about it.  What she does know is that

5    that night after the murder, she ends up in a $400 a night hotel room

6    at the Marriott.  A little celebration perhaps and she lied to the

7    police.  You heard that she was detained when this was a state case.

8    She was locked up.  But as you saw, she's now on the street meaning

9    she's free in this federal case.  She was facing life in the state

10   case.  And what did they give her?  What did they give her in exchange

11   for testimony?  Maximum three years.  How do you go from facing life

12   for the same conduct in the state case to facing a maximum of three

13   years in a federal conspiracy case?  You know how you go?  Because you

14   sign on the dotted line and you come right here and swear to tell the

15   truth and talk.  That's how you do it.  That's how you did it.

16              Mr. Cornish, the baby, the BG, the baby gangsta.  This is

17   the man who kills, the man who shot Carl Lackl.  The whole time

18   they've called him the teenager, that kid.  He's a killer.  He pulls

19   up to Mr. Lackl and takes three shots with that .44.  Hits him in the

20   chest, in the arm and in the leg and for good measure, he reaches out

21   the window and takes another shot.  The baby gangsta.  And why did he

22   do it?  Well, he wanted status in the Bloods.  He wanted to be a

23   bigger man.  How do you do that?  You kill somebody.  He does not know

24   Patrick.  What does he get out of this besides this deal he got?  He

25   got a hundred bucks from Pound.  The price for a life to people like

1   Mr. Cornish.  A hundred dollars.  A hundred dollars.  Probably not

2   even a good meal at a good restaurant.  That's what we got.  Boom,

3   boom, boom, boom.  Cornish.  He was facing life without parole in the

4   state case.  What's he facing now?  40 years.  And you might say to

5   yourself, 40 years is still a long time.  He's really paying for it.

6   He killed a man and he'll be out someday.  That's the deal they gave

7   him.  They gave him immunity and his own plea agreement with the

8   government.  The bottom portion, a sentence of 40 years is

9   appropriate, an appropriate disposition for this case.  The man shoots

10  Mr. Lackl for a hundred dollars and 40 years is what they sign for.

11  Why?  Because he comes here, raises his hand, says I am going to tell

12  the truth.  And of course, because he's doing that, he's telling the

13  truth, he wants you to tell believe him.

14              Who's next?  Mr. Pearson.  You remember him.  He's the one

15  that organized this thing.  No doubt about it.  He gets paid 2200

16  bucks for the murder.  What does he do that night?  The guy is used to

17  staying in flea bag motels.  Fifty, sixty-dollar a night motels.  All

18  of a sudden, he's at the Marriott celebrating.  You know that's what

19  he was doing with Tammy Graham.  He's celebrating a successful

20  mission.  This is a person who has no problems implicating other

21  people in crimes that they didn't commit.  In all those videos he

22  talks about somebody named Nelly driving a car.  Now you know.  Nelly

23  didn't drive a car.  He had no problem sticking Nelly's name in there.

24  And I'll show you video.  He said Mr. Byers, Patrick, killed my man,

25  Marco.  Do you remember that?  The man that they want you to believe,

1  the glue that holds this together sits here and on cross-examination

2  says yeah, that was a lie.  But he told Detective Ruby he killed

3  Marco.  He got away with it.  And what did he say on cross when I

4  pulled out the transcript of his statement?  He had implicated

5  somebody else in the Marco murder in 2002 or 3 which he now says

6  Mr. Byers committed.  This shows you the type of person you're dealing

7  with who doesn't give a damn.  He has no problem saying he killed

8  somebody or he did this.  He said I didn't do anything.  This is

9  Marcus Pearson, the glue that holds the burden over there.  Original

10 young gangsta.  This was not a low level guy.  He had rank in the

11 organization.  What were his tattoos?  He was an outlaw, a Cobra, a

12 rifle, a grim reaper.  Blood Life on his stomach.  This is what Tammy

13 Graham saw, the woman who's looking at three.  He's a drug dealer.  He

14 had shot at people, but he never hit them.  Okay.  Repeatedly lied to

15 the investigators.  He provided the story that they want to present to

16 you to meet their burden.  The glue.  He was facing the death penalty

17 in the state case.  He was facing the death penalty in a federal

18 court.  The death penalty.  That's what he was facing.  What does he

19 do?  He signs the dotted line and they award him with a 35-year

20 appropriate disposition in this case.  He gets less time than Cornish.

21 The guy who sets it all up.  35 years.  He's going home someday.

22 These are the deals that they cut.  That's the power that they have.

23 That's the authority that they have.  They can cut these deals.  And

24 you want a motive to lie, a motive to say whatever they want him to

25 say.  I'll get out of prison some day.  Beats looking at the death

1    penalty.  That's Mr. Pearson.

2              I think today Mr. Giblin said that after 2007, he finally

3    told the truth.  And what changed?  Well, he got a lawyer.  So now he

4    got a truth.  No.  What changed was he got a deal from the government.

5    And once you got a deal, you got to dance the dance.  You got to sing

6    the tune.  He's on board with the government team and he's here to say

7    whatever he has to say to make sure he keeps that 35 years.  This is

8    Mr. Pearson.  This is the glue.

9              (The video clip was played in open court.)

10             MR. BALAREZO:    I'm just going to play -- this is Pearson.

11   My bitch still out there?  What's her name?  He's about to say I don't

12   even know.  This is Pearson.

13             (The video clip was played in open court.)

14             MR. BALAREZO:    He got put out before he graduated.

15             (The video clip was played in open court.)

16             MR. BALAREZO:    "You think I was a Blood with all those phone

17   numbers stored in my phone.  You're not a Blood, are you?  Hell no."

18   I mean Mr. Pearson --

19             (The video clip was played in open court.)

20             MR. BALAREZO:    Did you tell Detective Ruby?  I don't even

21   remember what I told him.  It's hard to remember lies.  Glue.

22             (The video clip was played in open court.)

23             MR. BALAREZO:    This is August the 26th.  I guess it was

24   before he got a lawyer so he could still lie.  But he said everything

25   I told you today was the truth minutes after he said hell no, I ain't

| | |
|---|---|
| 1 | no Blood.  Blood Life.  We know he's a liar.  What does Mr. Pearson |
| 2 | lie about?  He lies pretty much about everything.  This is pretty |
| 3 | quick. |
| 4 | (The video clip was played in open court.) |
| 5 | MR. BALAREZO:    Now whatever he's talking about, he sees this |
| 6 | girl.  He sees a 10-year-old girl, 13, whatever.  He sees the car on |
| 7 | the curb.  He's giving you details.  He's giving you what he saw. |
| 8 | August the 1st. |
| 9 | (The video clip was played in open court.) |
| 10 | MR. BALAREZO:    I mean he gives details of the little girl |
| 11 | and he said I never saw it.  I heard it on the news.  I didn't know |
| 12 | she was 10 until I heard about it.  Like Mr. Parham heard about it. |
| 13 | They want you to believe this guy, but don't believe Parham.  This guy |
| 14 | heard something on the news and he's repeating it to the police.  Why? |
| 15 | Because that's what they want to hear.  The glue that holds the case |
| 16 | together. |
| 17 | (The video clip was played in open court.) |
| 18 | MR. BALAREZO:    Right at the beginning, I'll play it again. |
| 19 | Did Brazy get any money for it?  I don't know. |
| 20 | (The video clip was replayed in open court.) |
| 21 | MR. BALAREZO:    So I get a thousand dollars in this version. |
| 22 | (The video clip was played in open court.) |
| 23 | MR. BALAREZO:    This version is $200.  What does this man not |
| 24 | lie about?  Wasn't getting money.  Was paid a thousand dollars.  Was |
| 25 | going to get $200.  I think on the stand he says $2200.  Who cares? |

1  Really.  Because he provides what they want.  He cuts that deal with

2  them.  How can you believe anything that this person says?

3           (The video clip was played in open court.)

4           MR. BALAREZO:    Now admittedly, some of these are out of

5  order, but you can see that I'm not hiding.  They're different dates

6  that happened to be ordered.  Detective Ruby is trying to find out

7  what happened and you heard from Detective Ruby's supervisor.  I

8  forgot the gentleman's name with white hair.  The detective from

9  Baltimore County.  It's not a good practice when you interview a

10  witness to tell them information.  Why not?  Well, because they may

11  change.  And you get from the first day that Pearson started talking

12  until the last day, you can follow him.  You can follow what he says

13  based on what Detective Ruby says and I did this during the trial.

14  I'll skip through some because I don't want to be here all day, but

15  this is what's going on in these particular scenarios.

16           (The video clip was played in open court.)

17           MR. BALAREZO:    I'm going to skip ahead.  Basically he's

18  saying me and my girl were not out there.  He says she's telling me

19  she was.

20           (The video clip was played in open court.)

21           MR. BALAREZO:    That's their witness.  Don't tell me -- and

22  I'm not, believe me, I'm not suggesting the detective did anything

23  improper.  I'm not.  He's a good detective.  Did a good job.  But he's

24  questioning this person, telling him, this is kind of a story.  You're

25  not telling me -- tell me this.  Tell me what I want to hear.  And

1  that's what's going on and you'll see Pearson's story evolve.

2        (The video clip was played in open court.)

3        MR. BALAREZO:   That's what I need.  You got to give me that.

4  Remember that from cross-examination of Mr. Pearson?  This is what

5  you're telling me.  This is what I need.

6        (The video clip was played in open court.)

7        MR. BALAREZO:   Pearson is denying seeing anything up to this

8  point.  But what I need to see for you to tell me you saw it happen.

9  All right.

10        (The video clip was played in open court.)

11        MR. BALAREZO:   For me.  I'm investigating this case.  This

12  is what I need.  I need you to tell me you saw the gun in his hand,

13  which he denied up until now.

14        (The video clip was played in open court.)

15        MR. BALAREZO:   So what does Pearson do?  Story becomes like

16  everybody else's.  I don't want stories to be different.  I need all

17  the stories to be the same.  If I get them the same, that's the truth,

18  whatever that is from this man who lies about everything.

19        (The video clip was played in open court.)

20        MR. BALAREZO:   Pearson is denying that he called Mr. Lackl.

21        (The video clip was played in open court.)

22        MR. BALAREZO:   Brazy called Mr. Lackl.  I ain't never call

23  him.

24        (The video clip was played in open court.)

25        MR. BALAREZO:   He's sitting about two feet away from

1  Detective Ruby in his face lying to him.  In his face, I never called

2  him.  Brazy called him.

3             (The video clip was played in open court.)

4             MR. BALAREZO:   I ain't never called him.

5             (The video clip was played in open court.)

6             MR. BALAREZO:   That's what I need.  Remember that they want

7  all the stories to be the same.

8             (The video clip was played in open court.)

9             MR. BALAREZO:   What do you say to that?  I never called him.

10  I never called.  I never called him.  This is what I need.  I never

11  called him.  I never called him.  This is what I need.  All right.  I

12  called him once and he keeps lying and you know he called him.  The

13  point is not that he didn't call him.  The point is he's a liar.  He

14  sits two feet from the detective and lies and this is before he's

15  facing the death penalty.  You think he's really going to change for

16  you?  These are going to be quick.  I'll skip through these.

17             (The video clip was played in open court.)

18             MR. BALAREZO:   A little emphasis going on.  Never out there

19  on Philadelphia Road.

20             (The video clip was played in open court.)

21             MR. BALAREZO:   And the thing is you know he's lying and you

22  see the indignation in his voice.  Two feet from the detective.  Me

23  and my girl were not out there.  We were not out there.  And it's

24  ongoing.

25             (The video clip was played in open court.)

1          MR. BALAREZO:   We were not out there.  We were not out

2    there.  All of a sudden now he saw him shoot the white man.

3              (The video clip was played in open court.)

4          MR. BALAREZO:   Did you see it?  Yeah.  Just as he saw that

5    little girl that he never saw.

6              (The video clip was played in open court.)

7          MR. BALAREZO:   These tapes are in evidence.  It's constant

8    like this with Mr. Pearson.

9              (The video clip was played in open court.)

10         MR. BALAREZO:   So basically what you want me to say is that

11   I witnessed the shooting.  And the detective is not telling him why.

12   I want you to tell me what you saw.

13             (The video clip was played in open court.)

14         MR. BALAREZO:   If you want me to say I was calling him, I

15   was calling him.

16             (The video clip was played in open court.)

17         MR. BALAREZO:   He's lying about something.  You know that

18   much.

19             Trying to speed really quick.  He talked a lot about cell

20   phones at the jail.  Made it seemed like this place, Supermax, you

21   know getting a phone there is, you know, you got to be some master

22   criminal to do it.  Well, this is Pearson.

23             (The video clip was played in open court.)

24         MR. BALAREZO:   Everyone at the jail has got phones.  A whole

25   rack of MF's at the jail has phones.  They just raided the pen, the

1   penitentiary and got phones.  So make it seem like having a phone, you

2   know, it might not be part of the rules.  If you're locked up, what

3   else are you going to do?  You're going to talk on the phone.  It's

4   not that rare.  It's not a big deal to have a phone at the jail.

5           Now these, the government claims that Mr. Pearson as he sat

6   there with his deal claimed he did not know Patrick Byers.  And the

7   government latches onto that because then they'll say well, this man

8   does not know Patrick Byers.  Why would he say these things about him?

9   Let's listen.

10          (The video clip was played in open court.)

11          MR. BALAREZO:   Remember Brazy, he doesn't even know Pat.

12  But according to Pearson, Brazy is Pat's man doing all these things

13  for him at the jail.  Talk about that girl that they fought about.

14  That bitch that was doing something with Patrick.

15          (The video clip was played in open court.)

16          MR. BALAREZO:   The murder they're talking about is

17  Mr. Haynes' murder at Montford and Jefferson.  East Baltimore.  Not

18  South Baltimore.  This is Pearson spinning his web, writing that story

19  that he talked about.  He hears something, he'll throw it out there

20  because he's trying to help himself out.

21          (The video clip was played in open court.)

22          MR. BALAREZO:   Of course he would.  And that's what he does.

23  He talks.  If I knew, I'd tell you.

24          (The video clip was played in open court.)

25          MR. BALAREZO:   He doesn't know the man.  How does he know?

1   He keeps saying he's going to come home.  I don't know Pat.  But I
2   know he's going to come home.  He keeps saying these things.  To whom,
3   I don't know.
4                    (The video clip was played in open court.)
5                    MR. BALAREZO:    Kill two birds with one stone.  Pat's already
6   locked up.  Tell him Pat.
7                    (The video clip was played in open court.)
8                    MR. BALAREZO:    And tell on the others because I know they
9   did it.
10                   (The video clip was played in open court.)
11                   MR. BALAREZO:    And he did that.  Go to court.  Point him
12  out.
13                   (The video clip was played in open court.)
14                   MR. BALAREZO:    He's already locked up.  It doesn't matter.
15  Patrick is already locked up for the Haynes murder.  I'll go to court.
16  I'll point him out.  I'll say that he did it.  I'll kill two birds
17  with one stone.  Take care of Pearson and screw Pat.
18                   (The video clip was played in open court.)
19                   MR. BALAREZO:    Pat can stay locked up.
20                   (The video clip was played in open court.)
21                   MR. BALAREZO:    He can stay locked up.  When Pat comes home,
22  he's going to cause a whole lot of expletive.  But he doesn't know
23  Pat.  We don't know what their background is because he didn't testify
24  to it.  But you determine the facts.
25                   (The video clip was played in open court.)

1          MR. BALAREZO:   Did you all catch that?  At the same time he

2   ain't coming home if I got something to do with it.  But he doesn't

3   know Pat.  That's what he said here under oath.  I don't know Pat.

4          (The video clip was played in open court.)

5          MR. BALAREZO:   This is what I told you earlier.  He just

6   tells the detective that Patrick killed Marco.  Implicates him in

7   another murder.  And on the stand, I pulled out the transcript of his

8   own statements back when the Marco murder happened and Pearson

9   implicated somebody else.  He says they locked up the wrong person.

10  He named somebody else and now he names Patrick as the murderer.  This

11  is the government's glue.

12         (The video clip was played in open court.)

13         MR. BALAREZO:   I'll try anything to send that nigga to jail.

14  What does that tell you?  This is the man who claims he doesn't know

15  Patrick Byers.  We don't know if it's a beef, if they had a beef.  We

16  don't know if it's a girl.  But do you believe that he does not know

17  Patrick from the street?  The things that he's saying.  Do anything to

18  send him to jail.

19         (The video clip was played in open court.)

20         MR. BALAREZO:   I really want to see them in prison.

21         (The video clip was played in open court.)

22         MR. BALAREZO:   I'd really like to see him locked up.

23         (The video clip was played in open court.)

24         MR. BALAREZO:   I'd really like to see him in prison.  I'd

25  really like to see him locked up.  Cold to say, but just what it is.

1    It's just another day for Mr. Pearson.

2              (The video clip was played in open court.)

3              MR. BALAREZO:    I think that's obvious.

4              (The video clip was played in open court.)

5              MR. BALAREZO:    Do I need to say it again?  This man is

6    locked up for the Haynes murder that we've already talked about ad

7    nauseum and you got the government's witness saying I don't want him

8    to come home for whatever his reasons are.

9              (The video clip was played in open court.)

10             MR. BALAREZO:    Mr. Goodman's interview.

11             (The video clip was played in open court.)

12             MR. BALAREZO:    A bit of a dare?  Who knows?

13             (The video clip was played in open court.)

14             MR. BALAREZO:    Patrick's locked up, remember.  Talking to

15   Mr. Goodman.

16             (The video clip was played in open court.)

17             MR. BALAREZO:    Food for thought.  Mr. Pearson.

18             (The video clip was played in open court.)

19             MR. BALAREZO:    Ladies and gentlemen, I know it's late.  I

20   apologize for taking so long and I apologize for replaying and

21   repeating some of the things that Mr. Pearson said.  But that is the

22   government's case.  You've heard Mr. Haynes.  I'm not going to repeat

23   it.  You heard Mr. Coleman.  That has nothing to do with it.  I'm not

24   going to repeat it.  But the Lackl murder, Mr. Pearson is the one who

25   holds it all together.  He says I called -- I mean you got all these

1  things. I already talked about all these things. That is the person
2  who sits here and points the finger at Patrick Byers. What did that
3  man not lie about? What did he not lie about? What did he not do to
4  help himself out? Whatever the issue is here, was it a gang killing?
5  Remember he was a Blood. Was it an initiation? Was it Brazy trying
6  to get rank? Remember what I didn't play the video about that thing
7  he said about Ronnie. Ronnie, it's time to come home. They take the
8  cheap way out. Kill a man, rather than take a beating. Is that what
9  happened? Mr. Purpura in his opening statement said the government
10  has the burden and you're going to get at the end of the day more
11  questions than answers. Was it a gang killing? Was it a killing to
12  protect Mr. Hogan? Mr. Hogan's DNA was on that gun. Mr. Hogan was
13  the Blood. Notice, you don't see any Blood at this table.
14  Mr. Goodman is not a Blood. Mr. Byers is not a Blood. Cornish was a
15  Blood. Pearson was a Blood. Graham was a Blood woman. The driver
16  was a Blood. Everybody else was a Blood. Were they trying to protect
17  Mr. Hogan? He was still alive at this time, remember. Was it a dare
18  as the detective kept asking? Some idle talk on the street and
19  somebody took you up on it? He was locked up. He can't be
20  responsible for what other people decided to do. Was it Pearson's
21  revenge on Mr. Byers for some unknown beef? A woman perhaps, Lavinia
22  Winchester. Oh, I don't know her, but when I showed her the picture,
23  she remembered. I want that "N" to stay in prison. I don't want him
24  to come home. You heard it. I'm not going to repeat it, ladies and
25  gentlemen. That's the government's case. As I said in the beginning,

it's a tragic thing that happened to Mr. Lackl.  But your duty as a

jury is to determine the facts.  And the facts as they presented them,

have they met the burden of proof.  Had they met the burden of proof?

You've heard some bad things about Mr. Byers.  But the issue and I

think Mr. Davis said is not whether Mr. Byers is an innocent man.  The

issue is whether the government has proven him guilty beyond a

reasonable doubt.  And you sit here and you listen to Mr. Pearson.

You look at all these things that I mentioned to you about the phones,

the lack of evidence, what wasn't done, what was ignored, what wasn't

necessary, what wasn't needed, lack of motive.  You cannot let your

sympathy, your emotions get the best of you.  The Lackl family has

suffered.  They've lost a son and a husband.  Will you make the Byers

family lose a son or father based on Mr. Pearson?

       Ladies and gentlemen, again thank you for your time.  We

thank you for your consideration of this case.  We urge you to

seriously consider this.  Look at the facts and what I've pointed out

to you.  And I urge you and I strongly hope you come back with a

verdict of not guilty on each of these counts.  Thank you.

       THE COURT:   Thank you, Mr. Balarezo.  Counsel, if you'll

approach the bench for one second, please?

       (Bench conference:)

       THE COURT:   It is now 20 minutes of 5.  So it certainly

seems to me that in light of the hour, that we'll just call it a day

and excuse the jury and we'll deal with rebuttal argument tomorrow

morning and then instruct the jury.  Any objection from the point of

1    view of the government?

2          MR. PURCELL:    No.  As much as I'd prefer not to do it that

3    way --

4          THE COURT:    It's 20 minutes of 5.  Mr. Balarezo went for two

5    hours and 20 minutes.  I didn't want to interrupt him.  That's the

6    longest of all three arguments and it's now 20 minutes of 5 and the

7    jury has not had a break since 20 after 2.

8          MR. PURCELL:    No objection.

9          THE COURT:    All right.  So that's what we're going to do.

10   We're going to tell the jury they're excused to go home and have the

11   rebuttal argument tomorrow morning and start at 9:30 with rebuttal and

12   then I'll charge the jury.

13          (In open court:)

14          THE COURT:    All right.  Ladies and gentlemen, it is now 20

15   minutes of 5.  We're going to call it a day and I know you all are

16   tired.  You've been paying very good attention.  Thank you very much.

17   I thank you on behalf of everyone involved in this case for the

18   attention you're giving these arguments.  We'll proceed at 9:30

19   tomorrow morning with the rebuttal argument presented by Mr. Purcell

20   on behalf of the government and then I will give you instruction on

21   the law.  I will definitely take a break after Mr. Purcell's argument.

22   Then we'll take a break in the middle of the instructions to give you

23   time to rest and whathaveyou.  So the case will -- again you obviously

24   should not view any media with respect to this case.  The same

25   admonitions apply and we'll see you tomorrow at 9:30.  Thank you.

1    We'll stand adjourned for the day.

2              (Proceedings concluded.)

3

4    I, LISA K. BANKINS, certify that the foregoing is
     a correct transcript from the record of
5    proceedings in the above-entitled matter.

6

7    _____       _____
     Signature of Court Reporter/              Date
8    Transcriber

9

10   _____
     Typed or Printed Name
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

$15,000 [1] 599/19
$200 [3] 538/10 628/23 628/25
$2200 [1] 628/25
$2300 [2] 514/12 538/8
$25 [3] 577/6 577/11 577/16
$2500 [3] 502/23 528/11
$400 [2] 516/5 624/5
$700 [1] 589/1

## '

'06 [5] 592/14 592/15 592/17 603/17 609/12
'07 [4] 558/16 590/25 600/8 618/2
'09 [1] 619/25

## .

.44 [1] 624/19
.501 [1] 499/3
.556 [1] 499/4
.580 [1] 499/5

## 0

00 [1] 574/25
056 [1] 497/3
07 [2] 532/19 532/22
09 [1] 547/6

## 1

10 [5] 603/20 618/13 618/15 621/3 628/12
10-year-old [1] 628/6
101 [1] 498/1
10th [3] 497/24 511/20 618/1
11 [2] 531/7 577/22
11:00 [2] 562/1 616/14
11:10 [2] 598/10 598/20
12 [7]
1200 [1] 618/10
13 [1] 628/6
13th [1] 547/8
14 [1] 611/3
14,000 [2] 618/9 618/9
140 [1] 607/15
1450 [1] 606/3
1455 [1] 606/3
148 [3] 585/17 596/2 597/6
15 [8]
15,000 [1] 600/15
15-year-old [1] 513/25
15:36:05 [1] 622/2
15:36:29 [1] 622/5
15:37:06 [1] 622/4
16 [2] 533/3 533/3
160 [8]
17 [1] 532/24
170 [7]
175 [2] 612/1 612/6
17:25 [1] 593/19
17:50 [1] 595/9
18 [4] 533/6 621/25 622/1 622/7
180 [1] 612/8
19 [3] 619/25 621/13 621/25
1980 [1] 537/21
1:00 [7]
1:30 [1] 616/21
1st [1] 628/8

## 2

20 [9]
20's [1] 612/7
20-minute [1] 533/4

20001 [1] 497/21
20004 [1] 497/25
2002 [1] 626/5
2004 [1] 614/18
2006 [12]
2007 [22]
2008 [2] 546/15 546/18
2009 [3] 497/5 546/23 547/1
2010 [1] 544/15
20:45:40 [1] 534/12
20:51:35 [1] 534/18
21 [2] 533/7 533/9
21201 [3] 497/16 497/19 498/2
22 [1] 533/10
2200 [1] 625/15
22nd [2] 565/19 568/19
23 [1] 612/5
23-year-old [1] 581/25
23:10 [1] 598/20
23:15 [2] 597/22 598/21
23rd [1] 619/25
24 [1] 537/4
25 [4] 514/12 619/6 619/7 619/11
26th [1] 627/23
27 [1] 589/14
27th [1] 589/22
28 [3] 533/7 537/21 540/6
29 [2] 537/4 611/1
2:30 [2] 562/2 577/22
2nd [32]

## 3

3-12-09 [1] 547/6
30 [5] 575/13 585/17 597/5 597/24 616/7
30-some [1] 595/19
300 [2] 497/21 573/19
30th [2] 622/25 622/25
31st [1] 592/14
330 [1] 617/24
343 [1] 532/8
344 [1] 620/17
35 [7]
35-year [1] 626/19
352 [1] 618/21
36 [1] 497/15
37 [1] 534/15
3:00 [3] 620/22 620/25 621/5
3:28 [1] 532/25
3rd [1] 514/13

## 4

40 [5] 585/17 625/4 625/5 625/8 625/10
40's [1] 593/6
400 [1] 497/20
424-A [2] 531/6 620/18
428 [1] 531/6
443-722-8470 [1] 531/14
464 [1] 546/22
4th [9]

## 5

5'10 [11]
5'2 [2] 614/22 615/10
5'6 [2] 585/18 607/15
5'9 [1] 593/6
50 [1] 619/19
500 [2] 608/17 608/19
505 [3] 608/4 608/18 608/22
514 [1] 497/24
55 [1] 581/22
5515 [1] 498/2
5:25 [2] 593/19 594/19
5th [4] 565/6 593/18 594/19 595/12

## 6

6-28-07 [1] 532/19
6-30-07 [1] 532/22
60 [2] 596/3 597/5
656 [1] 530/13
6:00 [1] 562/17

## 7

73 [1] 534/4

## 8

8470 [1] 531/14
89 [1] 530/7
8:00 [3] 621/12 621/12 621/16
8th [1] 618/1

## 9

91 [1] 534/20
911 [3] 534/12 534/15 534/16
92 [1] 534/21
9:30 [4] 497/6 639/11 639/18 639/25
9th [1] 582/9

## A

a-ha [1] 579/1
a.m [4] 497/6 531/8 562/2 577/22
abet [1] 507/13
abetted [3] 505/11 505/21 507/5
abetting [6]
abettors [1] 504/7
ability [1] 585/16
able [4] 556/13 558/5 591/15 602/9
about [323]
above [2] 620/3 640/5
above-entitled [1] 640/5
absolute [3] 509/11 546/3 575/19
absolutely [17]
accommodations [1] 500/14
accompanied [1] 616/11
accomplices [3] 584/19 584/20 585/4
accomplish [1] 570/9
according [15]
accounted [2] 550/11 621/7
accurate [2] 575/6 622/3
accused [2] 551/17 598/8
acknowledged [1] 532/2
acquit [1] 582/20
across [14]
act [1] 504/3
acting [1] 541/18
action [2] 574/7 574/20
activations [1] 618/9
activity [1] 605/25
acts [1] 564/10
actual [3] 504/3 505/17 599/1
actually [26]
ad [2] 620/17 636/6
addicted [1] 585/12
addiction [2] 596/19 604/22
adding [1] 613/19
addition [1] 506/8
additional [1] 508/15
address [15]
adjourned [1] 640/1
adjust [1] 520/8
admissions [1] 539/22
admit [7]
admits [10]
admitted [21]
admittedly [1] 629/4
admitting [6]
admonitions [1] 639/25

# A

advances [1] 584/17
advantage [2] 577/14 577/15
advice [2] 502/12 547/12
advise [1] 555/20
affected [1] 508/11
afraid [9]
African [1] 612/1
African-American [1] 612/1
after [49]
afternoon [7]
afterwards [2] 533/10 575/1
again [38]
against [26]
age [1] 583/19
aggravated [1] 611/2
aggressive [1] 599/22
agitated [1] 610/4
ago [12]
agree [1] 507/20
agreed [3] 512/6 532/25 615/20
agreement [6]
agreements [1] 585/23
agrees [1] 615/21
ahead [1] 629/17
aid [1] 507/13
aided [3] 505/11 505/21 507/5
aiders [1] 504/7
aiding [6]
ain't [8]
air [5] 501/19 514/5 536/19 544/18
 545/12
albeit [1] 600/13
alcohol [1] 596/8
alibi [3] 541/3 541/20 550/20
alibis [2] 550/5 550/6
Alice's [1] 573/21
alive [2] 591/2 637/17
all [242]
allegation [1] 557/14
allegations [1] 563/11
alleged [3] 559/16 559/17 584/19
alley [24]
allow [1] 583/23
allowed [2] 508/9 613/20
allows [1] 613/21
allusions [1] 553/19
almost [3] 508/2 560/23 589/17
alone [6]
along [6]
already [11]
also [48]
although [5] 509/8 526/11 538/25 600/16
 612/13
always [7]
am [9]
amazing [1] 571/16
AMERICA [2] 497/3 577/10
American [2] 577/9 612/1
among [5] 509/23 518/12 518/18 521/3
 537/2
amount [1] 563/10
angle [2] 548/6 615/15
animated [1] 529/1
Annihilate [2] 569/5 569/8
another [33]
answer [4] 509/7 509/11 509/20 569/5
answers [3] 536/9 575/16 637/11
antenna [1] 597/20
anticipate [1] 542/22
any [51]
anybody [10]

anymore [2] 512/10 546/25
anyone [9]
anyplace [1] 571/12
anything [71]
anyway [2] 563/5 576/23
anywhere [1] 610/7
apologize [5] 580/2 580/9 580/11 636/20
 636/20
apology [2] 553/1 553/12
Apparently [3] 564/20 597/21 616/9
Appeals [1] 566/18
appear [1] 543/17
APPEARANCES [1] 497/13
appearing [2] 542/4 615/17
appears [1] 532/1
applies [1] 578/5
apply [1] 639/25
appointed [2] 528/3 547/13
approach [3] 615/6 615/7 638/20
approached [2] 503/1 623/1
approaching [1] 514/24
appropriate [3] 625/9 625/9 626/20
approximately [1] 594/14
April [5] 497/5 511/24 589/14 589/22
 590/25
are [118]
area [25]
areas [1] 610/14
aren't [2] 573/8 621/7
argue [2] 556/13 609/6
argument [18]
arguments [12]
arm [1] 624/20
around [23]
arranged [2] 515/24 564/6
arranges [1] 526/21
arranging [1] 506/16
array [19]
arrest [1] 577/21 599/15
arrested [14]
as [116]
aside [1] 552/6
ask [19]
asked [19]
asking [13]
asks [3] 508/15 570/14 597/9
assailants [1] 521/4
assaults [1] 611/2
assess [3] 566/15 567/17 578/12
associate [2] 579/13 619/7
associated [5] 559/13 559/14 620/24
 621/5 621/13
associates [1] 504/4
association [2] 522/25 579/10
assume [1] 586/21
assumes [1] 557/11
assumptions [8]
assure [1] 521/10
assuring [1] 522/4
at [225]
attack [2] 604/12 604/13
attempt [3] 541/3 541/13 575/23
attempts [1] 591/22
attention [4] 534/9 556/16 639/16 639/18
attorney [7]
Attorney's [1] 497/14
attorneys [4] 525/19 551/24 557/4 592/18
attract [1] 534/9
attribute [2] 618/15 620/19
attributed [4] 512/10 531/22 619/11
 619/20
August [4] 565/19 568/18 627/23 628/8
authorities [2] 506/2 539/4 554/18 590/18

591/10
authority [1] 626/23
automatic [1] 543/2
autopsy [2] 611/5 611/8
Ave [2] 572/18 572/18
Avenue [17]
award [1] 626/19
away [27]

# B

babbling [1] 583/6
baby [3] 624/16 624/16 624/21
back [67]
backed [1] 545/18
background [2] 502/7 634/23
backing [1] 548/16
backup [1] 589/3
backyard [1] 609/1
bad [13]
badly [1] 614/25
bag [1] 625/17
BALAREZO [10]
Baltimore [33]
Baltimore City [1] 540/16
bank [1] 570/12
Bankins [2] 498/1 640/4
barges [1] 614/9
based [14]
basically [14]
Bates [12]
battle [1] 539/20
be [120]
bear [2] 558/6 585/24
beard [1] 531/17
bears [1] 554/11
beat [3] 552/1 600/18 600/23
beating [1] 637/8
Beats [1] 626/25
became [1] 527/5
because [142]
become [1] 559/12
becomes [1] 630/15
beef [4] 520/17 635/15 635/15 637/21
been [58]
before [63]
began [1] 509/7
begin [1] 604/12
beginning [6]
begins [1] 622/2
behalf [8]
behind [9]
behold [5] 512/24 530/19 548/18 548/20
 615/8
being [33]
believable [1] 585/15
believe [38]
believed [1] 557/18
believes [1] 521/12
believing [1] 529/12
Bellamy [2] 540/5 543/13
belonged [2] 518/15 618/8
belongings [1] 509/23
belongs [1] 524/6
bench [2] 638/20 638/21
benefit [2] 523/22 584/15
BENNETT [1] 497/11
Beside [1] 572/15
besides [2] 514/21 624/24
best [10]
better [4] 543/9 543/16 591/5 611/4
between [26]
beyond [10]
BG [1] 624/16

# B

bias [8]
big [24]
bigger [1] 624/23
biggest [1] 522/19
bill [3] 536/16 577/6 577/7
billing [2] 536/8 536/16
birds [2] 634/5 634/16
bit [13]
bitch [3] 561/2 627/1 633/14
biting [1] 570/23
bits [1] 520/7
black [21]
Blackberry [2] 565/10 622/17
blank [1] 579/3
blanket [3] 563/23 563/24 602/7
blanks [3] 561/6 561/7 577/1
bleeding [1] 502/5
blessing [1] 585/10
blind [1] 548/10
block [2] 608/17 608/17
blocks [3] 545/14 545/19 588/1
blood [30]
Bloods [6]
blow [1] 580/23
blue [14]
board [1] 627/6
body [5] 506/8 602/6 604/1 604/2 611/16
boggling [1] 571/11
book [1] 520/25
boom [7]
Booze [3] 529/20 599/18 616/10
bored [1] 612/20
borrow [1] 570/15
borrowed [1] 531/4
both [10]
bother [6]
bothered [4] 606/15 606/19 609/9 613/5
bottom [10]
bought [6]
box [4] 518/12 519/1 519/3 566/3
boy [2] 554/2 618/24
boyfriend [1] 502/20
boys [1] 571/3
Bradford [1] 606/24
braids [5] 614/23 614/23 615/10 615/13
 615/15
brain [7]
brain-damaged [1] 601/23
Brazy [7]
break [10]
breakdown [2] 620/18 620/19
breaking [1] 555/5
bribed [1] 590/2
brief [2] 534/21 614/2
briefly [3] 504/21 532/9 590/23
Briggs [7]
Briggs' [2] 552/7 552/8
bright [2] 532/23 610/10
bring [12]
bringing [4] 526/7 526/7 557/2 605/11
brings [1] 584/1
broad [2] 502/9 540/12
broke [1] 620/17
broom [1] 614/8
brother [2] 552/7 552/8
brought [14]
BRYAN [1] 497/15
bucks [4] 577/12 614/6 624/25 625/16
buddies [2] 568/10 570/9
build [1] 593/6
building [1] 509/24

bullets [1] 591/24
bump [1] 534/18
bumped [1] 536/20
burden [49]
buried [1] 501/25
burner [5] 511/10 513/13 528/17 533/13
 534/1
business [3] 509/1 573/19 615/2
businesses [1] 575/14
busy [1] 551/18
but [194]
butt [1] 615/5
buttocks [1] 614/10
buttress [1] 613/25
buy [10]
buying [5] 500/24 511/10 528/1 576/20
 604/19
buys [2] 576/6 576/19
BYERS [342]
Byers' [42]

# C

cajoled [1] 590/2
call [32]
called [43]
caller [1] 574/10
calling [20]
calls [64]
Camaro [2] 513/17 513/20
came [25]
camera [6]
cameras [6]
can [69]
can't [14]
candid [1] 584/10
cannot [10]
cap [1] 544/24
car [26]
caravan [1] 511/9
care [8]
career [1] 570/24
cares [4] 577/10 577/11 609/18 628/25
Carl [46]
Carlisle [1] 553/2
Carlson [2] 591/13 611/18
Carlyle [8]
carried [1] 507/12
cars [2] 614/6 615/2
case [127]
cases [2] 566/13 599/25
cash [2] 570/11 572/9
casings [3] 604/3 604/5 604/7
catch [2] 605/18 606/1 635/1
catching [1] 607/3
caught [5] 521/24 564/12 601/12 606/6
 610/2
cause [2] 522/25 634/22
Caused [1] 507/16
causing [1] 615/5
caution [2] 585/5 586/3
caveat [1] 506/19
celebrating [3] 517/12 625/18 625/19
celebration [1] 624/6
cell [40]
center [3] 515/15 525/11 528/7
certain [8]
certainly [3] 555/17 555/18 638/22
certify [1] 640/4
cetera [3] 596/7 598/12 598/13
chair [4] 524/24 554/15 582/11 582/12
chance [2] 557/22 607/3
chances [1] 526/6
change [7]

changed [5] 528/9 564/16 621/23 627/3
 627/4
changes [1] 527/1
character [1] 561/4
character's [1] 545/3
characterization [1] 570/20
charge [8]
charged [27]
charges [12]
charging [1] 586/15
Charles [1] 497/15
chart [9]
charts [5] 573/20 573/22 583/10 617/14
 621/23
cheap [3] 503/3 550/24 637/8
check [5] 555/12 559/24 573/6 578/4
 585/18
checked [1] 568/4
checks [1] 577/9
Cheryl [4] 544/12 547/24 602/25 604/14
chest [2] 596/25 624/20
child [1] 580/22
children [1] 581/1
chip [4] 528/21 577/6 577/11 577/16
chips [1] 577/8
CHRISTOPHER [1] 497/23
chronology [1] 593/20
Chuck [1] 529/7
circuit [4] 501/12 539/19 540/16 592/22
circumstances [1] 578/14
citizens [1] 557/6
city [18]
claimed [1] 633/6
claims [3] 624/4 633/5 635/14
clear [1] 621/12
clearly [3] 505/5 505/20 507/7
clerk [1] 592/21
client [3] 585/2 609/7 623/16
Cliffview [2] 559/4 579/7
clip [79]
clips [2] 521/14 525/8
clock [1] 536/8 536/12 574/5
close [2] 546/20 568/7
closed [1] 607/21
closely [3] 598/22 598/23 609/13
closer [2] 526/11 601/24
closest [1] 594/25
closeup [1] 612/4
closing [17]
clown [1] 566/5
co [2] 537/2 585/23
co-conspirators [1] 537/2
Co-defendants' [1] 585/23
Cobra [1] 626/11
Code [1] 507/2
cohorts [1] 621/1
coincide [1] 564/20
coincidence [3] 514/3 548/17 552/25
coincidentally [1] 549/8
Cold [1] 635/25
Cole [5] 530/13 530/15 540/4 543/13
 616/6
Coleman [24]
Coleman's [2] 549/25 616/16
collapses [1] 530/22
colleagues [1] 573/3
collected [1] 559/19
colored [1] 515/9
colorful [1] 521/11
column [1] 620/12
combined [1] 538/3
come [43]
comes [16]

# C

comfort [1] 553/22
coming [8]
commerce [2] 505/1 508/11
commission [2] 506/3 506/3
commit [6]
commits [1] 504/3
committed [7]
committing [2] 506/7 579/13
common [25]
communicated [3] 510/11 525/6 527/15
communicating [3] 506/2 547/15 547/17
communication [1] 505/25
community [1] 557/6
companies [3] 574/11 575/14 621/22
company [1] 574/12
Compare [1] 568/16
compelling [1] 519/19
completed [1] 536/17
completely [4] 529/2 529/2 541/3 548/14
complexion [1] 607/18
Concealed [1] 604/21
concedes [1] 574/18
concepts [2] 503/24 504/18
concerned [4] 520/18 522/22 546/1 579/5
concerning [3] 586/12 586/12 586/13
concluded [1] 640/2
conclusion [4] 559/23 587/2 592/2 617/9
conclusions [1] 592/9
conclusive [1] 593/12
concocting [1] 523/22
concocts [1] 520/16
conduct [2] 541/1 624/12
conference [2] 500/6 638/21
confession [1] 526/23
confident [5] 509/10 587/17 600/11
600/15 617/21
confirm [2] 515/6 534/14
confirmed [5] 513/5 513/24 533/12
534/19 535/8
confirms [4] 514/14 516/21 517/19 517/20
confronted [4] 522/3 527/1 545/16 545/17
confused [3] 536/9 536/10 595/5
connect [8]
connected [1] 559/18
connection [7]
connections [5] 510/13 618/9 618/22
618/24 620/10
connects [5] 530/13 537/15 574/4 618/2
619/22
Connie [4] 501/23 502/3 593/22 594/24
consider [5] 519/8 581/4 583/17 584/3
638/16
consideration [1] 638/15
considered [1] 584/19
consistent [4] 529/4 603/19 603/19 604/6
conspiracy [15]
conspirators [2] 504/12 537/2
conspire [2] 507/20 509/9
conspired [1] 505/13
conspiring [1] 533/3
constant [2] 527/20 632/7
constantly [3] 578/25 579/3 624/3
constituted [2] 506/10 507/17
Constitution [1] 557/9
consultant [1] 575/14
contact [24]
contacted [1] 618/4
contacting [2] 552/9 559/16
contacts [7]
contend [1] 541/1
content [1] 573/15

contested [1] 506/11
continue [5] 553/5 555/11 579/21 613/13
617/10
continued [5] 502/12 526/10 527/16
527/16 605/1
continues [2] 536/21 553/7
continuing [1] 524/9
contraband [1] 512/5
contract [1] 538/6
control [2] 508/6 568/13
controls [7]
conversation [4] 514/5 514/6 536/22
536/24
conversations [8]
convict [4] 566/7 585/2 609/8 609/10
convicted [5] 508/8 579/9 579/11 589/4
612/16
conviction [2] 506/6 508/8
convince [1] 523/11
convinced [2] 509/12 582/21
cooperativeness [1] 541/7
cooperators [2] 617/17 623/22
cop [1] 608/6
copied [1] 518/17
copies [1] 500/5
cops [1] 610/15
corner [24]
corners [3] 563/21 564/24 605/17
Cornish [55]
Cornish's [1] 519/18
correct [3] 599/5 622/24 640/4
corrections [1] 551/20
correlation [1] 535/14
corroborate [3] 517/1 518/1 567/10
corroborated [3] 516/12 529/7 533/25
corroborates [3] 517/2 518/3 553/21
corroboration [2] 535/10 535/20
Cougar [1] 593/24
could [45]
couldn't [14]
counsel [3] 555/5 580/15 638/19
count [14]
counties [1] 588/11
counts [21]
county [10]
couple [2] 514/13 531/13
courage [1] 549/3
course [14]
court [107]
courthouse [3] 501/1 603/14 616/17
courtroom [8]
courts [1] 575/12
cousin [5] 540/11 540/12 602/11 616/7
616/9
cousins [5] 540/9 543/15 559/2 559/2
559/9
cover [3] 541/21 543/11 544/1
covered [2] 602/6 604/20
crack [4] 570/25 571/2 596/17 596/18
cracker [1] 518/11
cracks [1] 564/22
crazy [2] 529/17 608/6
created [1] 567/10
creates [1] 584/16
Creating [1] 523/25
credibility [5] 516/10 521/5 584/8 596/6
604/12
credible [5] 547/17 587/16 593/9 600/6
617/19
credit [1] 599/16
crime [23]
crimes [7]
criminal [10]

critical [4] 567/19 567/19 621/5 621/11
cross [9]
cross-examination [6]
cross-examine [1] 557/4
crossed [1] 508/12
CSI [1] 543/7 581/16
curb [1] 628/7
cut [5] 563/21 564/24 577/23 626/22
626/23
cutaway [2] 595/12 604/2
cuts [1] 629/1

# D

D.C [2] 497/21 497/25
damage [2] 593/1 604/15
damaged [5] 548/11 601/23 603/7 603/9
604/13
damn [1] 626/7
dance [2] 627/5 627/5
dare [2] 636/12 637/17
dark [2] 594/15 606/8
Darley [1] 572/18
Darrell [9]
Dash [2] 565/11 565/21
data [2] 621/22 621/23
date [12]
dated [1] 593/18
dates [2] 511/22 629/5
daughter [1] 580/22
Davina [2] 530/9 530/14
DAVIS [11]
Davis' [1] 582/13
Davon [1] 530/19
day [83]
daylight [2] 502/9 540/12
days [9]
dead [8]
deal [15]
dealer [3] 570/25 610/14 626/13
dealers [1] 610/14
dealing [4] 522/13 563/25 591/3 626/6
deals [3] 586/8 626/22 626/23
death [9]
decide [9]
decided [8]
decides [1] 557/1
decision [4] 503/4 503/5 518/6 585/25
decisionmaking [1] 583/24
deed [1] 571/3
deeper [6]
defend [1] 612/14
defendant [8]
defendant's [4] 568/14 568/16 569/9
583/18
defendants [3] 497/9 507/11 555/5
defendants' [1] 585/23
defender [1] 599/16
defense [26]
defies [2] 570/17 570/17
define [1] 567/13
definitely [2] 521/20 639/21
definition [1] 504/24
delays [1] 577/23
Deli [1] 559/6
deliberate [5] 506/12 506/15 514/7
552/13 553/23
deliberations [1] 553/14
delivers [1] 570/15
demonstrates [1] 566/12
demonstration [1] 604/5
denied [3] 563/2 573/5 630/13
denies [5] 522/2 525/14 563/3 563/4
578/25

# D

denigrate [2] 595/23 605/2
deny [9]
denying [5] 523/5 523/16 563/5 630/7 630/20
department [3] 529/8 592/4 610/12
depicts [2] 618/13 619/9
describe [1] 612/6
described [1] 604/19
describes [1] 595/14
description [13]
deserve [4] 553/18 553/18 553/20 599/17
deserves [1] 502/1
despite [2] 549/4 563/20
destroy [4] 569/5 569/8 575/8 575/9
detail [1] 525/16
details [7]
detained [1] 624/7
detective [138]
detective's [3] 565/5 598/1 612/7
detectives [10]
deter [1] 605/25
determination [2] 564/10 578/17
determine [3] 559/25 634/24 638/2
determined [1] 565/19
devil [1] 590/5
devoted [1] 502/20
diagonal [1] 602/4
diagram [1] 604/1
dialing [1] 536/13
did [176]
didn't [117]
die [1] 539/18
differ [2] 572/15 584/12
difference [3] 526/3 526/6 562/19
different [11]
difficult [1] 556/17
digging [2] 520/9 528/2
digs [1] 543/25
Dino [1] 560/14
Dino's [1] 560/14
direct [18]
direct-connect [5] 515/10 574/1 574/20 577/17 619/15
direct-connects [1] 619/22
directed [1] 528/16
directing [1] 621/17
directly [3] 517/20 528/6 553/17
directories [1] 532/4
directory [4] 527/18 530/17 530/18 530/21
disassociate [1] 524/1
discharged [1] 507/12
discount [1] 609/22
discovered [1] 567/2
discrepancy [1] 607/17
discuss [1] 587/19
discussion [1] 608/1
disposal [1] 537/18
disposition [2] 625/9 626/20
disproved [1] 529/9
dispute [2] 514/11 614/7
disputed [1] 574/21
distance [3] 595/20 595/20 596/2
distancing [1] 519/2
distinction [1] 504/9
distorted [1] 579/16
DISTRICT [3] 497/1 497/1 497/12
DIVISION [1] 497/2
DNA [9]
DNR [1] 574/14
DNRs [3] 574/9 574/9 574/9
do [159]

document [1] 518/16
documents [1] 609/16
does [87]
doesn't [65]
doing [16]
dollar [1] 625/17
dollars [7]
domestic [1] 611/3
don't [104]
done [18]
donor [1] 592/5
Dontay [3] 540/5 543/13 588/4
door [16]
dope [1] 570/25
Dorsey [5] 587/15 593/3 593/3 593/7 601/10
dots [1] 604/3
dotted [2] 624/14 626/19
doubt [21]
down [19]
downstairs [1] 603/15
doze [1] 612/20
dozed [1] 605/16
dragged [1] 563/12
draw [2] 575/22 575/24
drawn [1] 562/21
dressed [1] 549/17
drive [6]
driver [2] 510/1 637/15
driver's [2] 534/8 624/3
drives [1] 609/17
driving [7]
dropped [1] 607/7
drove [5] 502/2 513/14 517/4 527/5 623/23
drug [25]
drugs [21]
dug [1] 526/12
dumped [1] 606/12
dumps [1] 621/22
duration [3] 574/5 574/21 620/12
durations [1] 536/6
Duray [2] 540/4 543/13
during [19]
duty [1] 638/1
DVD [2] 561/9 561/13
dying [4] 502/8 509/18 509/24 559/21

# E

E-pills [3] 576/6 576/9 576/22
each [25]
earlier [3] 571/18 581/24 635/5
early [2] 514/13 612/7
easier [2] 531/11 551/22
easily [1] 559/25
east [4] 497/18 501/17 535/18 633/17
eastbound [1] 593/23
Easter [3] 568/22 568/25 569/3
easy [6]
Ebb [1] 587/15
Ebbs [4] 593/3 593/3 593/7 601/10
Ebony [3] 530/10 551/19 600/17
Edna [2] 599/18 616/10
Edna's [1] 616/20
EDUARDO [1] 497/20
effectively [1] 511/2
effects [2] 585/16 595/5
efforts [2] 529/21 531/12
Ehasz [2] 596/1 606/22
eight [4] 515/3 547/8 549/11 609/17
eight-minute [1] 547/8
either [5] 507/11 513/9 587/5 592/6 605/25

electrical [1] 575/13
element [3] 505/3 505/4 508/16
elements [1] 504/25
elevated [1] 524/23
eliminating [1] 503/6
else [55]
else's [5] 518/13 518/21 553/9 577/4 630/16
elsewhere [1] 595/20
emblematic [1] 608/2
emotional [1] 556/22
emotions [1] 638/11
emphasis [1] 631/18
empty [1] 566/3
encourage [2] 514/6 537/3
end [22]
ended [2] 513/2 513/22
ends [1] 624/5
enforcement [4] 505/25 563/9 567/21 578/7
enforcement's [1] 566/10
engineer [2] 575/11 575/13
enhanced [1] 589/4
enough [8]
enter [1] 507/20
entire [3] 510/6 526/5 595/13
entitled [1] 640/5
entrance [1] 602/5
envelope [10]
equal [1] 563/14
equally [1] 576/25
equals [1] 563/15
equate [1] 570/4
equivocating [1] 587/23
error [1] 594/5
escaped [1] 596/2
especially [2] 515/16 612/9
ESQUIRE [6]
essentially [6]
establish [3] 568/15 586/17 612/12
et [3] 596/7 598/12 598/13
evaluate [1] 566/14
evasive [2] 575/16 584/11
even [43]
event [1] 616/25
events [1] 608/14
eventually [1] 526/25
ever [21]
every [14]
everybody [18]
Everybody's [2] 562/11 562/12
everyone [12]
everything [17]
evidence [98]
evolve [1] 630/1
exact [7]
exactly [3] 542/23 553/15 609/5
exaggerate [1] 605/9
exaggerating [1] 587/23
examination [7]
examine [2] 557/4 586/2
examined [2] 585/6 585/14
examiner [1] 604/25
example [4] 504/25 520/13 564/18 574/3
except [4] 537/12 547/11 604/13 616/8
exchange [3] 536/5 608/7 624/10
exchanged [1] 577/9
excited [1] 610/4
exclude [1] 592/9
excluded [1]
exclusive [2] 618/19 621/14
exclusively [1] 619/11
excuse [2] 606/12 638/24

# E

excused [1] 639/10
executed [1] 538/7
exercise [1] 537/19
exhibit [22]
exhibits [4] 535/6 554/20 573/19 620/23
exist [3] 553/20 569/13 569/24
existed [2] 588/9 588/14
expensive [1] 538/10
experience [1] 548/9
experienced [2] 597/21 599/25
expert [13]
explain [1] 555/18
explained [5] 556/10 578/10 578/11 588/3
590/9
explaining [2] 563/25 564/1
explanation [8]
explanations [2] 523/10 576/25
expletive [1] 634/22
Express [1] 577/9
extensive [1] 610/25
extent [1] 604/22
extreme [1] 563/9
extremely [1] 566/2
eye [19]
eyes [8]
eyewitness [10]
eyewitnesses [10]

# F

face [12]
facilitate [2] 504/8 505/22
facility [1] 505/1
facing [14]
fact [12]
factors [1] 556/15
facts [18]
factual [1] 583/13
faculties [1] 585/20
fading [1] 612/19
failed [5] 557/20 601/12 606/10 606/17
607/20
fails [1] 582/22
faint [1] 609/12
fairly [1] 507/15
fairness [1] 601/13
fake [2] 521/23 522/3
false [2] 567/10 586/23
falsely [5] 546/5 584/16 586/2 590/19
598/8
familiar [1] 588/20
families [2] 500/15 618/4
family [22]
fancy [1] 574/10
far [9]
fashioned [1] 619/19
fast [2] 616/19 616/20
fatal [1] 611/2
fate [1] 560/10
father [5] 512/4 523/3 532/14 600/12
638/13
fault [1] 580/11
favorable [1] 586/1
favorably [1] 567/21
featured [1] 531/23
February [2] 540/6 619/25
federal [11]
federally [3] 528/3 546/19 547/13
federally-appointed [2] 528/3 547/12
feeds [1] 579/2
feel [11]
feelings [2] 583/18 583/23

feet [18]
feign [1] 541/6
felon [2] 508/5 508/8
felony [2] 506/6 508/8
felt [5] 511/8 511/8 587/16 600/11 600/14
few [11]
fiance's [1] 602/10
fiancee [1] 605/5
Fifteen [1] 611/3
Fifth [1] 497/20
Fifty [1] 625/17
fighting [1] 561/17
fights [2] 524/13 561/14
figure [2] 534/2 622/13
figured [1] 612/2
Figures [1] 541/4
figuring [2] 511/8 513/8
files [1] 612/1
filing [1] 592/14
fill [1] 577/1
filled [3] 500/24 561/5 572/9
fills [1] 561/7
film [1] 615/16
final [2] 566/17 566/17
finally [8]
find [19]
finder [1] 583/13
finders [2] 584/7 615/19
finding [2] 506/16 546/2
finds [2] 535/2 590/3
fine [8]
finger [1] 548/16 637/2
fingerprints [2] 543/3 543/7
finish [2] 555/19 558/1
finished [2] 545/8 556/5
finishes [1] 558/2
fire [2] 591/23 591/24
firearm [15]
firearms [5] 506/23 506/25 507/2 508/3
508/13
first [35]
Fisher [1] 568/20
fit [4] 564/16 603/18 604/16 609/22
five [15]
five-minute [1] 606/4
flea [1] 625/17
fleeting [1] 598/15
floor [3] 497/16 497/24 549/18
flowers [1] 605/24
fly [1] 588/21
focus [3] 533/3 541/7 543/20
folks [1] 566/16
follow [9]
following [2] 618/14 622/11
food [2] 616/20 636/17
fool [1] 583/6
foolish [1] 541/3
foregoing [1] 640/4
foremost [1] 537/7
forever [3] 520/19 527/9 528/2
forget [6]
forgot [2] 526/12 629/8
form [1] 581/18
formalize [1] 500/5
format [1] 569/25
former [2] 551/20 599/24
forth [6]
forthright [1] 584/10
forward [1] 520/4
fought [5] 527/9 529/17 529/24 531/13
633/13
found [10]
four [8]

fourth [2] 497/16 534/10
frame [2] 583/8 602/1
framework [1] 503/21
frank [89]
frankly [5] 560/17 573/11 591/16
free [4] 538/4 577/16 577/18 624/9
freedom [1] 587/4
frenzy [1] 566/15
friend [7]
friends [7]
front [15]
full [3] 546/4 546/6 585/19
fun [1] 564/2
fungible [1] 577/10
further [2] 500/7 500/10
furtherance [6]

# G

gain [3] 509/18 509/24 521/5
gang [5] 568/9 570/9 621/1 637/4 637/11
gangsta [3] 624/16 624/21 626/10
gangster [1] 564/8
gangsters [1] 573/8
garage [7]
garages [1] 553/8
Gary [1] 525/24
gave [10]
gears [1] 538/17
Gee [1] 571/3
general [1] 535/14
generalizations [1] 588/6
generally [4] 503/15 504/1 504/5 521/4
gentleman's [1] 629/8
gentlemen [23]
Germany [1] 508/14
get [96]
get-go [1] 558/12
gets [28]
getting [18]
GIBLIN [9]
Giblin's [2] 580/20 582/13
girl [11]
girlfriend [4] 512/20 542/15 560/17
623/23
give [18]
given [6]
gives [12]
giving [4] 538/21 628/7 628/7 639/18
glass [1] 604/8
glue [9]
go [50]
God [1] 578/13
goes [15]
going [160]
gone [4] 554/2 559/7 559/8 599/7
good [45]
GOODMAN [153]
Goodman's [18]
Google [1] 616/15
got [158]
gotten [2] 543/2 589/3
government [42]
government's [29]
grab [1] 563/15
grabbed [1] 591/24
graduated [1] 627/14
Graham [26]
Graham's [1] 572/11
grand [4] 557/1 557/3 570/13 576/12
grandmother [4] 530/8 588/2 599/18
616/10
granted [1] 614/17
great [6]

# G

greater [2]  585/6 585/14
green [5]  513/17 513/20 530/10 551/19 600/17
grim [1]  626/12
Gruss [13]
guess [13]
guilt [2]  582/21 583/22
guilty [16]
gun [67]
gunning [1]  611/10
guns [5]  508/23 508/23 540/23 610/13 610/21
gunshots [2]  501/18 593/25
guy [34]
guy's [1]  568/10
guys [10]

# H

ha [1]  579/1
had [176]
hadn't [1]  542/25
hair [5]  544/23 594/15 596/25 612/19 629/8
half [5]  550/5 550/20 561/23 611/4 619/19
ham [2]  613/2 613/3
hand [12]
handgun [2]  508/10 508/10
handle [2]  503/14 515/24
hands [1]  583/21
handwritten [6]
handy [1]  614/2
hanging [1]  560/10
hangs [1]  540/22
happen [14]
happened [44]
happening [5]  517/6 542/24 553/3 553/7 622/6
happens [12]
happy [2]  517/13 535/3
hard [9]
harder [1]  550/22
Harger [1]  622/19
has [67]
hasn't [1]  528/9
hat [1]  594/15
have [207]
haven't [4]  537/25 584/24 611/24 612/2
having [14]
Haynes [70]
Haynes' [8]
he [1004]
he'd [2]  543/9 563/5
he'll [2]  625/6 633/19
he's [190]
head [8]
heading [1]  597/8
hear [58]
heard [134]
hearing [1]  547/2
hears [2]  539/10 633/19
heavy [2]  558/6 593/6
heck [1]  574/15
height [2]  607/17 612/1
held [1]  515/18
hell [2]  627/17 627/25
help [16]
helped [3]  522/24 552/23 568/5
helpful [4]  526/19 526/22 526/22 541/7
helpfulness [1]  543/25
helping [2]  504/6 505/13

Hence [1]  543/10
her [54]
here [108]
Here's [3]  521/14 610/16 611/25
heroin [6]
hey [11]
hidden [1]  509/22
hide [5]  518/22 518/22 518/23 531/12 531/13
hides [1]  518/25
hiding [2]  584/10 629/5
high [12]
highlighting [1]  502/1
highly [2]  515/9 617/14
highly-colored [1]  515/9
Hill [3]  611/12 611/13 611/15
him [295]
himself [26]
hire [9]
hired [7]
hires [1]  504/23
his [243]
history [1]  577/13
hit [4]  535/7 535/15 551/17 626/14
Hits [1]  624/19
hitting [2]  535/22 536/1
hmm [1]  606/20
Hogan [12]
Hogan's [3]  611/23 612/9 637/12
hold [2]  579/17 594/6
holds [8]
home [31]
homeboy [3]  514/25 515/1 525/12
homeboys [1]  543/21
Homeowner [1]  589/11
homicide [13]
homicides [1]  611/1
honestly [5]  521/12 521/12 522/7 522/8 620/7
Honor [9]
HONORABLE [1]  497/11
hoody [2]  593/5 606/7
hope [6]
hoping [1]  503/23
Hopkins [1]  616/8
horrible [1]  580/24
horrific [2]  561/24 561/25
hospital [2]  615/6 615/24
hotel [6]
hour [12]
hourly [2]  620/18 620/19
hours [10]
house [24]
how [68]
however [5]  527/21 536/19 583/17 588/7 597/6
huge [1]  584/4
Humes [1]  605/5
hundred [6]
hung [2]  540/19 571/21
Hunt [17]
hurt [1]  614/25
husband [1]  638/12
hustled [1]  540/19
hustles [1]  542/12

# I

I'd [11]
I'll [22]
I'm [56]
I've [6]
I.D [6]
I.D.ed [1]  510/22

icons [1]  530/15
idea [1]  620/1
identification [16]
identified [8]
identifies [1]  614/21
identify [8]
identifying [1]  553/6
identity [1]  548/24
idle [1]  637/18
if [98]
ignored [1]  638/9
illegal [4]  504/15 512/5 529/22 552/9
Imagine [1]  564/7
imagined [1]  545/10
immediate [1]  606/22
immunity [5]  590/15 590/21 591/9 591/11 625/7
immunize [1]  590/22
immunized [2]  585/6 585/8
impending [1]  511/16
implicate [1]  527/12
implicated [3]  562/11 626/4 635/9
Implicates [1]  635/6
implicating [2]  528/15 625/20
implication [1]  575/20
implied [1]  566/3
important [13]
importantly [2]  516/17 602/14
impression [2]  569/14 569/16
impressions [1]  567/10
imprimatur [1]  585/9
improper [3]  583/22 613/21 629/23
in [630]
inaudible [1]  599/6
incarnate [1]  590/5
incident [2]  586/9 614/12
included [2]  592/6 611/19
including [3]  576/16 592/15 621/3
incoherent [1]  603/11
incomplete [1]  601/8
inconsistencies [1]  542/4
inconsistent [2]  541/1 541/24
incriminates [1]  519/4
inculpate [2]  560/5 560/6
inculpates [1]  560/16
inculpatory [5]  560/3 560/5 560/7 561/8 572/1
indicate [5]  556/14 605/9 609/14 609/14 609/15
indicated [1]  519/14
indicates [2]  504/10 616/13
indication [1]  578/3
indict [2]  583/8 613/2
indicted [3]  546/19 582/6 612/25
indictment [10]
indignation [1]  631/22
individual [3]  585/25 591/19 599/4
individual's [1]  591/18
individually [1]  582/24
individuals [5]  513/1 579/10 592/15 592/18 592/23
inexplicable [2]  552/12 552/19
lnez [1]  530/13
infer [1]  614/18
inference [2]  575/21 575/23
inferences [1]  556/15
inferred [1]  573/3
influence [2]  549/5 596/8
informant [1]  609/25
information [26]
initial [1]  592/18
initially [3]  564/18 567/15 567/15
initials [1]  611/13

**I**

initiated [1] 559/13
initiation [3] 517/14 517/18 637/5
injured [1] 615/23
innocence [4] 558/10 581/10 581/10 582/19
innocent [17]
innocuous [1] 573/11
innoxious [1] 566/21
input [1] 557/5
inside [1] 518/13
instance [1] 594/12
instant [2] 597/6 597/24
instead [2] 545/4 600/24
instruct [4] 504/7 505/19 582/4 638/25
instruction [2] 585/12 639/20
instructions [8]
instructs [1] 581/4
intended [1] 554/15
intent [2] 505/4 505/24
intentional [1] 506/14
intentions [8]
interest [2] 584/14 584/16
interested [1] 519/13
interesting [4] 552/9 564/4 577/25 612/5
interests [1] 584/17
interfere [1] 583/24
interrupt [1] 639/5
interruptions [1] 603/15
intersection [1] 607/6
interstate [1] 505/1
interview [25]
interviewed [11]
interviews [6]
into [45]
introduced [4] 556/12 557/17 609/16 611/1
inundated [1] 509/8
invade [1] 581/12
investigate [2] 583/8 606/19
investigated [1] 573/22
investigating [1] 630/11
investigation [9]
investigator [6]
investigators [5] 545/25 546/10 546/15 553/22 626/15
involved [15]
involving [1] 532/20
is [562]
isn't [14]
issue [7]
issued [1] 565/19
issues [2] 583/13 605/2
it [501]
it's [158]
iterations [1] 586/7
its [2] 580/18 582/22
itself [5] 505/22 553/22 592/6 598/6 612/13
Ivan [5] 525/17 587/16 589/21 599/23 599/24

**J**

J.I [5] 509/24 510/14 518/12 518/18 523/14
jacked [1] 578/8
jacket [2] 594/14 606/8
jail [55]
jails [1] 568/3
Jason [1] 530/21
jeans [1] 594/15
Jefferson [27]

Jenkins [19]
Jesus [1] 590/5
job [5] 570/4 584/5 586/6 590/2 629/23
Jocelyn [2] 591/13 611/18
JOHN [2] 497/14 599/25
joking [1] 567/7
Jonathan [13]
Joseph [8]
JR [3] 497/6 497/14 497/18
judge [12]
judge's [1] 582/15
judges [1] 580/8
judgment [1] 548/1
July [42]
jump [1] 523/20
jumps [1] 583/7
June [4] 537/21 565/14 622/24 622/25
jurisdictional [1] 504/25
jurors [1] 582/20
jury [32]
just [124]

**K**

keep [16]
keeping [4] 593/11 599/12 599/13 607/15
keeps [8]
Keisha [1] 551/19
kept [7]
Kevin [6]
key [1] 539/8
KH [1] 611/12
kicker [3] 565/2 565/2 565/3
kid [2] 528/20 624/18
kids [1] 564/6
kill [37]
killed [37]
killer [7]
killers [1] 571/21
killing [12]
kills [1] 624/17
kind [19]
kinds [2] 560/14 575/14
kitchen [1] 614/10
knew [59]
knit [1] 594/15
knocking [5] 545/13 545/20 545/21 569/1 614/9
know [208]
knowing [11]
knowingly [2] 504/4 507/12
knowledge [6]
known [6]
knows [53]

**L**

lack [4] 523/11 538/12 638/9 638/10
Lackl [191]
Lackl's [18]
ladies [23]
lady [5] 547/24 559/16 573/9 601/23 616/7
laid [2] 575/17 575/17
Larry [42]
last [14]
Lasted [1] 538/7
lasts [1] 622/2
latches [1] 633/7
late [3] 580/10 580/11 636/19
later [7]
Lavinia [1] 637/21
law [17]
lawn [1] 510/9
lawyer [22]

lawyers [8]
Laying [1] 549/18
layout [1] 548/5
laypersons [1] 503/25
lead [8]
leads [1] 601/12
leals [1] 591/15
leaning [1] 524/24
learn [1] 552/6
learned [3] 512/18 536/7 547/25
least [6]
leave [3] 526/23 526/24 550/13
leaves [1] 537/24
led [2] 509/12 611/16
left [13]
leg [1] 624/20
legal [3] 504/24 547/12 558/17
legs [1] 577/23
length [5] 503/21 504/18 506/13 515/8 519/22
lengths [1] 523/10
Lenny's [1] 559/5
lent [1] 531/3
less [5] 551/22 559/12 567/22 585/15 626/20
lesser [1] 521/5
let [12]
let's [25]
letter [4] 589/18 592/16 592/17 592/24
letting [1] 595/6
level [2] 568/9 626/10
Lewinsky [2] 578/5 578/8
liar [2] 628/1 631/13
liars [1] 617/20
license [1] 534/8
lie [32]
lied [24]
lies [20]
life [20]
lift [1] 543/7
light [19]
lightened [1] 590/7
like [75]
limit [1] 544/21
line [22]
lines [2] 532/23 621/25
lineup [2] 607/17 607/19
lining [1] 553/2
link [6]
lips [1] 529/14
Lisa [2] 498/1 640/4
list [6]
listed [1] 595/12
listen [8]
listened [1] 583/15
listening [2] 528/3 580/17
lists [1] 592/14
literally [5] 556/23 557/5 560/3 562/8 574/24
little [48]
live [1] 588/10
lived [1] 603/21
lives [10]
living [2] 574/3 579/7
lo [5] 512/24 530/18 548/18 548/20 615/8
location [1] 540/17
locked [17]
logical [1] 562/21
Lombard [1] 498/1
long [20]
long-term [1] 596/19
longer [1] 503/5
longest [1] 639/6

# L

look [71]
looked [12]
looking [12]
looks [5]  521/24 523/21 553/15 567/18
575/3
lose [6]
loss [1]  584/4
lost [2]  612/19 638/12
lot [18]
lots [6]
loved [2]  556/19 605/5
low [1]  626/10
loyalty [1]  559/21
luck [5]  553/1 553/5 553/6 553/10 553/11
luckily [1]  516/20
Lump [1]  530/8
lunch [12]
luncheon [2]  500/24 579/24
lure [1]  512/17
lying [18]

# M

made [47]
magazine [3]  591/21 591/23 591/25
main [2]  531/4 582/19
maintain [2]  549/4 598/2
make [49]
makes [11]
making [7]
male [9]
malice [1]  506/12
malicious [1]  506/15
man [68]
man's [3]  558/24 560/10 587/10
manufactured [2]  508/12 508/13
many [6]
map [5]  594/8 597/13 597/17 616/15
619/8
maps [1]  594/1
March [21]
Marco [5]  625/25 626/3 626/5 635/6
635/8
Marcus [40]
marijuana [5]  544/20 588/25 589/1 589/2
609/20
Mark [1]  525/18
Marriott [3]  516/4 624/6 625/18
Martin [41]
Martin's [1]  602/20
MARY [1]  497/23
MARYLAND [6]
master [2]  621/18 632/21
match [2]  516/25 613/7
matched [1]  573/12
mate [1]  621/9
material [1]  566/21
math [3]  618/13 618/15 622/3
matter [7]
mattress [1]  551/12
maximum [2]  624/11 624/12
may [21]
maybe [23]
Mays [7]
Mays' [1]  501/23
McElderry [7]
me [54]
meal [1]  625/2
mean [36]
mean Mr [1]  627/18
meaning [1]  624/8
means [13]

Mears [1]  530/9
measure [1]  624/20
measured [1]  595/18
mechanical [1]  498/4
media [1]  639/24
medical [1]  604/24
medicated [1]  615/7
medium [3]  594/14 595/15 595/16
medium skin [1]  595/15
meet [14]
meeting [7]
meets [1]  572/8
member [2]  530/14 532/3
members [5]  500/18 529/19 532/6 540/8
543/24
memory [1]  612/19
mention [3]  546/11 572/11 581/7
mentioned [3]  583/1 591/9 638/8
mentioning [1]  589/17
menus [1]  605/10
Mere [2]  579/7 579/10
mesh [1]  605/10
message [8]
messages [6]
met [15]
methadone [1]  604/23
MF's [1]  632/25
Michael [3]  513/15 552/15 560/15
middle [7]
might [27]
military [1]  598/20
mill [1]  600/19
mind [23]
minding [1]  615/1
mindset [1]  529/13
mine [3]  519/2 519/4 519/5
minor [1]  566/24
minute [12]
minutes [27]
MISCELLANY [1]  499/2
misidentify [1]  553/3
misleading [4]  592/20 615/21 617/14
619/6
misrepresentations [1]  564/14
Misrepresented [1]  604/22
missing [1]  512/15
mission [2]  516/21 625/20
mistake [3]  566/24 597/14 597/16
Mistaken [1]  548/24
misunderstand [1]  570/2
mix [3]  548/12 548/12 548/13
Mobile [10]
modified [1]  500/3
mom [3]  568/18 568/20 569/3
moment [3]  513/22 519/12 621/12
moments [1]  576/1
money [24]
Monica [2]  578/5 578/8
Montford [30]
month [3]  503/11 503/17 509/20
months [2]  562/18 604/23
Monument [16]
more [35]
morning [11]
most [13]
motels [2]  625/17 625/17
mother [2]  512/19 559/1
mother's [2]  589/9 589/13
motion [2]  533/14 534/23
motivation [3]  529/11 529/13 539/6
motivations [2]  520/13 543/19
motive [36]
motives [1]  617/18

move [3]  524/17 584/8 589/11
movie [1]  545/3
movies [2]  581/20 586/20
Moving [1]  601/24
Mr [246]
Mr. [457]
Mr. Balarezo [4]  558/2 560/8 579/22
580/13
Mr. Bates [7]
Mr. Byers [166]
Mr. Byers' [26]
Mr. Coleman [1]  616/22
Mr. Cornish [5]  516/6 516/20 517/20
624/16 625/1
Mr. Davis [8]
Mr. Davis' [1]  582/13
Mr. Ehasz [2]  596/1 606/22
Mr. Giblin [7]
Mr. Giblin's [2]  580/20 582/13
Mr. Goodman [54]
Mr. Goodman's [9]
Mr. Haynes [19]
Mr. Haynes' [5]  602/6 604/2 612/15
613/17 633/17
Mr. Hogan [2]  611/21 612/8
Mr. Hunt [7]
Mr. Jenkins [1]  541/14
Mr. Lackl [16]
Mr. Lackl's [11]
Mr. Larry [1]  550/18
Mr. Parham [2]  510/23 544/14
Mr. Patrick [1]  600/12
Mr. Pearson [62]
Mr. Pearson's [4]  515/8 515/11 527/20
529/11
Mr. Pound [2]  561/4 561/5
Mr. Pound's [1]  561/3
Mr. Purcell [1]  639/19
Mr. Purcell's [1]  639/21
Mr. Purpura [6]
Mr. Purpura's [1]  605/16
Mr. Quentin [1]  612/5
Mr. Randle [5]  513/15 513/21 516/7
516/23 517/8
Mr. Roland [1]  592/17
Mr. Ruby [1]  519/25
Mr. Snavely [4]  535/23 536/9 536/18
574/5
Mr. Thompson [1]  515/25
Mr. Traut [3]  545/13 549/5 589/20
Mr. Walker [1]  592/21
Mr. Warden [1]  568/4
Mr. Williams [4]  516/25 517/7 534/10
538/13
Ms [7]
Ms. [16]
Ms. Davis [1]  569/9
Ms. Fisher [1]  568/20
Ms. Goodman [1]  568/23
Ms. Graham [1]  517/13
Ms. Homeowner [1]  589/11
Ms. Humes [1]  605/5
Ms. Mays [3]  596/9 596/14 604/21
Ms. Rookstool [6]
Ms. Vonda [1]  616/6
much [21]
Mulberry [1]  497/18
Multiple [2]  617/19 617/20
Mundy [1]  615/9
murder [140]
murdered [15]
murderer [3]  545/22 601/12 635/10
murdering [2]  540/3 545/8

# M

must [2]  585/4 585/14
my [33]
myself [2]  526/10 599/21
mystery [1]  577/13

# N

name [22]
named [6]
names [4]  510/2 560/14 592/18 635/10
nap [1]  616/21
narcotics [1]  596/8
national [1]  583/19
nature [2]  571/12 583/23
nauseam [1]  620/17
nauseum [1]  636/7
near [1]  616/25
necessary [5]  590/6 607/23 607/23
607/25 638/10
need [23]
needed [7]
needs [3]  567/25 568/6 568/11
negative [1]  616/8
neighborhood [6]
neighborhoods [2]  588/20 605/25
neither [4]  507/24 516/16 516/17 592/5
Nelly [2]  625/22 625/22
Nelly's [1]  625/23
nervous [1]  541/17
neutralized [1]  511/2
never [70]
new [5]  577/12 587/16 589/2 600/21
617/21
news [11]
Newsome [1]  551/19
newspaper [1]  562/12
newspapers [3]  561/22 562/3 562/15
next [18]
Nextel [12]
nice [3]  547/24 589/10 598/3
nickname [1]  545/1
nigga [1]  635/13
night [15]
nine [5]  504/20 526/14 526/14 526/15
587/17
nine-count [1]  504/20
Ninth [1]  497/24
Nitty [3]  524/4 531/16 545/4
no [109]
nobody [14]
non [4]  503/25 544/11 566/21 611/2
non-eyewitnesses [1]  544/11
non-fatal [1]  611/2
non-lawyers [1]  503/25
non-material [1]  566/21
none [15]
nonfactor [1]  547/22
nonsense [1]  603/8
nor [2]  507/24 592/5
Normal [12]
normally [1]  563/15
North [3]  606/25 616/11 616/16
NORTHERN [1]  497/2
not [252]
note [3]  598/1 598/3 599/7
notereading [1]  498/4
notes [4]  593/16 593/21 610/8 612/7
nothing [31]
notice [2]  557/25 637/13
noticed [2]  581/1 621/24
notwithstanding [3]  591/22 592/25 616/5
November [3]  546/15 546/18 592/17

# O

now [146]
nowhere [1]  528/24 529/3
nuisance [1]  502/23
number [42]
numbers [9]
NW [2]  497/20 497/24

oath [4]  583/21 588/18 590/20 635/3
objection [3]  560/20 638/25 639/8
obscure [1]  529/21
observation [1]  605/3
observations [1]  604/13
obstacle [1]  502/22
obvious [5]  511/15 533/11 537/15 564/23
636/3
obviously [4]  555/9 571/1 589/21 639/23
occasion [3]  558/16 576/3 576/4
occur [1]  537/14
occurs [1]  504/2
October [1]  528/7
off [14]
offender [1]  589/5
offense [6]
offenses [4]  506/25 508/3 579/9 581/14
offering [1]  532/17
office [2]  497/14 570/14
officer [7]
officers [1]  608/5
oh [12]
okay [8]
old [10]
old-fashioned [1]  619/19
older [3]  531/16 554/9 599/20
on [344]
once [8]
one [120]
ones [1]  532/10
ongoing [2]  506/20 631/24
only [47]
onto [6]
open [70]
opened [1]  614/5
opening [4]  517/14 557/18 581/7 637/9
opiates [1]  604/25
opportunity [7]
opposite [2]  522/17 541/8
or [94]
orchestrate [2]  511/11 551/13
orchestrated [5]  506/13 521/3 528/23
538/14 600/24
orchestrating [2]  520/1 551/17
order [10]
ordered [4]  606/2 606/4 607/12 629/6
orders [1]  574/12
ordinary [1]  585/7
organization [1]  626/11
organized [2]  558/25 625/15
origin [1]  583/19
original [2]  597/15 626/9
Orioles [1]  600/4
other [65]
other's [1]  516/16
others [2]  528/16 634/8
otherwise [1]  590/4
our [7]
out [174]
outcome [3]  584/14 584/15 584/16
outlaw [1]  626/11
outside [3]  524/15 552/22 572/4
over [40]
overlook [2]  563/21 566/12
overlooked [1]  566/11

overpower [1]  571/14
Overruled [2]  560/21 560/21
overtop [1]  553/3
overwhelming [2]  538/25 553/16
overworked [1]  601/15
owe [2]  553/1 553/12
own [15]
owner [2]  602/2 614/4
owners [2]  601/10 602/19

# P

p.m [5]  531/8 531/8 593/19 594/20
609/15
pad [1]  602/22
page [3]  533/16 533/21 620/9
pages [2]  503/8 503/8
paid [16]
pain [1]  615/6
panicked [1]  596/15
paper [1]  576/16
paperwork [3]  519/14 524/12 531/16
paragraph [1]  596/24
parallel [2]  594/3 597/19
Parham [47]
Parham's [3]  546/13 594/18 609/11
parole [3]  564/5 567/23 625/3
part [6]
participating [1]  579/14
particular [6]
parties [1]  576/21
parts [1]  582/19
passenger [1]  624/3
past [12]
Pat [18]
Pat's [2]  633/12 634/5
paths [1]  559/5
PATRICK [161]
Patrick's [5]  591/12 592/12 598/17 600/9
636/14
pay [4]  500/25 615/4 615/5 621/8
paying [2]  625/5 639/16
Pearson [140]
Pearson's [8]
pee [1]  593/24
peeing [1]  594/25
peering [1]  602/2
pen [3]  529/8 536/11 621/20 632/25
penalties [1]  589/4
penalty [5]  626/16 626/17 626/18 627/1
631/15
pending [3]  506/20 587/3 589/3
penitentiary [1]  633/1
people [76]
perceive [1]  585/16
Perfect [1]  540/10
perhaps [9]
period [4]  533/4 559/15 559/19 606/3
perjury [1]  547/12
permutations [1]  586/8
person [60]
person's [2]  530/18 601/1
personal [2]  540/14 583/18
perspective [1]  574/24
petrified [1]  571/17
Philadelphia [7]
phone [175]
phones [16]
photo [18]
photograph [1]  558/20
photographs [5]  558/16 558/19 558/22
558/24 573/23
phrase [1]  587/5
physical [5]  514/16 518/2 518/8 518/11

# P

physical... [1] 553/16
physically [1] 561/17
pick [12]
picked [11]
picking [1] 553/5
picks [1] 536/13
picture [16]
pictures [2] 608/20 615/8
piece [3] 512/15 579/4 608/11
pieces [1] 520/7
Pierre [1] 614/7
piggy [1] 570/12
pile [1] 613/20
piling [1] 553/11
pillows [1] 589/11
pills [4] 571/3 576/6 576/9 576/22
pinpoint [1] 536/3
place [4] 540/23 571/12 589/12 632/20
plan [3] 534/23 555/20 621/1
planned [3] 506/13 538/14 558/24
planning [2] 506/18 506/19
planting [1] 605/24
plants [1] 605/24
plausible [1] 576/25
play [5] 557/9 567/6 627/10 628/18 637/6
played [70]
playing [2] 575/11 575/16
plea [2] 585/23 625/7
plead [1] 586/1
please [4] 501/6 572/3 580/14 638/20
plenty [3] 500/4 500/19 555/15
plotting [3] 501/14 501/15 575/24
pocket [4] 531/11 531/24 576/11 576/23
point [27]
pointed [4] 557/18 587/13 593/1 638/16
points [4] 553/17 554/20 554/24 637/2
police [38]
Pollard [1] 530/11
poor [1] 571/1
pop [3] 524/5 576/22 577/11
populated [2] 568/2 568/2
porch [2] 608/18 608/22
portion [4] 580/16 603/3 617/16 625/8
position [1] 556/13
positive [1] 598/13
possess [1] 508/9
possessed [5] 507/11 508/6 612/17 612/17 613/4
possessing [2] 508/4 612/21
possession [5] 506/9 508/5 518/12 518/24 530/6
possessions [1] 518/18
possible [1] 506/3
possibly [1] 541/5
postponed [3] 511/23 515/4 547/6
postponement [1] 511/24
postponements [1] 511/20
potatoes [1] 589/1
potential [1] 506/22
pound [79]
Pound's [2] 561/3 566/10
pounds [6]
power [2] 590/22 626/22
powers [1] 583/8
practice [1] 629/17
prefer [1] 639/2
premeditated [2] 506/15 538/14
premeditation [1] 506/18
prepaid [1] 577/5
prepared [2] 617/6 617/8
preparing [1] 511/21

presence [1] 579/7
present [8]
presented [7]
press [1] 600/19
pressure [22]
pressured [3] 563/23 563/25 564/11
presumably [2] 580/22 582/14
presumed [2] 582/5 582/18
presumes [1] 582/16
presumption [4] 581/9 581/10 581/20 582/19
pretends [3] 525/8 525/25 526/22
pretrial [2] 519/15 547/2
pretty [2] 628/2 628/2
prevent [3] 505/25 506/1 506/1
previously [2] 596/12 611/6 612/16
price [1] 624/25
primary [1] 537/18
Printed [1] 640/10
prior [4] 540/23 571/22 511/23 611/16
prison [5] 551/12 626/25 635/20 635/24 637/23
probably [27]
problem [14]
problems [1] 625/20
proceed [7]
proceedings [4] 498/4 506/20 640/2 640/5
process [1] 583/24
produced [1] 498/4
profile [6]
profusely [1] 502/5
program [2] 604/23 621/22
prominently [1] 531/23
promise [1] 581/11
promised [1] 528/10
prompted [1] 565/10
proof [26]
property [1] 512/13
proposed [1] 500/3
prosecuted [1] 590/16
prosecution [3] 548/15 583/3 586/2
prosecutor [2] 558/2 599/24
prosecutors [7]
protect [8]
protecting [1] 551/18
protection [1] 508/23
proud [1] 611/15
provable [1] 575/6
prove [10]
proved [5] 512/11 512/12 529/10 530/24 538/1
proven [4] 538/15 576/1 576/2 638/6
proves [3] 503/11 538/2 538/2
provide [1] 597/17
provided [4] 538/20 539/6 545/8 626/15
provides [2] 538/19 629/1
proving [1] 558/11
public [1] 599/16
puddle [1] 502/4
puffy [1] 594/14
pull [5] 504/6 505/20 505/21 542/5 545/12
pulled [4] 554/8 593/24 626/4 635/7
pulling [1] 504/5
pulls [3] 504/11 623/14 624/18
pulse [2] 524/23
punished [1] 585/8
puppet [1] 621/17
PURCELL [5] 497/14 549/19 581/11 584/22 639/19
Purcell's [3] 582/14 596/2 639/21
purported [1] 610/9
PURPURA [7]
Purpura's [1] 605/16

put [41]
puts [9]
putting [6]

# Q

Quentin [6]
question [6]
questioned [4] 557/17 568/22 578/1 587/25
questioning [8]
questionnaire [1] 581/18
questions [4] 525/24 561/7 623/7 637/11
quick [6]
quickly [3] 538/7 584/9 595/17
quite [3] 560/17 573/11 591/16
quotes [1] 586/19

# R

race [1] 583/18
rack [1] 632/25
raided [1] 632/25
raise [1] 597/19
raised [1] 583/20
raises [1] 625/11
raked [1] 562/16
ran [6]
Randle [11]
random [3] 540/17 611/21 620/4
range [2] 533/3 537/21
rank [4] 571/10 571/12 626/10 637/6
rare [2] 614/22 633/4
rate [2] 578/1 578/9
rather [1] 637/8
ratted [1] 568/9
Ravens [1] 600/4
RDB [1] 497/3
RDB-08-056 [1] 497/3
reach [1] 532/18
reaches [3] 532/16 570/12 624/20
react [1] 524/18
reaction [2] 535/2 535/4
reacts [1] 524/20
read [2] 582/4 586/15
reading [2] 561/22 582/18
ready [8]
ready-made [1] 543/9
real [11]
reality [2] 545/16 545/17
realize [1] 569/5
realizing [1] 545/21
really [39]
reaper [1] 626/12
reason [36]
reasonable [7]
reasons [2] 509/3 636/8
rebut [7]
rebuttal [12]
rebutted [1] 574/22
recall [2] 561/3 565/11
recant [1] 545/12
recantation [3] 546/14 589/22 609/11
recanted [9]
recanting [1] 502/17
recants [1] 546/21
received [2] 515/20 553/21
recent [4] 546/13 589/17 589/22 589/23
recently [2] 552/8 589/16
recess [6]
recipient's [1] 574/7
recollection [9]
record [16]
recorded [3] 498/4 596/22 598/4
recording [3] 597/3 598/1 598/21

# R

recordings [1] 554/19
records [43]
recovered [1] 548/23
recreate [1] 599/2
recruited [1] 560/24
red [3] 532/18 544/24 594/23
reference [1] 602/20
refined [1] 504/24
regarding [3] 608/12 616/5 623/7
Regardless [1] 536/20
registers [1] 536/11
relate [3] 508/2 508/4 585/17
related [1] 507/4
relates [1] 557/9
relating [3] 506/3 507/22 609/16
relation [1] 612/18
relationship [3] 508/22 523/11 561/15
relaxed [1] 524/24
release [1] 519/15
relevant [1] 605/19
reliable [7]
religion [1] 583/19
relying [1] 605/4
remain [1] 582/15
remained [1] 582/12
remaining [1] 552/3
remains [2] 582/12 582/22
remember [45]
remembered [1] 637/23
remembers [1] 610/10
repeat [3] 636/22 636/24 637/24
repeatedly [12]
repeating [3] 597/16 628/14 636/21
replayed [1] 628/20
replaying [1] 636/20
report [1] 610/8
Reporter [2] 498/1 640/7
reporting [1] 534/12
reports [1] 611/3
represent [2] 545/14 552/4
representation [2] 528/9 600/15
representations [1] 575/25
representative [1] 622/20
represented [2] 535/13 566/2
represents [1] 545/15
request [1] 592/21
requested [2] 511/20 606/7
requesting [1] 592/22
required [1] 506/22
requires [1] 574/7
requiring [1] 551/22
resigned [2] 529/2 529/3
resolve [2] 552/13 552/23
resources [1] 601/15
respect [8]
responsibility [2] 554/11 563/20
responsible [1] 637/20
rest [2] 554/5 639/23
restaurant [2] 573/21 625/2
result [3] 507/15 560/11 606/5
resulting [1] 505/8
retained [2] 587/16 599/17
Return [1] 554/25
returned [1] 557/8
revenge [1] 637/21
rich [4] 609/6 609/10 619/23 619/23
RICHARD [1] 497/11
rid [1] 566/4
ridiculous [3] 518/20 570/16 570/16
rifle [1] 626/12
right [125]

rims [2] 517/23 571/25
ringing [2] 501/19 536/13
risk [6]
RMR [1] 498/1
Road [7]
robs [1] 508/24
rocket [1] 590/21
Roland [6]
role [6]
rolling [1] 588/22
rolls [1] 575/12
Ronnie [8]
roof [2] 508/7 553/8
Rookstool [16]
room [9]
Rose [2] 606/18 606/25
Ruby [29]
Ruby's [3] 522/11 523/22 629/7
rules [1] 633/2
rumor [1] 588/19
rumors [1] 588/21
run [10]
run-of-the-mill [1] 600/19
running [17]
runs [2] 598/15 614/9
rush [2] 555/15 556/5
rushed [1] 555/19
rushing [1] 555/24
ruthless [1] 554/1
Ryan [1] 622/19

# S

sad [1] 556/22
said [105]
sale [1] 515/21
salvation [1] 558/13
Samaritan [1] 502/21
same [63]
sample [1] 591/21
samples [1] 591/15
sandwich [2] 613/2 613/3
sat [9]
satisfied [1] 513/7
satisfy [1] 505/3
Saturdays [1] 596/13
save [2] 566/10 567/14
saw [71]
say [84]
saying [33]
says [49]
scar [2] 549/16 549/17
scary [2] 560/7 560/10
scenarios [1] 629/15
scene [5] 501/23 511/4 573/5 573/22
  594/9
scent [1] 541/11
scheme [1] 538/6
schemes [1] 537/17
school [1] 559/6
science [1] 590/21
scout [1] 554/2
screen [4] 509/21 531/6 584/1 618/21
screw [1] 634/17
scrutinized [1] 585/4
scrutiny [1] 585/14
search [5] 569/4 569/8 575/8 575/8
  589/10
seat [2] 624/3 624/3
seated [4] 500/19 500/22 556/3 580/7
second [15]
seconds [10]
secret [2] 529/18 529/25
section [3] 518/12 518/18 523/14

see [85]
seeing [3] 591/3 594/1 630/7
seem [3] 525/10 618/18 633/1
seemed [3] 547/16 567/16 632/20
seems [2] 611/10 638/23
seen [25]
sees [9]
seized [1] 565/6
selection [3] 551/10 551/11 582/10
sell [1] 576/9
selling [4] 521/6 521/7 523/17 615/2
sells [7]
semi [1] 543/2
semi-automatic [1] 543/2
send [4] 577/7 579/12 635/13 635/18
Sending [1] 540/14
sense [32]
senseless [1] 561/25
sent [3] 569/18 622/15 623/4
sentence [1] 625/8
sentinel [1] 587/6
September [4] 565/6 577/21 577/21 618/1
sequence [1] 598/2
serious [5] 556/22 566/2 566/8 578/16
  579/15
seriously [2] 579/16 638/16
served [1] 513/12
services [1] 532/17
SESSION [1] 579/25
set [2] 505/14 505/15
sets [4] 526/14 526/15 593/17 626/21
setting [1] 564/5
settled [1] 601/16
seven [3] 514/7 575/20 586/9
several [8]
shading [1] 587/23
shaking [1] 541/18
shared [1] 600/1
sharing [1] 621/11
shaving [2] 574/3 574/4
she [115]
she's [15]
shed [2] 573/18 575/18
sheds [1] 574/23
sheet [2] 500/3 531/20
shell [1] 600/22
shelled [2] 599/18 600/15
shift [1] 538/17
shifts [1] 583/4
shoddy [1] 601/7
shoot [6]
shooter [15]
shooting [23]
shootings [1] 611/16
shoots [5] 540/13 614/10 614/10 615/3
  625/9
short [5] 514/6 537/22 538/7 563/4
  572/20
shorted [1] 538/10
shorter [1] 562/24
shot [28]
shots [10]
should [2] 554/24 639/24
shouldn't [1] 588/6
show [26]
showcase [1] 519/23
showed [14]
showing [2] 620/2 620/14
shown [8]
shows [9]
shut [1] 577/22
shy [1] 576/23
side [3] 604/2 604/6 620/18

# S

sight [1]  597/4
sign [3]  563/14 624/14 625/10
signature [2]  598/11 640/7
signed [5]  546/17 546/18 589/20 589/20 589/22
significance [2]  538/24 539/2
significant [1]  537/11
signs [2]  539/13 626/19
silence [3]  502/25 506/1 506/24 551/8
silenced [1]  554/14
similar [1]  548/9
Simmons [1]  561/12
simple [1]  507/15
since [5]  523/2 529/4 559/6 612/9 639/7
sing [1]  627/5
single [5]  510/17 510/18 510/25 579/4 620/13
sir [4]  580/3 580/4 596/9 599/5
sit [11]
sits [7]
sitting [9]
situation [2]  557/12 567/8
six [8]
sixty [1]  625/17
sixty-dollar [1]  625/17
sketch [1]  569/15
skewer [1]  568/6
ski [1]  544/24
skin [3]  594/14 595/15 595/16
skip [3]  629/14 629/17 631/16
slide [1]  572/2
slipped [1]  564/21
slugs [2]  611/7 611/16
small [4]  530/3 566/24 589/1 615/13
smaller [1]  615/18
smoke [3]  571/2 575/8 580/24
smokes [2]  571/2 576/21
snake [4]  570/19 570/20 570/21 571/2
snake's [1]  570/23
Snavely [5]  535/23 536/9 536/18 574/5 575/10
snippet [3]  591/17 596/25 620/12
snitch [4]  561/11 561/11 561/13 561/17
so [103]
so-and-so [1]  508/25
sold [2]  509/5 577/8
solely [1]  612/12
Solid [1]  566/7
solved [1]  581/23
solving [1]  563/20
some [81]
somebody [62]
someday [2]  625/6 626/21
somehow [3]  543/7 543/7 543/8
someone [27]
something [34]
sometimes [5]  500/24 563/21 570/5 599/16 612/20
somewhere [10]
son [5]  568/22 568/24 580/22 638/12 638/13
soon [1]  574/6
sorry [7]
sort [3]  518/14 533/25 534/11
sorts [3]  503/10 506/17 528/6
sound [3]  561/14 561/15 561/18
Sounds [1]  612/8
South [3]  497/15 577/9 633/18
space [1]  581/12
span [1]  606/4
speak [1]  547/3

speaking [4]  533/5 533/5 533/8 533/19
speaks [1]  561/3
specific [1]  606/3
specifically [4]  513/14 535/13 620/21 622/20
speed [1]  632/19
spend [2]  577/17 605/21
spent [8]
spinning [4]  528/25 605/20 607/2 633/18
spoke [3]  528/13 556/10 558/1
spreading [2]  588/23 588/23
Sprint [2]  529/7 622/19
sprinting [1]  606/8
Sr [4]  530/22 532/11 532/12 600/12
stage [1]  557/13
stair [1]  542/7
stand [12]
standing [8]
star [2]  553/2 623/6
stare [1]  539/11
stared [4]  501/20 597/23 599/6 599/9
start [10]
started [6]
starting [2]  534/4 553/2
starts [12]
stash [4]  608/15 608/17 610/15 610/18
stashed [3]  608/3 608/15 613/5
stashes [1]  609/5
stashing [2]  588/2 610/13
state [15]
stated [1]  566/3
statement [22]
statements [13]
STATES [11]
station [1]  562/16
stations [1]  561/22
status [1]  624/22
statute [1]  505/16
statutes [3]  503/19 507/2 507/8
stay [7]
stayed [3]  529/4 614/5 616/21
staying [1]  625/17
stenography [1]  498/4
step [2]  502/18 524/13
steps [2]  542/7 542/10
Steven [6]
stick [1]  615/22
sticking [2]  615/15 625/23
sticks [1]  517/17
still [16]
stomach [3]  550/15 614/11 626/12
stone [2]  634/5 634/17
stood [3]  509/18 509/24 553/3
stoop [7]
stop [6]
stopped [4]  571/24 588/12 604/24 608/5
stopping [1]  556/6
stops [2]  528/4 576/19
store [13]
stored [1]  627/17
stories [4]  543/24 630/16 630/17 631/7
story [27]
straight [1]  601/6
strange [2]  570/5 614/22
streak [1]  553/4
street [31]
streets [4]  502/8 589/5 595/4 601/11
strike [1]  594/15
string [2]  553/1 553/6
strong [5]  510/18 539/19 548/15 551/4 553/18
strongest [1]  550/3
strongly [1]  638/17

stubborn [1]  527/2
stuck [1]  591/25
stuff [6]
stuffs [1]  570/13
stupid [3]  564/3 570/17 571/8
stuttering [1]  541/17
submit [2]  519/7 558/17
subpoena [1]  501/10
subsequent [1]  589/4
substantive [1]  505/17
suburban [1]  571/4
succeed [1]  504/5
succeeded [1]  503/6
successful [1]  625/19
such [5]  583/18 584/15 588/21 588/21 610/15
sudden [5]  510/6 601/1 603/16 625/18 632/2
suffered [2]  584/4 638/12
sufficient [1]  582/20
suggesting [1]  629/22
suggestions [1]  553/20
suit [1]  618/15
Suite [1]  497/21
summarized [1]  503/9
summer [1]  509/14
Sunday [1]  602/9
Supermax [4]  551/12 551/16 551/20 632/20
supervisor [1]  629/7
supposed [10]
supposedly [1]  622/7
sure [16]
Surely [2]  611/8 611/9
surprise [4]  562/3 588/1 606/7 611/24
surprised [2]  524/24 524/25
surviving [1]  551/24
suspect [4]  584/11 609/4 611/3 611/4
Suspected [1]  609/25
sustained [1]  508/8
sway [2]  584/17 585/11
swayed [1]  583/25
swear [1]  624/14
sworn [1]  583/20
symbols [1]  612/4
sympathy [4]  583/25 583/25 584/3 638/11
system [2]  505/3 605/1

# T

T-Mobile [10]
T.V [5]  581/19 581/19 581/23 582/23 586/20
table [10]
tagging [1]  513/16
take [30]
taken [6]
takes [6]
taking [2]  556/4 636/20
talk [49]
talked [20]
talkie [6]
talkies [1]  577/15
talking [37]
talks [5]  525/21 542/20 591/11 625/22 633/23
tall [4]  531/17 541/11 541/12 544/23
Tammy [20]
tape [25]
taped [7]
tapes [2]  567/6 632/7
taping [2]  578/6 578/8
tapped [1]  571/1
taste [1]  544/3

# T

tattoo [1] 611/12
tattoos [2] 502/7 626/11
tax [2] 501/2 501/2
Tay [2] 588/4 588/4
Tay-Tay [1] 588/4
team [1] 627/6
tear [1] 605/12
teenager [1] 624/18
teeth [2] 526/5 623/9
telephone [5] 574/13 617/13 619/14
 619/14 619/15
tell [63]
telling [39]
tells [30]
ten [9]
term [1] 596/19
terms [4] 507/7 516/11 530/12 561/8
terrible [2] 510/2 580/25
Terry [1] 528/4
test [1] 611/22
testified [16]
testify [30]
testifying [2] 539/3 546/20
testimony [35]
text [16]
than [33]
thank [21]
that [1101]
that's [208]
the glue [1] 617/16
their [53]
them [93]
theme [2] 520/4 522/4
themselves [4] 519/10 520/3 520/4 520/9
then [59]
theoretical [3] 536/22 536/24 537/1
theoretically [3] 536/23 536/25 537/1
theories [1] 537/16
theory [3] 505/11 505/17 507/10
there [186]
there's [74]
therefore [1] 616/17
thereof [1] 523/11
these [132]
they [336]
they'll [3] 526/20 584/23 633/7
they're [60]
they've [7]
thin [6]
thing [57]
things [55]
think [74]
thinking [9]
thinks [6]
third [2] 581/13 597/22
thirty [2] 514/8 572/20
this [464]
Thompson [10]
those [48]
though [9]
thought [21]
thousand [2] 628/21 628/24
thousands [2] 551/20 551/21
threatened [1] 590/1
three [35]
threw [7]
through [48]
throughout [13]
throw [5] 511/10 530/16 541/11 541/13
 633/19
throwing [4] 501/23 508/7 553/8 613/7

thrown [3] 517/17 553/19 587/13
Thunderbird [2] 517/23 571/24
ticking [1] 574/5
tied [1] 618/10
Tierra [1] 530/11 559/16
ties [1] 519/4
tight [1] 510/13
time [75]
timeframe [1] 537/13
times [11]
timing [1] 511/15
tired [2] 594/1 639/16
Title [1] 574/11
toast [1] 568/8
today [7]
together [14]
told [93]
Tom [1] 525/9
tomorrow [6]
tone [1] 593/17
Tony [1] 545/2
too [15]
took [17]
tool [1] 537/18
top [9]
Torbert [1] 530/21
tossed [2] 558/17 562/16
total [1] 621/13
totally [2] 524/24 604/6
touch [2] 504/19 591/23
touched [3] 552/14 583/4 592/1
toward [4] 527/12 549/12 597/11 606/13
tower [6]
towers [5] 535/7 535/14 535/24 536/2
 575/19
town [2] 571/24 601/14
track [1] 574/12
tracks [2] 541/21 544/1
traditional [1] 536/14
traffic [1] 616/11
trafficking [4] 506/6 508/17 612/18 612/22
tragic [1] 638/1
Transcriber [1] 640/8
transcript [6]
transferring [1] 506/17
transported [1] 588/8
trash [2] 589/12 609/17
Traut [8]
traveling [2] 593/23 597/10
treated [3] 567/20 590/4 590/6
treatment [3] 567/14 567/20 604/23
trial [25]
tried [3] 505/22 518/23 605/9
tries [4] 504/4 539/12 541/10 579/2
Trigga [1] 560/15
trigger [6]
trip [1] 544/2
tripping [2] 542/4
trips [1] 517/20
trouble [7]
truck [2] 609/17 609/19
true [11]
truly [2] 552/11 552/12
trust [1] 571/6
truth [22]
truthful [3] 543/17 564/12 623/21
truthfully [1] 510/24
try [18]
trying [38]
tune [1] 627/6
turf [1] 509/4
turn [5] 503/13 568/7 580/20 597/11
 597/12

turned [1] 510/23
Turning [1] 533/21
turns [2] 563/15 563/17
twenty [5] 547/9 575/21 584/2 586/15
 595/9
Twenty-five [1] 595/9
twenty-one [1] 547/9
twenty-three [1] 575/21
two [39]
type [5] 561/15 563/18 565/21 615/16
 626/6
Typed [1] 640/10
typical [1] 575/11
typing [2] 601/22 601/23

# U

U.S [1] 507/2
ultimately [1] 516/18
unaccounted [1] 621/15
unanimously [1] 582/21
unbelievability [1] 546/3
unbending [1] 559/21
unclear [1] 620/10
under [16]
understand [5] 538/22 555/18 591/16
 591/17 615/1
undertook [1] 530/2
unfortunately [2] 551/9 604/25
unidentified [3] 587/13 592/2 611/22
UNITED [11]
unknown [4] 545/2 591/18 591/19 637/21
unlawful [1] 507/20
unless [3] 522/23 569/5 582/20
unlike [4] 510/23 511/22 541/17 549/3
unrebutted [1] 575/18
unreliable [1] 576/24
unsaw [2] 545/23 547/20
unsee [1] 545/22
unsupported [1] 553/19
until [17]
unusual [1] 597/4
up [111]
uphill [1] 539/20
upon [3] 501/10 583/4 599/15
urge [2] 638/15 638/17
us [9]
use [22]
used [19]
useful [2] 542/5 590/3
user [5] 551/1 571/4 585/19 585/21
 614/11
uses [1] 576/10
using [9]
usually [1] 584/22

# V

vacant [2] 608/19 608/20
valuable [2] 548/14 550/18
value [2] 505/7 505/7
various [2] 586/7 592/22
vary [1] 550/12
venture [1] 533/16
verdict [3] 500/3 554/25 638/18
verify [1] 621/24
version [4] 530/3 595/20 628/21 628/23
versions [1] 617/19
very [45]
vials [1] 509/1
vicinity [2] 536/2 606/23
victim [5] 571/1 592/10 611/2 611/3 611/4
victim's [3] 566/5 566/22 569/22
video [80]
videos [4] 584/7 601/11 604/18 625/21

# V

videotape [7]
videotaped [1]  558/19
view [5]  500/8 500/10 500/15 639/1 639/24
viewed [1]  585/5
violated [2]  507/3 507/8
Violates [1]  505/16
violation [1]  503/19
violence [4]  507/9 507/10 610/25 611/3
violent [2]  502/9 509/1
visit [2]  512/8 600/5
visited [2]  558/15 600/2
visitor [1]  525/17
visits [5]  525/17 525/18 540/1 549/4 600/9
voice [2]  597/7 631/22
voluntary [1]  587/20
volunteer [1]  543/16
volunteered [1]  543/14
volunteers [2]  540/4 543/1
Vonda [1]  530/15 616/6
vulnerable [1]  548/14

# W

wait [8]
waited [1]  590/16
waiting [1]  580/1
waivers [1]  579/1
wake [1]  554/2
walk [5]  601/11 606/15 606/19 607/20 607/22
walked [3]  582/8 594/13 608/25
Walker [7]
walkie [7]
walkie-talkie [6]
walkie-talkies [1]  577/15
walks [1]  568/4
wall [2]  595/21 597/24
want [70]
wanted [19]
wanting [1]  527/8
wants [7]
Warden [1]  568/4
warden's [1]  570/14
warrant [3]  556/14 558/17 589/10
warranted [1]  557/1
warrants [2]  557/2 574/11
was [634]
wash [4]  542/15 545/5 614/6 615/2
washing [2]  614/6 615/2
Washington [2]  497/21 497/25
wasn't [33]
watch [9]
watched [1]  583/14
watching [3]  561/9 562/17 586/20
waved [1]  565/5
wavered [1]  549/3
way [48]
Wayne [2]  541/2 541/9
ways [1]  521/11
we [145]
we'll [27]
we're [36]
we've [17]
weak [5]  552/1 600/17 613/19 613/25 617/20
weapon [6]
weapons [1]  586/9
wearing [2]  544/24 593/5
weather [1]  600/4
web [1]  633/18

Wednesdays [1]  580/8
weed [6]
week [3]  501/11 587/17 600/25
weekly [1]  580/9
weeks [6]
weigh [2]  581/5 583/16
weight [3]  598/4 607/17 612/1
weird [1]  565/17
welcome [1]  555/16
Weldon [4]  544/12 601/9 601/19 602/7
well [102]
Wendy's [1]  616/19
went [34]
were [89]
weren't [2]  558/24 558/25
west [5]  498/1 513/12 513/15 533/24 535/16
whacks [1]  614/8
what [402]
what's [23]
whatever [21]
whathaveyou [1]  639/23
whatsoever [1]  558/15
wheeling [1]  563/25
wheels [1]  533/14
when [159]
where [74]
whether [25]
which [51]
while [11]
white [4]  593/24 608/22 629/8 632/2
Whitney [1]  530/9
who [145]
who's [22]
whole [12]
whom [7]
whose [3]  523/3 613/7 614/19
why [108]
wife [1]  530/15
Wilkinson [1]  530/14
will [37]
willful [2]  506/12 506/14
willfulness [1]  506/18
WILLIAM [1]  497/18
Williams [11]
willing [2]  554/6 555/18
win [1]  539/6
Winchester [2]  530/9 637/22
wind [2]  560/10 601/2
window [5]  537/23 601/24 602/2 602/3 624/21
Wire [1]  581/17
wireless [1]  575/14
withdraw [4]  519/9 519/11 520/3 525/11
withdrawing [3]  526/10 527/10 527/10
withholding [1]  527/18
within [5]  508/6 514/2 533/7 533/8 588/7
without [12]
witness [68]
witnessed [7]
witnesses [29]
witnessing [1]  506/8
woman [4]  603/4 626/13 637/15 637/21
won't [6]
wonder [1]  571/3
wondering [1]  569/13
word [10]
work [14]
worked [3]  512/20 559/6 616/7
working [7]
works [3]  559/5 592/4 605/23
world [12]
worlds [1]  588/11

worried [7]
worry [3]  539/16 544/12 551/1
worse [1]  544/4
would [68]
wouldn't [6]
wow [1]  618/3
wrapped [1]  563/24
wrath [1]  596/2
write [1]  610/7
writes [1]  596/24
writing [1]  633/18
wrong [5]  562/18 562/18 593/18 595/4 635/9
wrongly [1]  540/20
wrongs [1]  585/8
wrote [3]  531/20 595/7 598/11

# Y

yard [1]  608/21
yeah [6]
year [8]
years [32]
yellow [3]  532/23 602/22 620/25
yes [8]
yesterday [11]
yet [8]
you [857]
you'd [2]  514/17 561/16
you'll [30]
you're [46]
you've [55]
young [5]  580/22 581/25 614/15 616/7 626/10
younger [2]  567/23 570/9
your [63]
yours [1]  577/12
yourself [15]
yourselves [1]  573/2
youth [9]
youths [1]  604/18

# Z

Zayon [1]  525/18
zero [1]  620/13