UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

UNITED STATES OF AMERICA   Criminal No.  RDB-08-056

Baltimore, Maryland

v.   April 16, 2009

PATRICK BYERS, JR.,   9:30 a.m.

AND

FRANK GOODMAN,

Defendants.

--------------------------------------------------------/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Government:       United States Attorney's Office
                          By:  JOHN PURCELL, JR., ESQUIRE
                               BRYAN GIBLIN, ESQUIRE
                          36 South Charles Street
                          Fourth Floor
                          Baltimore, Maryland 21201


For Patrick Byers, Jr.:   WILLIAM PURPURA, ESQUIRE
                          8 East Mulberry Street
                          Baltimore, Maryland 21201

                          A. EDUARDO BALAREZO, ESQUIRE
                          400 Fifth Street, NW
                          Suite 300
                          Washington, D.C. 20001


For Frank Goodman:        CHRISTOPHER DAVIS, ESQUIRE
                          MARY DAVIS, ESQUIRE
                          514 10th Street, NW
                          Ninth Floor
                          Washington, D.C. 20004

1   Court Reporter            Lisa K. Bankins RMR
                             101 West Lombard Street
2                            Room 5515
                             Baltimore, Maryland 21201
3

4   Proceedings recorded by mechanical stenography,
    transcript produced by notereading.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# T A B L E   O F   C O N T E N T S

MISCELLANY

Rebuttal argument on behalf of the Government . . . . . . . . . . .647

Jury Instructions . . . . . . . . . . . . . . . . . . . . . . . . . .683

1                  P R O C E E D I N G S

2           THE COURT:    Just quickly before we bring the jury in, Ms.

3    Davis, you had noted a slight adjustment to Instruction Number 36 and

4    I've made that adjustment.  I don't think there's any -- that was

5    fine.

6           MS. DAVIS:    All right.  Thank you.

7           THE COURT:    And then the verdict sheet, counsel, I think

8    you've got copies of the verdict sheet.  I just formalized the verdict

9    sheet a little more.  I thought it was a little more apt.  So I gather

10   there's no objection to the verdict sheet?

11          MR. PURCELL:    Yes, Your Honor.  It's fine.

12          MR. PURPURA:    No objection by the defense.  Thank you.

13          THE COURT:    All right.  Thank you.  It's all right?

14          MS. DAVIS:    It's fine, Your Honor.

15          THE COURT:    All right.  Thank you much.  So that's the

16   verdict sheet and then I noticed there's been some briefing with

17   respect to the matter of alternate jurors.  Let me just tell you what

18   I believe is and I've checked with some of my colleagues in other

19   similar such cases, Judges Chasanow and Blake with cases similar to

20   this.  With respect to the alternate jurors, they will be dismissed at

21   the conclusion of -- once the jury has been charged, the jury begins

22   its deliberations, I will tell the alternate jurors that they should

23   not review any press reports about the case.  They should proceed as

24   they have been and that they will remain on call in the event that

25   there is some difficulty with one of the 12 jurors and that we will

1   notify them once their verdicts have been reached.  Is that agreeable
2   to the government?
3              MR. PURCELL:   Dismissed, not excused.
4              THE COURT:   Not excused.  They are not excused.  I'm going
5   to tell them they are on standby.  That they're not dismissed yet from
6   the case.
7              MR. PURCELL:   Exactly.  That's fine.
8              THE COURT:   That they remain as alternate jurors in the
9   event that there's some health problem or something with one of the 12
10  jurors and with that, in that regard tell them that they absolutely
11  shall not review any press reports.  The same admonitions apply.  Is
12  that agreeable to the government?
13             MR. PURCELL:   Yes, it is.
14             THE COURT:   Agreeable to the defense, Mr. Purpura?
15             MR. PURPURA:   Yes, judge.  I think the language should be
16  until the completion of the case, not until verdict because you may
17  need them --
18             THE COURT:   Well, I understand.  Yes.  I understand.  Yes.
19  Just until the completion of the case, until the completion of the
20  case.  Is that agreeable to Mr. Goodman's counsel, Ms. Davis, as well?
21             MS. DAVIS:   It is, Your Honor.
22             THE COURT:   All right.  So that's the way we'll handle that.
23  So we're ready now to proceed with rebuttal argument by Mr. Purcell
24  and then what I propose is that I'll -- I have gotten good feedback
25  from jurors.  It may be a blow to my ego.  But they've all told me

1    it's nice if I break up the instructions sometimes to other jurors.

2    They find that the jury instructions are a little bit mind numbing is

3    what one juror once told me which is certainly understandable after

4    the eloquence and charisma of trial lawyers, to have to listen to a

5    trial judge drone on with the instructions.  So what I propose to do

6    is, Mr. Purcell, after you finish your rebuttal, depending upon the

7    timeframe, I'll probably start the instructions and then stop midway

8    through and give them their morning break and then complete

9    instructions.  Unless there's any problem from the point of view of

10   counsel on that, that's how that will be handled.  And we have I

11   gather Ms. West has got some lunch menus in there for them.  Is that

12   correct?

13              THE CLERK:   Yes.

14              THE COURT:   All right.  Well, with that, unless there's

15   anything further, we are ready to proceed.

16              (Jury present.)

17              THE COURT:   Good morning, everyone.  We're ready to now

18   proceed with the conclusion here of the case.  So we have rebuttal

19   argument from the government, from Mr. Purcell and you all may be

20   seated and then I'll give you the instructions on the law and we will

21   be taking a mid-morning break and you've had your lunch menus.  So

22   with that, Mr. Purcell -- one thing, Mr. Giblin, if you can help

23   Mr. Purcell for one second?  If you could just move this easel back a

24   little bit so I can see?  I just barely see all the jurors.  I'm

25   blocked out from Juror Number -- just pull back some just so I can see

1    the jurors.  I just can't see Jurors 7 and 8.  That's fine.  That's

2    perfect.  That's good.  That's perfect.  Thank you very much.  Okay.

3    And with that, we are ready to proceed.  Mr. Purcell, rebuttal for the

4    government.

5              MR. PURCELL:   Thank you, Your Honor.

6              Well, good morning, ladies and gentlemen.  This is the part

7    of the trial that I wish that we could just put in front of you a

8    little green light that indicates just push the button if you get it

9    and then I'll just sit down and wouldn't have to go any further.  I

10   think at this point if I were to say to you do you get it, there would

11   be 16 green lights going on.  Because I can't do that, I have to

12   proceed and I will not be nearly, nearly as long as I was in opening

13   statement.  I will not be nearly as long as any of the arguments that

14   you heard yesterday presented either by my colleague or by the

15   defense.

16             I wish however to address on this very important day some of

17   the matters that were not addressed by the defense yesterday.  And it

18   is an important day because finally today, finally today this long

19   after July 2, 2007, you will get to begin your work to review the

20   evidence and finally, deal with this crime the only way our civilized

21   society allows us to deal with it by considering it by a jury and you

22   rendering your verdict and that process will begin today and it's

23   about time.

24             Now yesterday I had the benefit and you had the benefit of

25   not having to hear from me.  You had the benefit of listening to

1    arguments from the defense and they were very interesting and I think
2    I didn't put a stop watch on it, but I know that a predominant part of
3    the time of the argument made to you was spent on one person and that
4    of course is Mr. Pearson.  And it was suggested to you, it wasn't
5    suggested, it was urged upon you and you were told in a most
6    convincing way that somehow Mr. Pearson is the glue in the
7    government's case.  That he is our case.  Well, I think if you were
8    able to put your green lights on and you'd say no, we understand that
9    is not our case.  He is part of our case.  A part that the prosecutor,
10   he's part of, he's one of these damned if you do, damned if you don't
11   sort of witnesses.  If I don't put him on, where is Pearson?  If I do
12   put him on, it's let's spend days and days cross-examining him and the
13   predominant part of our time in argument condemning him and by
14   association the government.  And what I would try to ask you to
15   consider today is he's not the glue to our case.  In fact, Pearson who
16   made six, I think at least six prior tape recorded, videotaped,
17   multi-hour statements on his own without a lawyer by his own choice
18   incidentally and I wish if he had just invoked at some point, all of
19   that would never have been done.  But that's not the way Pearson and
20   Byers and Goodman operate.  They are their own lawyers.  They don't
21   believe in lawyers.  Lawyers are the very last place they go.  They're
22   businessmen, but they're street businessmen.  A real businessman
23   doesn't put his tie on in the morning without calling his lawyer.  A
24   street businessman, a drug dealer, a lawyer is the last guy to go to.
25   These guys are enterprising and they take care of their problems as

1  we've seen themselves.  They deal with the police themselves.  The

2  best example of that in this case, of course, is Pearson trying to lie

3  his way, finagle his way out of well, out of this, his essential

4  position in the case and Goodman and Byers doing exactly the same

5  thing.  Byers of course doing it the day of the Haynes' murder by

6  interposing himself as a helpful associate, helpful informant to the

7  police, Officer Jenkins.  Hey, I heard about a tall guy who threw a

8  gun in an alley after shooting Mr. Haynes, my friend, with no name, no

9  first name in this case or no last name, told me about this, he was

10  there.  And by endearing himself and these are all juvenile tactics.

11  If any of you have children, you have an idea or if you're teachers

12  have dealt with teenagers and this is not sophisticated things we're

13  seeing, these tactics we're seeing from these defendants.  It's just

14  what they think will work.  I know what I'll do.  I'll just impose

15  myself and make it look like I'm trying to help them and they'll never

16  suspect me.  Well, that doesn't really work and I'm glad they did it

17  here and that's what they do.  That's what Byers did.  That's what

18  Pearson did.

19          Now Pearson, his persistence, his July 5, I'll give them

20  Cornish.  I wish they had just stopped then and said we're done.

21  July 7, I'll get you the gun and then July 31st and August 26th and

22  27th and 28th and I think it's the 30th.  Just, you know, he's now

23  being dragged into it.  He can't himself.  He's dug himself a hole he

24  can't get out of.  But what he did is he didn't glue my case together.

25  He glued his case together.  If he had just shut up on July 5 or

1    July 7, they would have been up here yesterday for about two minutes

2    because they didn't talk about the evidence.  They didn't talk about

3    the real glue to the government's case.

4            The real glue in the government's case isn't named Pearson.

5    The real glue in the government's case, his name is Byers and his name

6    is Patrick Byers, Jr.  Is Patrick Byers, Sr. back there, his trainer?

7    Congratulations, dad.  Your son has made it to the big leagues.

8    Patrick Byers, Jr. is the only thing in this case, the only component

9    in the case, the crystallizing force, the unifying force that makes

10   sense of everything else.  There can't be a Pearson without a Byers.

11   There can't be a Goodman without a Byers.  It's all about Mr. Byers.

12   And all Mr. Pearson is to them is a gift to throw at you and say the

13   government relies on him and talk about his many, many, many tapes of

14   lies.  Well, you know what?  We know he lied.  We know that.  We gave

15   them the tapes.  But, you know, you're damned if you do and you're

16   damned if you don't.  So we don't rely on Pearson.

17           Now his phone I will not say that about.  I'd love his

18   phone.  His phone is excellent evidence.  Unfortunately, he comes with

19   it.  But whether Pearson is as indicated over here which is where he

20   is.  I think we saw his attorney here again today watching.  He's

21   pled.  He's facing a possible sentence of 35 years.  That's an agreed

22   sentence by the way between the government and him.  Judge Bennett is

23   not a party to any of these sentences.  Judge Bennett can accept or

24   reject them.  We have no idea what he'll do and I suspect he doesn't

25   either at this point.  And if you don't like those sentences, those

1   agreed upon sentences, put it on me because my name is on each one of

2   them.  And if you don't like it, there's another name on the top of it

3   who's the U.S. Attorney, call him and complain to him.  But whether

4   Pearson sits over here as a government witness or if he had that day,

5   July 5th, after he tried to help the police with that what he had

6   heard about, you remember the first day the police met him by tracking

7   his phone and they tracked his phone, folks, because if you remember,

8   his phone, his phone.  It's not about Pearson, folks.  But I'm never

9   going to give up Pearson's phone.  Pearson's phone.  He made a really

10  stupid mistake.  He used his own phone.  Went through the effort of

11  getting a burner phone, buying a chip, putting it in an old phone like

12  he told you just so he wouldn't get caught and he called Mr. Lackl and

13  he did that at 3:46 p.m.  Now that was the key that led us to

14  Mr. Lackl.  The police, the detective.  I wasn't involved.  The feds,

15  as we are referred to, were not involved in the case until much later.

16  But the detectives from the county because this was a county murder at

17  that point were working on it.  And they were tracking his phone and

18  Pearson came along with it.  And he gave as Byers did.  Remember when

19  Byers was caught in the Haynes' murder?  Immediately -- well, actually

20  before he was caught, before he was even implicated, he was calling

21  Detective Jenkins and passing off some other information.  That's what

22  he did.  I heard, I heard said Mr. Pearson that this guy, Brazy, did

23  something for Pat in jail and I think they were on the phone.  Of

24  course, they recorded it.  You heard it and you have it.  You can

25  listen to it.  And what happened in that conversation?  Mr. Cornish

1    just -- I mean he's 15 years old.  It's like one of the sadder -- it's

2    sad.  Everything in this case is so awful.  You saw him.  Is he that

3    bad?  He's a 15-year-old kid, of course.  And 15-year-old kids,

4    history has proven time and time again will do anything.  15, 16, 17.

5    They'll do it.  Peer pressure, whatever reason.  They'll go out and

6    kill somebody.  They don't know any better.  And he did know better.

7    But, you know, he did it.  He was exploited.  Went along and he's

8    going to pay the price.  But he answered that call from this very same

9    phone and he answered the call from the very same phone that was

10   called later that day by Mr. Pearson and they were setting him up

11   after he called Trigga to get him recruited.  Same phone and he's

12   using his same phone and he says yes, shot a white guy with a .44,

13   shot him four times and after that, it was over for him.  There was no

14   Cornish trial.  Cornish is done.  And imagine, just imagine after that

15   that Detective Ruby had said we'll maybe wait another day, two more

16   days and get the gun back.  The gun in this case is a nice ornament.

17   It's a nice piece of evidence to have if you have a gun and it

18   corroborates what Pearson told us tremendously.  But we already knew

19   it was a .44 because unfortunately, one of the .44s that went through

20   Mr. Lackl was recovered.  So we knew it was a .44 and that

21   corroborated what Mr. Cornish said.  It was a .44.  But the gun was

22   nice.  But Detective Ruby knew this and he's not about to stop

23   investigating and stop talking to a guy who doesn't want to stop

24   talking.  The guy that would keep talking.  But when he talked, the

25   more he talked and ultimately Pearson came around to Mr. Saunders, met

1   with him and has a federal defense attorney now.  Told him you're

2   done.  Time for the truth.  In the interval, he gave them their

3   defense, which has been thrown at you over and over and over again.

4   Well, let's just step back for a second and think what if Detective

5   Ruby had said after he got the gun and maybe Mr. Pearson told him.

6   This guy, Pearson, who got his phone calling the family.  Cornish

7   obviously is going to talk and obviously and soon did would have given

8   him up anyway, that is Pearson.  We wouldn't have to worry about that.

9   Pearson is over here.  He would be convicted in a moment, wouldn't he?

10  Well, he's with them.  Pearson doesn't do a thing without Patrick

11  Byers and of course, he couldn't even begin to do a thing with Patrick

12  Byers without Goodman.  If the investigation had stopped with the

13  seizure of the gun and there were no more calls, I'm sorry, no more

14  meetings with Mr. Pearson, there wouldn't be any defense.  But we

15  still would have had, the police still would have had, the government

16  still would have had Pearson's directory.  All Pearson did by not

17  giving up those numbers in his directory and this is a blowup.  This

18  is Exhibit 408.  And 408 is a blowup of a particular page and these

19  are numbered.  You'll find 163 and 175 in your directory and you'll

20  have a copy of it.  You do have a copy.  But you have a copy here of

21  the most important part.  Trigga is in there, Killa is in there,

22  they're all in there.  Fat Jay is in there, the common person between

23  Pearson and Mr. Byers.  The common link.  Now if you are following and

24  I hope you are, if Pearson had just been locked up on July 7th after

25  they got the gun, he would have been around to conceal that until late

1   August which is what he did.  He never told anybody until August 26th.

2   He told Detective Childs, who is I think here today, finally, oh,

3   yeah, those guys are in my directory and if you recall, I asked a

4   couple of the detectives and I asked Pearson why didn't you give that

5   up earlier on and Pearson in his monosyllabic response said it would

6   have put me in the middle and the detective said, Detective Ruby said

7   and Detective Childs said it would have put him in the middle of it

8   and that never would have changed.  These records, these phone links,

9   the witnesses, Cornish, Ms. Graham, all of them would have exactly

10  remained the same because everything they did remained the same and

11  their testimony would have remained the same.  The only thing Pearson

12  did is give the defense a gift from trial heaven and that is something

13  to throw at you and to suggest that our case depends upon him.  So

14  strip him out of the case after his arrest and after he gives us

15  Cornish which is what guys like that do.  It's what Mr. Byers did.

16  And nothing else changes except they don't have a defense, something

17  to yell at you about and we would have found this a lot sooner.  And

18  what I mean by that is he distracted the police.  He was a live lead

19  that the homicide detectives were working and he told you, Detective

20  Ruby told you, they were getting boxes of records, boxes of phone

21  records and they were subpoenaing everything.  Once they got Pearson's

22  directory, they started looking at the chronology and started getting

23  the records.  They didn't make sense of it yet.  But that's largely

24  because he was keeping them distracted.  It didn't take long after

25  that distraction and with the arrest of Mr. Goodman and Mr. Byers in

1   September that we were able to pick out the chronology.  Now this

2   chronology is the same today if we are just beginning the

3   investigation today as it was then.  These relationships between these

4   phones and the phones in that directory and these people and those

5   people sitting over there never ever change.  Mr. Pearson only helps

6   their defense, helped the defendants and helped himself primarily by

7   not giving up that link.  He's not my glue.  His phone is.  But he's

8   not.  He's all they have.  And I'm sure when the defense attorneys got

9   the package we call discovery that had the six videotaped discs in

10  there, thank God, we have a defense.  Now we have something to work

11  with.  We tell the jury Pearson is their main guy and we just hammer

12  him, you know, hammer him.  He lied for six weeks incrementally moving

13  towards the truth because the truth is inescapable.  If he had said

14  nothing, if he had said nothing, would you really need Pearson, would

15  you need Pearson to tell you what he might be talking about, but

16  Patrick Byers.  You have a record in there by the way.  One of your

17  pen link reports shows and Ms. Gardner is not here.  Do you know what

18  that means?  I can't play any videos or tapes or anything on the

19  overhead.  We have to look at some big exhibits and I thank God for

20  that because that's not what I want to do.  But I do want to point out

21  this.  Do you really need a Pearson to tell you once it's established

22  as it would ultimately have been established with Cornish's help and

23  Ms. Graham's help, Cornish would have immediately said of course once

24  he began to cooperate, yeah, I shot the guy.  It was Mr. Pearson who

25  recruited me to do this and we drove out to Philadelphia Road and

1   Tammy would have said and all the same and it would have all been on

2   Pearson and now we would be asking the question why is Pearson who

3   takes the shooter out to Philadelphia Road to kill Mr. Lackl for whom

4   none of these people, with whom none of these people have any

5   relationship at all, why would he be talking to Byers and Goodman and

6   particularly Byers, particularly Byers?  The relationship with Goodman

7   would have required a bit more work to figure that out.  But you know,

8   they're detectives and they figured it out.  But unusually, the only

9   calls we have at all between Pearson and Byers are this day.

10          Now without Pearson as a witness and with Cornish telling

11   you what he and Pearson and Tammy did, would you really need somebody

12   to come in and tell you in a very, as I said, almost guttural fashion,

13   would you really need him to come in and tell you what they were

14   talking about?  Here I'm talking to Mr. Byers and this is Pearson and

15   then he calls Mr. Lackl and then seconds later, minutes later, he

16   calls Mr. Byers again.  Now the detective would have figured out that

17   that subpoena in the house was for the trial of Mr. Byers and just

18   eight days after the murder and this is the only time these guys have

19   ever talked and later that same day, this guy who's talking to

20   Mr. Byers killed or took a 15-year-old kid out to Philadelphia Road to

21   kill Mr. Lackl.  And then he's talking to him.  This is the same

22   exhibit highlighting the calls I was just showing you.  This is 393.

23   Do you need Pearson to tell you what these calls were about?  On this

24   particular day, the day Mr. Lackl was murdered and he's conversing

25   with the guy who was the only person in the world to benefit from

656

1   that?  This is before the murder.  Of course, this is a blowup of this

2   top part of 343 that you all have.  And then would you need Pearson to

3   tell you assuming Cornish and Tammy are still in the game, still as

4   witnesses which they would have been because they would have been

5   linked to Pearson's phone.  Cornish gave himself up in that first

6   conversation.  He was done and he knew Tammy.  Nothing else changes.

7   All we're taking out of the equation is the words out of the mouth of

8   Pearson.  Everything else is the same.  So do you need Pearson to tell

9   you what he said minutes after he leaves somebody out there to kill

10  Mr. Lackl at 8:45 on July 2nd and the first couple of calls he makes

11  after Jonathan Cornish calls to tell him as he goes to meet

12  Mr. Goodman downtown to get his $2300, he calls Patrick Byers.  He

13  calls him back.  He calls him back.  These are all calls between

14  Goodman, Byers and Pearson.  So do you need anybody to tell you what

15  was in those conversations?  And actually do you remember even what he

16  said?  Basically he said I told him it was done and he told me that he

17  had some other guys that would like me to do the same thing.  And then

18  I called and he says I called Goodman and said I'll meet you down the

19  way.  And Tammy if you remember Tammy Graham told you yes, we did meet

20  with Goodman.  She was indifferent about it because she didn't know at

21  that point what happened.  But she does remember that on the way back,

22  he said he called somebody and said I'll meet you down the way.

23          Now that her testimony is essentially benign.  But it's

24  highly corroborative because she sees the meeting with Goodman and she

25  hears the comment, I'll meet you down the way.  They do meet down the

1   way.  I don't know if they met at Darling or Cliftview.  If you look

2   at the map, these streets all angle in from Harford Road and they hit

3   at the same place.  You can stand somewhere and meet on both Cliftview

4   and Normal at the same time and Darling comes up right behind there.

5   We have maps to show that.  Now did you need Pearson for that?  Did I

6   need Pearson for that?  I mean who do you think they were talking

7   about?

8           Now when I say to you I wanted to talk to you about what

9   wasn't mentioned in closing, I'm asking you to think now back to what

10  Mr. Davis, unfortunately who's not here today and Mr. Balarezo, who is

11  here today, what did they say in their combined four hours of argument

12  to you?  Did you see these exhibits?  Did you hear any explanation

13  beyond condemning Mr. Pearson in which I largely join.  Did you hear

14  anything about these conversations?  Why was Goodman's T-Mobile doing

15  calling Byers' father two days before the murder?  They didn't discuss

16  it.  They can't discuss it.  You can be a great lawyer or even a not

17  great lawyer, but even a great lawyer can't explain that which just

18  can't be explained except for the obvious fact.  Just stay away from

19  it.  They just left it alone because nothing they said would have made

20  any sense.  So they just said, well, you can't tell what the duration

21  is or other people used the phone.  Now I'm not really sure what

22  that's supposed to mean.  But let's just consider that for a second.

23  Are we supposed to believe that there's somebody else in the Baltimore

24  City Jail who just coincidentally borrowed Mr. Byers' phone on the day

25  of the murder to arrange to kill without him knowing anything about it

1    Mr. Byers' only untarnished identification witness for the trial that

2    was coming up in eight days and just happens to be on the day that the

3    guy is killed?  I mean come on.  But nobody else was using the phone

4    in the conversation between Pearson and Byers and Pearson and Goodman

5    about this.  And we know, we do all agree, I think it's agreed upon

6    everyone in the courtroom that Mr. Pearson was in the middle of this

7    and is responsible for the murder.  So if you believe that, if you

8    believe Pearson is involved in the murder which I think we all agree

9    and it's undisputed, then what is he doing talking to Byers and

10   Goodman on that day?  And that is something that was never ever

11   addressed.  They showed us the box from the T-Mobile.  The T-Mobile

12   phone is not the phone that Mr. Goodman used to talk to Mr. Pearson or

13   talk to Mr. Byers.  He spoke to Mr. Byers, Jr. I think one time on the

14   T-Mobile phone.  Maybe twice.  You'll have a record of that back

15   there.  I know there was one on the day before the murder.  Here's

16   Patrick Byers, it's T-Mobile and then he calls him again on his

17   regular phone.  But the Nextel, the blue phone, the direct connect

18   phone, that was used to communicate with Pearson and Byers by

19   Mr. Goodman, that phone, the phone that was taken from him when he was

20   arrested, that's the phone linked to Mr. Goodman.  That phone goes

21   right to Mr. Byers and that phone by the way talked to Mr. Byers.

22   Remember those sheets we have of contacts just between certain

23   individuals and Mr. Byers?  They're like broken up in color codes to

24   show which evolving number or changing number that they're in touch

25   with.  They look like this.  The red which is -- this is actually the

1    second and third page.  But the yellow is the second phone.  The

2    purple is for the third phone.  We have those for Goodman.  Hundreds,

3    not hundreds, but many, many, many, many such calls.  That's the phone

4    that was taken from Mr. Goodman.

5              Now getting back to the things that they were not talking

6    about.  The main thing they were not talking about, the phones.  Did

7    you hear any explanation for those calls by either Goodman or Byers?

8    No.  And there's a reason for that.  So they can't explain it.

9              So I guess my point to you about Pearson, he's not my glue.

10   He's their glue.  He's their whole defense.  Attack him, show what a

11   piece of crap he is, how mean he is to women and how he made things

12   up.  We know that.  We know that.  That doesn't matter.  That's not

13   why he's valuable to us.  We love his phone.  His phone made the case.

14   The case probably would have been made ultimately anyway.  But by that

15   red line mistake right there, that allowed the police even though he

16   threw out the burner phone, that allowed the police to find him, take

17   that phone off his person and make him start explaining it.  His first

18   explanation, he gave up Cornish who stupidly and honestly admitted his

19   role.  Pearson for all I care could have been arrested and sitting

20   with those guys from that point on.  All he did after that is obstruct

21   the investigation by not allowing us to get to these phones faster and

22   provide them with a defense in a case to which there is no defense.

23   And that's the simple fact.  You didn't hear about these things

24   yesterday because there's no explanation for them instead let's look

25   at clip after clip after clip after clip of Mr. Pearson lying.  Well,

1    you know, I didn't show you clips of Goodman and Byers.  I showed you

2    the whole thing.  We played the entire tapes with Detective Martin.

3    You heard from Detective Jenkins about his encounter with Mr. Byers.

4    And you heard Mr. Byers and Mr. Goodman's interviews on the 5th and

5    7th of September respectively.  And did you see something familiar in

6    those conversations, in those interviews?  Exactly the same thing.  I

7    don't know him.  I don't know Goodman.  I don't know Byers.  I don't

8    how many times Peter denies Jesus.  But these guys far exceeded any

9    sorts of biblical proportion denials.  These are denials beyond that.

10   Byers denying Goodman.  Don't know him, don't know him, don't know

11   him.  Never saw him before, never visited me.  Why would anybody and

12   did you hear anybody say, did Goodman's lawyer or Byers' lawyer tell

13   you why on earth if they're innocent, why would Byers deny Frank

14   Goodman?  Why would he deny knowing him?  Why?  No explanation for

15   that.  So they didn't explain it.

16          Detective Jenkins, I mean I was listening to that and when

17   that came up in the discussion about the I guess it was the Haynes'

18   case, the defense, Mr. Balarezo simply said about Detective Jenkins, I

19   don't know why Jenkins came in and said that and he just moved on.

20   Well, let's stop for a second and ask ourselves why did he come in and

21   say that.  Because it's true.  Byers called him.  Gave him a false

22   lead.  Tried to cover himself up.  And then when he met with Detective

23   Martin on the 20th of March when he was finally arrested for that, has

24   to create a whole new scenario because he doesn't know what the police

25   know.  He doesn't know whether the gun was recovered with his

1   fingerprints on it.  So he has to create an explanation for why a gun

2   with his fingerprints on it might be found in that alley.  He said I

3   left one there for Officer Kevin.  Officer Kevin, Tony, doesn't even

4   know first or last name.  Do you really need to turn your green lights

5   on?  Do you really need me to go through this with you to see what

6   these guys do?  They just lie.  They sort of fabricate as they go

7   along.  And their lawyers, of course, work with what they have and

8   what they have is Pearson.

9              If we had heard explanations about those calls, there would

10  be a real reason for me to have some rebuttal up here.  But what I'm

11  going to ask you to do is basically strip out Pearson after Cornish,

12  after that call, put him over there, and you'd be voting on three

13  people today instead of two.  And he just makes my case easier sitting

14  over there.  He didn't help me.

15             Let me make a point about this.  There's been a lot said

16  about these plea agreements.  Look at Tammy Graham.  Use her as an

17  example.  It would suggest that I guess that Tammy Graham as it was

18  suggested of Pearson, as it was suggested of Cornish that, you know,

19  they sign the plea agreements.  But they're saying whatever it is I

20  want them to say.  Well, I wish someone had, you know, told me that

21  comes along with this job when I flip somebody and get them to do a

22  cooperation agreement and they plead guilty to a certain number of

23  years, that I get them to say whatever I want them to say.  Do you

24  remember Mr. Pearson's testimony?  I mean the transcript for that

25  testimony can be -- well, I could order it and if you'd just took out

1    the answers, you got the questions, just put the answers in the

2    transcript would be yes, no, correct, correct, correct, no, that's not

3    what I said, Pat was there, I did talk to Pat, I didn't make that up.

4    But if I had known I could, you know, have him say whatever I wanted

5    him to say, I would have had him say a whole lot more about his

6    relationship with Pat, about the substance of their conversations.  I

7    would have, you know, I could have come up with a lot of good things

8    for him to say.  He told me what happened.  These guys, you know, he

9    called Byers that morning and you can see where he called him.  It's

10   right before the red line where he called Mr. Lackl.  Right here he

11   calls Mr. Byers for one reason.  His money is good.  Goodman is

12   telling me that money is good.  Didn't take a minute.  Didn't take two

13   minutes.  Yeah, it's good.  And of course, Goodman was the money man.

14   That money wasn't mailed out of jail.  Goodman had it.  In fact when

15   there was a beef about the money.  I'm glad it was short because it

16   made Mr. Pearson call Mr. Byers again.  Byers told him Goodman will

17   take care of the money.  It's Goodman's money.  He's taking care of

18   that.  He's the guy with the money.  But if I had been able to make

19   them say whatever I wanted them to say, I would have come up with some

20   enlargement on those conversations.  I would have had a broader base

21   of their relationship.  But actually on the narrow base of the

22   relationship served us just right, doesn't it, because it puts it all

23   in perspective.  The only day they had a relationship was the day that

24   Pearson got somebody out there to kill the witness, the only

25   untarnished witness against Mr. Byers.  Ms. Graham it was suggested,

1    of course she's saying whatever I want her to say.  She got a deal.

2    They are giving her basically a plea to just lying.  Well, yes, and

3    she was charged with a first degree murder in Baltimore County.  And

4    yes, I did dismiss that charge.  I did have that done.  That was me.

5    Now do you think she was properly charged and she should be facing a

6    first degree murder charge, then call that number on the top of the

7    plea letter and let somebody know.  Do you think Tammy Graham knew

8    anything other than what she told you she learned that day when she

9    got to the hotel?  Obviously, if you do, we don't agree.  Sorry.  If

10   she lied, she's prosecuted for that.  No matter what she does.  She

11   could tell me tomorrow I'm not testifying, no way, never going to

12   testify again, I don't like it, I can't do it.  And she was here for

13   you to see and hear and that's why we bring them in so you can make

14   your own evaluation and judgments and I submit to you she testified as

15   a truthful person when she told you her whole role.  But if she were

16   to tell me I can't do it anymore, Mr. Purcell, I refuse to testify, I

17   couldn't turn around and say well, we're charging you with first

18   degree murder.  I can't.  I've stipulated to the fact that she isn't

19   involved in a first-degree murder.  I can't unstipulate those facts.

20   She's telling you what happened.  And if I could have told her to say

21   more, if I knew I had that power, I would have had her saying yes, the

22   whole way out there he was talking to his friend, Patrick Byers, Pat,

23   in jail and they were talking about the contract murder they were

24   about to do.  And afterwards, she met with Frank Goodman and he came

25   back and I counted $2300 that Patrick had sent through Mr. Goodman to

1   pay him for a contract murder he had just done.  But she didn't say

2   that because she didn't know that.  She did know though and I'll take

3   it that on the way back, Pearson said I'll meet you down the way and

4   she met with Goodman.  I'll take that because, you know what, because

5   that's confirmed by the phone records I don't need just her.  But it's

6   also confirmed by the cell tower records and it's confirmed of course

7   by Mr. Pearson.  And in his own way it's confirmed by Mr. Goodman and

8   Mr. Byers who deny they know Pound and deny they know each other and

9   there's a reason for that.  You know, people don't lie without a

10  reason.  They just don't unless they're sociopaths.  Otherwise, lying

11  is hard to do.  Particularly the important things and these were

12  important lies and these guys when they were confronted with do you

13  know each other, they knew what they had done.  No.  I don't know.

14  They didn't know what the police knew.  So Detective Ruby is really

15  great at that.  He's trained other detectives.  He started his

16  interrogation way out here and he works their way, he takes them 20

17  minutes to get to what he really wants to talk about.  They have no

18  idea what he really wants to talk about.  It's great.  It's not fun to

19  watch, but it's interesting to see.  And they deny each other over and

20  over and over again.  They deny pictures, any contact.  They denied

21  any phone contact with each other.  Sorry.  We have your phone

22  records.  We know you had phone contact with each other.  And you

23  can't do anything about it and you can't get off of that hook by

24  saying, bringing in some expert from Florida and saying I can't tell

25  there's any duration here.  Let me talk about that guy for a minute.

1    I'm sure he's a wonderful electrical engineer.  I can never -- I

2    barely got through the education program much less electrical

3    engineering.  And he is probably very, very good at what he does.  But

4    he didn't have the information.  When he was making his analysis to

5    you or his opinion to you about what these durations mean, his whole

6    fundamental premise was based on that this was all information based

7    on what's called a DNR which operates completely differently in terms

8    of generating duration records than a billing record.  And you heard

9    it.  We asked him.  The first question.  Now we let it go.  So what

10   are you basing this all on?  What's your opinion as to -- I think

11   Bryan was asking what's your opinion as to what's the source of these

12   records and in a pen link and he said I believe they come from a

13   court-ordered DNR and that is a way to get such records.  That's how

14   we got these records.  These are billing records.  And if Nextel does

15   not bill you -- if I pick up the phone to call you, you are going to

16   get billed for that if you don't answer the phone.  Would you want to

17   get a bill where you're getting billed for people who are calling you

18   and you're not answering the phone?  It's bad enough as it is.  So

19   they don't do that.  But he didn't know that.  And they didn't know

20   it.  And that's not my fault.  But don't bring an expert in who

21   doesn't know what he's talking about.  Prepare him.  I'm sure if we

22   asked him about how cell towers work in some mechanical way, he would

23   wow us all.  But his premise was incorrect.  Sorry.  They wasted their

24   money.

25                And really, the point isn't the duration, is it?  That

1    doesn't answer the basic question.  You know, I really don't care how

2    long they were talking.  Why was Pearson calling Byers on this day?

3    Why was Byers calling Pearson on this day?  Why was Byers talking to

4    Goodman all the time?  Why was Pearson talking to Goodman on this day,

5    the day of the murder right before the calls to Mr. Lackl, right after

6    the murder of Mr. Lackl?  We did not hear a word about that.  We just

7    heard there is no evidence of duration.  But we heard no explanation

8    as to the contact.  It's the contact that makes the difference.  And

9    how long does it say I'll meet you, how long does it take to say I'll

10   meet you down the way?  Time yourselves back in the jury room when

11   you're deliberating.  Test the theories that have been presented to

12   you in that room.  You may do that.  But you know, I wouldn't even

13   have to speak to you if it wasn't for Pearson if he didn't go on and

14   on and on.  He was their glue.  He was a gift to them.

15           Now I do have some notes that I'm going to blow right

16   through very quickly because there's a couple of other things I wanted

17   to mention to you.  If you have a pencil or a pen, I don't think you

18   really need it.  I was going to ask you to point out to you the exact

19   line numbers of these calls.  But if you use these smaller exhibits

20   and there's nothing edited out of them.  They're exactly the same as

21   the large exhibit except they focus -- the line numbers are exactly

22   the same.  But these are all the contacts right after the murder and

23   this one which is the red line is exactly the same as without any

24   exclusion as that top part of that exhibit.  And just look at Byers

25   and Pearson, their call.  And then who's he call?  Pound calls Byers.

1    Did we hear anything about why that happened?  Why would they do that?
2     They can't talk about that.  So they don't.  But nothing is excluded.
3    Now what's the middle part?  The middle part of that exhibit is Pound
4    arranging for the murder.  Calling Lackl, calling Mr. Lackl's home.
5    And you have this exhibit.  This is exactly the -- this is 343.  So
6    it's what you all are carrying around and you have it.  But here you
7    can see his contacts with Trigga, his contact with Brazy, his contacts
8    with the burner phone are all to Mr. Lackl.  They're there.  They're
9    there.  They're there.  Want to come out and look at your car.  This
10   exhibit, 304, which I think you all have is one the defense does not
11   want you to see, look at or discuss.  But it's what Pearson was trying
12   to evade.  It's what Pearson was trying to avoid because as I say, if
13   he had given up that he had Goodman and Byers' numbers in his
14   directory, all one has to do then is look at his phone records or
15   their phone records or Byers' phone records for that day and see the
16   interplay between the numbers.  It doesn't change.  You don't get to
17   manipulate these records.  They are what they are.  They are today as
18   they were then and that's how they are.  And by his not revealing
19   that, as he said, he kept himself right out of the middle of all this.
20   Put it off on somebody else and as he said, he was hoping that Cornish
21   wouldn't talk.  Wrong.  Cornish had no choice.  He got tricked into
22   confessing and that's good.  That's good police work.
23           Every page I turn is something good for you.  If you do,
24   there was a snippet that if Ms. Gardner had been here, I was going to
25   ask her to show you.  But you'll find it yourself.  If you watch the

1  tape, don't start with -- you watch all the tapes you want.  But don't

2  start with Pearson.  His case is over.  He's done.  We know he's a

3  liar.  We know what he said.  We know what he did.  So entertain

4  yourself if you want to watch a guy lie for six hours.  My suggestion

5  to you is you watch the tapes of the two defendants on trial first,

6  Mr. Goodman and Mr. Byers and you'll see them do basically the same

7  thing.  But the snippet I wanted you to see is when Detective Ruby

8  presents Mr. Byers with a copy of what some people have referred to as

9  the exhibit list, but which is in fact the subpoena, the subpoena from

10  Roland Walker's office which handily provides Mr. Byers, I'm sorry,

11  Mr. Lackl's address, but not his phone number, but his address and he

12  presented this and Mr. Byers said that stuff is not mine, a piece of

13  paper found in the box a few days after the murder of Mr. Lackl and

14  it's paperwork at city jail, this piece of paper which was not

15  discussed at all.  Was this discussed at all yesterday, Mr. Balarezo

16  in his two and a half hours?  I'm not faulting them for it.  A good

17  lawyer never talks about something he can't explain and these are good

18  lawyers.  I don't know if they're the best lawyers in the world, but

19  they're very, very, very, very good lawyers.  And I'm glad I have

20  evidence and not rely on argument because evidence always wins.  If

21  this document, the snippet I wanted you to see was Mr. Byers was

22  presented this particular piece of paper that was taken out of his

23  property and he denied it on July 12th and he denied it on

24  September 7th and he said who are those people, I don't know those

25  people.

1          Now on one hand, we have the defendant saying I don't know

2     anything about my case and he told Detective Ruby on that tape all

3     that Bates ever does is ask me for money.  Now we know that's not true

4     because Mr. Bates actually takes his phone calls from the jail the day

5     before the murder and the day after the murder on his own personal

6     cell phone from Byers' personal cell phone because he's a helpful

7     handy lawyer.  Call him on your jail contraband cell phone the day

8     before and after this murder.  It wasn't a witness, but I would have

9     loved to ask him a few questions.

10         We got to see instead Mr. Trout.  What a team they must be.

11    Mr. Trout is in the recantation business.  Walks around the street

12    with his preprinted recantation forms.  I'm sorry.  His tell-the-truth

13    forms.  I think you probably can make a good living in Baltimore City

14    going about and getting people who have told the police that they saw

15    a murder to recant.  You show up on your front door and say yeah, I've

16    been hired by Mr. Byers, you know, the guy who's in jail now facing a

17    life sentence who you know about and who shot that guy, Carwash, right

18    in the gut a couple of years ago and shot Larry Haynes five times in

19    the head.  Yeah.  You have a wonderful house and family here.  Oh, and

20    by the way, here's my recantation form.  Why don't you just tell me

21    the truth about what happened?  You know the truth that you really

22    weren't there.  The guy makes a living doing that.  He does it all the

23    time.  So what a great team they must be.  They must be very, very

24    good business in Baltimore City getting people to recant and pretty

25    easy when you live right down the street from the guy that you

670

1   implicated in the murder.  But that little snippet that you would have

2   seen and you can look for yourself, he doesn't know those people.  But

3   of course, he did.  Of course he did.  This is a guy who spends a lot

4   of time trying to get out of jail.  Not go to trial, but get out of

5   jail and there was not a word, not a word about this exhibit.  What it

6   meant, where it was and what he said about it, what Byers said about

7   it.  Not a word.  And this, not Pearson, is the glue that holds our

8   case together.  All they needed now was the phone number.  They have

9   the address.  How did they get the phone number?  I don't know.  I

10  don't know about that phone number.  Maybe Goodman, maybe Senior.  Who

11  knows?  Somebody got it.  Somebody went out and looked at that house.

12  I asked Ms. Humes who may not be here, I asked Ms. Humes how long was

13  that car for sale early on and I think you heard testimony three or

14  four weeks ago.  She said only for about a week.  So somebody in that

15  week before the murder rolled out to Philadelphia Road, saw that car

16  for sale, saw the phone number on the car and Carl, of course they had

17  his name already and called and then they sent Mr. Pearson out there

18  who obviously didn't know how to get out there.  He had to ask his

19  girlfriend how to get to Philadelphia Road.  They knew to call Carl

20  and ask about the car that he had for sale.  That all happened in a

21  week because that car was only out there for a week.  And you know, I

22  don't know.  If the T-Mobile calls between Goodman and Byers' father a

23  couple of days before the murder, I don't know.  I know that, I know

24  that Mr. Byers when he was asked about that, I'm sure the Byers' team

25  was happy to hear this.  But his explanation was -- actually, I'm sure

1    the Goodman team was happy to hear this, too.  Yeah, that was about

2    heroin.  I used to sell heroin of course and when I got out of jail, I

3    got my son into the heroin business so he would have a source of

4    supply that wouldn't kill him.  So father and son team and he told you

5    that was about heroin.  Now this must be something that runs in that

6    family because when he's asked about that call which looks a lot like

7    somebody talking to Goodman who we know is the person who transferred

8    the information to Byers, he said heroin.  I mean that's so stupid.

9    He defaults to a heroin crime rather than talk about a murder.  Now

10   who else have we heard that does that?  Oh, I'm sorry.  His son.  When

11   asked about the Haynes' murder, embraces being a drug dealer to cover

12   himself.  Well, I'm a drug dealer.  I'm not a murderer.  I would have

13   never even dreamed of shooting the guy who I just told you I suspect

14   of killing my two cousins four days ago, five times in the head and

15   there's been no other person with a motive or recent motive to kill

16   Mr. Haynes presented.  Of course, Mr. Byers brought that up without

17   any mention by Detective Martin.  You know what, these guys really

18   need to learn to shut up and get a lawyer rather than try to handle it

19   themselves.  They're just not good enough.  They're just not -- Mr.

20   Byers, next time get a lawyer.  Don't talk.  They just get themselves

21   in trouble.  But he must have learned that from his father.  Embrace a

22   different crime to cover the crime you really did.  Now if you can't

23   see that, if you really believe that Frank Goodman was calling Mr.

24   Byers, Sr. about getting some heroin, well, you know, I can't do much

25   about it.  If you do because I can't control what you believe.  You

1   did take an oath and your oath is that you consider the evidence, you

2   know, with each other and openmindedly and intelligently.  I don't

3   believe any of that, any application of those characteristics to that

4   statement would result in believing that this call was about anything

5   related to heroin.  It wasn't.  That's a little bit beyond my proof.

6   Just don't know.  And it really doesn't matter, does it?  But it's

7   there.  And it wasn't explained.  Rather we're told about the

8   duration.  Those were both one-minute calls incidentally.

9          Now I don't know what to say about Mr. Parham that hasn't

10  been said.  It goes to the second part of the defense strategy which

11  is to convince you that there was no motive.  That in Byers' state of

12  mind, he was not interested in killing a witness.  Now I just propose

13  to you that that's sort of defeated by the fact that Mr. Lackl is now

14  dead.  And the only person on earth with a motive to kill him is

15  Mr. Byers and his associate, Mr. Goodman, for their own purposes.  So,

16  you know, if there hadn't been these conversations on this particular

17  day with the particular guy who we all know is the murderer, I might

18  say okay, well, maybe there's some other explanation.  But there isn't

19  any other explanation.  We all know that Pearson was involved.

20  Pearson set the murder up.  Pearson talked to these guys only on this

21  particular day.

22          Now as to Mr. Parham, what we see there is just more

23  evidence.  I mean if I could ask you yes or no, green light, yes, red

24  light, no, do you believe Parham when he said he wasn't there?  You

25  know Parham, they're suggesting to you had some sort of immunity that

1  allowed him to finally come in and tell you that he really wasn't

2  there.  Well, he was all ready to go to trial in July of 2007 where he

3  would have done exactly what he did here there and he would have not

4  had immunity in state court.  You know, he's not concerned about

5  immunity or anything.  There's nothing I can do to Mr. Parham that he

6  cares about.  We are far too civilized in our legal process to affect

7  a guy like Mr. Parham who actually lives right down the street from

8  where Byers and his friends run the drug corner.  Sorry.  But however

9  many marshals we have in here and in our courthouse and around the

10  building, we're in a very protected little fortress here.  Mr. Parham

11  lives on the street.  Every now and then a district patrol car goes

12  by.  That's it.  And he doesn't care how this trial goes.  He doesn't

13  care.  He's right about that.  He doesn't care what happens to Byers,

14  he doesn't care what happens to Goodman as long as he did what he's

15  supposed to do which is not to tell and the last word he said, I'm not

16  telling on anyone from the stand.  That's the last thing.  Okay,

17  world, everybody here, anybody who sees him can testify he did not

18  tell.  That's all he wants.  Now he may have to answer a few questions

19  down the line about why he identified Mr. Byers in the first place.

20  But you know, he's going to have to explain those things on his own.

21  Maybe get Mr. Trout to protect him.  He was -- well, I can't give you

22  my opinion and I won't.  You have to make your own determination and

23  that's again why witnesses are brought to you so you can evaluate them

24  like you do everything else in your life and say is that guy being

25  truthful or not.  But I think that probably to assist you in your

1    determination as to how truthful he was to learn that without anybody

2    on our side of the bench knowing, without the government having any

3    knowledge, Mr. Byers and his new cell phone have been in contact with

4    Mr. Parham on the very day.  He finally was going to come into a

5    courtroom and testify about his identification of Mr. Byers and that

6    was March 12, 2009, this year.  Last month.  And on that day, he

7    finally came in and in a room right down the hall told prosecutors and

8    agents I wasn't there.  That was the first time he told anybody other

9    than Mr. Trout and Mr. Byers who knew all along, didn't tell the state

10   prosecutors and they did leave Mr. Lackl out there all by himself.

11   And yet, Mr. Trout, Mr. Bates, all for a stunning little trial moment

12   over in the city court when he pulled out the stipulation or pulled

13   out the statement where I recant and the state prosecutor's case falls

14   out from under her.  For that dramatic moment which only comes by

15   keeping it a secret which they're allowed to do, Mr. Lackl is dead.

16   And if he doesn't really see that responsibility, that's fine.  But

17   I'm not going to hug the guy.  And I hope one of these days he wakes

18   up and realizes his role in the death of Mr. Lackl, all for

19   gamesmanship in a trial.

20             Did you hear a word, a single word from Mr. Balarezo

21   yesterday about these contacts in March of 2009 between Byers on his,

22   undoubtedly his phone based on the 3000 calls to Keisha Newsome who

23   came in here and told you she spoke only to him.  And was there a

24   single word about why Byers was calling Parham?  I mean was there?

25   No.  And these guys are going there's no records.  You have all the

1    records.  There's no other records of any contacts between Byers and

2    Parham.  But it just happens that on the day he's supposed to testify

3    and Byers knows when all these things are going to happen.  He's a

4    defendant.  He knows when we're doing things in court.  He gets to

5    come to all of them.  We have a defendant or a witness who comes in

6    and tells us I'm not going to testify.  On the very day, the first day

7    ever in this whole series of events, Parham finally had to take the

8    stand and he wasn't immunized.  Believe me he is not -- I think he

9    could care less.  He committed blatant perjury 25 feet away from a

10   federal judge.  He could care less.  Do what you're going to do.  He

11   has to live out there as he said.  And Mr. Byers reminded him of that.

12   I'm quite sure he didn't call him and say I'll visit death upon you.

13   All I have to do is reach out and, you know, how you doing, it's me.

14   Yeah, the guy you put in jail for three years by telling on me and now

15   I'm facing the death penalty.  How you doing?  You don't have to say

16   very much when he knows the guy that caught him is the guy who knows

17   he shot another guy in the stomach and who saw you shoot somebody five

18   times in the head.  You don't have to say very much.  Hi, it's me,

19   Pat.  How did you get my number?  And, you know, it was actually

20   really funny almost.  If it wasn't so serious, it would have been

21   funny.  We're good friends.  We're very good friends and I never told

22   the government about this because nobody asked.  I mean come on.  I

23   would not be a state prosecutor, I'll tell you that, not in Baltimore

24   City because if this is what they deal with, the products of the

25   Trouts and the Bates.

1           Anyway, there's no Tony.  There's no Officer Kevin.  And

2    Pearson is not my glue.  He's their glue.  There's no explanation for

3    these calls and there can only be one explanation for why a person who

4    we know orchestrated a murder did, who was calling the people.  He did

5    it before, right before and right after the murder.  You can't see

6    that there's nothing more that I can say or do.  No more evidence we

7    can find.  There isn't any more evidence.  We know our burden and we

8    know about our burden.  Our burden, our burden.  Yeah, we know that.

9    We know who hears our cases.  We know it doesn't get presented to an

10   audience or to one of the lawyers.  We know it goes to a jury who

11   doesn't know anything about the investigation and wasn't with us when

12   we went to the grand jury or interviewed witnesses or any of this

13   stuff.  We have to put on basically a play of our case for this

14   audience called the jury and hope that they see it, desperately hope

15   that they see it because this is the only chance that we get to

16   present it.  And it's important for so many reasons for the justice

17   system to put an end to this reign of bloody terror that this man has

18   inflicted on east Baltimore, you know, Montford Street.  It's got to

19   end.  And you know, I can't end it.  And the Lackl family and the

20   investigators, we all have a sense of what we know.  We've studied

21   these records.  You may hear a person talk about them momentarily and

22   you heard somebody say something yesterday about pressure.  Well,

23   there is no pressure.  We took our time putting this case together.

24   We took our time putting it in front of you and we want you to take

25   your time considering it because it's important and it's the only shot

1 we're going to get presenting this to you and the only shot there will

2 be for justice.  And our system, unlike their system, their system is

3 you're telling, we kill you.  Do you think Byers and Goodman said

4 let's talk about the case, Frank?  Well, we have this witness here.

5 We might be able to get him to withdraw or he's going to recant.

6 Excellent thinking.  And this witness here, well, we know he has a

7 drug problem.  Maybe we can impeach his credibility with that.  And in

8 fact we have this witness over here who they present an array to.  We

9 can suggest that perhaps that person would never identify me.

10 Excellent thinking, Patrick.  We'll do that.  Let's go.  You'll be out

11 in no time.  No.  It's like that guy is telling.  He saw me.  I know

12 he saw me because he looked me right in the eye.  He knows me, man,

13 and he saw me throw the gun.  They don't really give it a lot of

14 thought because they didn't hear it.  They called this guy.  They knew

15 who would do it.  Not for $2300.  He called a kid who he know would do

16 it for nothing.  A Blood.  And that's the only Blood component in this

17 case incidentally, ladies and gentlemen.  For all the Blood M.O.B.,

18 Member of Bloods?  What is this, like a fashion line or something?

19 Everybody knows that's Money Over Bitches.  Come on.  The only Blood

20 aspect here -- I heard Mr. Purpura laughing.  The only Blood aspect is

21 that Pearson was a Blood and he had to find somebody to do his dirty

22 work for him.  He wanted to get $2300.  So he called an idiot he know

23 would do it.  A kid, an impressional kid who wanted to impress a

24 person like Pearson and that is the state of our society which we

25 cannot address in this courtroom.  We can't fix that.  That's the way

1    it is.  All we can address is this particular manifestation of that

2    problem.  But that's what he did.  And that's the only Blood component

3    here.  This Blood exploited his bloodness to get some baby gangster to

4    go out and kill somebody and it has nothing to do, other than that,

5    nothing to do with Bloods or anything else and nothing to do with

6    tattoos.  I mean we're happy to hear that's where the defense goes.

7    They're talking about tattoos.  That's great because it means they

8    have nothing else to talk about.  It's a specter of the defense.  A

9    real defense, a real core defense, a real fight, a real struggle for

10   us would have been explaining these calls.  And there wasn't.  There

11   was no mention of them.  Explain that piece of paper in Mr. Byers'

12   paperwork.  It wasn't even mentioned.

13            A word on the law I was asked to mention.  There's a 924(c)

14   count.  It's Count 8, Count 9 of the indictment.  It's based on the

15   conduct of Mr. Byers on March 4, 2006, the day he murdered Mr. Haynes.

16   Just to be clear, the gun that is charged there, it was described as

17   the Sigsauer and you won't be getting a copy of the indictment I'm

18   told.  The indictment is incorporated in the instructions.  So as you

19   go through your instructions, you'll read about each count.  They will

20   have the count right there for you to read or most of it.  Not the

21   entire count.  Not all of the language necessarily.  But that gun is

22   not by the way the hypothetical gun that was referred to by Mr. Byers

23   that he told Officer Kevin about.  The gun that's described in that

24   count is the gun used to kill Mr. Haynes.  That Mr. Lackl who's not

25   here to testify, but has testified before in a manner of speaking

1    through this tape, that's the gun he saw Mr. Byers throw just to be

2    clear.  That 924(c) count.  And how is it connected with drug

3    trafficking?  Well, we didn't have to produce any evidence of that

4    because Mr. Byers provided that.  He told us he was a drug trafficker

5    on that corner.  That he sold heroin.  In his statement and he had the

6    convenience of having his father corroborate that a couple of

7    different ways and it was corroborated by other witnesses.  I think

8    one of the, I forget the young man the defense brought in who had

9    contact with, Mr. Byers had contact with the brother who also

10    acknowledged Mr. Byers to be a drug trafficker in this area.

11             It's a count really that I'll tell you why it's in the

12    indictment.  Remember the witness intimidation count?  The idea that

13    the witness intimidation of Mr. Lackl, the murder of Mr. Lackl who was

14    a potential federal witness.  There were no federal charges at that

15    time.  But the two federal charges that actually did exist at that

16    time when we saw Byers run down the street are Counts 8 and 9.  Felony

17    possession on March 4th and possession of a firearm in relation to

18    drug trafficking.  Those two counts, 8 and 9, are potential, no longer

19    potential counts which Mr. Lackl could have been a witness.  And

20    they're basically brought and essentially, well, he's a witness to

21    those counts.  I'm going to talk about them.

22             Now I'm not going to get into Mr. Coleman because I think he

23    speaks for himself except to say this.  Mr. Balarezo made a lot of

24    gestures and remarks about the Coleman case.  The thrust of which was

25    what's it mean anyway.  What's it in there for?  Well, the judge will

1  tell you.  There are issues in every case, things that you're allowed

2  to consider.  Elements they're called.  Some you have to consider.

3  And the identity of a person whether they possess a firearm or not and

4  their intent are elements that you may consider and they're elements

5  of the crimes that are charged and this other event, other act by

6  Mr. Coleman is included to allow you to consider whether in the counts

7  that you have in the indictment whether Mr. Lackl's identification was

8  right because here's Mr. Lackl is saying I saw this guy on Montford

9  Avenue, that guy right there with a gun in 2006.  Now Mr. Coleman will

10  say hey, I saw the same guy with a gun on that block in 2004 and I

11  remember him because he was putting that gun into my stomach when he

12  shot me.  Yeah.  That guy right there.  That's why it's permitted.

13  It's not a charged count.  It's there to assist you to evaluate Mr.

14  Lackl's identification of a person doing similar conduct in that area

15  later on also with a gun.  Mr. Coleman's shooting is otherwise not

16  charged here.  It's there for your consideration in that aspect of the

17  case.

18              And I grant to you that his testimony, he's not going to

19  forget Mr. Byers.  So remember there was a, he even saw this guy,

20  whatever his name was, walking away on his phone, comes back and now

21  he's with Byers, who's now just minutes out of traffic court.  That's

22  not an alibi.  That's just where he was before he shot Mr. Coleman.

23  And they actually had the audacity to point out that in the picture of

24  Mr. Byers, he actually has four braids, not two.  But Mr. Coleman when

25  he saw the very same picture, I asked him how many braids he saw, he

1    said two.  And I thought really an interesting aspect of his

2    testimony, we've heard all about his height.  This guy is 5'2, this

3    guy is 5'8.  Play a game back there where you all know your own

4    heights and you have other people guess and you see how wildly

5    inaccurate they are.  But it was almost a sweet moment when counsel

6    asked if he had described Mr. Byers to be 5'2.  Somebody, Mr. Purpura

7    I guess.  I'm not sure who it was.  One of them said and how tall are

8    you and Mr. Coleman said I'm a pretty big guy.  He said I'm 5'2.

9    That's pretty funny.  But it just shows how people just don't

10   necessarily have a really accurate sense even of their own height.

11   You know, I'm 6'3.  So some people, you know, take that perspective.

12           The state of mind of Patrick Byers on July 2, 2007 is clear

13   as crystal.  He was desperately anxious to kill the only thing that

14   kept him in jail at that point.  It didn't work.  And now it's time

15   for you to do something about it.  And I will just ask you to consider

16   the evidence.  Consider Pearson's real role in this case and his real

17   value to me -- his value to them is far, far, far more than it is to

18   me.  I'll keep his phone if you don't mind, but they can have Pearson.

19           Now finally, it's time for you to get to the really most

20   exciting and important part of the case and that is where Judge

21   Bennett gets to read you the jury instructions and the only reason

22   they allow the judge to do that because if anybody else did it, we'd

23   be run out of the courtroom because we can't do that if you're not a

24   federal judge.  I'm going to sit down because you've heard so much

25   more of me than you needed to ever hear.  But I think you understand

1    how important this is and how important it is to the Lackl family who

2    have been here every day for you to consider the evidence with as much

3    time as you need, as much deliberation that you need.  But just focus

4    on the evidence.  Somebody said at the beginning, keep your eye on the

5    ball and then he took the ball and hid it behind the clock.  Well,

6    this is the ball.  These records, the testimony of Mr. Cornish and

7    Ms. Graham, the record of the contacts which have not been explained

8    and can't be explained and the very fact of Mr. Lackl's murder.  And

9    these circumstances lead to the unavoidable conclusion as to who is

10   responsible.  If you can find somebody else that's responsible, just

11   let me know because there is nobody else.  These two individuals did

12   it.  Everybody knows it and now you know it.  Us knowing about it

13   means nothing.  Only you can do something about it and that's what

14   we're asking you to do.  Thank you very much.

15            THE COURT:   Thank you, Mr. Purcell.  All right.  Ladies and

16   gentlemen, now comes time for the process to which Mr. Purcell just

17   made reference and I will tell you that one juror one time after --

18   I've discussed cases with jurors at the end of deliberations in all my

19   cases and I will tell you that, I'll repeat that one of the jurors one

20   time said, Judge Bennett, no disrespect, but the instructions, the

21   jury instructions, the reading of them is mind numbing was the phrase

22   that she used.  Was mind numbing.  And I've still thought of that and

23   I've known that when I was a trial lawyer.  I knew it was mind

24   numbing.  But it was still somewhat of a blur to the ego here to hear

25   that.  But it's very important.

1            What I'm going to do is I'm going to read a portion of these

2     jury instructions to you and then we're going to take a break because

3     I have heard from jurors before that they found that was helpful.  But

4     all these instructions are important and they have found it was

5     helpful to take a break in the middle and it will come about the right

6     time, too.  So we're going to go through this for a while and then

7     we'll take a break in the middle of these jury instructions and then

8     we'll continue after the morning break.  And you will get a copy of

9     everything from which I am reading.  So you certainly are welcome to

10    take notes, but you don't need to take notes verbatim in terms of what

11    I'm reading because you will get a copy as I say of everything that I

12    read now.

13           You are about to enter your final duty which is to decide

14    the fact issues in this case.  Before you do that, I will instruct you

15    on the law.  You must pay close attention to me now.  I will go as

16    slowly as I can and be as clear as possible.  I told you at the very

17    start of the trial that your principal function during the taking of

18    testimony would be to listen carefully and observe each witness who

19    testifies.  It has been obvious to me and to counsel that you have

20    faithfully discharged this duty.  Your interest never flagged and it

21    is evident that you followed the testimony with close attention.  And

22    I know I thank, I speak for all the lawyers and the parties in the

23    case when I thank you for that because this is obviously a very

24    important case.  I ask that you give that same careful attention to me

25    now as I instruct you on the law.

1          You have now heard all the evidence in the case and you have

2     heard the final arguments of the lawyers for the parties.  My duty at

3     this point is to instruct you as to the law.  It is your duty to

4     accept these instructions of law and apply them to the facts as you

5     determine them just as it has been my duty to preside over the trial

6     and decide what testimony and evidence is relevant under the law for

7     your consideration.

8          On these legal matters, you must take the law as I give it

9     to you.  If any attorney has stated a legal principle different from

10    any that I state to you in my instructions, it is my instructions that

11    you must follow.  You should not single out any instruction as alone

12    stating the law, but you should consider my instructions as a whole

13    when you retire to deliberate in the jury room.

14         You should not, any of you, be concerned about the wisdom of

15    any rule of law that I state.  Regardless of any opinion that you may

16    have as to what the law may be or ought to be, it would violate your

17    sworn duty to base a verdict upon any other view of the law than that

18    which I give you.  Your final role is to pass upon and decide the

19    factual issues that are in the case.

20         You, the members of the jury, are the sole and exclusive

21    judges of the facts.  You pass upon the weight of the evidence.  You

22    determine the credibility of the witnesses.  You resolve such

23    conflicts as there may be in the testimony and you draw whatever

24    reasonable inferences you decide to draw from the facts as you have

25    determined them.  I shall later discuss with you how to pass upon the

1    credibility or believability of the witnesses.

2           In determining the facts, you must rely upon your own

3    recollection of the evidence.  What the lawyers have said in their

4    opening statements on March the 23rd, in their closing arguments

5    yesterday and today, in their objections or in their questions is not

6    evidence.  In this connection, you should bear in mind that a question

7    put to a witness is never evidence.  It is only the answer which is

8    evidence.  Nor is anything I may have said during the trial or may say

9    during these instructions with respect to a factual matter to be taken

10   in substitution for your own independent recollection.  What I say is

11   not evidence.

12          The evidence before you consists of the answers given by the

13   witnesses, the testimony they gave as you recall it and the exhibits

14   that were received in evidence.  It also includes a few stipulations

15   as well.  The evidence does not include questions.  Only the answers

16   are evidence.  But you may not consider any answer that I directed you

17   to disregard or that I directed struck from the record.  Do not

18   consider such answers.

19          You may also consider the stipulations of the parties as

20   evidence.  Since you are the sole and exclusive judges of the facts, I

21   do not need to indicate any opinion as to the facts of what your

22   verdict should be.  The rulings I have made during the trial are not

23   any indication of my views of what your decision should be as to

24   whether or not the guilt of the defendants has been proven beyond a

25   reasonable doubt.  As to the facts, ladies and gentlemen, you are the

1    exclusive judges.  You are to perform the duty of finding the facts

2    without bias or prejudice as to any party.

3              In determining the facts, the jury is reminded that before

4    each member was accepted and sworn to act as a juror, he or she was

5    asked questions concerning competency, qualifications and fairness and

6    freedom from prejudice and bias and indeed in this case as you all

7    know, you all were individually called here into this courtroom and

8    individually questioned.  On the faith of those answers, the juror was

9    accepted by the parties.  Therefore, those answers are binding on each

10   of the jurors now as they were then and should remain so until the

11   jury is discharged from consideration of this case.

12             You are to perform the duty of finding the facts without

13   bias or prejudice as to any party.  You're to perform your final duty

14   in an attitude of complete fairness and impartiality.  This case is

15   important to the government for the enforcement of criminal laws is a

16   matter of prime concern to this community.  Equally, it is important

17   to each of the two defendants who are charged with serious crimes.

18   The fact that the prosecution is brought in the name of the United

19   States of America entitles the government to no greater consideration

20   than that accorded to any other party to a litigation.  By the same

21   token, the government is entitled to no less consideration.  All

22   parties whether government or individuals stand as equals at the bar

23   of justice.

24             It is the duty of the attorneys for each side of the case to

25   object when the other side offers testimony or other evidence which

1     the attorney believes is not properly admissible.  Counsel also have

2     the right and duty to ask the Court to make rulings of law and to

3     request conferences at the bench out of the hearing of the jury.  All

4     those questions of law must be decided by me, the Court.  You should

5     not show any prejudice against an attorney or his or her client

6     because the attorney objected to the admissibility of evidence or

7     asked for a conference out of the hearing of the jury or asked the

8     Court for a ruling on the law.  As I already indicated, my rulings on

9     the admissibility of evidence do not indicate any opinion about the

10    weight or effect of such evidence.  You are the sole judges of the

11    credibility of all witnesses and the weight and effect of all

12    evidence.  Your verdict must be based solely upon the evidence

13    developed at trial or the lack of evidence.  It would be improper for

14    you to consider in reaching your decision as to whether the government

15    sustained its burden of proof any personal feelings you may have about

16    a defendant's race, religion, national origin, sex or age.  All

17    persons are entitled to the presumption of innocence and the

18    government has the burden of proof as I will discuss in a moment.  It

19    would be equally improper for you to allow any feelings you might have

20    about the nature of the crime charged to interfere with your

21    decision-making process.  To repeat, your verdict must be based

22    exclusively upon the evidence or the lack of evidence in the case.

23            Under your oaths as jurors, you are not to be swayed by

24    sympathy.  You are to be guided solely by the evidence in this case

25    and the crucial hardcore question that you must ask yourselves as you

1   sift through the evidence is has the government proven the guilt of

2   each defendant beyond a reasonable doubt.  It is for you alone to

3   decide whether the government has proven that each defendant is guilty

4   of the crimes charged solely on the basis of the evidence and subject

5   to the law as I charge you this morning.  It must be clear to you that

6   once you let fear or prejudice or bias or sympathy interfere with your

7   thinking, there is a risk that you will not arrive at a true and just

8   verdict.  If you have a reasonable doubt as to a defendant's guilt,

9   you should not hesitate for any reason to find a verdict of acquittal.

10          But on the other hand, if you should find that the

11  government has met its burden of proving a defendant's guilt beyond a

12  reasonable doubt, you should not hesitate because of sympathy or any

13  other reason to render a verdict of guilty.

14          You're about to be asked to decide whether or not the

15  government has proven beyond a reasonable doubt the guilt of each of

16  the two defendants.  You are not being asked whether any other person

17  has been proven guilty.  Your verdict should be based solely upon the

18  evidence or lack of evidence as to each defendant in accordance with

19  my instructions and without regard to whether the guilt of other

20  people has or has not been proven.

21          Although the defendants have been indicted, you must

22  remember that an indictment is only an accusation.  It is not

23  evidence.  Each defendant has pleaded not guilty to that indictment.

24  As the result of each defendant's plea of not guilty, the burden is on

25  the prosecution to prove guilt beyond a reasonable doubt.  This burden

1   never shifts to the defendant for the simple reason that the law never

2   imposes upon a defendant in a criminal case the burden or duty of

3   calling any witness or producing any evidence.  The law presumes a

4   defendant to be innocent of all the charges against him.  I therefore

5   instruct you that each defendant is presumed by you to be innocent

6   throughout your deliberations until such time if ever you as a jury

7   are satisfied that the government has proven him guilty beyond a

8   reasonable doubt.  Each defendant begins the trial here with a clean

9   slate.  This presumption of innocence alone is sufficient to acquit a

10  defendant unless you as jurors are unanimously convinced beyond a

11  reasonable doubt of his guilt after a careful and impartial

12  consideration of all of the evidence in this case.  If the government

13  fails to sustain its burden, you must find the defendant not guilty.

14  This presumption was with each defendant when the trial began and

15  remains with each even now as I speak to you and will continue with

16  the defendants into your deliberations unless and until you are

17  convinced that the government has proven each defendant's guilt beyond

18  a reasonable doubt.

19          The superseding indictment contains a total of nine counts.

20  Each count charges the defendants with a different crime.  There are

21  two defendants on trial before you.  You must as a matter of law

22  consider each count of the superseding indictment and each defendant's

23  involvement in that count separately and you must return a separate

24  verdict on each defendant for each count in which he is charged.

25          In reaching your verdict, bear in mind that guilt is

1   personal and individual.  Your verdict of guilty or not guilty must be

2   based solely upon the evidence about each defendant.  The case against

3   each defendant on each count stands or falls upon the proof or lack of

4   proof against that defendant alone.  And your verdict as to any

5   defendant on any count should not control your decision as to any

6   other defendant or any other count.  No other considerations are

7   proper.

8            While we're on the subject of the indictment, I should draw

9   your attention to the fact that the superseding indictment charges

10  that specific acts and offenses occurred on or about certain dates.

11  The proof need not establish with any certainty the exact date of the

12  specific acts or offenses.  It is sufficient if the evidence in this

13  case establishes that the offenses were committed on dates reasonably

14  near the dates alleged in the superseding indictment.  The law only

15  requires a substantial similarity between the dates alleged in the

16  superseding indictment and the dates established by testimony or

17  exhibits.

18           During the trial, you may have heard testimony of witnesses

19  and argument by counsel that the government did not utilize specific

20  investigative techniques.  For example, some seized items may not have

21  been submitted for fingerprint analysis and chemical analysis may not

22  have been done on every item seized.  You may consider these facts in

23  deciding whether the government has met its burden of proof because as

24  I told you, you should look to all the evidence or lack of evidence in

25  deciding whether a defendant is guilty.  However, you are also

1   instructed that there is no legal requirement that the government use

2   any of these specific investigative techniques to prove its case.  For

3   example, there is no requirement to attempt to take fingerprints or

4   that the government offer fingerprints in evidence.  Law enforcement

5   techniques are not your concern.  Your concern as I have said is to

6   determine whether or not on the evidence or lack of evidence each

7   defendant's guilt has been proved beyond a reasonable doubt.

8   Moreover, the law does not require the prosecution to call as

9   witnesses all persons who have been present at any time or place

10   involved in the case or who may appear to have some knowledge of the

11   matters at issue in this trial.  Nor does the law require the

12   prosecution to produce as exhibits all papers and things mentioned in

13   evidence.

14           As I mentioned to you back on March the 23rd at the

15   beginning of the testimony in this case, there are two types of

16   evidence, direct and circumstantial evidence.  These two types of

17   evidence which you may properly use in deciding whether a defendant is

18   guilty or not guilty.  One type of evidence is called direct evidence.

19   Direct evidence is where a witness testifies to what he saw, heard or

20   observed.  In other words, when a witness testifies about what is

21   known to him of his own knowledge by virtue of his own senses.  What

22   he sees, feels, touches or hears.  That is called direct evidence.

23   Circumstantial evidence is evidence which tends to prove a disputed

24   fact by proof of other facts.  There is a simple example of

25   circumstantial evidence which is often used in this courthouse and I

1    think I used it or something to this effect back on March the 23rd.

2    Assume that when you came into the courthouse this morning, that the

3    sun was shining and it was a nice day.  Assume that the courtroom

4    blinds were drawn and you could not look outside.  As you were sitting

5    here, someone walked in with an umbrella which was dripping wet.

6    Somebody else then walked in with a raincoat which was also dripping

7    wet.  Now you cannot look outside of the courtroom and you cannot see

8    whether or not it is raining.  So you have no direct evidence of the

9    fact.  But on the combinations of fact which I have asked you to

10   assume, it would be reasonable and logical for you to conclude that it

11   had been raining.  That is all there is to circumstantial evidence.

12   You infer on the basis of reason and experience and common sense from

13   an established fact the existence or the nonexistence of some other

14   fact.  Circumstantial evidence is of no less value than direct

15   evidence.  For it is a general rule that the law makes no distinction

16   between direct and circumstantial evidence.  It simply requires that

17   before convicting a defendant, the jury must be satisfied of the

18   defendant's guilt beyond a reasonable doubt from all the evidence in

19   the case.

20            Let me emphasize that a lawyer's question is not evidence.

21   At times, a lawyer on cross-examination may have incorporated into a

22   question a statement which assumes certain facts to be true and asked

23   the witness if the statement was true.  If the witness denies the

24   truth of the statement and if there is no evidence in the record

25   proving that the assumed fact is true, then you may not consider the

1  fact to be true simply because it was contained in the lawyer's

2  question.  A well-known example of this is a lawyer's question of a

3  witness, when did you stop cheating on your taxes.  You would not be

4  permitted to consider as true the assumed fact that the witness ever

5  cheated on his taxes unless the witness himself indicated that he had,

6  that he had unless there was some other evidence in the record that he

7  had cheated on his taxes.  In short, questions are not evidence.

8  Answers are.

9         The evidence in this case consists of the sworn testimony of

10  the witnesses, the exhibits received in evidence and stipulations.

11  Exhibits which have been marked for identification, but not received

12  may not be considered by you in evidence and there are a few of those.

13  Most of the exhibits are in evidence, but there were a few that were

14  marked only for identification.  Only those exhibits received into

15  evidence may be considered as evidence.  Similarly, you are to

16  disregard any testimony when I have ordered it to be stricken.  As I

17  indicated before, only the witness' answers are evidence and you are

18  not to consider a question as evidence.  Similarly, statements by

19  counsel are not evidence.  You should consider the evidence in light

20  of your own common sense and experience.  And you may draw reasonable

21  inferences from the evidence.  Anything you may have seen or heard

22  outside this case, outside the courtroom is not evidence.  It must be

23  entirely disregarded.

24         I mentioned stipulations.  A stipulation is an agreement

25  among the parties that a certain fact is true.  You may regard such

1    agreed facts as true and I believe any stipulations were not only read

2    to you, but are marked as exhibits and will go back in the jury room.

3            You have also heard testimony in this case regarding

4    evidence seized by the government during the execution of search

5    warrants.  You are hereby instructed that it is the responsibility of

6    the Court alone to determine the validity and legality of those search

7    warrants and other seizures.  And the Court has determined that the

8    seizures in this case were valid and legal.  It is up to you to decide

9    what significance if any the evidence seized may have in this case.

10           The government and the defense have shown you certain

11   summary charts which were marked as exhibits which were shown to you

12   in order to make the other evidence more meaningful and to aid you in

13   considering the evidence.  They are no better than the testimony or

14   the documents upon which they are based and are not themselves

15   independent evidence.  Therefore, you are to give no greater

16   consideration to these charts or summaries than you would give to the

17   evidence upon which they are based.  It is for you to decide whether

18   such exhibits correctly present the information contained in the

19   testimony and in the exhibits on which they are based.  You are

20   entitled to consider the charts and summaries if you find they are of

21   assistance to you in analyzing the evidence and understanding the

22   evidence.

23           The defendants did not testify in this case.  Under our

24   Constitution, a defendant has no obligation to testify or to present

25   any other evidence because it is the prosecution's burden to prove a

695

1   defendant guilty beyond a reasonable doubt.  That burden remains with

2   the prosecution throughout the entire trial and never shifts to the

3   defendant.  A defendant is never required to prove that he is

4   innocent.  You may not attach any significance to the fact that a

5   defendant did not testify.  No adverse inference against a defendant

6   may be drawn by you because he did not take the witness stand.  You

7   may not consider this against a defendant in any way in your

8   deliberations in the jury room.

9           During the trial you have heard the attorneys use the term

10  inference and in their arguments yesterday and today they may ask you

11  to infer on the basis of reason, experience and common sense from one

12  or more established facts the existence of some other fact.  An

13  inference is not a suspicion or a guess.  It is a reasoned, logical

14  decision to conclude that a disputed fact exists on the basis of

15  another fact which you know exists.

16          There are times when different inferences may be drawn from

17  facts whether proved by direct or circumstantial evidence.  The

18  government asked you to draw one set of inferences while the defense

19  asks you to draw another.  It is for you and you alone to decide what

20  inferences you will draw.  The process of drawing inferences from

21  facts in evidence is not a matter of guesswork or speculation.  An

22  inference is a deduction or conclusion which you, the jury, are

23  permitted to draw, but not required to draw from the facts which have

24  been established by either direct or circumstantial evidence.  In

25  drawing inferences, you should exercise your common sense.  So while

1   you are considering the evidence presented to you, you are permitted

2   to draw from the facts which you find to be proven such reasonable

3   inferences as would be justified in light of your experience.  Here

4   again let me remind you that whether based upon direct or

5   circumstantial evidence or upon the logical, reasonable inferences

6   drawn from such evidence, you must be satisfied of the guilt of a

7   defendant beyond a reasonable doubt before you convict that defendant.

8            You have had an opportunity to observe all of the witnesses.

9   It is now your job to decide how believable each witness was in his or

10  her testimony.  You are the sole judges of the credibility of each

11  witness and of the importance of his or her testimony.  It must be

12  clear to you by now that you are being called upon to resolve various

13  factual issues under the superseding indictment in the face of the

14  very different pictures painted by the government and the defense.

15  You will now have to decide where the truth lies and an important part

16  of that decision will involve making judgments about the testimony of

17  the witnesses you have listened to and observed.  In making those

18  judgments, you should carefully scrutinize all the testimony of each

19  witness, the circumstances under which each witness testified and any

20  other matter in evidence which may help you to decide the truth and

21  the importance of each witness' testimony.  Your decision whether to

22  believe, whether or not to believe a witness may depend upon how that

23  witness impressed you.  Was the witness candid, frank and forthright

24  or did the witness seem as if he or she was hiding something, being

25  evasive or suspect in some way?  How did the way the witness testified

697

1   on direct examination compare with the way the witness testified on

2   cross-examination?  Was the witness consistent in his or her testimony

3   or did he or she contradict himself or herself?  Did the witness

4   appear to know what he or she was talking about and did the witness

5   strike you as someone who is trying to report his or her knowledge

6   accurately?  How much you choose to believe a witness may be

7   influenced by the witness' bias?  Does the witness have a relationship

8   with the government or the defendant which may affect how he or she

9   testified?  Does the witness have some incentive, loyalty or motive

10  that might cause him or her to shade the truth or does the witness

11  have some bias, prejudice or hostility that may have caused the

12  witness consciously or not to give you something other than a

13  completely accurate account of the facts he or she testified to?  Even

14  if the witness was impartial, you should consider whether the witness

15  had an opportunity to observe the facts he or she testified about and

16  you should also consider the witness' ability to express himself or

17  herself.  Ask yourselves whether the witness' recollection of the

18  facts stands up in the light of all other evidence.  In other words,

19  what you must try to do in deciding credibility is to size a person up

20  in light of his or her demeanor, the explanations given and in light

21  of all the other evidence in this case just as you would in any

22  important matter where you are trying to decide if a person is

23  truthful, straightforward and accurate in his or her recollection.

24          In deciding the question of credibility, remember that you

25  should use your common sense, your good judgment and your experience.

1    Inconsistencies or discrepancies in the testimony of a witness or

2    between the testimony of different witnesses may or may not cause you

3    to discredit such testimony.  Two or more persons witnessing an

4    incident or transaction may see or hear it differently.  An innocent

5    misrecollection like a failure of recollection is not an uncommon

6    experience.  In weighing the effect of a discrepancy, always ask

7    yourself whether it pertains to a matter of importance or an

8    unimportant detail and whether the discrepancy results from an

9    innocent error or intentional falsehood.

10              Throughout the trial, you have heard witnesses testify to

11   facts they failed to mention or omitted in prior summaries.  You may

12   consider such prior omissions as inconsistent statements when deciding

13   the credibility of a witness.  In deciding what effect to give the

14   omission, you should consider whether the omitted fact is an important

15   or unimportant detail and whether it is the type of matter one would

16   normally expect another to remember when asked about an event.  You

17   should also consider any explanation offered by the witness to explain

18   the omission and consider the explanation the same as you would any

19   other aspect of a witness' testimony.

20              You should also consider whether the witness had a full and

21   complete opportunity to explain everything on the earlier occasion.

22   An omission from a statement like any inconsistency of testimony may

23   result from an innocent failure of recollection or deliberate

24   falsehood.  If you find that a witness has testified willfully and

25   falsely with regard to any matter of trial, you may choose to reject

1   any part or all of said witness' testimony.  After making your own

2   judgment, you should give the testimony of each witness such

3   credibility as you think it is fairly entitled to receive if any.

4           In connection with your evaluation of the credibility of the

5   witnesses, you should specifically consider evidence of resentment or

6   anger which some government witnesses may have towards a defendant.

7   Evidence that a witness is biased, prejudiced or hostile towards a

8   defendant requires you to view that witness' testimony with caution,

9   to weigh it with care and subject it to close and searching scrutiny.

10          You have heard witnesses who've testified that they were

11  actually involved in planning and carrying out the crimes charged in

12  the indictment.  There has been a great deal said about these

13  so-called accomplice witnesses in the summations of counsel and

14  whether or not you should believe them.  The government argues as it

15  is permitted to do that it must take the witnesses as it finds them.

16  It argues that only people who themselves take part in criminal

17  activity have the knowledge required to show criminal behavior by

18  others.  For these very reasons, the law allows the use of accomplice

19  testimony.  Indeed, it is the law in federal court that the testimony

20  of accomplices may be enough in itself for conviction if the jury

21  finds that the testimony establishes guilt beyond a reasonable doubt.

22  However, it is also the case that accomplice testimony is of such

23  nature that it must be scrutinized with great care and viewed with

24  particular caution when you decide how much of that testimony to

25  believe.

1    I have given you some general considerations on credibility

2    and I will not repeat all of them here.  Nor will I repeat all of the

3    arguments made on both sides.  However, let me say a few things that

4    you may want to consider during your deliberations on the subject of

5    accomplices.  You should ask yourselves whether these so-called

6    accomplices would benefit more by lying or by telling the truth.  Was

7    their testimony made up in any way because they believed or hoped that

8    they would somehow receive favorable treatment by testifying falsely

9    or did they believe that their interest would be best served by

10   testifying truthfully?  If you believe that the witness was motivated

11   by the hopes of personal gain, was the motivation one which would

12   cause him to lie or was it one which would cause him to tell the

13   truth?  Did this motivation color his testimony?  In sum, you should

14   look at all the evidence in deciding what credence and what weight if

15   any you will give to accomplice witnesses?

16   You have heard the testimony of a witness more than one I

17   believe who has testified under a grant of immunity from this court.

18   What this means is that the testimony of a witness may not be used

19   against him in any criminal case except a prosecution for perjury,

20   giving a false statement or otherwise failing to comply with the

21   immunity order of this court.  You are instructed that the government

22   is entitled to call as a witness a person who has been granted

23   immunity by order of this court and that you may convict a defendant

24   on the basis of such witness testimony alone if you find that the

25   testimony proved the defendants guilty beyond a reasonable doubt.

1    However, the testimony of a witness who's been granted immunity should

2    be examined by you with greater care than the testimony of an ordinary

3    witness.  You should scrutinize it closely to determine whether or not

4    it is colored in such a way as to place guilt upon the defendant in

5    order to further the witness' own interest.  For such a witness

6    confronted with the realization that he can win his own freedom by

7    helping to convict another has a motive to falsify his testimony.

8    Such testimony should be scrutinized by you with great care and you

9    should act upon it with caution.  If you believe it to be true and

10   determine to accept the testimony, you may give it such weight if any

11   as you believe it deserves.

12             There has been evidence introduced at the trial that the

13   government or the defendant called a witness as a person who was using

14   or addicted to drugs when the evidence he observed took place or who

15   is now using drugs.  I instruct you that there is nothing improper

16   about calling such a witness to testify about events within his

17   personal knowledge.  On the other hand, his testimony must be examined

18   with greater scrutiny than the testimony of any other witness.  The

19   testimony of a witness who was using drugs at the time of the events

20   he's testifying about or who's using drugs at the time of his

21   testimony may be less believable because of the effect the drugs may

22   have on his ability to perceive or relate the events in question.  If

23   you decide to accept his testimony after considering it in light of

24   all the evidence in this case, then you may give it whatever weight if

25   any you find it deserves.

1           In this case, there has been testimony from a government

2    witness who pled guilty after entering into an agreement with the

3    government to testify.  There is evidence that the government agreed

4    to dismiss some charges against the witness and agreed not to

5    prosecute him on any other charges in exchange for the witness'

6    agreement to plead guilty and testify at this trial against one of the

7    defendants.  The government has also promised to bring the witness'

8    cooperation to the attention of the sentencing court.  The government

9    is permitted to enter into this kind of plea agreement.  You in turn

10   may accept the testimony of such a witness and convict a defendant on

11   the basis of this testimony alone if it convinces you of a defendant's

12   guilt beyond a reasonable doubt.  However, you should bear in mind

13   that a witness who has entered into such an agreement has an interest

14   in this case different than any ordinary witness.  A witness who

15   realizes that he may be able to obtain his own freedom or receive a

16   lighter sentence by giving testimony favorable to the prosecution has

17   a motive to testify falsely.  Therefore, you must examine his

18   testimony with caution and weigh it with great care.  If after

19   scrutinizing his testimony, you decide to accept it, you may give it

20   whatever weight if any you find it deserves.

21           One of the most important issues in this case is the

22   identification of a defendant as the perpetrator of the crime.  The

23   government has the burden of proving identity beyond a reasonable

24   doubt.  It is not essential that the witness himself be free from

25   doubt as to the correctness of his identification of the defendant.

1    However, you the jury must be satisfied beyond a reasonable doubt of

2    the accuracy of the identification of a defendant before you may

3    convict him.  If you are not convinced beyond a reasonable doubt that

4    a defendant was the person who committed the crime, you must find the

5    defendant not guilty.

6            Identification testimony is an expression of belief on the

7    part of the witness.  Its value depends on the opportunity the witness

8    had to observe the offender at the time of the offense and later to

9    make a reliable identification of the offender.  You have heard

10   arguments of counsel on this subject and I will not repeat all of them

11   here.  I will only suggest to you that you should consider the

12   following matters.  Did the witness have the ability to see the

13   offender at the time of the offense?  Has the witness' identification

14   of a defendant as the offender been influenced in any way?  Has his

15   identification been unfairly suggested by events that occurred since

16   the time of the arrest.  Is his recollection accurate?  In addition,

17   you should consider the credibility of the identification witness just

18   as you would any other witness.  Let me repeat.  The burden is on the

19   prosecution to prove every element of the crime charged including the

20   identity of the defendant as the offender.  Therefore, if after

21   examining all of the evidence, you find that the crime was committed,

22   but you have a reasonable doubt about whether it was a defendant who

23   committed the crime, you must find him not guilty.

24           In evaluating the credibility of the witnesses, you should

25   take into account any evidence that the witness who testified may

1  benefit in some way from the outcome of this case.  Such an interest

2  in the outcome creates a motive to testify falsely and may sway the

3  witness to testify in a way that advances his or her own interest.

4  Therefore, if you find that any witness whose testimony you're

5  considering may have an interest in the outcome of this trial, then

6  you should bear that factor in mind in evaluating the credibility of

7  his or her testimony and accept it with great care.  This is not to

8  suggest that every witness who has an interest in the outcome of the

9  case will testify falsely.  It is for you to decide to what extent if

10  at all the witness' interest has affected or colored his or her

11  testimony.  And we're going to stop in a minute for your break.  Just

12  a few more minutes.

13          You have heard the testimony of some witnesses who were

14  previously convicted of crimes punishable by more than one year in

15  jail.  These prior convictions were placed into evidence for you to

16  consider in evaluating the witness' credibility.  You may consider the

17  fact that the witness who testified is a convicted felon in deciding

18  how much of his testimony to accept and what weight if any it should

19  be given.

20          You have heard evidence that a witness made a statement on

21  an earlier occasion which counsel may argue is inconsistent with the

22  witness' trial testimony.  Evidence of the prior inconsistent

23  statement was placed before you for the limited purpose of helping you

24  decide whether to believe the trial testimony of the witness.  If you

25  find that the witness made an earlier statement that conflicts with

1   his or her trial testimony, you may consider that fact in deciding how

2   much of his or her trial testimony if any to believe.  In making this

3   determination, you may consider whether the witness purposely made a

4   false statement or whether it was an innocent mistake, whether the

5   inconsistency concerns an important fact or whether it had to do with

6   a small detail, whether the witness had an explanation for the

7   consistency and whether that explanation appealed to your common

8   sense.  It is exclusively your duty based upon all evidence and your

9   own good judgment to determine whether the prior statement was

10  inconsistent and if so, how much if any weight to be given to the

11  inconsistent statement in determining whether to believe all or part

12  of the witness' testimony.

13          You have heard the testimony of many law enforcement

14  officials.  The fact that a witness may be employed by the federal

15  government or a state or local government as a law enforcement

16  official does not mean that his or her testimony is necessarily

17  deserving of more or less consideration or greater or lesser weight

18  than that of any ordinary witness.  At the same time, it is quite

19  legitimate for defense counsel to try to attack the credibility of a

20  law enforcement witness on the grounds that his or her testimony may

21  be colored by a personal or professional interest in the outcome of

22  the case.  It is your decision after reviewing all the evidence

23  whether to accept the testimony of a law enforcement witness and to

24  give that testimony whatever weight if any you find it deserves.

25          You have heard testimony from certain persons who were

1    qualified as expert witnesses and at the time I explained to you the

2    process.  Specifically, the government has introduced the following

3    experts:  Michael Thomas, firearms examiner, James Wagster, firearms

4    examiner, Jack Titus, medical examiner and Jocelyn Carlson, DNA

5    forensic specialist.  In addition, the Defendant Goodman has

6    introduced David Snavely as a wireless communications expert.  An

7    expert is allowed to express his or her opinion on those matters about

8    which he or she has special knowledge and training.  Expert testimony

9    is presented to you on the theory that someone who is experienced in

10   the field can assist you in understanding the evidence or in reaching

11   an independent decision on the facts.  In weighing the expert

12   testimony, you may consider the expert's qualifications, his or her

13   opinion, his or her reasons for testifying as well as all the other

14   considerations that ordinarily apply when you are deciding whether or

15   not to believe a witness' testimony.  You may give the expert

16   testimony whatever weight if any you find it deserves in light of all

17   the evidence in this case.  You should not, however, accept the

18   witness' testimony merely because he or she is an expert nor should

19   you substitute it for your own reason, judgment and common sense.  The

20   determination of the facts in this case rests solely with you.

21           There has been evidence that the defendants made certain

22   post-arrest statements.  In deciding what weight to give to those

23   statements of the defendants, you should first examine with great care

24   whether each statement was made or whether it was in fact and whether

25   in fact it was voluntarily and understandably made.  I instruct you

1    that you are to give the statements such weight as you feel they

2    deserve in light of all the evidence.

3              The government has offered evidence tending to show that on

4    a different occasion, the defendant, Patrick A. Byers, Jr., engaged in

5    conduct similar to the charges in the indictment.  Specifically, you

6    have heard testimony that Patrick Byers shot Carlyle Coleman in May of

7    2004.  In that connection let me remind you that Patrick Byers is not

8    on trial for committing this alleged prior bad act and he is not

9    charged with the shooting of Mr. Coleman.  Accordingly, you may not

10   consider the evidence of this alleged act as a substitute for proof

11   that the defendant committed a crime charged in the indictment.  Nor

12   may you consider this evidence as proof that the Defendant Byers is a

13   criminal personality or bad character.  This evidence was admitted for

14   limited purposes and you may consider this evidence only for the

15   purpose of deciding intent, possession and identity.  If you find that

16   the Defendant Byers did engage in that other conduct and if you find

17   that the other conduct has sufficiently similar characteristics to

18   that charged in the indictment, then you may, but you need not infer

19   that the Defendant Byers was the person who committed the acts charged

20   in the relevant counts of the indictment.  That is you may consider

21   the prior act evidence as evidence of intent, possession and identity.

22             You have heard evidence that the Defendant Byers may not

23   have been present at the time and the place where the Coleman shooting

24   occurred in May of 2004.  Of course, it is for you to determine

25   whether you believe this evidence and if you do believe it, whether

1   you accept it for the purpose offered.  You may give it such weight as

2   you feel it deserves, but only for the limited purpose that I

3   described to you.  The defendant is not on trial for committing the

4   Coleman shooting.  You may not consider the evidence of the Coleman

5   shooting as a substitute for proof that the defendant committed the

6   crimes charged.  You may not consider this evidence as proof that the

7   defendant has a bad character or any propensity to commit crimes.

8   Specifically, you may not use this evidence to conclude that because

9   the defendant may have committed the Coleman shooting, he must also

10   have committed the Haynes shooting or been involved in the Lackl

11   murder.

12          You have heard evidence regarding the murder of Larry Haynes

13   on March 4, 2006.  The defendants are not charged with this murder.

14   However, as to Counts 1 through 7, evidence of that murder and the

15   related state charges that were brought against Mr. Byers for that

16   murder may be considered for the limited purpose of establishing

17   Byers' motive for the murder of Mr. Lackl as charged in Counts 1

18   through 7.  As to Counts 8 and 9, any evidence that has been presented

19   in relation to the murder of Larry Haynes on March 4, 2006 may be

20   considered as you would consider any other evidence in this case as to

21   the charges specified in Counts 8 and 9 of the superseding indictment.

22          You have heard testimony that a defendant made certain

23   statements outside the courtroom to law enforcement authorities in

24   which the defendant claims that his conduct was consistent with

25   innocence and not with guilt.  The government claims these statements

1    in which he exonerated or exculpated himself were false.  If you find

2    that a defendant gave a false statement in order to divert suspicion

3    from himself, you may, but are not required to infer that the

4    defendant believed that he was guilty.  You may not however infer on

5    the basis of this alone that the defendant is in fact guilty of the

6    crimes which he is charged.  Whether or not the evidence as to a

7    defendant's statement shows that the defendant believed he was guilty

8    and the significance of any to be attached to any such evidence are

9    matters for you, the jury, to decide.

10            We will now next consider the crimes which the defendants

11   are charged in the superseding indictment.  Each alleged crime is

12   charged in what is called a count.  A count may charge more than one

13   defendant.  I will next discuss with you the rules of law which govern

14   whether the crime charged has been proven and we will start with that,

15   ladies and gentlemen, after our break.  We will now take a ten-minute

16   recess, ten to fifteen-minute recess and then I will continue with the

17   balance of the instructions in this case.

18            (Recess.)

19            THE COURT:   Counsel, your copy of Instruction Number 34 had

20   said admissions of defendant.  I have now changed that.  When it goes

21   in the jury room, it will say post-arrest statements of defendants.

22            MR. PURPURA:   Thank you.

23            (Jury present.)

24            THE COURT:   All right.  You may all be seated.  Thank you,

25   Ms. West.  All right.  Now continuing.  With respect to aiding and

1    abetting.  The government has alleged the defendants committed the

2    charged offenses as principal actors and except for Count 7 under the

3    aiding and abetting statute.  18 United States Code, Section 2.  Under

4    the aiding and abetting statute, it is not necessary for the

5    government to show that a defendant himself physically committed the

6    crime with which he is charged in order for you to find the defendant

7    guilty.  A person who aids or abets another to commit an offense is

8    just as guilty of that offense as if he committed it himself.

9    Accordingly, you may find a defendant guilty of the offense charged if

10   you find beyond a reasonable doubt that the government has proved that

11   another person actually committed the offense with which the defendant

12   is charged and that the defendant aided or abetted that person in the

13   commission of the offense.  As you can see, the first requirement is

14   that you find that another person has committed the crime charged.

15   Obviously, no one can be convicted of aiding or abetting the criminal

16   acts of another if no crime was committed by the other person in the

17   first place.  But if you do find that a crime was committed, then you

18   must consider whether the defendant aided or abetted the commission of

19   the crime.  In order to aid or abet another to commit a crime, it is

20   necessary that the defendant willfully and knowingly associate himself

21   in some way with the crime and that he willfully and knowingly seek by

22   some act to help make the crime succeed.  Participation in a crime is

23   willful if action is taken voluntarily and intentionally or in the

24   case of a failure to act with the specific intent to fail to do

25   something the law requires to be done.  That is to say with a bad

1   purpose either to disobey or disregard the law.  The mere presence of

2   a defendant where a crime is being committed even coupled with

3   knowledge by the defendant that a crime is being committed or the mere

4   acquiescence by a defendant in the criminal conduct of others even

5   with guilty knowledge is not sufficient to establish aiding and

6   abetting.

7         To determine whether a defendant aided or abetted the

8   commission of the crime with which he is charged, ask yourself these

9   questions.  Did he participate in the crime charged as something he

10  wished to bring about?  Did he associate himself with the criminal

11  venture knowingly and willfully?  Did he seek by his actions to make

12  the criminal venture succeed?  If he did, then the defendant is an

13  aider and abettor and therefore, guilty of the offense.  If on the

14  other hand, your answers to this series of questions are no, then the

15  defendant is not an aider and abettor and you must find him not

16  guilty.  You have been instructed and will be further instructed that

17  in order to sustain its burden of proof, the government must prove the

18  defendant acted knowingly and willfully.  A person acts knowingly if

19  he acts intentionally and voluntarily and not because of ignorance,

20  mistake, accident or carelessness.  Whether the defendant acted

21  knowingly may be proven by the defendant's conduct and by all the

22  facts and circumstances surrounding the case.

23         Willfully means to act with knowledge that one's conduct is

24  unlawful and with the intent to do something the law forbids.  That is

25  to say with the bad purpose to disobey or to disregard the law.  The

1   defendant's conduct was not willful if it was due to negligence,

2   inadvertence or mistake.  In Count 1, the defendants are charged with

3   conspiracy to use a facility of interstate commerce in the commission

4   of a murder for hire.  In Count 2, the defendants are charged with the

5   substantive offense of using a facility of interstate commerce in the

6   commission of a murder for hire.  Both charges are brought under Title

7   18, United States Code, Section 1958(a), which makes it a crime to use

8   or cause another to use a facility of interstate commerce with intent

9   that a murder be committed in violation of the laws of any state or

10  the United States as consideration for the receipt of or as

11  consideration for a promise or agreement to pay anything of pecuniary

12  value or to conspire to do so.

13          Specifically, Count 1 of the superseding indictment.  Now

14  you will not get a copy of the indictment, but I summarize the

15  indictment in all of these instructions.  So you'll get all of this

16  verbatim in the instructions.  Specifically Count 1 of the superseding

17  indictment alleges as follows:  From on or about May 18, 2007 until on

18  or about September 5, 2007 in the State and District of Maryland,

19  Patrick Albert Byers, Jr. and Frank Keith Goodman, the defendants

20  herein with each other and others known and unknown to the grand jury,

21  did knowingly and unlawfully combine, conspire and agree to violate 18

22  United States Code, Section 1958 specifically, to use and cause to be

23  used a facility of interstate commerce, to wit, various means

24  including cellular telephones and telephones of the interstate

25  communication system of the United States with intent that the murder

1    of Carl Stanley Lackl be committed in violation of the laws of the

2    State of Maryland which resulted in the death of Carl Stanley Lackl as

3    consideration for the receipt of and as consideration for a promise

4    and agreement to pay something of pecuniary value, to wit, a sum of

5    United States currency.

6           Count 2 of the superseding indictment alleges as follows.

7    From on or about May 18, 2007 until on or about September 5, 2007 in

8    the State and District of Maryland, Patrick Albert Byers, Jr. and

9    Frank Keith Goodman, the defendants herein, did use and cause to be

10   used a facility of interstate commerce, to wit, various means

11   including telephones, cellular phones and direct-connect features of

12   the interstate communication system of the United States as described

13   in Count 1 which is incorporated herein with intent that the murder of

14   Carl Stanley Lackl be committed in violation of the laws of the State

15   of Maryland and which resulted in the death of Carl Stanley Lackl as

16   consideration for the receipt of and as consideration for a promise

17   and agreement to pay something of pecuniary value, to wit, a sum of

18   United States currency to be paid to the defendants.

19          We will now turn to the elements of these offenses.  I will

20   explain the elements for Count 2 first before returning back to Count

21   1.  Count 2.  In order to prove this charge against the defendant, the

22   government must establish beyond a reasonable doubt each of the

23   following elements of the crime.  First, that a defendant used or

24   caused someone else to use a facility of interstate commerce.  Second,

25   that the use of an interstate facility was done with the intent that a

1    murder be committed or in violation of the laws of any state or the

2    United States.  Third, that the murder in question was intended to be

3    committed as consideration for the receipt of anything of value and

4    fourth, that the commission of the offense resulted in the death of

5    Carl Stanley Lackl.

6            The first element the government must prove beyond a

7    reasonable doubt is that the defendant -- again we're on Count 2

8    still -- is that the defendant used or caused someone else to use a

9    facility of interstate commerce.  A facility of interstate commerce is

10   a vehicle or means of communication that crosses state lines in the

11   course of commerce.  You are instructed as a matter of law that the

12   making of a telephone call constitutes the use of a facility of

13   interstate commerce regardless of whether the particular communication

14   which is alleged actually crossed the state line.  That is a telephone

15   call between two individuals in the same state qualifies as the use of

16   an interstate facility for purposes of this statute.  The telephone

17   call or other use of an interstate facility must have occurred to

18   facilitate, promote, manage, carry out or further the commission of

19   the murder.  It need not have been the only reason or even the

20   principal reason for the use of an interstate facility as long as it

21   was one of the reasons for the use of a facility.

22           The second element with respect to Count 2, the second

23   element the government must prove beyond a reasonable doubt is the use

24   of an interstate facility was done with the intent that a murder be

25   committed in violation of the laws of any state or the United States.

1    To satisfy this particular element, the government does not have to

2    prove that the murder was actually committed on even that it was

3    attempted.  Rather it must prove that the use of an interstate

4    facility was done with the intent to further or facilitate the

5    commission of the murder.  You are thus being asked to look into the

6    defendant's mind and ask what was the defendant's purpose in using

7    interstate facilities or causing another to use interstate facilities.

8    You may determine the defendant's intent from all of the evidence that

9    has been placed before you including the statements of the defendants

10   and their conduct before and after the use of the interstate

11   facilities.  I instruct you as a matter of law that the murder of Carl

12   Stanley Lackl qualifies as a murder in violation of state or federal

13   law.

14           The third element that the government must establish beyond

15   a reasonable doubt is that the murder in question was intended to be

16   committed as consideration for the receipt of anything of value.  This

17   requires that the government prove that there was a mutual agreement,

18   understanding or promise that something of value would be exchanged

19   for committing the murder.  Anything of value means money, negotiable

20   instruments or anything else.  The primary significance of which is

21   economic advantage.  Finally, the government must prove that the

22   commission of this offense resulted in the death of Carl Stanley Lackl

23   as charged.

24           Now as to Count 1 -- they were the elements of Count 2.  Now

25   back to Count 1, the conspiracy charge with relation to that.  Having

1    instructed you as to Count 2 of the superseding indictment, I'll now

2    turn to Count 1.  In order to satisfy its burden of proof as to Count

3    1, the government must establish beyond a reasonable doubt each of the

4    following two elements:  First, that two or more people entered into

5    the unlawful agreement as charged.  That is an agreement to use an

6    interstate commerce facility with the intent that a murder be

7    committed in violation of state or federal law, which murder was

8    intended to be committed as consideration for the receipt of anything

9    of value.

10           Second, that the defendant knowingly and willfully became a

11   member of that conspiracy and third, that the conspiracy resulted in

12   the death of Carl Stanley Lackl.  A conspiracy is a kind of criminal

13   partnership, a combination or agreement of two or more persons to join

14   together to accomplish some unlawful purpose.  In this case, the

15   lawful purpose alleged to be the object of the conspiracy is the

16   violation of the federal law against using a facility of interstate

17   commerce with the intent to commit a murder for hire.  The crime of

18   conspiracy to commit a murder for hire as charged in Count 2 is an

19   independent offense.  The conspiracy alleged in Count 1 is the

20   agreement to violate the laws of the United States and it is an

21   entirely distinct and separate offense from the actual violation of

22   the murder for hire law charged in Count 2.  The essence of conspiracy

23   is the unlawful combination or agreement to violate the law.  The

24   success of the conspiracy or the actual commission of the criminal act

25   that is the object of the conspiracy is not an essential element of

1    the crime of conspiracy.  However in this case, the superseding

2    indictment charges that the conspiracy was in fact successful in that

3    it resulted in the death of Carl Stanley Lackl.  Congress has deemed

4    it appropriate to make conspiracy standing alone a separate crime even

5    if the conspiracy is not successful.  This is because collective

6    criminal activity poses a greater threat to the public safety and

7    welfare than individual conduct and increases the likelihood of

8    success of a particular criminal venture.

9              The first element the government must prove beyond a

10   reasonable doubt as to establish the offense of conspiracy as charged

11   in Count 1 is that two or more persons entered the unlawful agreement

12   charged in the superseding indictment which is alleged to be a

13   conspiracy to use interstate communication facilities in the

14   commission of a murder for hire.  In order for the government to

15   satisfy this element, you need not find that the alleged members of

16   the conspiracy met together and entered into any express or formal

17   agreement.  Similarly, you need not find that the alleged conspirators

18   stated in words or writing what the scheme was, its object or purpose

19   or every precise detail of the scheme or the means by which its object

20   or purpose was to be accomplished.  What the government must prove is

21   that there was a mutual understanding either spoken or unspoken

22   between two or more people to cooperate with each other to accomplish

23   an unlawful act or acts.  You may, of course, find that the existence

24   of an agreement to disobey or disregard the law has been established

25   by direct proof.  However, such conspiracy is by its very nature

1  characterized by secrecy.  You may also infer its existence from the

2  circumstances of this case and the conduct of the parties involved.

3  In a very real sense then in the context of conspiracy cases, actions

4  often speak louder than words.  In this regard you may in determining

5  whether an agreement existed here consider the actions and statements

6  of all those you find to be participants as proof that a common design

7  existed on the part of the persons charged to act together to

8  accomplish an unlawful purpose.

9           The second element -- again so now we're on Count 1 still --

10  that the government must prove beyond a reasonable doubt to establish

11  the offense of conspiracy is that each defendant knowingly, willfully

12  and voluntarily became a member of the conspiracy.  If you are

13  satisfied that the conspiracy charged in the indictment existed, you

14  must next ask yourselves who the members of the conspiracy were.  In

15  deciding whether each defendant was in fact a member of the

16  conspiracy, you should consider whether each defendant knowingly and

17  willfully joined the conspiracy.  Did he participate in it with

18  knowledge of its unlawful purpose and with the specific intention of

19  furthering its business or objective as an associate or worker?  In

20  that regard, it has been said that in order for a defendant to be

21  deemed a participant in a conspiracy, he must have had a stake in the

22  venture or its outcome.  You are instructed that while proof of a

23  financial interest in the outcome of a scheme is not essential.  If

24  you find that the defendant had such an interest, that is a factor

25  which you may properly consider in determining whether or not the

1    defendant was a member of the conspiracy charged in the superseding

2    indictment.  As I mentioned a moment ago, before a defendant can be

3    found to have been a conspirator, you must find that he knowingly

4    joined in the unlawful agreement or plan.  The key question therefore

5    is whether the defendant joined the conspiracy with an awareness of at

6    least some of the basic aims and purposes of the unlawful agreement.

7    It is important for you to note that a defendant's participation in

8    the conspiracy may be established by independent evidence of his own

9    acts or statements as well as those of alleged co-conspirators and the

10   reasonable inferences which may be drawn from them.  Like the

11   conspirator's agreement, a defendant's participation in the conspiracy

12   need not be explicit.  It may be inferred from circumstantial

13   evidence.  A defendant's knowledge is a matter of inference from the

14   facts proved.  In that connection I instruct you that to become a

15   member of the conspiracy, a defendant need not have known the

16   identities of each and every member nor need he have been aware of all

17   their activities.  Moreover, a defendant need not have been fully

18   informed as to all the details or the scope of the conspiracy in order

19   to justify an inference of knowledge on his part.  Furthermore, a

20   defendant need not have joined in all the conspiracy's unlawful

21   objectives.  The extent of a defendant's participation has no bearing

22   on the issue of the defendant's guilt.  A conspirator's liability is

23   not measured by the extent or duration of his participation.  Indeed

24   each member may perform separate and distinct acts and may perform

25   them at different times.  Some conspirators play major roles while

1    others play minor roles in the scheme.  An equal role is not what the

2    law requires.  A defendant's connection to the conspiracy can be

3    slight.  In fact even a single act may be sufficient to draw a

4    defendant within the ambit of the conspiracy and only a slight

5    connection need be shown linking a particular defendant to the

6    conspiracy to support a finding that a defendant was a member of the

7    conspiracy.  The government must prove the connection however slight

8    beyond a reasonable doubt.  Thus, a defendant may be convicted of

9    conspiracy without full knowledge of all of the conspiracy's details

10   if he joins the conspiracy with an understanding of the unlawful

11   nature thereof and willfully joins in the plan on at least one

12   occasion even though he may not have participated before, might not

13   participate again and played only a minor role.  I want to caution you

14   however that a defendant's mere presence at the scene of the alleged

15   crime does not by itself make him a member of the conspiracy.

16   Similarly, mere association with one or more members of the conspiracy

17   by itself does not automatically make the defendant a member.  A

18   person may know or be friendly with a criminal without being a

19   criminal himself.  Mere similarity of conduct or the fact that they

20   may have assembled together and discussed common aims and interests

21   does not necessarily establish proof of the existence of a conspiracy,

22   although those factors may be considered by you in determining the

23   existence of a conspiracy.

24              I also want to caution you that mere knowledge or

25   acquiescence without participation in the unlawful plan is not

1    sufficient.  Moreover, the fact that the acts of a defendant without

2    knowledge merely happened to further the purposes or objectives of the

3    conspiracy does not make the defendant a member.  More is required

4    under the law.  What is necessary is that the defendant must have

5    participated in some way however slight with knowledge of at least

6    some of the purposes or objectives of the conspiracy and with the

7    intention of aiding in the accomplishment of those unlawful end.

8            In sum, before you may find a defendant guilty of

9    conspiracy, the government must have proved beyond a reasonable doubt

10   that each defendant with an understanding of the unlawful character of

11   the conspiracy must have intentionally engaged, advised or assisted in

12   it for the purpose of furthering the illegal act undertaking.  He

13   thereby becomes a knowing and willing participant in the unlawful

14   agreement.  That is to say, a conspiracy.  Finally, the government

15   must prove the commission of the offense resulted in the death of Carl

16   Stanley Lackl and they are the elements of Counts 1 and 2 that I've

17   just summarized.

18           Now onto Counts 3 and 4.  In Count 3, the defendants are

19   charged with conspiracy to kill another person with intent to prevent

20   his communication to a law enforcement officer or judge of the United

21   States related to the commission of or possible commission of a

22   federal crime.  In Count 4, the defendants are charged with the

23   substantive offense of killing another person with intent to prevent

24   his communication to a law enforcement officer or judge of the United

25   States related to the commission or possible commission of a federal

1  offense.  Both charges are brought under Title 18, United States Code,

2  Section 1512(a)(1)(c), which makes it a crime to kill another person

3  with intent to prevent the communication by any person to a law

4  enforcement officer or judge of the United States of information

5  relating to the commission or possible commission of a federal offense

6  or a violation of conditions of probation, parole or release pending

7  judicial proceedings or to conspire to do so.

8            Now specifically, Count 3 of the superseding indictment

9  alleges as follows.  From on or about May 18, 2007 until on or about

10  September 5, 2007, in the State and District of Maryland, Patrick

11  Albert Byers, Jr. and Frank Keith Goodman, the defendants herein, with

12  each other and others known and unknown to the grand jury, did

13  knowingly and unlawfully combine, conspire and agree to violate 18

14  United States Code, Section 1512(a)(1)(c), specifically to kill

15  another person with intent to prevent the communication by Carl

16  Stanley Lackl to a law enforcement officer or judge of the United

17  States relating to the commission or possible commission of a federal

18  offense by defendant, Patrick Albert Byers, Jr., to wit, a firearms

19  violation pursuant to 18, Title 18, United States Code, Section

20  922(g)(1), a prohibited person in possession of a firearm on March 4,

21  2006 as set forth in Count 8 of this superseding indictment which is

22  incorporated herein and violation of 18 United States Code, Section

23  924(c), possession of a firearm in furtherance of a drug trafficking

24  crime on March 4, 2006 as set forth in Count 9 of the superseding

25  indictment, which is incorporated herein, which killing is a murder as

1  defined in 18 United States Code, Section 1111 in that the defendants

2  with malice aforethought unlawfully killed a human being, Carl Stanley

3  Lackl, willfully, deliberately and maliciously and with premedition.

4          Count 4 of the superseding indictment alleges as follows:

5  From on or about July 2, 2007, in the State and District of Maryland,

6  Patrick Albert Byers, Jr. and Frank Keith Goodman, the defendants

7  herein, did knowingly and unlawfully kill another person with intent

8  to prevent the communication by any person to a law enforcement

9  officer of the United States relating to the commission or possible

10  commission of a federal offense by Defendant Patrick Albert Byers,

11  Jr., to wit, a firearms violation pursuant to Title 18, United States

12  Code, Section 922(g)(1), prohibited person in possession of a firearm

13  on March 4, 2006 as set forth in Count 8 of the superseding

14  indictment, which is incorporated herein in violation of Title 18,

15  United States Code, Section 924(c), possession of a firearm in

16  furtherance of a drug trafficking crime on March 4, 2006 as set forth

17  in Count 9 of the superseding indictment, which is incorporated

18  herein, which killing is a murder as defined in 18 United States Code,

19  Section 1111 in that the defendants with malice aforethought

20  unlawfully killed a human being, Carl Stanley Lackl, willfully,

21  deliberately, maliciously and with premeditation.

22          We will now turn to the elements of these offenses.  I will

23  explain the elements for Count 4 first before turning to Count 3.

24  Count 4, Elements of the Offense.  In order to prove a defendant

25  guilty of Count 4, the government must prove each of the following

1    elements beyond a reasonable doubt.  First, that on or about the date

2    charged, the defendant killed another person or aided and abetted the

3    killing of another person.  Second, that the defendant acted knowingly

4    and with intent to prevent the communication by any person to a law

5    enforcement officer or judge of the United States of information

6    relating to the commission or possible commission of a federal

7    offense.  Third, that the killing is a murder as defined in 18 United

8    States Code, Section 1111 in that the defendant with malice

9    aforethought unlawfully killed a human being, Carl Stanley Lackl,

10   willfully, deliberately, maliciously and with premeditation.

11          The first element the government must prove beyond a

12   reasonable doubt is that the defendant killed another person or that

13   the defendant aided and abetted the killing of another person.

14          The second element the government must prove beyond a

15   reasonable doubt is that the defendant acted knowingly and with the

16   specific intent to prevent the communication by any person to a law

17   enforcement officer or judge of the United States of information

18   relating to the commission or possible commission of a federal

19   offense.  That is possession of a firearm by a convicted felon and

20   possession of a firearm in furtherance of drug trafficking as charged

21   in Counts 8 and 9 of the superseding indictment.  An act is done

22   knowingly if it is done voluntarily and purposely and not by accident

23   or mistake.  By specific intent I mean that the defendant must have

24   acted knowingly and with the unlawful intent to hinder, delay or

25   prevent the communication to a law enforcement officer or judge.  In

1  order to satisfy this element, it is not necessary for the government

2  to prove that the defendant knew he was breaking any particular

3  criminal law.  Nor need the government prove that the defendant knew

4  that the judge is a United States judge or a law enforcement officer,

5  is a federal law enforcement officer.  Also I instruct you that being

6  a felon in possession of a firearm and possession of a firearm in

7  furtherance of a drug trafficking crime is charged in Counts 8 and 9

8  are federal offenses.  Again, however it is not necessary for the

9  government to prove that the defendant knew that being a prohibited

10  person in possession of a firearm and possession of a firearm in

11  furtherance of a drug trafficking crime is a federal offense.

12          The law does not require that a federal proceeding be

13  pending at the time or even that it was about to be initiated when the

14  attempted action, threat, intimidation or corrupt persuasion was made.

15  Nor does the law require that the recipient of the intimidation must

16  be involved in an ongoing federal investigation or in an investigation

17  of a federal crime.

18          Third, the killing is a murder as defined in 18 United

19  States Code, Section 1111 in that the defendants with malice

20  aforethought unlawfully killed a human being, Carl Stanley Lackl,

21  willfully, deliberately, maliciously and with premeditation.  That is

22  the third element if you were to so find.  Section 1111 of Title 18

23  defines murder as follows:  Murder is the unlawful killing of a human

24  being with malice aforethought.  Every murder perpetrated by any kind

25  of willful, deliberate, malicious and premeditated killing is murder

1  in the first degree.  Any other murder is murder in the second degree.

2  The government must prove beyond a reasonable doubt -- the

3  next element here is the government must prove beyond a reasonable

4  doubt that the defendants acted with malice aforethought.  Malice

5  aforethought is the state of mind that would cause a person to act

6  without regard for life of another.  To satisfy this element, the

7  defendant must have acted consciously with the intent to kill another

8  person.  However, the government need not prove a subjective intent to

9  kill on the part of the defendant.  It would be sufficient to satisfy

10  this element if it proved reckless and wanton conduct on the part of

11  the defendant which grossly deviated from a reasonable standard of

12  care such that he was aware of the serious risk of death.  In order to

13  establish this element, the government must prove that the defendant

14  acted willfully with a bad or evil purpose to break the law.  However,

15  the government need not prove spite, malevolence, hatred or ill will

16  toward the victim.

17  Fourth, premeditation.  Finally, the government must prove

18  beyond a reasonable doubt with respect to premeditated murder -- the

19  final thing the government must prove beyond a reasonable doubt with

20  respect to premeditated murder is that the defendants acted willfully,

21  deliberated and with premeditation.  And act is done with

22  premeditation if it's done upon deliberation.  In other words,

23  premeditation means deliberating or thinking about whether to act

24  before actually committing the crime as opposed to doing something

25  instantaneously.  In order to satisfy this element, the government

1   must prove that the defendants killed the victim only after thinking

2   the matter over, deliberating whether to act before committing the

3   killing.  There is no requirement that the government prove that the

4   defendants deliberated for any particular period of time in order to

5   show premeditation.  Willful, deliberate and premeditated simply means

6   that the killing is done on purpose after a period of time for prior

7   consideration.  The duration of that period cannot be arbitrarily

8   fixed.  The time in which to perform a deliberate design varies as the

9   minds and temperaments of individuals differ and according to the

10  circumstances in which the individual may be placed.  An interval of

11  any time between the forming of the intent to kill and the execution

12  of that intent which is of sufficient duration for the accused to be

13  fully conscious of what he intended is sufficient to support a

14  conviction for premeditated murder.

15          Again still as to Count 4, this statute, 18 United States

16  Code, Section 1512, is designed to protect persons from retaliation

17  for the appearance of witnesses or parties in criminal and civil

18  federal proceedings and from retaliation for information given to law

19  enforcement officers about federal crimes.  The integrity of the

20  federal system of justice depends upon persons giving truthful

21  evidence and information free from the fear of retaliation.  This

22  statute is devised to make it unlawful for anyone to retaliate against

23  someone who's been a witness, victim or informant or against anyone

24  associated with a witness, victim or informant.

25          In order to satisfy its burden of proof as to Count 3, the

1    government must establish beyond a reasonable doubt each of the

2    following two elements.  First, that two or more people entered into

3    the unlawful agreement as charged.  That is that a conspiracy existed

4    to kill another person with intent to prevent his communication to a

5    law enforcement officer or judge.  Second, that said killing is a

6    murder as defined in 18 United States Code, Section 1111 in that the

7    defendants with malice aforethought unlawfully killed a human being,

8    Carl Stanley Lackl, willfully, deliberately, maliciously and with

9    premeditation.  And third, that the defendant knowingly and willfully

10   became a member of that conspiracy.  Earlier in these instructions, I

11   explained the law and defined the terms regarding conspiracies.  You

12   are advised that the previous instructions regarding conspiracy

13   including the instructions about the purpose of the conspiracy statute

14   and membership in that conspiracy apply to the conspiracy charged in

15   Count 3 as well.  So I don't need to repeat the entire conspiracy

16   charge.  But it's the same principle as to conspiracy there as well.

17            Now Count 5.  Total of nine counts.  Both defendants are

18   charged in Counts 1 through 7 and only the Defendant Byers is charged

19   in Counts 8 and 9.  Count 5.  In Count 5, the defendants are charged

20   with the substantive offense of using a firearm in furtherance of a

21   crime of violence and aiding and abetting the use of that firearm in

22   furtherance of such a crime.  Count 5 of the superseding indictment

23   alleges as follows.  On or about July 2, 2007, in the State and

24   District of Maryland, Patrick Albert Byers, Jr. and Frank Keith

25   Goodman, the defendants herein, did knowingly use, carry and discharge

1   a firearm during and in relation to a crime of violence for which they

2   may be prosecuted in a court of the United States, to wit, a

3   conspiracy to use and cause to be used a facility in interstate

4   commerce with intent that the murder of Carl Stanley Lackl be

5   committed in violation of the laws of the State of Maryland which

6   resulted in the death of Carl Stanley Lackl as charged in Count 1 of

7   the superseding indictment which is incorporated herein.  Furthermore,

8   using and causing the use of a facility of interstate commerce with

9   intent that the murder of Carl Stanley Lackl be committed in violation

10   of the State of Maryland which resulted in the death of Carl Stanley

11   Lackl is charged in Count 2 of the superseding indictment which was

12   incorporated by reference herein.  C, conspiracy to kill another

13   person with intent to prevent the communication by any person to a law

14   enforcement officer or judge of the United States relating to the

15   commission or possible commission of the federal offense as set forth

16   in Count 3 of this superseding indictment which is incorporated

17   herein.  D, killing another person with intent to prevent the

18   communication by any person to a law enforcement officer or judge of

19   the United States relating to the commission or possible commission of

20   a federal offense as set forth in Count 4 of the superseding

21   indictment which is incorporated herein.  The relevant statute here is

22   Title 18, United States Code, Section 924(c)(1)(a), subpart 3, which

23   provides that any person who during and in relation to any crime of

24   violence for which the person may be prosecuted in a court of the

25   United States, uses or carries or discharges a firearm shall be guilty

1   of the crime.

2   We will now turn to the elements of the offense as set forth

3   in Count 5 of the indictment.  The government must prove each of the

4   following elements beyond a reasonable doubt to sustain its burden of

5   proving the defendants, both of them, guilty of Count 5.  First, that

6   the defendant committed a crime of violence which he might be

7   prosecuted in a court of the United States.  And second, that the

8   defendant knowingly used, carried or discharged a firearm during and

9   in relation to that crime of violence.  To sustain its burden of proof

10   under the aiding and abetting statute, the government must prove

11   beyond a reasonable doubt that the defendant aided or abetted another

12   whose conduct satisfies these elements.  As I instructed you before,

13   in order to aid or abet another to commit a crime, it is necessary

14   that the defendant willfully and knowingly associate himself in some

15   way with the crime and that he willfully and knowingly seek by some

16   act to help make the crime succeed.

17   The first element the government must prove beyond a

18   reasonable doubt is that the defendant committed a crime of violence

19   for which he might be prosecuted in a court of the United States or

20   aided and abetted another person who committed such a crime.  The

21   defendants are charged in Count 1 of the superseding indictment with

22   conspiracy to use an interstate commerce facility in the commission of

23   a murder for hire and in Count 2 with use of an interstate commerce

24   facility in the commission of a murder for hire.  The defendants are

25   also charged in Count 3 of the superseding indictment with conspiracy

1  to kill another person with intent to prevent his communication to a

2  law enforcement officer or judge relating to the commission or

3  possible commission of a federal offense.  And in Count 4 with killing

4  another person with intent to prevent his communication to a law

5  enforcement officer or judge relating to the commission or possible

6  commission of a federal offense.  I instruct you that each of these

7  crimes is a crime of violence.  However, it is for you to determine

8  that the government has proven beyond a reasonable doubt that the

9  defendants committed the crimes in Counts 1, Count 2, Count 3 or Count

10  4 as charged.  So that is the first element of Count 5.

11             The second element of Count 5.  The second element that the

12  government must prove beyond a reasonable doubt is that the defendant

13  knowingly used, carried or discharged a firearm in the furtherance of

14  a crime of violence charged in Count 1 and Count 2 and Count 3 or

15  Count 4 or that the defendant knowingly aided and abetted another

16  person in doing so.  A firearm is any weapon which will or is designed

17  or may be readily converted to expel a projectile by the action of an

18  explosive.  In order to satisfy this element, the government must

19  prove that the defendant had possession of the firearm and that such

20  possession was in furtherance of a crime of violence.  Possession

21  means that the defendant or the person he aided and abetted either had

22  physical possession of the firearm on his person or that he had

23  dominion and control over the place where the firearm was located and

24  had the power and intention to exercise control over the firearm.  To

25  possess a firearm in furtherance of a crime of violence means that the

1  firearm helped forward, advance or promote the commission of the

2  crime.  The mere possession of the firearm at the scene of the crime

3  is not sufficient under this definition.  The firearm must have played

4  some part in furthering the crime in order for this element to be

5  satisfied.  For this element, you must also find that the defendant or

6  the person he aided and abetted possessed the firearm knowingly.  This

7  means that he possessed it purposely and voluntarily and not by

8  accident or mistake.  It also means that he knew that the weapon was a

9  firearm as we commonly use the word.  However, the government is not

10 required to prove that the defendant knew he was breaking the law.

11             Count 5 of the superseding indictment charges that the

12 defendants possessed a firearm in furtherance of four predicate

13 crimes.  Counts 1, 2, 3 and 4.  If the government falls to prove that

14 a defendant committed at least one of these predicate crimes as set

15 forth in those four counts, then you must find the defendants not

16 guilty on Count 5.  On the other hand, the government need not prove

17 all of the predicate crimes for you to find the defendant guilty on

18 Count 5.  It is sufficient if you find beyond a reasonable doubt that

19 the defendants, both of them or either one of them committed at least

20 one of the predicate offenses charged in Counts 1, 2, 3 and 4 in order

21 to convict a defendant on Count 5.  And as I've said and I'll say

22 again, you have to judge Byers and Goodman individually in terms of

23 their involvement.  However, in order to convict a defendant on this

24 count, all 12 of you must agree on the specific predicate offenses in

25 furtherance of which the defendant possessed a firearm.  Accordingly,

1    in order to find a defendant guilty in Count 5, all of you must agree

2    that a defendant possessed a firearm in furtherance of a crime of

3    violence charged in Count 1.  All of you must agree that the defendant

4    possessed a firearm in furtherance of a crime of violence charged in

5    Count 2.  All of you must agree that the defendant possessed a firearm

6    in furtherance of the crime charged in Count 3 or all of you must

7    agree that the defendant possessed a firearm in furtherance of a crime

8    of violence charged in Count 4.  Of course, it is also possible that

9    all of you may also agree that the defendant committed more than one

10   of these predicate offenses.

11              Count 7.  Now I'm going to charge you now as to Counts 6 and

12   7.  I'm going to go to Count 7 first and then Count 6.  In Count 7,

13   the defendants are charged with conspiracy to use a firearm in

14   furtherance of a crime of violence and again both defendants are

15   charged in Counts 1 through 7.  Only Defendant Byers is charged in

16   Counts 8 and 9.  We're on Count 6 and 7 now.  Count 7.  In Count 7,

17   the defendants are charged with conspiracy to use a firearm in

18   furtherance of a crime of violence.  Specifically, Count 7 of the

19   superseding indictment alleges as follows:  From on or about May 18,

20   2007 up through and including September 5, 2007 in the State and

21   District of Maryland, Patrick Albert Byers, Jr. and Frank Keith

22   Goodman, the defendants herein, did knowingly, intentionally and

23   unlawfully combine, conspire, confederate and agree with each other

24   and with other persons known and unknown to the grand jury to

25   knowingly use firearms during and in relation to crimes of violence

1  for which they may be prosecuted in a court of the United States as

2  set forth in Counts 1, 2, 3 and 4 of the superseding indictment which

3  are incorporated by reference herein in violation of 18 United States

4  Code, Section 924(c).  The relevant statute is Title 18, United States

5  Code, Section 924(c)(1)(a), subpart 3, which provides that any person

6  who during and in relation to any crime of violence for which the

7  person may be prosecuted in a court of the United States, uses or

8  carries or discharges a firearm shall be guilty of a crime.  Whereas

9  Count 5 of the superseding indictment charges the defendants with

10  using, carrying and discharging a firearm in furtherance of a crime of

11  violence in violation of the statute, Count 7 charges the defendants

12  with conspiring to use a firearm in furtherance of a crime of

13  violence.

14          We will now turn to the elements of this offense on Count 7.

15  In order to satisfy its burden of proof as to Count 7, the government

16  must establish beyond a reasonable doubt each of the following two

17  elements.  First, that two or more people entered into an unlawful

18  agreement as charged, that is that a conspiracy existed to use a

19  firearm in furtherance of a crime of violence for which the defendants

20  might be prosecuted in a court of the United States.  And second, that

21  the defendant knowingly and willfully became a member of that

22  conspiracy.  Earlier in these instructions, I explained the law and

23  defined the terms regarding conspiracies.  You are advised that the

24  previous instructions regarding conspiracy including the instruction

25  about the purpose of the conspiracy statute and membership of the

1    conspiracy apply to the conspiracy charged in Count 7 as well.  So I'm

2    not going to repeat it here.  You have three different times it's used

3    the same instructions on conspiracy.

4                    Count 6.  Count 6 charges the defendants with causing the

5    death of Carl Stanley Lackl through the use of a firearm in the course

6    of the violation of Title 18, United States Code, Section 924(c)

7    charged in Count 5.  In other words, Count 6 charges the defendants

8    with committing murder in the course of committing the crime charged

9    in Count 5.  Count 6 reads as follows:  On or about July 2, 2007 in

10   the State and District of Maryland, Patrick Albert Byers, Jr. and

11   Frank Keith Goodman, the defendants herein, in the course of using,

12   carrying and discharging a firearm during and in relation to a crime

13   of violence in violation of 18 United States Code, Section 924(c) as

14   set forth in Count 5 of this superseding indictment and incorporated

15   by reference herein, did cause the death of a person through the use

16   of a firearm which killing is a murder as defined in 18 United States

17   Code, Section 1111 in that the defendants with malice aforethought

18   unlawfully killed a human being, to wit, Carl Stanley Lackl,

19   willfully, deliberately, maliciously and with premeditation.  The

20   relevant statute is Title 18, United States Code, Section 924(j) which

21   provides that a person who in the course of a violation of Subsection

22   C of this statute causes the death of a person through the use of a

23   firearm if the killing is a murder as defined in Section 1111 is

24   guilty of the crime.  As I stated before, Section 1111 of Title 18,

25   United States Code defines murder as follows:  Murder is the unlawful

1    killing of a human being with malice aforethought.  Every murder

2    perpetrated by any kind of willful, deliberate, malicious and

3    premeditated killing is murder in the first degree.  Any other murder

4    is murder in the second degree.

5            As to the elements of Count 6, the government must prove

6    each of the following elements beyond a reasonable doubt to sustain

7    its burden of proving the defendants guilty of Count 6.  First, that

8    the defendant committed the crime charged in Count 5 as either a

9    principal participant or as an aider and abettor.  That is that the

10   defendant committed a crime of violence which he might be prosecuted

11   in a court of the United States and knowingly used, carried or

12   discharged a firearm during or in relation to one or more of these

13   predicate crimes.  Second, that the defendant either as a principal

14   participant or as an aider and abettor through the use of firearms

15   caused the death of Carl Stanley Lackl.  Third, that in causing the

16   death of Mr. Lackl, the defendant acted willfully and with malice

17   aforethought and fourth, that the defendant acted with premeditation.

18          As I indicated earlier, Count 6 charges the defendants with

19   committing a murder during the course of committing the crime charged

20   in Count 5.  Accordingly, if upon all the evidence you find that the

21   government has failed to prove Count 5 beyond a reasonable doubt as to

22   a particular defendant, then you will proceed no further as to that

23   defendant on Count 6.  You should only consider the question of

24   whether the defendant committed the offense charged in Count 6 if you

25   first find a particular defendant guilty under Count 5 as charged.

1          The second element, still on count 6, the second element the

2   government must prove is that the defendants killed the victim, Carl

3   Stanley Lackl, through the use of a firearm either as principal

4   participants or as aiders and abettors.  In this regard, it is the

5   government's burden to prove that the defendants' use or the use of

6   someone whom the defendants aided and abetted of a firearm was a

7   direct cause of Carl Stanley Lackl's death.  This means simply that

8   the government must prove that the defendants or someone the

9   defendants aided and abetted inflicted an injury or injuries upon Carl

10   Stanley Lackl using a firearm from which Carl Stanley Lackl died.  It

11   is not necessary that the injuries inflicted by the use of the firearm

12   alone caused the death of Mr. Lackl.  It is instead sufficient that

13   the government proves that the injury or injuries resulted from the

14   defendants' use of the firearm was a cause of Mr. Lackl's death.  As I

15   stated before, the defendants are charged as principals and as aiders

16   and abettors.  In order to aid or abet another to commit a crime, it

17   is necessary that the defendant wilfully and knowingly associate

18   himself with some way with the crime and that he willfully and

19   knowingly seek by some act to help make the crime succeed.

20          The next element the government must prove beyond a

21   reasonable doubt as to Count 6 is that the defendant acted willfully

22   with malice aforethought and with premeditation.  Earlier in my

23   instructions I advised you as to the meaning of the terms willfully,

24   malice aforethought and premeditation and those previous instructions

25   apply equally to this count of the indictment as well.  I don't need

1     to repeat those.

2              Now we're as to Count 8.  Count 8 and 9 only charge the

3     defendant, Patrick Albert Byers, Jr.  Count 8 charges the defendant

4     with unlawful possession of a firearm.  Count 8 reads specifically as

5     follows:  On or about March 4, 2006 in the State and District of

6     Maryland, Patrick Albert Byers, Jr., the defendant herein, having

7     previously been convicted of a crime punishable by imprisonment for a

8     term exceeding one year, did knowingly and unlawfully possess a

9     firearm, to wit, one Sigsauer .40 caliber semi-automatic handgun,

10    serial number AH-13333 in and affecting commerce.  The relevant

11    statute here is Section 922(g)(1) of Title 18 of the United States

12    Code.  Section 922(g)(1) provides in part that it shall be unlawful

13    for any person who has been convicted in any court of a crime

14    punishable by imprisonment for a term exceeding one year to possess or

15    affect in commerce any firearm.

16             Now as to Count 8, the elements of the offense are the

17    government must prove each of the following elements beyond a

18    reasonable doubt in order to sustain its burden of proving the

19    defendant, Patrick Albert Byers, Jr. guilty.  First, that prior to

20    March 4, 2006, the Defendant Byers had been convicted in any court of

21    a crime punishable by imprisonment for a term exceeding one year.

22    Second, that the defendant knowingly possessed the firearm as charged

23    and third, that the possession charged was in or affecting interstate

24    or foreign commerce.

25             The first element the government must prove beyond a

1    reasonable doubt before you can convict is that before the date the

2    defendant, Patrick Byers, is charged with possessing the firearm, the

3    defendant had been convicted of a crime punishable by imprisonment for

4    a term exceeding one year.  The parties have stipulated that the

5    defendant was convicted of a crime in state court and that this crime

6    is punishable by imprisonment for a term exceeding one year.  It has

7    also been stipulated that this felony conviction occurred prior to the

8    time that the defendant is alleged to have possessed the weapon

9    charged in the indictment.  You may thus accept this fact and not

10   require the government to produce any further proof upon the matter.

11            The second element which the government must prove beyond a

12   reasonable doubt is that on or about the date set forth in the

13   indictment, the defendant, Patrick Byers, knowingly possessed a

14   firearm specified in Count 8, to wit, one Sigsauer .40 caliber

15   semi-automatic handgun.  As I instructed you previously, a firearm is

16   any weapon which will or is designed to or may be readily converted to

17   expel a projectile by the action of an explosive.  To possess means to

18   have something within a person's control.  This does not necessarily

19   mean that the defendant had to hold the firearm physically, that is

20   have actual possession of it.  As long as the firearm is within his

21   control, the defendant possesses it.  If you find that the defendant

22   either had actual possession of the firearm or that he had the power

23   and intention to exercise control over it even though it was not in

24   his physical possession, you may find the government has proven

25   possession.

1            The law also recognizes that possession may be sole or

2     joint.  If one person alone possesses it, that is sole possession.

3     However, it is possible that more than one person may have the power

4     and intention to exercise control over the firearm.  This is called

5     joint possession.  If you find that the defendant had such power and

6     intention, then he possessed the firearm under this element even if he

7     possessed it with another.  Proof of ownership of the firearm is not

8     required.  To satisfy this element, you must also find that the

9     defendant knowingly possessed the firearm.  This means that he

10    possessed the firearm purposely and voluntarily and not by accident or

11    mistake.  It also means that he knew that the weapon was a firearm as

12    we commonly use the word.  However, the government is not required to

13    prove that the defendant knew that he was breaking the law.  You are

14    further instructed that the government is not required to prove that

15    the firearm was operable in order to prove that it was a firearm as I

16    have just defined for you.

17           The third element the government must prove as to Count 8

18    beyond a reasonable doubt is that the firearm the Defendant Byers is

19    charged with possessing was in or affecting interstate commerce.

20    There is a stipulation that the firearm in question was in or

21    affecting interstate commerce.

22           Now finally, as to Count 9, Count 9 charges the defendant,

23    Patrick Byers, Jr. with possession of a firearm in furtherance of a

24    drug trafficking crime.  The count reads as follows:  On or about

25    March 4, 2006, in the State and District of Maryland, Patrick Albert

1   Byers, Jr., the defendant herein, did knowingly possess a firearm, to

2   wit, one Sigsauer .40 caliber semi-automatic handgun, serial number

3   AH-13333 in furtherance of a drug trafficking crime for which he may

4   be prosecuted in a court of the United States, to wit, conspiracy to

5   possess with intent to distribute controlled substances in violation

6   of Title 21, United States Code, Section 846.  The relevant statute is

7   Title 18, United States Code, Section 924(c), which provides that any

8   person who in furtherance of any drug trafficking crime for which a

9   person may be prosecuted in a court of the United States possesses a

10  firearm shall be guilty of the crime.

11          As to Count 9, the government must prove each of the

12  following elements beyond a reasonable doubt to sustain its burden of

13  proving the defendant guilty of Count 9.  First, that the defendant

14  committed a drug trafficking crime for which he may be prosecuted in a

15  court of the United States.  And second, that the defendant knowingly

16  possessed a firearm, to wit, one Sigsauer .40 caliber semi-automatic

17  handgun in furtherance of one or more of those predicate crimes.  In

18  these counts, the Defendant Byers is charged with possessing a firearm

19  or firearms in furtherance of a drug trafficking crime for which he

20  might be prosecuted in a court of the United States.  To wit,

21  conspiracy to possess with intent to distribute a controlled substance

22  in violation of Title 21, United States Code, Section 846.  If upon

23  all the evidence, you find that the government has failed to prove

24  beyond a reasonable doubt that the defendant violated Title 21 United

25  States Code, Section 846, then you will proceed no further as to that

1    defendant on Count 9.  You should only consider the question of

2    whether the defendant, Byers, possessed a firearm in furtherance of a

3    drug trafficking crime if you find that the government has proven that

4    the defendant violated Title 21, United States Code, Section 846.

5            The first element the government must prove as to Count 9

6    beyond a reasonable doubt is that the defendant, Patrick Byers,

7    committed a drug trafficking crime which he might be prosecuted in a

8    court of the United States.  I instruct you that conspiracy to possess

9    with intent to distribute a controlled substance in violation of Title

10   21, United States Code, Section 846 -- I instruct you that conspiracy

11   to possess with intent to distribute a controlled substance is a drug

12   trafficking crime.  However, it is for you to determine that the

13   government has proven beyond a reasonable doubt that the defendant

14   committed that crime and I would note that that language was slightly

15   left out there.  It was a typographical error there when you look at

16   Instruction Number 81.

17           You are instructed that violation -- this is covered in

18   Number 82 to make it more clear.  You are instructed that a violation

19   of Section 841(a)(1) of Title 21, United States Code is an offense

20   defined in this subchapter and that Section 841(a)(1) provides that it

21   shall be unlawful for any person knowingly or intentionally to possess

22   with intent to distribute a controlled substance.  Accordingly, you

23   are instructed that it is a violation of Section 846 of Title 21 of

24   the United States Code for any person to conspire to distribute or to

25   conspire to possess with intent to distribute any controlled

1   substance.

2        I will now define for you the concept of possession with

3   intent to distribute and distribution.  Although I'm defining these

4   concepts for you, remember that in order for you to find a defendant

5   guilty of conspiring to commit one of these crimes, you need not find

6   that the objects of the conspiracy were actually accomplished.  Only

7   that the underlying crimes were actually committed.  You need simply

8   find that the defendant conspired to commit those crimes as defined

9   previously in these instructions.

10        Actual possession is what most of us think of as possession.

11  That is having physical custody or control of an object.  For example,

12  if a person had drugs on his person, you may find that he had

13  possession of the drugs.  However, a person need not have actual

14  physical custody of an object in order to be in legal possession of

15  it.  If an individual has the ability to exercise substantial control

16  over an object that he does not have in his physical custody, then he

17  is in possession of that item.  An example of this from everyday

18  experience would be the person's possession of items he keeps in the

19  safe deposit box of his bank.  Although the person does not have

20  physical custody of those items, he exercises substantial control over

21  them and so has what is known as constructive possession of them.

22  Possession of drugs cannot be found solely on the ground that a person

23  was near or close to the drugs nor can it be found simply because a

24  person was present at a scene where drugs were involved or solely

25  because a person associated with someone who does control the drugs or

1   the property where they are found.  However, these factors may be

2   considered in connection with other evidence.  More than one person

3   can have control over the same drugs.  If this is so, then these

4   people have what is called joint possession.  Joint possession is no

5   different from sole possession.  An intent to distribute means that a

6   person had control over drugs with the state of mind for purpose to

7   transfer them to another person.  Since you cannot read a person's

8   mind, inferences may be made from behavior.

9          The word, distribute, means to deliver a controlled

10  substance.  Deliver is defined as the actual constructive or attempted

11  transfer of a controlled substance.  Simply stated, the words

12  distribute and deliver mean to pass on or to hand over to another or

13  to cause to be passed on or handed to another or to try to pass on or

14  hand over to another drugs.  Distribution does not require a sale.

15  Activities in furtherance of the ultimate sale such as vouching for

16  the quality of the drugs, negotiating for or receiving the price and

17  supplying or delivering the drugs may constitute distribution.  In

18  short, distribution requires a concrete involvement in the transfer of

19  drugs.  Keeping this general definition of distribution in mind, you

20  should make your decision about whether the defendant conspired to

21  distribute controlled substances from all the evidence presented.

22  Again you are reminded that in order to find a defendant guilty of

23  conspiracy to possess with intent to distribute controlled substances,

24  you need not find that the defendant actually distributed or possessed

25  controlled substances.  Instead you need simply find that he conspired

1    to possess controlled substances with intent to distribute by agreeing

2    to engage in an act in furtherance of a scheme to possess and

3    distribute controlled substances.

4              The second element -- we're still on Count 9.  The second

5    element that the government must prove beyond a reasonable doubt as to

6    Count -- I'm sorry, this is as to Count 8 -- is that the defendant,

7    Patrick Byers, knowingly possessed a firearm in furtherance of a drug

8    trafficking crime.  A firearm is any weapon which will or is designed

9    to or may be readily converted to expel a projectile by the action of

10   an explosive.  In order to satisfy this element, the government must

11   prove that the defendant had possession of the firearm and that such

12   possession was in furtherance of the drug trafficking crime.

13   Possession means that the defendant either had physical possession of

14   the firearm on his person or that he had dominion and control over the

15   place where the firearm was located and had the power and intention to

16   exercise control over the firearm.  To possess a firearm in

17   furtherance of a drug trafficking crime means that the firearm helped

18   forward, advance or promote the commission of the crime.  The mere

19   possession of the firearm at the scene of the crime is not sufficient

20   under this definition.  The firearm must have played some part in

21   furthering the crime in order for this element to be satisfied.  For

22   this element, you must also find that the defendant possessed the

23   firearm knowingly.  This means that he possessed it purposely and

24   voluntarily and not by accident or mistake.  It also means that he

25   knew the weapon was a firearm as we commonly use the word.  However,

1    the government is not required to prove that the defendant knew he was

2    breaking the law.

3                Now finally, we're about to conclude.  At this stage, the

4    question of possible punishment of either defendant is not of concern

5    to the jury and should not in any sense enter into or influence your

6    deliberations.  The duty of imposing sentence as to Mr. Goodman rests

7    exclusively upon this Court and as to Mr. Byers is not a matter that

8    should affect your deliberations at this phase.  Your function is to

9    weigh the evidence in the case and determine whether or not a

10   defendant is guilty beyond a reasonable doubt solely upon the basis of

11   such evidence.  Under your oath as jurors, you cannot allow a

12   consideration of the punishment which may be imposed upon a defendant

13   if he is convicted to influence your verdict in any way or in any

14   sense enter into your deliberations.

15               The government to prevail must prove the essential elements

16   by the required degree of proof as already explained exhaustively in

17   these instructions.  If it succeeds, your verdict should be guilty.

18   If it fails, it should be not guilty.  To report a verdict, it must be

19   unanimous.  Your function is to weigh the evidence in the case and

20   determine whether or not each defendant is guilty solely upon the

21   basis of such evidence.  Each juror is entitled to his or her opinion.

22    Each should however exchange views with his or her fellow jurors.

23   That is the very purpose of jury deliberations, to discuss and

24   consider the evidence, to listen to the arguments of fellow jurors, to

25   present your individual views, to consult with one another and to

1    reach an agreement based solely and wholly on the evidence if you can

2    do so without violence to your own individual judgment.  Each of you

3    must decide the case for yourself after consideration with your fellow

4    jurors of the evidence in the case.  But you should not hesitate to

5    change an opinion which after discussion with your fellow jurors

6    appears erroneous.  However, if after carefully considering all the

7    evidence and the arguments of your fellow jurors, you entertain a

8    conscientious view that differs from the others, you are not to yield

9    your convictions simply because you are outnumbered.  Your final vote

10   must reflect your conscious conviction as to how the issues should be

11   decided.  Your verdict whether guilty or not guilty must be unanimous.

12              Upon retiring to the jury room, Juror Number 1 will be your

13   foreperson.  He is the person who will preside over your deliberations

14   and who will be your spokesperson here in court.  The foreperson runs

15   the meeting, controls deliberations and communicates with the Court.

16   A verdict form has been prepared for your convenience and I'm going to

17   go over that with you in a second.  In fact I'll go over that now with

18   you.  The verdict form simply says Count 1, with respect to Count 1,

19   the superseding indictment which charges a conspiracy to use a

20   facility of interstate commerce in the commission of a murder for hire

21   of Carl Stanley Lackl, how do you find the defendant, Patrick Byers?

22   Not guilty or guilty.  How do you find the defendant, Frank Goodman?

23   Not guilty or guilty.  Count 2, with respect to Count 2 of the

24   superseding indictment which charges using a facility of interstate

25   commerce in the commission of a murder for hire of Carl Stanley Lackl,

1   once again how do you find the defendant, Patrick Byers?  Not guilty

2   or guilty.  How do you find the defendant, Frank Goodman?  Not guilty

3   or guilty.  Count 3, with respect to Count 3 of the superseding

4   indictment which charges a conspiracy to kill another person with

5   intent to prevent his communication to a law enforcement officer or

6   judge of the United States related to the commission or possible

7   commission of a federal offense, how do you find the defendant,

8   Patrick Byers?  Not guilty or guilty.  How do you find the defendant,

9   Frank Goodman?  Not guilty or guilty.  Same as to Count 4.  With

10   respect to Count 4 of the superseding indictment which charges killing

11   another person with intent to prevent his communication to a law

12   enforcement officer or judge of the United States related to the

13   commission or possible commission of a federal offense.  Once again

14   how do you find each defendant?  Not guilty or guilty.  Count 5, with

15   respect to Count 5, which charges using a firearm in furtherance of a

16   crime of violence and aiding and abetting the use of a firearm in

17   furtherance of a crime of violence.  Same breakdown.  Count 6 which

18   charges causing the death of Carl Stanley Lackl for the use of a

19   firearm in the course of commission of Count 5.  Once again, it's the

20   same breakdown as to each defendant.  Count 7, with respect to Count 7

21   charging a conspiracy to use a firearm in furtherance of a crime of

22   violence.  Same breakdown.  And finally, Counts 8 and 9 only as to the

23   Defendant Byers.  With respect to Count 8 of the superseding

24   indictment which charges the unlawful possession of a firearm by a

25   prohibited person, how do you find the defendant, Patrick Byers?  Not

1    guilty or guilty.  And finally, with respect to Count 9, charging the

2    possession of a firearm in furtherance of a drug trafficking crime,

3    how do you find the defendant, Patrick Byers?  Not guilty or guilty.

4    And it will be signed by your foreperson and dated.

5            If it becomes necessary during deliberations to communicate

6    with the Court, you may send a note by the marshal signed by your

7    foreperson or by one of the members of the jury.  It will be signed by

8    your foreperson.  No member of the jury should communicate with the

9    Court by any means other than a signed writing and I will not

10   communicate with any member of the jury on any subject touching on the

11   merits of the case other than in writing or here open in court.  What

12   I do if there's any question, you give it to -- your foreperson will

13   sign the note.  The foreperson will give it to the bailiff outside of

14   the jury room.  That will be given to me.  I will call the lawyers and

15   the lawyers and the parties will come back into the courtroom and we

16   will address the question here in open court.

17           You will note from the oath about to be taken by the marshal

18   that he, too, as well as all other persons is forbidden to communicate

19   in any way or manner with any member of the jury on any subject

20   touching on the merits of the case.  He will just merely take the note

21   and see that I get it.

22           Bear in mind that you may not reveal to any person, not even

23   to me how the jury stands numerically or otherwise on the question of

24   the guilt or innocence of the accused persons on any particular count

25   until after you have reached a verdict.  You do not send a note to me

1  saying that you have a particular vote with respect to one matter or

2  not.  You just send a question out.

3          Ultimately, when you reach your verdict, you have to be

4  unanimous as to each one of these counts and you have to deliberate as

5  to each individual defendant.  You'll finish the verdict form.  You

6  will then indicate to the marshal that you have a verdict.  You do not

7  give the verdict sheet to the marshal.  You tell the marshal you have

8  a verdict.  The marshal then will advise Ms. Martina West, the deputy

9  clerk of court and I will notify the lawyers and we'll come back in

10  here to the courtroom.  She will then take roll and she will ask if

11  you have reached a verdict.  And the foreperson, you will say yes and

12  the foreperson and she'll ask, who shall speak for you and the

13  foreperson will say I shall speak for the jury.  At that time she will

14  indicate that the verdict sheet, it's desired for review by the Court.

15  The foreperson of the jury will give her the verdict sheet.  It will

16  be brought to me.  I will look at it.  Then I will hand it back to her

17  and she'll hand it back to your foreperson and then she will call for

18  a rendering of the verdict on the charges in this case.

19          Counsel, if you will approach the bench, please?

20          (Bench conference:)

21          THE COURT:   Any objections have been preserved and

22  exceptions to the instructions.  I just call people up to make sure

23  there haven't been any mistakes or additional objections from my

24  reading of the instructions.

25          MR. PURCELL:   No objections, Your Honor.

1    THE COURT:   Any objection?  Any further objection?

2    MR. PURPURA:   No.  Thank you.

3    THE COURT:   All right.  You all may return.

4    MR. PURPURA:   Judge, two quick questions.  The alternates,

5  you're going to --

6    THE COURT:   What I'm going to do is I'm going to tell the

7  alternates to stand by and they're not dismissed yet and they must

8  stand by and remain on call until the conclusion of the case and tell

9  them that they should not listen to any press reports about the case.

10  That the deputy clerk of court will contact them if they need, if

11  there are any further services needed, that they're absolutely to

12  stand by as alternates and that they absolutely cannot, you know,

13  they're admonished not to read any press reports about the case, any

14  radio or television commentary and that they should just tell their

15  family members just to seal themselves off and await further contact

16  from the Court until there's a conclusion of the case.

17    MR. PURPURA:   And the last question is you initially told

18  the jury they were not sitting on Friday.  I would hope they're --

19    THE COURT:   They're going to deliberate tomorrow.

20    MR. PURPURA:   Good.

21    THE COURT:   I'm going to tell them that they're going to

22  deliberate tomorrow.  That's right.  I told them they wouldn't.  But I

23  think they should understand now they're not going to have three days

24  off before they come back to deliberate.

25    MR. PURPURA:   Sounds good to us, judge.  Thank you.

1            THE COURT:   All right.

2            (In open court:)

3            THE COURT:   All right.  Now, ladies and gentlemen, a few

4    housekeeping matters.  First of all, as to the four alternates, you

5    all are not dismissed yet at this time.  You will not be part of

6    deliberations obviously.  But as to the four alternates, I want to

7    thank you first of all for your service.  As you heard me mention back

8    on March the 23rd when the other persons were not selected, the other

9    potential jurors, I indicated that this Court is very much involved in

10   international exchanges with other courts around the world.  In fact

11   I'll be leaving for Russia in about three weeks with two state judges

12   and we're part of an exchange program and the Russian judges will be

13   here in September and the jury system is our greatest hallmark of our

14   judicial system and it is revered and modeled by many countries around

15   the world.  Some of our greatest critics still marvel at our jury

16   system.  So you have been part of a very important process here over

17   several weeks.  But you're now going to be excused, but you're not

18   dismissed yet.  You are to stand by and to remain on call in the event

19   that you would be needed to come back.  So it is very important that

20   you not listen to any television or radio coverage about this case,

21   that you not read any newspapers.  As tempting as it will be, you are

22   not to discuss it with family members and if family members say well,

23   how did it go, you're not with the jury deliberating now, you have to

24   say don't talk to me about it, I've still got this protective cocoon

25   around me and you can't talk to them about it at all until the Court

1    provides me further notice and the Court will then be getting back in

2    contact with you with respect to whether the case is concluded or not.

3    So I want to thank you sincerely for your service in that regard.

4    Madam Clerk, with respect to certificates, they will --

5              THE CLERK:   We mail them.

6              THE COURT:   They will be mailed as well.  And once again,

7    obviously, your identities are known only to me and to the clerk of

8    the court and remain confidential.  But your juror certificates as a

9    token of our appreciation will be mailed to you.  But again Ms. West

10   will be back in touch with you.  But I can't emphasize enough it's

11   very important that you remain on standby in the event that one of the

12   12 jurors will be taken ill suddenly or something, we would need to

13   call an alternate juror back and the lawyers in the case both the

14   government and the defense feel very strongly about that and I'm going

15   to make sure you understand, you need to stand by just in the event

16   you need to be called back.  So with that, you are excused.  And hold

17   on just one second.  Counsel, approach the bench one second, please.

18             (Bench conference:)

19             THE COURT:   With respect to the four alternate jurors,

20   they're going to be escorted back to their cars by the marshal

21   service.  But because of certain security considerations, there's been

22   some suggestion by the marshals that they need to go into the jury

23   room with the 12 jurors.  They can't do that.  Once the jury is sworn,

24   only those 12 jurors go back in the jury room.  So you're going to

25   need to --

1          THE CLERK:   I can put them in Judge Garbis' jury room.

2          THE COURT:   That's fine.  That's what you'll do.  You'll

3   take the four jurors, the alternates, have them stay in Judge Garbis'

4   jury room and that will need to be done before the bailiff is sworn.

5   How long will it take to do that now?

6          THE CLERK:   They got to get their lunches out of there and

7   their personal belongings out of there.

8          THE COURT:   All right.  Then that's what we're going to do.

9   We're going to hold for a minute and we're going to have them go get

10  their lunches and personal belongings and then they can go out the

11  door in the hallway and go to another jury room.

12         THE CLERK:   Right.

13         THE COURT:   So we're just going to stand fast for a minute

14  and we're going to do that before we swear the bailiff.

15         (In open court:)

16         THE COURT:   All right.  Ladies and gentlemen, as to that,

17  your lunches however have arrived and you four are going to take steps

18  now for you all to secure your personal belongings and if you'll go

19  with Ms. West.  Everyone wait for a minute until Ms. West comes back.

20  As with many things, nothing else is going to happen until Ms. West

21  comes back here.  All right.  You four, thank you.  Alternate Number

22  1, 2, 3 and 4, thank you very much.

23         I will tell you, ladies and gentlemen, while we're waiting

24  for Ms. West that I think it probably should be obvious to you that

25  unlike the other previous weeks we have not been sitting on Fridays

1   taking testimony, your deliberations will start today and if you need

2   to come back tomorrow, whatever.  So deliberations start now and

3   continue and then go at a pace as you desire.  But it is Friday is no

4   longer an off day.  There are no off days once you start deliberating.

5   You just let me know what you want to do and we can talk about that

6   later.  Counsel, if you'll approach the bench for one second while

7   we're waiting?

8            (Bench conference:)

9            THE COURT:   What my thought is on today's deliberations is

10  that once they start to deliberate, they'll have lunch, they

11  deliberate.  Around 6:00 it would be my intention, 5:30, 6:00 would be

12  my intention to send them in a note indicating that -- they certainly

13  can continue to deliberate, but they certainly can go home and come

14  back the next day.  That's how I normally handle it.  I don't tell

15  them that until 5 or 5:30.  I would not intend to keep them past 5:30.

16  Is that agreeable to the government?

17           MR. PURCELL:   Yes, sir.

18           THE COURT:   Is that agreeable with the defense?

19           MR. PURPURA:   Fine.

20           THE COURT:   All right.  So I won't tell them that now.  But

21  around 5 or 5:30, I'll indicate to them you're free to go and come

22  back again tomorrow and they just take the same steps that they

23  normally do.

24           MR. PURCELL:   Just you might want to make it clear to them

25  you don't mean Saturday and Sunday.

1          THE COURT:   No.  I'm going to let them know that we -- I

2    don't need to say that to them yet.  I'll just wait and see, you know.

3    I'm not going to address the matter of the weekend, Mr. Purcell,

4    because that implies they need to -- just let them do what they're

5    going to do and then I will make sure they know they come back and

6    then if for some reason they deliberate all day Friday and haven't

7    reached a verdict, then I will tell them they're excused for the

8    weekend and have them come back Monday morning.

9          (In open court:)

10          THE COURT:   All right.  With that, Ms. West will swear the

11    bailiff.  The bailiff will come forward, please.

12          (Bailiff sworn.)

13          THE COURT:   All right.  Ladies and gentlemen, you may now

14    begin your deliberations.  You'll be sent a copy of the tape recording

15    of my instructions in case you want to listen to them again as well as

16    a copy of the written instructions and the verdict sheet and the

17    exhibits will be brought in to you and with that, you all may begin

18    your deliberations.

19          (Jury excused.)

20          THE COURT:   All right.  Just with that, I want to compliment

21    the lawyers on a vigorously tried case and the lawyers were very

22    professional and I want to also note that we scheduled this case back

23    on March of 2008 and stayed right with the schedule right along the

24    way and exactly a year later, this case was tried right on time and I

25    want to compliment both the government lawyers and the defense

1   lawyers, court-appointed counsel in this case for a very vigorous

2   presentation on both sides and I want to compliment the lawyers for

3   their professionalism and their hard work in this case and we are

4   right on schedule now.  It's very important to keep this case on

5   track, important to the defendants and for the government obviously

6   and to everyone involved.  So with that, I compliment the lawyers.

7   Everyone needs to just stand by.  Is there anything further from the

8   point of view of the government?

9              MR. PURCELL:   No.  Thank you, Your Honor.

10             THE COURT:   Anything further from the point of view of

11  defense counsel?

12             MR. PURPURA:   No.  Thank you.

13             MR. DAVIS:   No, Your Honor.

14             THE COURT:   All right.  This Court stands in recess awaiting

15  the return of the jury.

16             (Proceedings concluded.)

17

18  I, LISA K. BANKINS, certify that the foregoing is
    a correct transcript from the record of
19  proceedings in the above-entitled matter.

20

21  _____          _____
    Signature of Court Reporter/                    Date
22  Transcriber

23

24  _____
    Typed or Printed Name
25

**$**

$2300 [4]  657/12 664/25 678/15 678/22

**.**

.40 [4]  739/9 740/14 742/2 742/16
.44 [4]  652/12 652/19 652/20 652/21
.44s [1]  652/19
.647 [1]  643/4
.683 [1]  643/5

**0**

056 [1]  641/3

**1**

101 [1]  642/1
10th [1]  641/24
1111 [9]
12 [7]
12th [1]  669/23
13333 [2]  739/10 742/3
15 [2]  652/1 652/4
15-year-old [3]  652/3 652/3 656/20
1512 [3]  723/2 723/14 728/16
16 [3]  641/5 647/11 652/4
163 [1]  653/19
17 [1]  652/4
175 [1]  653/19
18 [31]
1958 [2]  713/7 713/22

**2**

20 [1]  665/16
20001 [1]  641/21
20004 [1]  641/25
2004 [3]  681/10 708/7 708/24
2006 [11]
2007 [14]
2008 [1]  757/23
2009 [3]  641/5 675/6 675/21
20th [1]  661/23
21 [7]
21201 [3]  641/16 641/19 642/2
23rd [4]  686/4 692/14 693/1 753/8
25 feet [1]  676/9
26th [2]  649/21 654/1
27th [1]  649/22
28th [1]  649/22
2nd [1]  657/10

**3**

300 [1]  641/21
3000 [1]  675/22
304 [1]  668/10
30th [1]  649/22
31st [1]  649/21
34 [1]  710/19
343 [2]  657/2 668/5
35 [1]  650/21
36 [2]  641/15 644/3
393 [1]  656/22
3:46 [1]  651/13

**4**

400 [1]  641/20
408 [2]  653/18 653/18
4th [1]  680/17

**5**

5'2 [3]  682/2 682/6 682/8
5'8 [1]  682/3
514 [1]  641/24
5515 [1]  642/2

5:30 [4]  756/11 756/15 756/15 756/21
5th [1]  651/5 661/4

**6**

6'3 [1]  682/11
6:00 [2]  756/11 756/11

**7**

7th [3]  653/24 661/5 669/24

**8**

81 [1]  743/16
82 [1]  743/18
841 [2]  743/19 743/20
846 [6]
8:45 [1]  657/10

**9**

922 [4]  723/20 724/12 739/11 739/12
924 [11]
9:30 [1]  641/6

**A**

a.m [1]  641/6
abet [3]  711/19 731/13 738/16
abets [1]  711/7
abetted [1]
abetting [8]
abettor [4]  712/13 712/15 737/9 737/14
abettors [2]  738/4 738/16
ability [4]  698/16 702/22 704/12 744/15
able [5]
about [145]
above [1]  758/19
above-entitled [1]  758/19
absolutely [3]  645/10 752/11 752/12
accept [12]
accepted [2]  687/4 687/9
accident [5]
accomplice [4]  700/13 700/18 700/22
 701/15
accomplices [3]  700/20 701/5 701/6
accomplish [3]  717/14 718/22 719/8
accomplished [2]  718/20 744/6
accomplishment [1]  722/7
accordance [1]  689/18
accorded [1]  687/20
according [1]  728/9
Accordingly [5]
account [2]  698/13 704/25
accuracy [1]  704/2
accurate [4]  682/10 698/13 698/23
 704/16
accurately [1]  698/6
accusation [1]  689/22
accused [2]  728/12 750/24
acknowledged [1]  680/10
acquiescence [2]  712/4 721/25
acquit [1]  690/9
acquittal [1]  689/9
act [22]
acted [12]
action [5]
actions [3]  712/11 719/3 719/5
activities [2]  720/17 745/15
activity [2]  700/17 718/6
actors [1]  711/2
acts [10]
actual [7]
actually [19]
addicted [1]  702/14
addition [2]  704/16 707/5
additional [1]  751/23

address [8]
addresses [2]  697/11 697/11
adjustment [1]  644/3 644/4
admissibility [2]  688/6 688/9
admissible [1]  688/1
admissions [1]  710/20
admitted [2]  660/18 708/13
admonished [1]  752/13
admonitions [1]  645/11
advance [2]  733/1 746/18
advances [1]  705/2
advantage [1]  716/21
adverse [1]  696/5
advise [1]  751/8
advised [4]  722/11 729/12 735/23 738/23
affect [4]  674/6 698/8 739/15 747/8
affected [1]  705/10
affecting [4]  739/10 739/23 741/19 741/21
aforethought [13]
after [45]
afterwards [1]  664/24
again [25]
against [15]
age [1]  688/16
agents [1]  675/8
ago [4]  670/18 671/14 672/14 720/2
agree [12]
agreeable [6]
agreed [6]
agreeing [1]  746/1
agreement [26]
agreements [2]  662/16 662/19
AH [2]  739/10 742/3
AH-13333 [2]  739/10 742/3
aid [4]  695/12 711/19 731/13 738/16
aided [12]
aider [4]  712/13 712/15 737/9 737/14
aiders [2]  738/4 738/15
aiding [9]
aids [1]  711/7
aims [2]  720/6 721/20
Albert [13]
alibi [1]  681/22
all [145]
alleged [15]
alleges [6]
alley [2]  649/8 662/2
allow [4]  681/6 682/22 688/19 747/11
allowed [6]
allowing [1]  660/21
allows [2]  647/21 700/18
almost [3]  656/12 676/20 682/5
alone [13]
along [6]
already [4]  652/18 671/17 688/8 747/16
also [30]
alternate [7]
alternates [6]
although [4]  689/21 721/22 744/3 744/19
always [3]  669/20 699/6
am [1]  684/9
ambit [1]  721/4
AMERICA [2]  641/3 687/19
among [1]  694/25
analysis [3]  666/4 691/21 691/21
analyzing [1]  695/21
anger [1]  700/6
angle [1]  658/2
another [44]
answer [5]
answered [2]  652/8 652/9
answering [1]  666/18
answers [10]

## A

anxious [1] 682/13
any [152]
anybody [8]
anymore [1] 664/16
anyone [3] 674/16 728/22 728/23
anything [23]
anyway [4] 653/8 660/14 677/1 680/25
appealed [1] 706/7
appear [2] 692/10 698/4
appearance [1] 728/17
APPEARANCES [1] 641/13
appears [1] 748/6
application [1] 673/3
apply [6]
appointed [1] 758/1
appreciation [1] 754/9
approach [3] 751/19 754/17 756/6
appropriate [1] 718/4
April [1] 641/5
apt [1] 644/9
arbitrarily [1] 728/7
are [147]
area [2] 680/10 681/14
argue [1] 705/21
argues [2] 700/14 700/16
argument [8]
arguments [9]
around [11]
arrange [1] 658/25
arranging [1] 668/4
array [1] 678/8
arrest [5]
arrested [3] 659/20 660/19 661/23
arrive [1] 689/7
arrived [1] 755/17
as [284]
ask [23]
asked [23]
asking [4] 656/2 658/9 666/11 683/14
asks [1] 696/19
aspect [5]
assembled [1] 721/20
assist [3] 674/25 681/13 707/10
assistance [1] 695/21
assisted [1] 722/11
associate [7]
associated [2] 728/24 744/25
association [2] 648/14 721/16
assume [3] 693/2 693/3 693/10
assumed [2] 693/25 694/4
assumes [1] 693/22
assuming [1] 657/3
at [79]
attach [1] 696/4
attached [1] 710/8
attack [2] 660/10 706/19
attempt [1] 692/3
attempted [3] 716/3 726/14 745/10
attention [5]
attitude [1] 687/14
attorney [7]
Attorney's [1] 641/14
attorneys [3] 655/8 687/24 696/9
audacity [1] 681/23
audience [1] 677/10 677/14
August [3] 649/21 654/1 654/1
August 26th [2] 649/21 654/1
authorities [1] 709/23
automatic [4] 739/9 740/15 742/2 742/16
automatically [1] 721/17
Avenue [1] 681/9

avoid [1] 668/12
awaiting [1] 707/6
awaiting [1] 758/14
aware [2] 720/16 727/12
awareness [1] 720/5
away [3] 658/18 676/9 681/20
awful [1] 652/2

## B

baby [1] 679/3
back [42]
bad [8]
bailiff [6]
balance [1] 710/17
BALAREZO [6]
ball [3] 683/5 683/5 683/6
Baltimore [10]
bank [1] 744/19
Bankins [2] 642/1 758/18
bar [1] 687/22
barely [2] 646/24 666/2
base [3] 663/20 663/21 685/17
based [14]
basic [2] 667/1 720/6
basically [6]
basing [1] 666/10
basis [9]
Bates [4] 670/3 670/4 675/11 676/25
be [207]
bear [5]
bearing [1] 720/21
became [4] 717/10 719/12 729/10 735/21
because [67]
become [1] 720/14
becomes [2] 722/13 750/5
beef [1] 663/15
been [74]
before [45]
began [2] 655/24 690/14
begin [5]
beginning [3] 655/2 683/4 692/15
begins [1] 644/21 690/8
behalf [1] 643/4
behavior [2] 700/17 745/8
behind [2] 658/4 683/5
being [20]
belief [1] 704/6
believability [1] 686/1
believable [2] 697/9 702/21
believe [28]
believed [3] 701/7 710/4 710/7
believes [1] 688/1
believing [1] 673/4
belongings [3] 755/7 755/10 755/18
bench [8]
benefit [6]
benign [1] 657/23
BENNETT [5]
best [3] 649/2 669/18 701/9
better [3] 652/6 652/6 695/13
between [17]
beyond [59]
bias [6]
biased [1] 700/7
biblical [1] 661/9
big [3] 650/7 655/19 682/8
bill [2] 666/15 666/17
billed [1] 666/16 666/17
billing [2] 666/8 666/14
binding [1] 687/9
bit [4] 646/2 646/24 656/7 673/5
Bitches [1] 678/19
Blake [1] 644/19

blatant [1] 676/9
block [1] 681/10
blocked [1] 646/25
Blood [8]
bloodness [1] 679/3
Bloods [2] 678/18 679/5
bloody [1] 677/17
blow [2] 645/25 667/15
blowup [3] 653/17 653/18 657/1
blue [1] 659/17
blur [1] 683/24
borrowed [1] 658/24
both [12]
box [3] 659/11 669/13 744/19
boxes [2] 654/20 654/24
braids [2] 681/24 681/25
Brazy [2] 651/22 668/7
break [10]
breakdown [3] 749/17 749/20 749/22
breaking [4] 726/2 733/10 741/13 747/2
briefing [1] 644/16
bring [5]
bringing [1] 665/24
broader [1] 663/20
broken [1] 659/23
brother [1] 680/9
brought [10]
BRYAN [2] 641/15 666/11
building [1] 674/10
burden [26]
burner [1] 651/11 660/16 668/8
business [4] 670/11 670/24 672/3 719/19
businessman [2] 648/22 648/24
businessmen [2] 648/22 648/22
but [116]
button [1] 647/8
buying [1] 651/11
BYERS [137]
Byers' [12]

## C

caliber [4] 739/9 740/14 742/2 742/16
call [27]
called [28]
calling [14]
calls [26]
came [8]
can [42]
can't [33]
candid [1] 697/23
cannot [8]
car [7]
care [19]
careful [2] 684/24 690/11
carefully [3] 684/18 697/18 748/6
carelessness [1] 712/20
cares [1] 674/6
Carl [32]
Carlson [1] 707/4
Carlyle [1] 708/6
carried [3] 731/8 732/13 737/11
carries [2] 730/25 735/8
carry [2] 715/18 729/25
carrying [4] 668/6 700/11 735/10 736/12
cars [1] 754/20
Carwash [1] 670/17
case [109]
cases [6]
caught [5] 651/12 651/19 651/20 676/16
cause [13]
caused [5]
causes [1] 736/22

Case 1:08-cr-00056-RDB    Document 393    Filed 01/14/10    Page 121 of 131

# C

causing [5]
caution [6]
cell [6]
cellular [2]  713/24 714/11
certain [10]
certainly [4]  646/3 684/9 756/12 756/13
certainty [1]  691/11
certificates [2]  754/4 754/8
certify [1]  758/18
chance [1]  677/15
change [3]  655/5 668/16 748/5
changed [2]  654/8 710/20
changes [2]  654/16 657/6
changing [1]  659/24
character [3]  708/13 709/7 722/10
characteristics [2]  673/3 708/17
characterized [1]  719/1
charge [9]
charged [82]
charges [29]
charging [2]  664/17 749/21 750/1
charisma [1]  646/4
Charles [1]  641/15
charts [3]  695/11 695/16 695/20
Chasanow [1]  644/19
cheated [2]  694/5 694/7
cheating [1]  694/3
checked [1]  644/18
chemical [1]  691/21
children [1]  649/11
Childs [2]  654/2 654/7
chip [1]  651/11
choice [2]  648/17 668/21
choose [2]  698/6 699/25
CHRISTOPHER [1]  641/23
chronology [3]  654/22 655/1 655/2
circumstances [5]
circumstantial [10]
city [6]
civil [1]  728/17
civilized [2]  647/20 674/6
claims [2]  709/24 709/25
clean [1]  690/8
clear [8]
clerk [4]  751/9 752/10 754/4 754/7
client [1]  688/5
Cliftview [2]  658/1 658/3
clip [4]  660/25 660/25 660/25 660/25
clips [1]  661/1
clock [1]  683/5
close [4]  684/15 684/21 700/9 744/23
closely [1]  702/3
closing [2]  658/9 686/4
co [1]  720/9
co-conspirators [1]  720/9
cocoon [1]  753/24
Code [32]
codes [1]  659/23
coincidentally [1]  658/24
Coleman [13]
Coleman's [1]  681/15
colleague [1]  647/14
colleagues [1]  644/18
collective [1]  718/5
color [2]  659/23 701/13
colored [3]  702/4 705/10 706/21
combination [2]  717/13 717/23
combinations [1]  693/9
combine [3]  713/21 723/13 734/23
combined [1]  658/11
come [24]

comes [9]
comfortable [1]  669/8
comment [1]  657/25
commentary [1]  752/14
commerce [23]
commission [45]
commit [1]
committed [45]
committing [9]
common [11]
commonly [3]  733/9 741/12 746/25
communicate [5]
communicates [1]  748/15
communication [20]
communications [1]  707/6
community [1]  687/16
compare [1]  698/1
competency [1]  651/3
complain [1]  651/3
complete [3]  646/8 687/14 699/21
completely [2]  666/7 698/13
completion [6]  645/16 645/19 645/19
compliment [4]  757/20 757/25 758/2
  758/6
comply [1]  701/20
component [3]  650/8 678/16 679/2
conceal [1]  653/25
concept [1]  744/2
concepts [1]  744/4
concern [4]  687/16 692/5 692/5 747/4
concerned [2]  674/4 685/14
concerning [1]  687/5
concerns [1]  706/5
conclude [4]  693/10 696/14 709/8 747/3
concluded [2]  754/2 758/16
conclusion [6]
concrete [1]  745/18
condemning [2]  648/13 658/13
conditions [1]  723/6
conduct [16]
confederate [1]  734/23
conference [4]  688/7 751/20 754/18
  756/8
conferences [1]  688/3
confessing [1]  668/22
confidential [1]  754/8
confirmed [4]  665/5 665/6 665/6 665/7
conflicts [2]  685/23 705/25
confronted [2]  665/12 702/6
Congratulations [1]  650/7
Congress [1]  718/3
connect [2]  659/17 714/11
connected [1]  680/2
connection [8]
conscientious [1]  748/8
conscious [2]  728/13 748/10
consciously [2]  698/12 727/7
consider [54]
consideration [20]
considerations [4]  691/6 701/1 707/14
  754/21
considered [6]
considering [7]
consistency [1]  706/7
consistent [2]  698/2 709/24
consists [2]  686/12 694/9
conspiracies [2]  729/11 735/23
conspiracy [79]
conspiracy's [2]  720/20 721/9
conspirator [1]  720/3
conspirator's [2]  720/11 720/22
conspirators [3]  718/17 720/9 720/25
conspire [7]

conspired [3]  744/8 745/20 745/25
conspiring [2]  735/21 741/5
constitute [1]  745/17
constitutes [1]  715/12
Constitution [1]  695/24
constructive [2]  744/21 745/10
consult [1]  747/25
contact [12]
contacts [7]
contained [2]  694/1 695/18
contains [1]  690/19
context [1]  719/3
continue [5]
continuing [1]  710/25
contraband [1]  670/7
contract [2]  664/23 665/1
contradict [1]  698/3
control [16]
controlled [13]
controls [1]  748/15
convenience [2]  680/6 748/16
conversation [3]  651/25 657/6 659/4
conversations [6]
conversing [1]  656/24
converted [3]  732/17 740/16 746/9
convict [8]
convicted [12]
convicting [1]  693/17
conviction [4]  700/20 728/14 740/7
  748/10
convictions [2]  705/15 748/9
convince [1]  673/11
convinced [3]  690/10 690/17 704/3
convinces [1]  703/11
convincing [1]  648/6
cooperate [2]  655/24 718/22
cooperation [2]  662/22 703/8
copies [1]  644/8
copy [11]
core [1]  679/9
corner [2]  674/8 680/5
Cornish [19]
Cornish's [1]  655/22
correct [5]
correctly [1]  695/18
correctness [1]  703/25
corroborate [1]  680/6
corroborated [2]  652/21 680/7
corroborates [1]  652/25
corroborative [1]  657/24
corrupt [1]  726/14
could [13]
couldn't [2]  653/11 664/17
counsel [18]
count [157]
counted [1]  664/25
countries [1]  753/14
counts [29]
county [3]  651/16 651/16 664/3
couple [6]
coupled [1]  712/2
course [27]
court [54]
court-appointed [1]  758/1
court-ordered [1]  666/13
courthouse [3]  674/9 692/25 693/2
courtroom [11]
courts [1]  753/10
cousins [1]  672/14
cover [3]  661/22 672/11 672/22
coverage [1]  753/20
covered [1]  743/17
crap [1]  660/11

Case 1:08-cr-00056-RDB   Document 616393   Filed 01/14/10   Page 122 of 131

## C

create [2]  661/24 662/1
creates [1]  705/2
credence [1]  701/14
credibility [16]
crime [106]
crimes [21]
criminal [19]
critics [1]  753/15
cross [3]  648/12 693/21 698/2
cross-examination [2]  693/21 698/2
cross-examining [1]  648/12
crossed [1]  715/14
crosses [1]  715/10
crucial [1]  688/25
crystal [1]  682/13
crystallizing [1]  650/9
currency [2]  714/5 714/18
custody [4]  744/11 744/14 744/16 744/20

## D

D.C [2]  641/21 641/25
dad [1]  650/7
damned [4]  648/10 648/10 650/15 650/16
Darling [2]  658/1 658/4
date [83]
dated [1]  750/4
dates [5]
David [1]  707/6
DAVIS [5]
day [39]
days [12]
dead [2]  673/14 675/15
deal [6]
dealer [3]  648/24 672/11 672/12
dealt [1]  649/12
death [22]
decide [20]
decided [2]  688/4 748/11
deciding [14]
decision [10]
decision-making [1]  688/21
deduction [1]  696/22
deemed [2]  718/3 719/21
defaults [1]  672/9
defeated [1]  673/13
defendant [218]
defendant's [22]
defendants [67]
defendants' [2]  738/5 738/14
defense [32]
define [1]  744/2
defined [13]
defines [2]  726/23 736/25
defining [1]  744/3
definition [3]  733/14 745/19 746/20
degree [9]
delay [1]  725/24
deliberate [14]
deliberated [2]  727/21 728/4
deliberately [6]
deliberating [5]
deliberation [2]  683/3 727/22
deliberations [19]
deliver [3]  745/9 745/10 745/12
delivering [1]  745/17
demeanor [1]  698/20
denials [2]  661/9 661/9
denied [3]  665/20 669/23 669/23
denies [2]  661/8 693/23
deny [6]
denying [1]  661/10

depend [1]  697/22
depending [1]  725/23
depends [3]  654/13 704/7 728/20
deposit [1]  744/19
deputy [2]  751/8 752/10
described [5]
deserve [1]  708/2
deserves [6]
deserving [1]  706/17
design [2]  719/6 728/8
designed [4]  728/16 732/16 740/16 746/8
desire [1]  756/3
desired [1]  751/14
desperately [2]  677/14 682/13
detail [4]  699/8 699/15 706/6 718/19
details [2]  720/18 721/9
detective [20]
detectives [5]
determination [4]  674/22 675/1 706/3
707/20
determine [14]
determined [2]  685/25 695/7
determining [6]
developed [1]  688/13
deviated [1]  727/11
devised [2]  728/22
did [83]
didn't [29]
died [1]  738/10
differ [1]  728/9
difference [1]  667/8
different [12]
differently [2]  666/7 699/4
differs [1]  748/8
difficulty [1]  644/25
direct [15]
direct-connect [1]  714/11
directed [2]  686/16 686/17
directory [7]
dirty [1]  678/21
discharge [1]  729/25
discharged [5]
discharges [2]  730/25 735/8
discharging [2]  735/10 736/12
discovery [1]  655/9
discredit [1]  699/3
discrepancies [1]  699/1
discrepancy [2]  699/6 699/8
discs [1]  655/9
discuss [8]
discussed [4]  669/15 669/15 683/18
721/20
discussion [2]  661/17 748/5
dismiss [2]  664/4 703/4
dismissed [6]
disobey [3]  712/1 712/25 718/24
disputed [2]  692/23 696/14
disregard [5]
disregarded [1]  694/23
disrespect [1]  683/20
distinct [2]  717/21 720/24
distinction [1]  693/15
distracted [2]  654/18 654/24
distraction [1]  654/25
distribute [15]
distributed [1]  745/24
distribution [5]
district [13]
divert [1]  710/2
DIVISION [1]  641/2
DNA [1]  707/4
DNR [2]  666/7 666/13
do [112]

document [1]  669/21
documents [11]
does [30]
doesn't [22]
doing [11]
dominion [2]  732/23 746/14
don't [58]
done [22]
door [2]  670/15 755/11
doubt [59]
down [13]
downtown [1]  657/12
dragged [1]  649/23
dramatic [1]  675/14
draw [11]
drawing [2]  696/20 696/25
drawn [5]
dreamed [1]  672/13
dripping [2]  693/5 693/6
drone [1]  646/5
drove [1]  655/25
drug [26]
drugs [17]
due [1]  713/1
dug [1]  649/23
duration [9]
durations [1]  666/5
during [17]
duty [14]

## E

each [69]
earlier [8]
early [1]  671/13
earth [2]  661/13 673/14
easel [1]  646/23
easier [1]  662/13
east [2]  641/18 677/18
easy [1]  670/25
economic [1]  716/21
edited [1]  667/20
EDUARDO [1]  641/20
education [1]  666/2
effect [6]
effort [1]  651/10
ego [2]  645/25 683/24
eight [2]  656/18 659/2
either [14]
electrical [2]  666/1 666/2
element [40]
elements [25]
eloquence [1]  646/4
else [19]
Embrace [1]  672/21
embraces [1]  672/11
emphasize [2]  693/20 754/10
employed [1]  706/14
encounter [1]  661/3
end [5]
endearing [1]  649/10
enforcement [25]
engage [2]  708/16 746/2
engaged [2]  708/4 722/11
engineer [1]  666/1
engineering [1]  666/3
enlargement [1]  663/20
enough [4]  666/18 672/19 700/20 754/10
enter [4]  684/13 703/9 747/5 747/14
entered [6]
entering [1]  703/2
enterprising [1]  648/25
entertain [2]  669/3 748/7
entire [4]  661/2 679/21 696/2 729/15

# E

entirely [2] 694/23 717/21
entitled [7]
entitles [1] 687/19
equal [1] 721/1
equally [3] 687/16 688/19 738/25
equals [1] 687/22
equation [1] 657/7
erroneous [1] 748/6
error [2] 699/9 743/15
escorted [1] 754/20
ESQUIRE [6]
essence [1] 717/22
essential [5]
essentially [2] 657/23 680/20
establish [11]
established [8]
establishes [2] 691/13 700/21
establishing [1] 709/16
evade [1] 668/12
evaluate [2] 674/23 681/13
evaluating [3] 704/24 705/6 705/16
evaluation [2] 664/14 700/4
evasive [1] 697/25
even [25]
event [1]
events [5]
ever [8]
every [11]
everybody [3] 674/17 678/19 683/12
everyday [1] 744/17
everyone [5]
everything [9]
evidence [155]
evident [1] 684/21
evil [1] 727/14
evolving [1] 659/24
exact [2] 667/18 691/11
exactly [10]
examination [3] 693/21 698/1 698/2
examine [2] 703/17 707/23
examined [2] 702/2 702/17
examiner [3] 707/3 707/4 707/4
examining [1] 648/12 704/21
example [8]
exceeded [1] 661/8
exceeding [5]
excellent [3] 650/18 678/6 678/10
except [6]
exceptions [1] 751/22
exchange [3] 703/5 747/22 753/12
exchanged [1] 716/18
exchanges [1] 753/10
exciting [1] 682/20
excluded [1] 668/2
exclusion [1] 667/24
exclusive [3] 685/20 686/20 687/1
exclusively [3] 688/22 706/8 747/7
exculpated [1] 710/1
excused [7]
execution [2] 695/4 728/11
exercise [6]
exercises [1] 744/20
exhaustively [1] 747/16
exhibit [9]
exhibits [15]
exist [1] 680/15
existed [5]
existence [6]
exists [2] 696/14 696/15
exonerated [1] 710/1
expect [1] 699/16

expel [3] 732/17 740/17 746/9
expelement [1] 709/9
experienced [1] 707/9
expert [9]
expert's [1] 707/12
experts [1] 707/3
explain [10]
explained [8]
explaining [2] 660/17 679/10
explanation [16]
explanations [2] 662/9 698/20
explicit [1] 720/12
exploited [2] 652/7 679/3
explosive [3] 732/18 740/17 746/10
express [3] 698/16 707/7 718/16
expression [1] 704/6
extent [3] 705/9 720/21 720/23
eye [2] 678/12 683/4

# F

fabricate [1] 662/6
face [1] 697/13
facilitate [2] 715/18 716/4
facilities [4] 716/7 716/7 716/11 718/13
facility [24]
facing [4] 650/21 664/5 670/16 676/15
fact [41]
factor [2] 705/6 719/24
factors [2] 721/22 745/1
facts [28]
factual [3] 685/19 686/9 697/13
fail [1] 711/24
failed [3] 699/11 737/21 742/23
failing [1] 701/20
fails [2] 690/13 747/18
failure [4] 699/5 699/23 711/24
fairly [1] 700/3
fairness [2] 687/5 687/14
faith [1] 687/8
faithfully [1] 684/20
falls [3] 675/13 691/3 733/13
false [5]
falsehood [2] 699/9 699/24
falsely [5]
falsify [1] 702/7
familiar [1] 661/5
family [8]
far [5]
fashion [2] 656/12 678/18
fast [1] 755/13
faster [1] 660/21
Fat [1] 653/22
father [5]
fault [1] 666/20
faulting [1] 669/16
favorable [2] 701/8 703/16
fear [2] 689/6 728/21
features [1] 714/11
federal [33]
feds [1] 651/14
feedback [1] 645/24
feel [3] 708/1 709/2 754/14
feelings [2] 688/15 688/19
feels [1] 692/22
feet [1] 676/9
fellow [5]
felon [3] 705/17 725/19 726/6
felony [2] 680/16 740/7
few [9]
field [1] 707/10
fifteen [1] 710/16
fifteen-minute [1] 710/16
Fifth [1] 641/20

fight [1] 679/9
figure [2] 656/8 656/16
figured [2] 656/8 656/16
finagle [1] 649/3
final [6]
finally [17]
financial [1] 719/23
find [70]
finding [3] 687/1 687/12 721/6
finds [2] 700/15 700/21
fine [8]
fingerprint [1] 691/21
fingerprints [4] 662/1 662/2 692/3 692/4
finish [2] 646/6 751/5
firearm [95]
firearms [7]
first [42]
first-degree [1] 664/19
five [3] 670/18 672/14 676/17
fix [1] 678/25
fixed [1] 728/8
flagged [1] 684/20
flip [1] 662/21
Floor [2] 641/16 641/24
Florida [1] 665/24
focus [2] 667/21 683/3
folks [2] 651/7 651/8
follow [1] 685/11
followed [1] 684/21
following [12]
follows [11]
forbidden [1] 750/18
forbids [1] 712/24
force [2] 650/9 650/9
foregoing [1] 758/18
foreign [1] 739/24
forensic [1] 707/5
foreperson [12]
forget [2] 680/8 681/19
form [4] 670/20 748/16 748/18 751/5
formal [1] 718/16
formalized [1] 644/8
forming [1] 728/11
forms [2] 670/12 670/13
forth [11]
forthright [1] 697/23
fortress [1] 674/10
forward [3] 733/1 746/18 757/11
found [9]
four [13]
fourth [4] 641/16 715/4 727/17 737/17
frank [17]
free [3] 703/24 728/21 756/21
freedom [3] 687/6 702/6 703/15
Friday [3] 752/18 756/3 757/6
Fridays [1] 755/25
friend [2] 649/8 664/22
friendly [1] 721/18
friends [3] 674/8 676/21 676/21
front [3] 647/7 670/15 677/24
full [2] 699/20 721/9
fully [2] 720/17 728/13
fun [1] 665/18
function [3] 684/17 747/8 747/19
fundamental [1] 666/6
funny [3] 676/20 676/21 682/9
further [17]
furtherance [36]
furthering [4] 719/19 722/12 733/4 746/21
Furthermore [2] 720/19 730/7

# G

gain [1] 701/11

# G

game [2]  657/3 682/3
gamesmanship [1]  675/19
gangster [1]  679/3
Garbis' [2]  755/1 755/3
Gardner [2]  655/17 668/24
gather [2]  644/9 646/11
gave [8]
general [3]  693/15 701/1 745/19
generating [1]  666/8
gentlemen [9]
gestures [1]  680/24
get [43]
gets [2]  676/4 682/21
getting [10]
GIBLIN [2]  641/15 646/22
gift [3]  650/12 654/12 667/14
girlfriend [1]  671/19
give [29]
given [9]
gives [1]  654/14
giving [6]
glad [3]  649/16 663/15 669/19
glue [13]
glued [1]  649/25
go [29]
God [2]  655/10 655/19
goes [8]
going [55]
good [24]
GOODMAN [59]
Goodman's [5]
got [21]
gotten [1]  645/24
govern [1]  710/13
government [123]
government's [5]
Graham [7]
Graham's [1]  655/23
grand [4]  677/12 713/20 723/12 734/24
grant [2]  681/18 701/17
granted [2]  701/22 702/1
great [13]
greater [6]
greatest [2]  753/13 753/15
green [5]
grossly [1]  727/11
ground [1]  744/22
grounds [1]  706/20
guess [6]
guesswork [1]  696/21
guided [1]  688/24
guilt [19]
guilty [68]
gun [22]
gut [1]  670/18
guttural [1]  656/12
guy [39]
guys [13]

# H

had [81]
hadn't [1]  673/16
half [1]  669/16
hall [1]  675/7
hallmark [1]  753/13
hallway [1]  755/11
hammer [2]  655/11 655/12
hand [9]
handed [1]  745/13
handgun [4]  739/9 740/15 742/2 742/17
handily [1]  669/10

handle [3]  645/22 672/18 756/14
handled [1]  669/23
handy [1]  670/7
happen [2]  676/3 755/20
happened [8]
happens [4]  659/2 674/13 674/14 676/2
happy [4]  671/25 672/1 679/6
hard [2]  665/11 758/3
hardcore [1]  688/25
Harford [1]  658/2
has [78]
hasn't [1]  673/9
hatred [1]  727/15
have [231]
haven't [2]  751/23 757/6
having [6]
Haynes [8]
Haynes' [4]  649/5 651/19 661/17 672/11
he [305]
he'll [1]  650/24
he's [43]
head [3]  670/19 672/14 676/18
health [1]  645/9
hear [18]
heard [39]
hearing [2]  688/3 688/7
hears [3]  657/25 677/9 692/22
heaven [1]  654/12
height [2]  682/2 682/10
heights [1]  682/4
help [10]
helped [4]  655/6 655/6 733/1 746/17
helpful [5]
helping [2]  702/7 705/23
helps [1]  655/5
her [32]
here [54]
here's [3]  659/15 670/20 681/8
hereby [1]  695/5
herein [20]
heroin [9]
herself [2]  698/3 698/17
hesitate [3]  689/9 689/12 748/4
hey [2]  649/7 681/10
Hi [1]  676/18
hid [1]  683/5
hiding [1]  697/24
highlighting [1]  656/22
highly [1]  657/24
him [82]
himself [24]
hinder [1]  725/24
hire [10]
hired [1]  670/16
his [148]
history [1]  652/4
hit [1]  658/2
hold [3]  740/19 754/16 755/9
holds [1]  671/7
hole [1]  649/23
home [2]  668/4 756/13
homicide [1]  654/19
honestly [1]  660/18
Honor [7]
HONORABLE [1]  641/11
hook [1]  665/23
hope [5]
hoped [1]  701/7
hopes [1]  701/11
hoping [1]  668/20
hostile [1]  700/7
hostility [1]  698/11
hotel [1]  664/9

hour [1]  648/17
hours [2]  669/9 669/16
house [3]  656/17 670/19 671/11
housekeeping [1]  753/4
how [50]
however [31]
hug [1]  675/17
human [8]
Humes [2]  671/12 671/12
hundreds [2]  660/2 660/3
hypothetical [1]  679/22

# I

I'd [1]  650/17
I'll [27]
I'm [53]
I've [10]
idea [4]  649/11 650/24 665/18 680/12
identification [14]
identified [1]  674/19
identify [1]  678/9
identities [2]  720/16 754/7
identity [5]
idiot [1]  678/22
if [162]
ignorance [1]  712/19
ill [2]  727/15 754/12
illegal [1]  722/12
imagine [2]  652/14 652/14
immediately [2]  651/19 655/23
immunity [7]
immunized [1]  676/8
impartial [2]  690/11 698/14
impartiality [1]  687/14
impeach [1]  678/7
implicated [2]  651/20 671/1
implies [1]  757/4
importance [3]  697/11 697/21 699/7
important [26]
impose [1]  649/14
imposed [1]  747/12
imposes [1]  690/2
imposing [1]  747/6
impress [1]  678/23
impressed [1]  697/23
impressional [1]  678/23
imprisonment [9]
improper [3]  688/13 688/19 702/15
in [666]
inaccurate [1]  682/5
inadvertence [1]  713/2
incentive [1]  698/9
incident [1]  699/4
incidentally [3]  648/18 673/8 678/17
include [1]  686/15
included [1]  681/6
includes [1]  686/14
including [7]
Inconsistencies [1]  699/1
inconsistency [2]  699/22 706/5
inconsistent [5]
incorporated [13]
incorrect [1]  666/23
increases [1]  718/7
incrementally [1]  655/12
indeed [3]  687/6 700/19 720/23
independent [5]
indicate [5]
indicated [6]
indicates [1]  647/8
indicating [1]  756/12
indication [1]  686/23
indicted [1]  689/21

Case 1:08-cr-00056-RDB Document 343 Filed 01/14/10 Page 125 of 131

## I

indictment [59]
indifferent [1] 657/20
individual [7]
individually [3] 687/7 687/8 733/22
individuals [5]
inescapable [1] 655/13
infer [6]
inference [6]
inferences [11]
inferred [1] 720/12
inflicted [3] 677/18 738/9 738/11
influence [2] 747/5 747/13
influenced [2] 698/7 704/14
informant [3] 649/6 728/23 728/24
information [10]
informed [1] 720/18
initially [1] 752/17
initiated [1] 726/13
injuries [3] 738/9 738/11 738/13
injury [2] 738/9 738/13
innocence [4] 688/17 690/9 709/25
 750/24
innocent [8]
instantaneously [1] 727/25
instead [5]
instruct [12]
instructed [14]
instruction [5]
instructions [38]
instruments [1] 716/20
integrity [1] 728/19
intelligently [1] 673/2
intend [1] 756/15
intended [4] 715/2 716/15 717/8 728/13
intent [46]
intention [9]
intentional [1] 699/9
intentionally [5]
interest [12]
interested [1] 673/12
interesting [3] 648/1 665/19 682/1
interests [1] 721/20
interfere [2] 688/20 689/6
international [1] 753/10
interplay [1] 668/16
interposing [1] 649/6
interrogation [1] 665/16
interstate [32]
interval [2] 653/2 728/10
interviewed [1] 677/12
interviews [2] 661/4 661/6
intimidation [4] 680/12 680/13 726/14
 726/15
into [25]
introduced [3] 702/12 707/2 707/6
investigating [1] 652/23
investigation [6]
investigative [2] 691/20 692/2
investigators [1] 677/20
invoked [1] 648/18
involve [1] 697/16
involved [13]
involvement [3] 690/23 733/23 745/18
is [474]
isn't [5]
issue [2] 692/11 720/22
issues [6]
it [324]
it's [62]
item [2] 691/22 744/17
items [3] 691/20 744/18 744/20

its [23]
itself [10] 700/20 723/3 724/13

## J

Jack [1] 707/4
jail [14]
James [1] 707/3
Jay [1] 653/22
Jenkins [6]
Jesus [1] 661/8
job [2] 662/21 697/9
Jocelyn [1] 707/4
JOHN [1] 641/14
join [2] 658/13 717/13
joined [4] 719/17 720/4 720/5 720/20
joins [2] 721/10 721/11
joint [4] 741/2 741/5 745/4 745/4
Jonathan [1] 657/11
JR [21]
judge [32]
judges [8]
judgment [5]
judgments [3] 664/14 697/16 697/18
judicial [2] 723/7 753/14
July [15]
July 12th [1] 669/23
July 31st [1] 649/21
July 5 [2] 649/19 649/25
July 5th [1] 651/5
July 7 [2] 649/21 650/1
July 7th [1] 653/24
juror [9]
Juror Number [1] 646/25
jurors [29]
jury [59]
just [89]
justice [4] 677/16 678/2 687/23 728/20
justified [1] 697/3
justify [1] 720/19
juvenile [1] 649/10

## K

keep [5]
keeping [3] 654/24 675/15 745/19
keeps [1] 744/18
Keisha [1] 675/22
Keith [7]
kept [2] 668/19 682/14
Kevin [4] 662/3 662/3 677/1 679/23
key [2] 651/13 720/4
kid [5]
kids [1] 652/3
kill [24]
killed [12]
killing [21]
kind [4] 703/9 717/12 726/24 737/2
knew [21]
know [115]
knowing [5]
knowingly [40]
knowledge [17]
known [10]
knows [8]

## L

lack [6]
Lackl [58]
Lackl's [7]
ladies [9]
language [3] 645/15 679/21 743/14
large [1] 667/21
largely [3] 654/23 658/13

Larry [3] 670/18 709/12 709/19
last [11] 653/25
late [10]
later [10]
laughing [1] 678/20
law [74]
lawful [1] 717/15
laws [8]
lawyer [14]
lawyer's [3] 693/20 694/1 694/2
lawyers [22]
lead [3] 654/18 661/22 683/9
leagues [1] 650/7
learn [2] 672/18 675/1
learned [2] 664/8 672/21
least [6]
leave [1] 675/10
leaves [1] 657/9
leaving [1] 753/11
led [1] 651/13
left [3] 658/19 662/3 743/15
legal [6]
legality [1] 695/6
legitimate [1] 706/19
less [7]
lesser [1] 706/17
let [15]
let's [7]
letter [1] 664/7
liability [1] 720/22
liar [1] 669/3
lie [5]
lied [3] 650/14 655/12 664/10
lies [3] 650/14 665/12 697/15
life [3] 670/17 674/24 727/6
light [11]
lighter [1] 703/16
lights [3] 647/11 648/8 662/4
like [19]
likelihood [1] 718/7
limited [4] 705/23 708/14 709/2 709/16
line [8]
lines [1] 715/10
link [4] 653/23 655/7 655/17 666/12
linked [2] 657/5 659/20
linking [1] 721/5
links [1] 654/8
Lisa [2] 642/1 758/18
list [1] 669/9
listen [7]
listened [1] 697/17
listening [2] 647/25 661/16
litigation [1] 687/20
little [9]
live [3] 654/18 670/25 676/11
lives [2] 674/7 674/11
living [2] 670/13 670/22
local [1] 706/15
located [2] 732/23 746/15
locked [1] 653/24
logical [3] 693/10 696/13 697/5
Lombard [1] 642/1
long [2]
longer [2] 680/18 756/4
look [18]
looked [2] 671/11 678/12
looking [1] 654/22
looks [1] 672/6
lot [2]
louder [1] 719/4
love [2] 650/17 660/13
loved [1] 670/9
loyalty [1] 698/9

## L

lunch [3]  646/11 646/21 756/10
lunches [3]  755/6 755/10 755/17
lying [4]  660/25 664/2 665/10 701/6

## M

M.O.B [1]  678/17
Madam [1]  754/4
made [24]
mail [1]  754/5
mailed [3]  663/14 754/6 754/9
main [2]  655/11 660/6
major [1]  720/25
make [27]
makes [8]
making [7]
malevolence [1]  727/15
malice [13]
malicious [2]  726/25 737/2
maliciously [6]
man [4]  663/13 677/17 678/12 680/8
manage [1]  715/18
manifestation [1]  679/1
manipulate [1]  668/17
manner [2]  679/25 750/19
many [14]
map [1]  658/2
maps [1]  658/5
March [19]
March 4 [1]  679/15
March 4th [1]  680/17
marked [4]  694/11 694/14 695/2 695/11
marshal [7]
marshals [2]  674/9 754/22
Martin [3]  661/2 661/23 672/17
Martina [1]  751/8
marvel [1]  753/15
MARY [1]  641/23
MARYLAND [18]
matter [22]
matters [7]
may [138]
maybe [8]
me [59]
mean [20]
meaning [1]  738/23
meaningful [1]  695/12
means [27]
meant [1]  671/6
measured [1]  720/23
mechanical [2]  642/4 666/22
medical [1]  707/4
meet [10]
meeting [2]  657/24 748/15
meetings [1]  653/14
member [18]
members [8]
membership [2]  729/14 735/25
mention [6]
mentioned [6]
menus [2]  646/11 646/21
mere [8]
merely [3]  707/18 722/2 750/20
merits [2]  750/11 750/20
met [9]
Michael [1]  707/3
mid [1]  646/21
mid-morning [1]  646/21
middle [8]
midway [1]  646/7
might [14]
mind [17]

minds [1]  728/9
mine [1]  669/11
minor [2]  721/1 721/13
minute [9]
minutes [7]
MISCELLANY [1]  643/3
misrecollection [1]  699/5
mistake [9]
mistakes [1]  751/23
Mobile [6]
modeled [1]  753/14
moment [6]
momentarily [1]  677/21
Monday [1]  757/8
money [12]
monosyllabic [1]  654/5
Montford [2]  677/18 681/8
month [1]  675/6
more [38]
Moreover [2]  692/8 720/17 722/1
morning [10]
most [7]
motivated [1]  701/10
motivation [2]  701/11 701/13
motive [9]
mouth [1]  657/7
move [1]  646/23
moved [1]  661/19
moving [1]  655/12
Mr [51]
Mr. [108]
Mr. Balarezo [4]  658/10 661/18 669/15 680/23
Mr. Bates [2]  670/4 675/11
Mr. Byers [32]
Mr. Byers' [2]  658/24 659/1
Mr. Coleman [5]
Mr. Coleman's [1]  681/15
Mr. Cornish [3]  651/25 652/21 683/6
Mr. Davis [1]  658/10
Mr. Giblin [1]  646/22
Mr. Goodman [10]
Mr. Goodman's [1]  661/4
Mr. Haynes [4]  649/8 672/16 679/15 679/24
Mr. Lackl [10]
Mr. Lackl's [2]  669/11 738/14
Mr. Parham [6]
Mr. Pearson [15]
Mr. Pearson's [1]  662/24
Mr. Purcell [2]  646/19 646/23
Mr. Purpura [1]  682/6
Mr. Saunders [1]  652/25
Mr. Trout [4]  670/10 670/11 674/21 675/11
Ms [10]
Ms. [9]
Ms. Gardner [2]  655/17 668/24
Ms. Graham [3]  654/9 663/25 683/7
Ms. Graham's [1]  655/23
Ms. Humes [1]  671/12
Ms. West [2]  755/19 757/10
much [1]
Mulberry [1]  641/18
multi [1]  648/17
multi-hour [1]  648/17
murder [93]
murdered [2]  656/24 679/15
murderer [2]  672/12 673/17
must [102]
mutual [2]  716/17 718/21
my [37]
myself [1]  649/15

## N

name [12]
named [1]  650/4
narrow [1]  663/21
national [1]  688/16
nature [4]  688/20 700/23 718/25 721/11
near [2]  691/14 744/23
nearly [3]  647/12 647/12 647/13
necessarily [5]
necessary [9]
need [53]
needed [4]  671/8 682/25 752/11 753/19
needs [1]  758/7
negligence [1]  713/1
negotiable [1]  716/19
negotiating [1]  745/16
never [21]
new [2]  661/24 675/3
Newsome [1]  675/22
newspapers [1]  753/21
next [7]
Nextel [2]  659/17 666/14
nice [5]
nine [2]  690/19 729/17
Ninth [1]  641/24
no [72]
nobody [3]  659/3 676/22 683/11
none [2]  656/4 656/4
nonexistence [1]  693/13
nor [9]
Normal [1]  658/4
normally [3]  699/16 756/14 756/23
NORTHERN [1]  641/2
not [273]
note [9]
noted [1]  644/3
notereading [1]  642/4
notes [3]  667/15 684/10 684/10
nothing [17]
notice [1]  754/1
noticed [1]  644/16
notify [2]  645/1 751/9
now [92]
number [19]
numbered [1]  653/19
numbers [5]
numbing [4]  646/2 683/21 683/22 683/24
numerically [1]  750/23
NW [1]  641/20 641/24

## O

oath [4]  673/1 673/1 747/11 750/17
oaths [1]  688/23
object [8]
objected [1]  688/6
objection [4]  644/10 644/12 752/1 752/1
objections [4]  686/5 751/21 751/23 751/25
objective [1]  719/19
objectives [3]  720/21 722/2 722/6
objects [1]  744/6
obligation [1]  695/24
observe [4]  684/18 697/8 698/15 704/8
observed [3]  692/20 697/17 702/14
obstruct [1]  660/20
obtain [1]  703/15
obvious [3]  658/18 684/19 755/24
obviously [9]
occasion [4]  699/21 705/21 708/4 721/12
occurred [5]
off [8]
offender [5]

Case 1:08-cr-00056-RDB Document 393 Filed 01/14/10 Page 127 of 131

# O

offense [37]
offenses [10]
offer [1] 692/4
offered [3] 699/17 708/3 709/1
offers [1] 687/25
office [2] 641/14 669/10
officer [22]
officers [1] 728/19
official [1] 706/16
officials [1] 706/14
often [2] 692/25 719/4
oh [3] 654/2 670/19 672/10
okay [3] 647/2 673/18 674/16
old [5]
omission [3] 699/14 699/18 699/22
omissions [1] 699/12
omitted [2] 699/11 699/14
on [230]
once [14]
one [71]
one's [1] 712/23
one-minute [1] 673/8
ongoing [1] 726/16
only [53]
onto [1] 722/18
open [5]
opening [1] 647/12 686/4
openmindedly [1] 673/2
operable [1] 741/15
operate [1] 648/20
operates [1] 666/7
opinion [11]
opportunity [4] 697/8 698/15 699/21
704/7
opposed [1] 727/24
or [397]
orchestrated [1] 677/4
order [35]
ordered [2] 666/13 694/16
ordinarily [1] 707/14
ordinary [3] 702/2 703/14 706/18
origin [1] 688/16
ornament [1] 652/16
other [78]
others [6]
otherwise [4] 665/10 681/15 701/20
750/23
ought [1] 685/16
our [28]
ourselves [1] 661/20
out [58]
outcome [7]
outnumbered [1] 748/9
outside [6]
over [35]
overhead [1] 655/19
own [26]
ownership [1] 741/7

# P

p.m [1] 651/13
pace [1] 756/3
package [1] 655/9
page [3] 653/18 660/1 668/23
paid [1] 714/18
painted [1] 697/14
paper [4] 669/13 669/14 669/22 679/11
papers [1] 692/12
paperwork [2] 669/14 679/12
Parham [11]
parole [1] 723/6

part [28]
participant [4] 719/22 737/9
737/14
participants [2] 719/6 738/4
participate [3] 712/9 719/17 721/13
participated [2] 721/12 722/5
participation [6]
particular [18]
particularly [3] 656/6 656/6 665/11
parties [10]
partnership [1] 717/13
party [4] 650/23 687/2 687/13 687/20
pass [5]
passed [1] 745/13
passing [1] 651/21
past [1] 756/15
Pat [6]
PATRICK [40]
patrol [1] 674/11
pay [5]
Pearson [85]
Pearson's [7]
pecuniary [3] 713/11 714/4 714/17
Peer [1] 652/5
pen [3] 655/17 666/12 667/17
penalty [1] 676/15
pencil [1] 667/17
pending [2] 723/6 726/13
people [26]
perceive [1] 702/22
perfect [2] 647/2 647/2
perform [6]
perhaps [1] 678/9
period [3] 728/4 728/6 728/7
perjury [2] 676/9 701/19
permitted [6]
perpetrated [2] 726/24 737/2
perpetrator [1] 703/22
persistence [1] 649/19
person [88]
person's [3] 740/18 744/18 745/7
personal [10]
personality [1] 708/13
persons [13]
perspective [2] 663/23 682/11
persuasion [1] 726/14
pertains [1] 699/7
Peter [1] 661/8
phase [1] 747/8
Philadelphia [5]
phone [68]
phones [5]
phrase [1] 683/21
physical [7]
physically [2] 711/5 740/19
pick [2] 655/1 666/15
picture [2] 681/23 681/25
pictures [2] 665/20 697/14
piece [6]
place [10]
placed [4] 705/15 705/23 716/9 728/10
plan [3] 720/4 721/11 721/25
planning [1] 700/11
play [5]
played [4] 661/2 721/13 733/3 746/20
plea [6]
plead [2] 662/22 703/6
pleaded [1] 689/23
please [3] 751/19 754/17 757/11
pled [2] 650/21 703/2
point [17]
police [13]
portion [1] 684/1

poses [1] 718/6
position [14]
possess [16]
possessed [21]
possesses [3] 740/21 741/2 742/9
possessing [3] 740/2 741/19 742/18
possession [48]
possible [18]
post [2] 707/22 710/21
post-arrest [2] 707/22 710/21
potential [4] 680/14 680/18 680/19 753/9
Pound [3] 665/8 667/25 668/3
power [6]
precise [1] 718/19
predicate [8]
predominant [2] 648/2 648/13
prejudice [6]
prejudiced [1] 700/7
premeditated [6]
premeditation [14]
premise [2] 666/6 666/23
Prepare [1] 666/21
prepared [1] 748/16
preprinted [1] 670/12
presence [2] 712/1 721/14
present [10]
presentation [1] 758/2
presented [10]
presenting [1] 678/1
presents [1] 669/8
preserved [1] 751/21
preside [2] 685/5 748/13
press [4] 644/23 645/11 752/9 752/13
pressure [3] 652/5 677/22 677/23
presumed [1] 690/5
presumes [1] 690/3
presumption [3] 688/17 690/9 690/14
pretty [3] 670/24 682/8 682/9
prevail [1] 747/15
prevent [15]
previous [4] 729/12 735/24 738/24 755/25
previously [4] 705/14 739/7 740/15 744/9
price [2] 652/8 745/16
primarily [1] 655/6
primary [1] 716/20
prime [1] 687/16
principal [6]
principals [1] 738/15
principle [2] 685/9 729/16
Printed [1] 758/24
prior [11]
probably [6]
probation [1] 723/6
problem [4] 645/9 646/9 678/7 679/2
problems [1] 648/25
proceed [8]
proceeding [1] 726/12
proceedings [5]
process [7]
produce [3] 680/3 692/12 740/10
produced [1] 642/4
producing [1] 690/3
products [1] 676/24
professional [2] 706/21 757/22
professionalism [1] 758/3
program [2] 666/2 753/12
prohibited [4] 723/20 724/12 726/9
749/25
projectile [3] 732/17 740/17 746/9
promise [4] 713/11 714/3 714/16 716/18
promised [1] 703/7
promote [3] 715/18 733/1 746/18
proof [24]

# P

propensity [1] 709/7
proper [1] 691/7
properly [4] 664/5 688/1 692/17 719/25
property [2] 669/23 745/1
proportion [1] 661/9
propose [3] 645/24 646/5 673/12
prosecute [1] 703/5
prosecuted [14]
prosecution [8]
prosecution's [1] 695/25
prosecutor [2] 648/9 676/23
prosecutor's [1] 675/13
prosecutors [2] 675/7 675/10
protect [2] 674/21 728/16
protected [1] 674/10
protective [1] 753/24
prove [63]
proved [7]
proven [16]
proves [1] 738/13
provide [1] 660/22
provided [1] 680/4
provides [8]
proving [7]
public [1] 718/6
pull [1] 646/25
pulled [2] 675/12 675/12
punishable [6]
punishment [2] 747/4 747/12
PURCELL [11]
purple [1] 660/2
purpose [21]
purposely [5]
purposes [6]
PURPURA [4] 641/18 645/14 678/20
682/6
pursuant [2] 723/19 724/11
push [1] 647/8
put [17]
puts [1] 663/22
putting [4] 651/11 677/23 677/24 681/11

# Q

qualifications [2] 687/5 707/12
qualified [1] 707/1
qualifies [2] 715/15 716/12
quality [1] 745/16
question [24]
questioned [1] 687/8
questions [11]
quick [1] 752/4
quickly [2] 644/2 667/16
quite [2] 676/12 706/18

# R

race [1] 688/16
radio [2] 752/14 753/20
raincoat [1] 693/6
raining [2] 693/8 693/11
rather [4] 672/9 672/18 673/7 716/3
RDB [1] 641/3
RDB-08-056 [1] 641/3
reach [3] 676/13 748/1 751/3
reached [4] 645/1 750/25 751/11 757/7
reaching [3] 688/14 690/25 707/10
read [9]
readily [3] 732/17 740/16 746/9
reading [4] 683/21 684/9 684/11 751/24
reads [3] 736/9 739/4 741/24
ready [5]
real [12]

realization [1] 702/6
realize [3] 675/8 693/15
really [28]
reason [16]
reasonable [65]
reasonably [1] 691/13
reasoned [1] 661/9
reasons [4] 677/16 700/18 707/13 715/21
rebuttal [6]
recall [2] 654/3 686/13
recant [6] 670/15 670/24 675/13 678/5
recantation [3] 670/11 670/12 670/20
receipt [6]
receive [3] 700/3 701/8 703/15
received [4] 686/14 694/10 694/11 694/14
receiving [1] 745/16
recent [1] 672/15
recess [4] 710/16 710/16 710/18 758/14
recipient [1] 726/15
reckless [1] 727/10
recognizes [1] 741/1
recollection [7]
record [8]
recorded [3] 642/4 648/16 651/24
recording [1] 757/14
records [21]
recovered [2] 652/20 661/25
recruited [2] 652/11 655/25
red [5]
reference [4] 683/17 730/12 735/3 736/15
referred [3] 651/15 669/8 679/22
reflect [1] 748/10
refuse [1] 664/16
regard [9]
regarding [6]
regardless [2] 685/15 715/13
regular [1] 659/17
reign [1] 677/17
reject [2] 650/24 699/25
relate [1] 702/22
related [6]
relating [9]
relation [10]
relationship [7]
relationships [1] 655/3
release [1] 723/6
relevant [7]
reliable [1] 704/9
relies [1] 650/13
religion [1] 688/16
rely [3] 650/16 669/20 686/2
remain [7]
remained [3] 654/10 654/10 654/11
remains [2] 690/15 696/1
remarks [1] 680/24
remember [15]
remind [2] 697/4 708/7
reminded [3] 676/11 687/3 745/22
render [1] 689/13
rendering [2] 647/22 751/18
repeat [9]
report [2] 698/5 747/18
Reporter [2] 642/1 758/21
reports [5]
request [1] 688/3
require [6]
required [12]
requirement [4] 692/1 692/3 711/13 728/3
requires [7]
resentment [1] 700/5
resolve [2] 685/22 697/12
respect [19]
respectively [1] 661/5

response [1] 654/5
responses [2] 675/16 695/5
responsibility [28] 675/18
responsible [3] 659/7 683/10 683/10
rests [2] 707/20 747/6
result [3] 673/4 689/24 699/23
resulted [10]
results [1] 699/8
retaliate [1] 728/22
retaliation [3] 728/16 728/18 728/21
retire [1] 685/13
retiring [1] 748/12
return [3] 690/23 752/3 758/15
returning [1] 714/20
reveal [1] 750/22
revealing [1] 668/18
revered [1] 753/14
review [4] 644/23 645/11 647/19 751/14
reviewing [1] 706/22
RICHARD [1] 641/11
right [51]
risk [2] 689/7 727/12
RMR [1] 642/1
Road [6]
Roland [1] 669/10
role [7]
roles [2] 720/25 721/1
roll [1] 751/10
rolled [1] 671/15
room [15]
Ruby [8]
rule [2] 685/15 693/15
rules [1] 710/13
ruling [1] 688/8
rulings [3] 686/22 688/2 688/8
run [3] 674/8 680/16 682/23
runs [2] 672/5 748/14
Russia [1] 753/11
Russian [1] 753/12

# S

sad [1] 652/2
sadder [1] 652/1
safe [1] 744/19
safety [1] 718/6
said [58]
sale [5]
same [37]
satisfied [7]
satisfies [1] 731/12
satisfy [12]
Saturday [1] 756/25
Saunders [1] 652/25
saw [18]
say [49]
saying [8]
says [3] 652/12 657/18 748/18
scenario [1] 661/24
scene [4] 721/14 733/2 744/24 746/19
schedule [2] 757/23 758/4
scheduled [1] 757/22
scheme [5]
scope [1] 720/18
scrutinize [2] 697/18 702/3
scrutinized [2] 700/23 702/8
scrutinizing [1] 703/19
scrutiny [2] 700/9 702/18
seal [1] 752/15
search [2] 695/4 695/6
searching [1] 700/9
seated [2] 646/20 710/24
second [33]
seconds [1] 656/15
secrecy [1] 719/1

**S**

secret [1] 675/15
Section [36]
secure [1] 755/18
security [1] 754/21
see [30]
seeing [2] 649/13 649/13
seek [4] 711/21 712/11 731/15 738/19
seem [1] 697/24
seen [3] 649/1 671/2 694/21
sees [3] 657/24 674/17 692/22
seized [4] 691/20 691/22 695/4 695/9
seizure [1] 653/13
seizures [2] 695/7 695/8
selected [1] 753/8
sell [1] 672/2
semi [4] 739/9 740/15 742/2 742/16
semi-automatic [4] 739/9 740/15 742/2
742/16
send [4] 750/6 750/25 751/2 756/12
Senior [1] 671/10
sense [15]
senses [1] 692/21
sent [3] 664/25 671/17 757/14
sentence [5]
sentences [3] 650/23 650/25 651/1
sentencing [1] 703/8
separate [4] 690/23 717/21 718/4 720/24
separately [1] 690/23
September [8]
September 7th [1] 669/24
serial [2] 739/10 742/2
series [2] 676/7 712/14
serious [3] 676/20 687/17 727/12
served [2] 663/22 701/9
service [3] 753/7 754/3 754/21
services [1] 752/11
set [13]
setting [1] 652/10
several [1] 753/17
sex [1] 688/16
shade [1] 698/10
shall [9]
she [41]
she'll [2] 751/12 751/17
she's [3] 664/1 664/10 664/20
sheet [9]
sheets [1] 659/22
shifts [2] 690/1 696/2
shining [1] 693/3
shoot [1] 676/17
shooter [1] 656/3
shooting [9]
short [3] 663/15 694/7 745/18
shot [11]
should [62]
show [11]
showed [2] 659/11 661/1
showing [1] 656/22
shown [3] 695/10 695/11 721/5
shows [3] 655/17 682/9 710/7
shut [2] 649/25 672/18
side [3] 675/2 687/24 687/25
sides [2] 701/3 758/2
sift [1] 689/1
sign [2] 662/19 750/13
Signature [1] 758/21
signed [4] 750/4 750/6 750/7 750/9
significance [4] 695/9 696/4 710/8 716/20
Sigsauer [5]
similar [5]
similarity [2] 691/15 721/19

Similarly [4] 694/15 694/18 718/17 721/16
simply [11]
since [3] 686/20 704/15 745/7
sincerely [1] 754/3
single [4] 675/20 675/24 685/11 721/3
sir [1] 756/17
sit [2] 647/9 682/24
sits [1] 651/4
sitting [6]
six [5]
size [1] 698/19
slate [1] 690/9
slight [5]
slightly [1] 743/14
slowly [1] 706/6
small [1] 706/6
smaller [1] 667/19
Snavely [1] 707/6
snippet [4] 668/24 669/7 669/21 671/1
so [72]
so-called [2] 700/13 701/5
society [2] 647/21 678/24
sociopaths [1] 665/10
sold [1] 680/5
sole [7]
solely [11]
some [52]
somebody [21]
somehow [1] 648/6 701/8
someone [10]
something [26]
sometimes [1] 646/1
somewhat [1] 683/24
somewhere [1] 658/3
son [4] 650/7 672/3 672/4 672/10
soon [1] 653/7
sooner [1] 654/17
sophisticated [1] 649/12
sorry [1]
sort [4] 648/11 662/6 673/13 673/25
sorts [1] 661/9
Sounds [1] 752/25
source [2] 666/11 672/3
South [1] 641/15
speak [6]
speaking [1] 679/25
speaks [1] 680/23
special [1] 707/8
specialist [1] 707/5
specific [9]
specifically [11]
specified [2] 709/21 740/14
specter [1] 679/8
speculation [1] 696/21
spend [1] 648/12
spends [1] 671/3
spent [1] 648/3
spite [1] 727/15
spoke [2] 659/13 675/23
spoken [1] 718/21
spokesperson [1] 748/14
Sr [2] 650/6 672/24
stage [1] 747/3
stake [1] 719/21
stand [12]
standard [1] 727/11
standby [2] 645/5 754/11
standing [1] 718/4
stands [4] 691/3 698/18 750/23 758/14
Stanley [30]
start [10]
started [3] 654/22 654/22 665/15

state [36]
Statement [5] 669/20 689/3 693/24
statement [18]
statements [13]
STATES [70]
stating [1] 685/12
statute [15]
stay [2] 658/18 755/3
stayed [1] 757/23
stenography [1] 642/4
step [1] 653/4
steps [2] 755/17 756/22
still [14]
stipulated [3] 664/18 740/4 740/7
stipulation [3] 675/12 694/24 741/20
stipulations [5]
stomach [2] 676/17 681/11
stop [8]
stopped [2] 649/20 653/12
straightforward [1] 698/23
strategy [1] 673/10
street [13]
streets [1] 658/2
stricken [1] 694/16
strike [1] 698/5
strip [2] 654/14 662/11
strongly [1] 754/14
struck [1] 686/17
struggle [1] 679/9
studied [1] 677/20
stuff [2] 669/12 677/13
stunning [1] 675/11
stupid [2] 651/10 672/8
stupidly [1] 660/18
subchapter [1] 743/20
subject [7]
subjective [1] 727/8
submit [1] 664/14
submitted [1] 691/21
subpart [2] 730/22 735/5
subpoena [3] 656/17 669/9 669/9
subpoenaing [1] 654/21
Subsection [1] 736/21
substance [8]
substances [6]
substantial [3] 691/15 744/15 744/20
substantive [3] 713/5 722/23 729/20
substitute [3] 707/19 708/10 709/5
substitution [1] 686/10
succeed [4] 711/22 712/12 731/16 738/19
succeeds [1] 747/17
success [2] 717/24 718/8
successful [2] 718/2 718/5
such [38]
suddenly [1] 754/12
sufficient [12]
sufficiently [1] 708/17
suggest [5]
suggested [6]
suggesting [1] 673/25
suggestion [2] 669/4 754/22
Suite [1] 641/21
sum [4] 701/13 714/4 714/17 722/8
summaries [1] 695/16 695/20 699/11
summarize [1] 713/14
summarized [1] 722/17
summary [1] 695/11
summations [1] 700/13
sun [1] 693/3
Sunday [1] 756/25
superseding [39]
supply [1] 672/4
supplying [1] 745/17

**S**

support [1] 721/6 728/13
supposed [4] 658/22 658/23 674/15 676/2
sure [11]
surrounding [1] 712/22
suspect [4] 649/16 650/24 672/13 697/25
suspicion [2] 696/13 710/2
sustain [7]
sustained [1] 688/15
sway [1] 705/2
swayed [1] 688/23
swear [2] 755/14 757/10
sweet [1] 682/5
sworn [6]
sympathy [3] 688/24 689/6 689/12
system [10]

**T**

T-Mobile [6]
tactics [2] 649/10 649/13
take [31]
taken [7]
takes [3] 656/3 665/16 670/4
taking [5]
talk [22]
talked [5]
talking [22]
talks [1] 669/17
tall [2] 649/7 682/7
Tammy [9]
tape [5]
tapes [6]
tattoos [2] 679/6 679/7
taxes [3] 694/3 694/6 694/7
teachers [1] 649/11
team [5]
techniques [3] 691/20 692/2 692/5
teenagers [1] 649/12
telephone [3] 715/12 715/14 715/16
telephones [3] 713/24 713/24 714/11
television [2] 752/14 753/20
tell [40]
tell-the-truth [1] 670/12
telling [8]
tells [1] 676/6
temperaments [1] 728/9
tempting [1] 753/21
ten [2] 710/15 710/16
ten-minute [1] 710/15
tending [1] 708/3
tends [1] 692/23
term [6]
terms [6]
terror [1] 677/17
Test [1] 667/11
testified [13]
testifies [3] 684/19 692/19 692/20
testify [18]
testifying [5]
testimony [88]
than [28]
thank [22]
that [771]
that's [58]
their [42]
them [74]
themselves [7]
then [58]
theories [1] 667/11
theory [1] 707/9
there [104]
there's [28]

thereby [1] 722/13
therefore [3]
thereof [1] 721/11
these [85]
they [168]
they certainly [1] 756/12
they'll [4] 649/15 652/5 652/5 756/10
they're [34]
they've [1] 645/25
thing [14]
things [14]
think [36]
thinking [5]
third [12]
this [232]
Thomas [1] 707/3
those [43]
though [4] 660/15 665/2 721/12 740/23
thought [5]
threat [2] 718/6 726/14
three [6]
threw [2] 649/7 660/16
through [21]
throughout [3] 690/6 696/2 699/10
throw [4] 650/12 654/13 678/13 680/1
thrown [1] 653/3
thrust [1] 680/24
thus [3] 716/5 721/8 740/9
tie [1] 648/23
time [47]
timeframe [1] 646/7
times [9]
Title [20]
Titus [1] 707/4
today [15]
today's [1] 756/9
together [8]
token [2] 687/21 754/9
told [37]
tomorrow [1]
Tony [2] 662/3 677/1
too [4] 672/1 674/6 684/6 750/18
took [6]
top [4] 651/2 657/2 664/6 667/24
total [2] 690/19 729/17
touch [2] 659/24 754/10
touches [1] 692/22
touching [2] 750/10 750/20
toward [1] 727/16
towards [3] 655/13 700/6 700/7
tower [1] 665/6
towers [1] 666/22
track [1] 758/5
tracked [1] 651/7
tracking [2] 651/6 651/17
traffic [1] 681/21
trafficker [2] 680/4 680/10
trafficking [19]
trained [1] 665/15
trainer [1] 650/6
training [1] 707/8
transaction [1] 699/4
Transcriber [1] 758/22
transcript [5]
transfer [3] 745/7 745/11 745/18
transferred [1] 672/7
treatment [1] 701/8
tremendously [1] 652/18
trial [38]
tricked [1] 668/21
tried [4] 651/5 661/22 757/21 757/24
Trigga [3] 652/11 653/21 668/7
trouble [1] 672/21

Trout [5]
trust [2] 676/25
true [11]
truth [12]
truthful [5]
truthfully [1] 701/10
try [5]
trying [7]
turn [9]
turning [1] 724/23
twice [1] 659/14
two [31]
type [2] 692/18 699/15
Typed [1] 758/24
types [2] 692/15 692/16
typographical [1] 743/15

**U**

U.S [1] 651/3
ultimate [1] 745/15
ultimately [4] 652/25 655/22 660/14 751/3
umbrella [1] 693/5
unanimous [3] 747/19 748/11 751/4
unanimously [1] 690/10
unavoidable [1] 683/9
uncommon [1] 699/5
under [18]
underlying [1] 744/7
understand [6]
understandable [1] 646/3
understandably [1] 707/25
understanding [6]
undertaking [1] 722/12
undisputed [1] 659/9
undoubtedly [1] 675/22
unfairly [1] 704/15
unfortunately [3] 650/18 652/19 658/10
unifying [1] 650/9
unimportant [2] 699/8 699/15
UNITED [70]
unknown [3] 713/20 723/12 734/24
unlawful [26]
unlawfully [11]
unless [7]
unlike [2] 678/2 755/25
unspoken [1] 718/21
unstipulate [1] 664/19
untarnished [2] 659/1 663/25
until [20]
unusually [1] 656/8
up [35]
upon [37]
urged [1] 648/5
us [16]
use [54]
used [19]
uses [2] 730/25 735/7
using [16]
utilize [1] 691/19

**V**

valid [1] 695/8
validity [1] 695/6
valuable [1] 660/13
value [12]
varies [1] 728/8
various [3] 697/12 713/23 714/10
vehicle [1] 715/10
venture [4] 712/11 712/12 718/8 719/22
verbatim [1] 684/10 713/16
verdict [37]
verdicts [1] 645/1
very [42]

771

# V

victim [5]
videos [1]  655/18
videotaped [2]  648/16 655/9
view [6]
viewed [1]  700/23
views [3]  686/23 747/22 747/25
vigorous [1]  758/1
vigorously [1]  757/21
violate [5]
violated [2]  742/24 743/4
violation [27]
violence [26]
virtue [1]  692/21
visit [1]  676/12
visited [1]  661/11
voluntarily [8]
vote [2]  748/9 751/1
voting [1]  662/12
vouching [1]  745/15

# W

Wagster [1]  707/3
wait [3]  652/15 755/19 757/2
waiting [2]  755/23 756/7
wakes [1]  675/17
walked [2]  693/5 693/6
Walker's [1]  669/10
walking [1]  681/20
Walks [1]  670/11
want [24]
wanted [8]
wanton [1]  727/10
wants [3]  665/17 665/18 674/18
warrants [2]  695/5 695/7
was [222]
Washington [2]  641/21 641/25
wasn't [16]
wasted [1]  666/23
watch [6]
watching [1]  650/20
way [43]
ways [1]  680/7
we [119]
we'd [1]  682/22
we'll [6]
we're [33]
we've [3]  649/1 677/20 682/2
weapon [7]
week [4]  671/14 671/15 671/21 671/21
weekend [2]  757/3 757/8
weeks [5]
weigh [4]  700/9 703/18 747/9 747/19
weighing [2]  699/6 707/11
weight [15]
welcome [1]  684/9
welfare [1]  718/7
well [42]
well-known [1]  694/2
went [5]
were [56]
weren't [1]  670/22
West [10]
wet [2]  693/5 693/7
what [125]
what's [7]
whatever [13]
when [51]
where [22]
Whereas [1]  735/8
whether [70]
which [129]

while [8]
white [1]  660/12
who [84]
who's [10]
who've [1]  700/10
whole [9]
wholly [1]  748/1
whom [3]  656/3 656/4 738/6
whose [2]  705/4 731/12
why [27]
wildly [1]  682/4
wilfully [1]  738/17
will [107]
willful [5]
willfully [26]
WILLIAM [1]  641/18
willing [1]  722/13
win [1]  702/6
wins [1]  669/20
wireless [1]  707/6
wisdom [1]  685/14
wish [5]
wished [1]  712/10
wit [14]
withdraw [1]  678/5
within [4]  702/16 721/4 740/18 740/20
without [22]
witness [94]
witness' [18]
witnesses [27]
witnessing [1]  699/3
women [1]  660/11
won't [3]  674/22 679/17 756/20
wonderful [2]  666/1 670/19
word [13]
words [8]
work [11]
worker [1]  719/19
working [2]  651/17 654/19
works [1]  665/16
world [5]
worry [1]  653/8
would [92]
wouldn't [9]
wow [1]  666/23
writing [3]  718/18 750/9 750/11
written [1]  757/16
Wrong [1]  668/21

# Y

yeah [9]
year [11]
years [5]
yell [1]  654/17
yellow [1]  660/1
yes [16]
yesterday [10]
yet [7]
yield [1]  748/8
you [743]
you'd [3]  648/8 662/12 662/25
you'll [14]
you're [20]
you've [3]  644/8 646/21 682/24
young [1]  680/8
your [118]
yourself [6]
yourselves [5]